# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>FLEETCOR TECHNOLOGIES, INC., a corporation,<br><br>and<br><br>RONALD CLARKE,<br><br>　　　Defendants. | <br><br><br><br>**Case No. _____**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.　　The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

1

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.

§§ 1331, 1337(a), 1345.

3.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2),

(c)(1), (c)(2), and (d), and under 15 U.S.C. § 53(b).

## PLAINTIFF

4.     The FTC is an independent agency of the United States Government

created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or

affecting commerce.

5.     The FTC is authorized to initiate federal district court proceedings, by

its own attorneys, to enjoin violations of the FTC Act and to secure such equitable

relief as may be appropriate in each case, including rescission or reformation of

contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten

monies.  15 U.S.C. § 53(b).

## DEFENDANTS

6.     Defendant FleetCor Technologies, Inc. ("FleetCor Technologies" or

"Corporate Defendant") is a Delaware corporation with its principal place of

business at 3280 Peachtree Road, Suite 2400, Atlanta, Georgia 30305.  FleetCor

2

Technologies markets payment cards, including fuel cards, principally to companies in the trucking and commercial fleet industry.  FleetCor Technologies transacts or has transacted business in this District and throughout the United States.

7.     Defendant Ronald Clarke ("Clarke") is the Chief Executive Officer of FleetCor Technologies.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendant, including the acts and practices set forth in this Complaint.  Clarke resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMERCE

8.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## FLEETCOR'S BUSINESS ACTIVITIES

### Overview

9.     FleetCor Technologies and Clarke (collectively, "FleetCor" or "Defendants") have marketed payment cards to companies that operate vehicle

3

fleets, including many small businesses, since at least 2014.  Specifically, FleetCor has marketed fuel cards, which are charge cards that customers can distribute to vehicle drivers to purchase fuel and other transportation-related products and services.  FleetCor has enticed businesses to sign up for its fuel cards by making three main claims:  that customers will save money; that the cards provide fraud controls that protect customers from unauthorized transactions; and that the cards have no set-up, transaction, or membership fees, including when used to purchase fuel at any of the thousands of locations nationwide that accept FleetCor fuel cards. Each of these claims is false or unsubstantiated.

10.     After sign up, FleetCor has charged customers at least hundreds of millions of dollars in unexpected fees, a practice one FleetCor employee has referred to as "add[ing] arbitrary fees and run[ing] off [] the accounts."  When customers have noticed the charges and complained to FleetCor, and FleetCor has agreed to remove them, in many instances FleetCor has begun charging these customers for different fees to make up the difference.  At least tens of thousands of customers have complained about these practices to the company, government agencies, and the Better Business Bureau ("BBB").

11.     FleetCor also has charged fuel card customers at least tens of millions of dollars in recurring fees for programs they have not ordered.  Customers who

have become aware of the fees have complained that they did not consent to be charged for these programs.

## FleetCor's Fuel Card Practices

### *Savings Claims*

12.     FleetCor's electronic and print advertisements have represented that consumers will achieve specific per-gallon savings by using its fuel cards, despite Defendant Clarke and other high-level employees being aware that many customers, including small- and medium-sized business customers, do not achieve the claimed savings.  Two such advertisements appear below:

**Fuelman**®   FUELMAN DIESEL PLATINUM FLEETCARD

# Save 10¢ per gallon on diesel fuel
## with a customized fleet management solution.*

Fuel your business with everyday diesel savings. Throughout the Fuelman Network, the Fuelman Diesel Platinum FleetCard offers a 10¢ per gallon rebate on diesel fuel.*

With Fuelman Diesel Platinum, savings at the pump are just the beginning. In addition, our purchase controls and detailed reporting can save your business in overall fuel management costs through fuel spend monitoring and the prevention of driver theft and fraud.

Here's how the Fuelman Diesel Platinum FleetCard helps your business:



 **Savings**

- Save 10¢ per gallon on diesel fuel throughout the Fuelman Network*
- Save money with customized limits that prevent purchases outside of the parameters you select

 **Controls**

- Ensure drivers can only make business purchases by restricting cards to fuel or fuel and maintenance only
- Get real-time transaction monitoring and account management capabilities with the iFleet online platform
- Customize card limits by gallon amount, fuel type, time or day of week
- Receive real-time email or text alerts on unusual transactions

 **Convenience**



- Accepted at 50,000 commercial fuel and 20,000 maintenance locations nationwide
- Find locations via **www.fuelman.com** or the Fuelman Mobile Site Locator
- Manage your fleet on-the-go with the free Fuelman Mobile application. Download today in the iTunes or Google Play Stores by searching "Fuelman Mobile".

# Take advantage of better fuel management.

For more information or to apply today:
## 1-800-FUELMAN (1-800-383-5626) or www.fuelman.com

* Earn a 10¢ per gallon volume discount on diesel purchases. Discount is not available on purchases at Loves, Chevron/Texaco, Arco, and Sinclair. Customer's price will never be below Fuelman's cost paid to merchant. Fuelman® is a registered trademark of FLEETCOR Technologies Operating Company, LLC.

6

**Fuelman**®   FUELMAN DISCOUNT ADVANTAGE FLEETCARD

# Earn 5¢ cash back per gallon
## from the very first gallon pumped.*

The Fuelman Discount Advantage FleetCard is the choice for businesses with smaller fleets that want to maximize discounts on retail fuel prices. In addition, our purchase controls and detailed reporting can save your business up to 15% in overall fuel management costs through fuel spend monitoring and the prevention of driver theft and fraud.[1]

Here's how the Fuelman Discount Advantage FleetCard helps your business:



 **Savings**

- Earn 5¢ cash back per gallon at 25,000 locations*
- No volume requirements—ever!
- Start saving with the first gallon
- No set-up, transaction or annual fees

 **Controls**

- Ensure drivers can only make business purchases by restricting cards to fuel or fuel and maintenance only
- Monitor transactions and manage your account online in real time
- Customize card limits by gallon amount, fuel type, time or day of week
- Receive real-time email or text alerts on unusual transactions

 **Convenience**

- Fuel up at 40,000 commercial fueling locations nationwide
- Use the card for maintenance purchases at 25,000 locations
- Find convenient locations via **www.fuelman.com** or the Fuelman Mobile Site Locator

## Take advantage of better fuel management.

**For more information or to apply today:**
**1-800-FUELMAN (1-800-383-5626) or www.fuelman.com**

FDSNC ©112

\* Rebates credited to account statement quarterly, and limited to 2,000 gallons per quarter. Rebates are subject to forfeiture for inactivity or late payment behavior during the quarter. Discount does not apply to gallons pumped at the Convenience Network of Chevron, Texaco, Loves, Pilot, Sinclair and ARCO. Convenience Network is subject to change without notice.

[1] A *Fleet Financials* survey shows that, on average, fleets that change from no fuel management program to a managed fuel program realize savings of up to 15% on their overall fuel management costs.

Fuelman® is a registered trademark of FLEETCOR Technologies Operating Company, LLC.

13.     Despite these claims, customers generally do not experience any savings, due to significant unexpected fees FleetCor charges, as described below, that exceed any savings customers might experience using FleetCor's cards.  These unexpected fees often amount to at least hundreds to tens of thousands of dollars in charges per year per customer.

14.     Further, even setting aside fees, customers typically do not achieve the promised per-gallon savings, including because the savings come as rebates and discounts that are not available for fuel purchases at a number of large retailers frequently used by FleetCor's customers' drivers.  As set forth in fine-print disclaimers at the bottom of the advertisements shown above, these retailers have included Pilot, Texaco, Chevron, and Loves.

15.     FleetCor's own analysis of the aggregate rebates and discounts provided to customers fails to substantiate its per-gallon savings claims. FleetCor's data shows that many customers have saved less than one cent per gallon on fuel purchases.

16.     In response to a public report highlighting FleetCor's problematic marketing and fee practices and reporting that, despite FleetCor's savings claims, customers frequently pay more than the retail price of fuel on each gallon pumped, Defendant Clarke provided "thoughts on what we should do" and asked employees

to "calculate the total US retail discount that customers are getting."  Clarke then received an email with this "discount analysis" showing that customers only saved a fraction of a cent per gallon.  After receiving this information, Clarke did not direct employees to make any changes to the Company's per-gallon savings advertising.

### Fraud Controls and "Fuel Only" Claims

17.    In its electronic and print advertising materials and during sales pitches, FleetCor has misrepresented the protections it offers customers to prevent unauthorized purchases on its fuel cards.  Specifically, FleetCor has represented that customers can "[e]liminate [u]nauthorized [p]urchases," "[p]revent unwanted non-fuel spending with a fuel-only card," and "[c]ontrol fraud."  Examples of such advertisements are attached as Exhibits A, B, and C.  FleetCor also has claimed that when customers use its cards they can "[s]top worrying about unauthorized purchases.  Easy-to-use online controls allow [customers] to authorize each card for 'fuel only' or 'fuel and maintenance only' purchases."  An example of such a representation is attached as Exhibit D.

18.    FleetCor has directed customers applying for certain fuel cards to select their desired level of "card access," including by designating a card "fuel only."  Customers have also been able to make and change these elections any time

while they hold a fuel card.  An example of the application section where customers make this election appears below:

| 1. DRIVER/VEHICLE CARD SETUP | Card Access (Select One) | | |
|---|---|---|---|
| Required for each card requested. Cards may be assigned to a person or a vehicle. Enter an employee's name or a vehicle description. The first word in a Vehicle Description must be "VEHICLE". | Fuel Only | Maintenance Only | Fuel and Maintenance Only |
| **Description** (limit to 24 characters for Driver Cards; 15 characters for Vehicle Cards) — Vehicle/Employee Number | | | |
| Ex: V E H I C L E _ F O R D _ F 1 5 0 _ 1 4 3 _ _ _ _ _     5 7 8 4 0 0 | ☐ | ☐ | ☐ |
| 1. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     _ _ _ _ _ _ | ☐ | ☐ | ☐ |
| 2. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     _ _ _ _ _ _ | ☐ | ☐ | ☐ |
| 3. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     _ _ _ _ _ _ | ☐ | ☐ | ☐ |

19.     Despite these representations, FleetCor has failed to give customers the protections it has promised.  In fact, in numerous instances, FleetCor's fuel cards have permitted purchases of any type of good or service available at a fueling site, regardless of whether a customer selected "fuel only" card access.

20.     Some "fuel only" cards have been limited to purchasing a single item at fueling locations, but that item can be anything available for sale (*e.g.*, snacks, beer, etc.).  For these cards, FleetCor training documents acknowledge that "'fuel only' is a misnomer."  Other so-called "fuel only" cards have limited the initial authorization to fuel, but have permitted any type of item to be added to the transaction thereafter.  For these cards, an internal document explains that "fuel

only restrictions only work for getting the authorization and there is no restriction on what can be purchased or added to the transaction."

21.     Even these limited restrictions have failed to work.  In 2016, in the wake of customer complaints about unauthorized transactions on "fuel only" cards, FleetCor determined that "fuel only" cards that FleetCor internally described as limiting the initial card authorization to fuel in fact allowed initial authorization for non-fuel items.

22.     To the extent that FleetCor has admitted that its fraud control claims are false, it has only done so in Terms & Conditions ("Ts&Cs") documents.  A sample Ts&Cs document is excerpted below:

paying what is owed under the terms of this Agreement. Unless FleetCor notifies Customer otherwise, use of any Card issued to the Account after the effective date of the change shall be deemed acceptance of the new terms. FleetCor may terminate this Agreement at any time by written or telephone notice to Customer.

**16. Statements and Reporting.** Account statements and standard fleet management reports are available on-line via iConnectdata. FleetCor reserves the right to charge a Reporting fee of up to a maximum of twenty dollars ($20) per billing cycle. FleetCor can also provide paper copies of each statement and the accompanying management report with transaction details via US Mail. FleetCor reserves the right to charge a Paper Report Fee up to a maximum of fifteen dollars ($15) per billing cycle. FleetCor also reserves the right to charge a Research Fee of up to twenty dollars ($20) per statement for providing copies of prior period statements. Customer understands and agrees that Operator may be required to filter data received from merchants from time to time as necessary to provide complete reporting information to Customer when the merchant is unable to deliver complete purchase detail data (e.g. product code, gallons, price per gallon).

**17. Tax-Reclamation Processing.** If your company is exempt from certain fuel taxes, FleetCor may be able to calculate the taxes and bill you net of those amounts. Government required tax-exempt identification and certification will be required for consideration and approval into the program. FleetCor reserves the right to charge a Tax Reclamation Processing fee to Accounts utilizing the service of up to the greater of one percent (1%) of the applicable retail purchase amount or ten dollars ($10), but not to exceed one hundred dollars ($100) per Billing Cycle. This service is only available to certain types of Accounts in certain geographies.

**18. Card Acceptance.** MasterCard fleet cards are typically accepted at all fueling locations that accept MasterCard, and if approved by Operator may be allowed to make purchases at other business-related merchants (e.g. maintenance, office supplies, airlines, hotels, restaurants, etc.). However, Operator is not responsible and shall have no liability if a merchant or any third party refuses to honor Customer's Card or accept a transaction on Customer's Account. Operator, accepting merchants, and their card processors may restrict the maximum amount of any particular transaction, especially fuel being dispensed from an automated device. Similarly, the number of transactions allowed by Customer's Account in one day, one week, or one month may be limited by Operator, accepting merchants and their card processors. These restrictions are primarily for security and fraud control reasons. Additionally, if the Account is over the spend limit or delinquent, authorization of additional transactions may be declined. Operator reserves the right to prevent Cards from working at certain types of merchant locations deemed to be "quasi-cash" or a higher risk of fraud (e.g. internet purchases, casinos, money transfer agents, financial institutions) at any time without prior notice.

**19. Card Purchasing Controls.** Cards may be configured to attempt to limit acceptance and transaction amounts, for example, by limiting Card authorization to: specific merchant category codes (MCCs), maximum transaction dollar amounts, maximum number of transactions in a given time period, certain days of the week, and times of day, etc. Cards may also be configured to prompt for a valid driver or vehicle identification number (ID) and odometer at most fueling locations prior to turning on the pump. While merchants may limit the amount of fuel dispensed per transaction, fuel pumps typically do not automatically shut off at a Card's transaction dollar limit. Operator establishes these standard parameter controls as a means of assisting Customer in limiting purchase abuse and fraud. While Operator attempts to control the use of the Card to the parameters selected, Customer agrees to pay for all transactions on the Account ("Charges") regardless of whether such Charges are within or outside the parameters established for each Card.

**20. International Card Acceptance.** Operator reserves the right to prevent Cards from working outside of the US. In the event that the Card is allowed to make international purchases, the transaction amount will include a MasterCard Currency Conversion Assessment Fee of 20 basis points (0.2%) of the purchase amount, may include a MasterCard Cross-Border Fee of up to 90 basis points (0.9%) of the purchase amount depending on the merchant location's processor.

**21. Disputed Item.** Customer must notify Operator in writing to customer service address on the billing statement of any disputed item on Customer's billing statement within sixty (60) days from the date of the billing statement, or it will be deemed undisputed and

In paragraph 19, "Card Purchasing Controls," starting on the eighth line, FleetCor states: "Operator establishes these standard parameter controls as a means of assisting Customer in limiting purchase abuse and fraud. While Operator attempts to control the use of the Card to the parameters selected, Customer agrees to pay for all charges to the Account ('Charges') regardless of whether such Charges are within or outside the parameters established for each Card."

23.     Customers generally do not expect that they will be liable when FleetCor's controls fail to work as advertised. One customer thought it was

protected from fraud when it elected to implement FleetCor's fraud controls.  Yet

when unauthorized purchases were made on the account, FleetCor told the

customer that it was responsible for the purchases.  Similarly, another customer

complained that, despite the company's claims that its cards can control fraud, the

customer had multiple fraudulent charges that FleetCor refused to refund.

24.     FleetCor has been aware of the harm caused by its practices.  In one

internal communication from 2017, the Senior Vice President of Product Growth

discussed customers' confusion regarding the account terms and noted, "[B]ecause

they hold consumer cards personally, [customers] are accustomed to all [f]raud

being taken care of."  The Vice President of Risk Management agreed, responding

that holding customers responsible for fraudulent purchases on their accounts "is

also the most egregious customer impact we do as it takes customers by surprise

(unless they're really large) based on their experience with consumer card[s]."

### *Fee and Convenience Claims*

25.     In its ads, FleetCor promises "[n]o set-up, transaction or annual fees,"

and "[n]o fees for set-up, transactions or annual membership," including in the

advertisements attached as Exhibits E and F.  Contrary to these claims, as

described here and in further detail below, the company charges fees for set-up,

transactions, and membership.

26.     In the same advertisements, FleetCor has claimed that consumers can enjoy the "[c]onvenience" of fueling at tens of thousands of locations nationwide.

27.     In fact, many customers have not been able to fuel at those tens of thousands of locations nationwide without incurring a transaction fee.  Instead, many customers have incurred a "convenience" transaction fee of $2.00 or more per transaction when their drivers have used FleetCor fuel cards at any of a number of large fuel retailers that are frequently used by the drivers—including Pilot, Texaco, Chevron, and Loves—because FleetCor considers those retailers to be part of its non-preferred "Convenience Network."

28.     In order to avoid the fee, each time customers fuel, they must first call FleetCor's customer service line or go through FleetCor's website or app to determine where they can fuel to avoid the fee.  They must then drive to those specific locations, when often, another location that accepts FleetCor fuel cards is closer and more convenient.  FleetCor has not disclosed this fee in its advertisements touting nationwide acceptance and convenience.

### *Unauthorized Fees*

29.     FleetCor has charged customers substantial unexpected fees. Examples of these fees include:  Account Administration Fees, Program Fees, Late Fees and Interest and Finance Charges when payments are made on time, High

Credit Risk Account Fees, Convenience Network and Out of Network Fees, and Minimum Program Administration Fees.  FleetCor often has begun charging customers all or some of these fees only after a few billing cycles have passed. Even if customers read FleetCor's small-print, multi-page Ts&Cs, they have not been able to determine from one billing cycle to the next which fees FleetCor will assess, how those fees could be avoided, or how much those fees will cost. Further, FleetCor charges these fees, which include fees that depend on how FleetCor sets up a customer's account, for transactions, and "for membership," despite its promise in its marketing materials that there are "[n]o fees for set-up, transactions or annual membership."

30.     FleetCor has not provided a billing invoice to customers specifying fees.  Instead, in a separate report, FleetCor has listed some, but not all, of the individual fees it has assessed.  If customers do find out about one or more of the fees, call FleetCor, and convince a customer service representative to waive the fees, FleetCor often subsequently replaces the complained-about fees with different fees.  FleetCor's own employees have characterized the company's practices as "add[ing] arbitrary fees and run[ning] off all the accounts."

31.     In numerous instances, after the company migrated to a new payment and billing platform, customers could not access their bills.  Further, even when

customers could access their bills, FleetCor's invoices have listed total amounts due that FleetCor later has deemed inaccurate, causing the customer to pay less than the amount FleetCor determines they should pay.  Despite these issues, FleetCor assessed fees to customers based on inaccurate or untimely payments.

32.     FleetCor's CEO was actively involved in efforts to create fees, knew how and when the company was charging them, and that the company re-enrolled customers in certain fees after those customers asked FleetCor to remove the fees from their statements.  In an internal email, FleetCor's President wrote Defendant Clarke to "follow-up[]" on discussions that took place the week prior about fee increases, and recommended to Clarke that the company not add fees to fuel card customers until complaints decreased: "we still recommend not adding any fees to [one group of fuel card customers] until the noise levels come down further."  In the same email, the President warned Clarke that they would be "testing re-enrolling [a different group of fuel card] customers into the Min Program Fee program…. We are very concerned about attrition since they already asked us to remove the fees."

33.     Clarke received another email from a high-level employee giving him "a heads up" when new fee implementations caused customer complaints.  In response, Clarke said, "thx for the feedback.  Not unexpected.  Hang tough."

16

When FleetCor's revenue fell, Clarke issued a directive to employees to prepare "recovery ideas" to increase fees to replace revenue shortfalls.

34.     Clarke also knew of the Company's poor notification practices when charging customers a fee for the first time.  For example, he asked by email, "'what notification' does a customer get when they are put into a fee for the first time[?]"  A senior executive responded, "none.  Other than T&C change."  Despite his awareness of public reports and customer complaints of the company's unexpected fees, including of the company "tacking on extra fees that have no real explanation," Clarke did not change the company's fee notification practices.

35.     Clarke also directed the effort to minimize public criticism of the company's practices, without fixing those practices.  For example, when FleetCor's fee and billing practices became the subject of a second round of public reporting, Clarke emailed internally, "Here we go again!"  He then ordered employees to "fix the BBB rating ASAP…..just like we did last time.  Pls advise what we can do to get at this."  Clarke did not fix the practices that caused the criticism.

36.     FleetCor has charged customers at least two hundred million dollars in unexpected fees.  At least tens of thousands of customers have been harmed by these practices.

*Account Administration Fee*

37.     In numerous instances, FleetCor has charged customers an Account Administration Fee.  FleetCor has often started charging this fee after a few billing cycles, without notice to the consumer.  Many customers have complained about this practice.  Tens of thousands of customers incurred the fee in one year alone, totaling over $1.68 million in fees.

38.     FleetCor mentions some, but not all, information about fees in small-print, multi-page Ts&Cs documents, an example of which is attached hereto as Exhibit G.  If a customer were to review these Ts&Cs, and notice any information about an Account Administration Fee, the customer might see the following:

9.1  Change in Bank Account.  To change the Bank Account, Customer's authorized representative must provide a written request of such change.  The request should include the following information for the new account:
• Bank name (the bank must be a member of the National Automated Clearinghouse Association (NACHA);
• Branch address;
• Branch number; and
• Account number
The request should also contain a voided check from the new Bank Account.  It will take approximately ten days for us to change the account.  During this time, you agree to cooperate with us to provide additional information necessary to make the change and to execute a test of the change.
10.   Account Administration Fee. Depending on the application under which you applied and your account pricing, your account may be charged an Account Administration Fee of up to ten dollars ($10) per billing cycle. FleetCor reserves the right to change this fee with prior notice.
11.  Rebate Program Terms.  Depending on the application under which you applied and your account pricing, your cards may qualify for a purchase rebate program. The rebate program, if applicable to your account, is only available if your account is open, in good standing, and is not in default of the payment terms provided within these cardholder terms and conditions. Please refer to your account pricing documentation for specifics regarding rebate levels. Aviation purchases, bulk fuel purchases, international fuel purchases, transactions at non-qualifying gasoline merchants, and any account in default of the payment terms provided within these cardholder terms and conditions are excluded from this rebate. FleetCor reserves the right to charge a Rebate Program Fee of up to ten dollars ($10) per card per billing cycle. We reserve the right to change or terminate this Fuel Rebate Program at any time and in any manner with prior notice.  Changes may include, among other things, changing the benefits, imposing additional restrictions, or terminating the program. In addition, we reserve the right to remove any account from the rebate program in the event of any fraud or abuse. Participation in the rebate program will be suspended if the account is suspended. Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may change, suspend, or terminate the rebate program without notice.
12.  Minimum Program Administration Fee.  Under circumstances where the previous month's average fuel price (defined as the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may charge a Minimum Program Administration Fee of up to 10 cents per gallon or $2 per transaction to cover ongoing program operation costs.
13.  Additional Services Customer may be eligible for additional services from time to time. If Customer is eligible for an additional service, FleetCor may enroll Account in the service. The terms and fees applicable to such service will be disclosed prior to enrollment. Customer will have the opportunity to opt-out of enrollment in such service. FleetCor also reserves the right to deliver informational material in reference to ancillary fleet management related products and services provided by other Vendors to the Customer. In no case is FleetCor making any representation about the quality or value of any particular product or service.
14.  Credit Balance.  Unless your Account is a prepaid account, you may not make a payment on your Account that will create and/or maintain a credit balance on your Account in excess of any assigned spend limit.  You may request a refund of a credit balance at any time.  We may reduce the amount of any credit balance by the amount of new charges posted to your Account. You agree and understand that a credit balance on your Account may not increase the amount of available credit on your Account.
15.  High Credit Risk Account.  In the event that the Customer's Commercial and/or Consumer

The tenth paragraph states that accounts may be charged an Account Administration Fee of up to $10 per billing cycle depending on "the application under which you applied and your account pricing."  FleetCor's customers would not know from this statement whether their accounts were subject to the Account Administration Fee, whether or how the fee could be avoided, or the specific amount of the fee.  Further, customers who discovered this information and who were not charged the fee in the first billing cycle would not expect that the application under which they previously applied or their account pricing had somehow changed, such that they would incur this fee.  These fees are also unexpected given FleetCor's promise of "[n]o fees for set-up, transactions or annual membership" in its marketing materials.

*Program Fee*

39.    FleetCor has charged customers unexpected Program Fees.  At least tens of thousands of customers have incurred Program Fees.  FleetCor has charged at least tens of millions of dollars in such fees.

40.    To the extent a customer could find information about this fee, it has appeared in the Ts&Cs.  If a customer reviewed these Ts&Cs, and noticed any information about the Program Fee, the customer might see the following:

2.  **Additional Cards.**  Customer may request additional Cards on the Account for Customer or others. Customer may permit such an authorized user to have access to Cards or a Card requested for them on the Customer Account number. However, Customer must pay FleetCor for all charges made by those persons, including charges for which Customer may not have intended to be responsible.  In order to cancel permission of such an authorized user to use the Account, Customer must notify Operator in writing, and Customer must return to Operator, with written notice, any Card in the possession of such authorized user. Customer will continue to be liable for all purchases made by authorized users, even if Customer no longer want them to make purchases and even if they leave Customer employment, and all other resulting Account fees and charges, until Operator receives letter cancelling permission.  If Authorized Representative leaves the business for any reason, or if the business ceases ongoing operations, is subject to a change in control or structure or transfers or agrees to transfer a substantial part of its assets, Customer must notify Operator in writing so that the Account may be closed.   Customer is responsible for the use of each Card issued on the Account according to the terms of this Agreement.
3.  **Program Fee.**  FleetCor reserves the right to charge Program Fees for membership, tax exempt reclamation processing, enhanced reporting and/or other features and benefits made available to certain accounts. These fees may be subject to change.  Tax exempt reclamation is only available to certain types of accounts in certain geographies
4.  **Account Fee.**  FleetCor reserves the right to charge up to a ten dollar ($10) per month Account Fee, which may be subject to change. This fee is waived for any month that the Account purchases are more than 5,000 gallons of fuel.
5.  **Credit Limit.**  The credit limit for the Account is determined by FleetCor and adjusted up or down periodically without prior notice based on changes in the Account's purchase volume, average fuel prices, billing frequency, payment terms, and the Customer's creditworthiness.  The amount of credit and open-to-buy for the Account is available

The third paragraph of the Ts&Cs for this FleetCor card states that FleetCor "reserves the right to charge Program Fees for membership . . . and/or other features and benefits made available to certain accounts."  Customers could not know what program memberships or "features and benefits" might trigger the fee, whether or how the fee could be avoided, or the amount of the fee.  These fees are also unexpected given FleetCor's promise of "[n]o fees for set-up, transactions or annual membership" in marketing materials.

41.     Internal emails indicate that FleetCor treated this fee as a catch-all provision that allowed the company to charge a multitude of fees.  Specifically, one FleetCor representative asked whether FleetCor's "changes to the program fee

section seem broad enough for us to charge whatever program fees we want?"  In response, another employee stated, "We would have to come up with some benefit or tie it to a new add/on product. Unlike [our] Fuelman [card] we can't just add arbitrary fees and run off all the accounts."

*Late Fees and Interest and Finance Charges*

42.     In numerous instances, FleetCor has charged customers Late Fees and related Interest and Finance Charges even when the customers have paid their balance in full by the due date.  Numerous customers have complained about such fees, interest, and charges, which typically have ranged from hundreds to thousands of dollars in a single billing cycle.

43.     When customers have noticed that FleetCor charged Late Fees for timely payments, in many instances, customers have called FleetCor and FleetCor representatives have admitted that FleetCor may take days to process or post payments, and may charge Late Fees as a result.

44.     FleetCor has charged customers Late Fees without informing them of the true circumstances that trigger such fees.  To the extent a customer could find any information about this fee in the Ts&Cs, these documents claim that FleetCor will credit payments made by a particular time on the same day, but it makes

21

inconsistent statements about what that time is.  An example set of Ts&Cs appears below:

Transaction is equal to the prevailing Merchant Location's retail price plus or minus a fixed adjustment factor but never below Fuelman cost. In the event there is no established retail price (e.g., unattended fueling sites, mobile refueling), the retail price will be established by Fuelman.

9.3   **Merchant National Account-Based Pricing.** Client price for each Fuel or Maintenance Transaction is equal to the Merchant's prevailing national account price.

9.4   **Fuelman Cost-Based Pricing.** Client price for each Fuel or Maintenance Transaction is equal to Fuelman's delivered cost plus a mark-up. Fuelman's cost is dependent on a variety of factors and can include any or all of the following components: wholesale cost, merchant freight, dealer adjustment, network operation costs, merchant commission, and applicable taxes. Under no circumstance will Client's price be below Fuelman's cost.

9.5   **Special Network Pricing.** Fuelman reserves the right to charge for the use of select sites/merchants. The added charge to use these sites will not exceed the greater of ten cents ($0.10) per gallon or two dollars fifty cents ($2.50) per transaction. The list of select sites/merchants is available upon request by calling Fuelman Customer Service.

9.6   **Universal Pricing.** Client price for each Fuel or Maintenance Transaction is equal to an index price established by surveying a subset of transactions in the fueling area. This index can vary from posted retail price and may include a mark-up, but will never be below Fuelman cost. The markup and index calculation basis may vary by region and can change at any time.

9.7   **Level 2 Pricing.** Fuelman may deem the Client to be High Credit Risk Account and reserves the right to invoke Level 2 Pricing in the event that the Client's Commercial and/or Consumer Credit Score as reported by a credit reporting agency utilized at Fuelman's discretion is below Fuelman's standard threshold for creditworthiness (this threshold is five hundred and twenty (520) for commercial scores and six hundred and sixty (660) for individual credit scores), or the score drops by fifty-one (51) points or more in any 3 month rolling period, or the Client incurs more than one late fee in any 12-month rolling period, or is 30 days or more delinquent in any 12-month rolling period, or makes a payment that is not honored by Customer's bank, or the Client operates in the trucking or transportation industry. Level 2 Pricing is an incremental charge above Client's current pricing and the maximum increase is twenty cents ($0.20) per gallon purchased. Level 2 Pricing remains in effect until such time that Client is no longer considered High Credit Risk Account. Fuelman will review each High Credit Risk Account at least once every three months for changes in creditworthiness. This decision is made solely by Fuelman based on information provided by the credit reporting agency along with the Account's payment history. The credit reporting agency does not participate in the decision. Client questions concerning their commercial and/or consumer credit scores should be directed to the applicable reporting agencies directly. D&B may be contacted at 800-234-3867 or by mail to Dun and Bradstreet Corporation, 103 JFK Parkway, Short Hills, NJ 07078. Equifax may be contacted at 800-727-8495 or at sbfe@equifax.com. Experian may be contacted at 888-397-3742 or online at www.experian.com/reportaccess.

9.8   **Minimum Program Administration Fee.** Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may charge a Minimum Program Administration Fee of up to 10 cents per gallon or $2 per transaction to cover ongoing program operation costs.

9.9   **Rebate/Volume Discount.** Fuelman may provide rebate or volume discount off retail price for fuel and nonfuel purchases under certain customer pricing. Such rebate or volume discount could be at transaction level or as separate credit. The rebate program, if applicable to the Client, is only available if the Account is open, in good standing, and is not in default of the payment terms provided within these card client agreement terms and conditions. Please refer to the account pricing documentation for specifics regarding the rebate program detail. Aviation purchases, bulk fuel purchases, international fuel purchases, transactions at non-qualifying gasoline merchants, and any account in default of the payment terms provided within these card client agreement terms and conditions are excluded from the rebate program. Fuelman reserves the right to charge a Rebate Program Fee of up to ten dollars ($10) per card per billing cycle. Fuelman also reserve the right to change or terminate the rebate program at any time and in any manner with prior notice. Changes may include, among other things, changing the benefits, imposing additional restrictions, or terminating the program. In addition, reserve the right to remove any account from the rebate program in the event of any fraud or abuse. Participation in the rebate program will be suspended if the account is suspended. Under circumstances where the previous month's average fuel price (defined as the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may change, suspend, or terminate this rebate program without notice.

**10   Billing & Payments.**

10.1   **Billing.** Billing cycle is agreed upon with the Client during the Application and Account setup process. Client shall be responsible for all credit extended on the Account. This is not a revolving credit account (unless subsequently converted by FleetCor to a revolving credit account as contemplated by Section 10.13). Revolving credit status is not available for Clients located in Alaska, California,

Michigan, New York, North Dakota, South Dakota, Rhode Island, Vermont. The total amount shown on each Account Statement is due and payable in full by the Due Date shown on the Statement. Unless otherwise agreed upon, the standard Due Date is ten (10) days after the date the Account Statement is created, regardless of the delivery method. Regardless of the delivery method selected, it shall be the obligation of the Client to notify Fuelman within five (5) business days of the end of each Billing Cycle if Client does not receive a Statement. If the Client does not receive a Statement and this payment is not completed by the Due Date, Client is responsible for any Late Fees or Finance Charges.

10.2   **Extended Terms Programs.** Upon Client's request and subject to Fuelman approval, terms can be extended at an additional charge.

10.3   **Payment.** Client hereby unconditionally promises to pay Fuelman, in accordance with this Agreement, all outstanding Obligations (as defined below) which may, from time to time, be owing to Fuelman by Client. As used herein, "Obligations" shall mean all outstanding sums owing to Fuelman by Client, including, without limitation, reimbursement for petroleum products obtained through Fuelman, payments for any products or services obtained using the Card(s), and interest, penalties, fees, report delivery, reporting, account charges, service charges, costs and expenses (including attorneys' fees) and all other obligations under this Agreement or otherwise. Do not send cash payments. We can accept late or partial payments, as well as payments that reflect "paid in full" or other restrictive endorsements, without losing any of our rights under this Agreement. Client agrees to pay in U.S. dollars drawn on funds on deposit in the United States using a payment check, similar instrument, or automatic debit that will be processed and honored by your bank.

Client must pay all outstanding Obligations on the statement by the Due Date to avoid Late Fees and Finance Charges. Failure by Client to pay all amounts by the Due Date shall be a breach of the Terms and Conditions of this Agreement. Conforming payments received by 7:00 a.m. Eastern Time on a business day (Monday through Friday of each week, excluding banking holidays) will be credited to your Account as of the date received. Otherwise, payments will be credited to your Account as of the next business day. In the event your billing statement reflects a Due Date which falls on a day which is not a business day, your payment must be received by 7:00 a.m. Eastern Time on the preceding business day. If we do not receive your payment for the Amount Due by the Due Date, you may not be able to make any further purchases until such time that you pay the entire outstanding balance on the Account. We may change our billing and debiting cycle at any time by reflecting the change on your billing statement.

10.4   **Principal Guaranty.** Principal hereby unconditionally and irrevocably guarantees to Fuelman and its successors, endorsees, transferees and assigns, the punctual payment when due (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations, now or hereafter owing, whether for principal, late interest, premiums, fees, expenses or otherwise (collectively, the "Guaranteed Obligations"). Any and all payments by the Principal hereunder shall be made free and clear of and without deduction for any set-off, counterclaim, or withholding. Principal acknowledges and agrees that this is a guaranty of payment when due, and not of collection, and Principal agrees that his obligations under this Agreement shall not be discharged until the payment and performance, in full, of the Guaranteed Obligations. Principal shall be regarded, and shall be in the same position, as Client with respect to the Guaranteed Obligations. Principal expressly waives all rights he may now or in the future have under any statute, or at common law, or at law or in equity, or otherwise, to compel Fuelman to proceed in respect of the Guaranteed Obligations against Client or any other party before proceeding against, or as a condition to proceeding against, Principal. Principal acknowledges and agrees that any delay or failure by Fuelman to take any action regarding the Guaranteed Obligations does not limit or prohibit Fuelman from enforcing its rights under this Agreement and further that Principal's liability under this Agreement shall not be eliminated or reduced by any such failure or delay on the part of Fuelman. Principal further expressly waives and agrees not to assert or take advantage of any defense based upon the failure of Fuelman in respect of the Guaranteed Obligations against Client or any other party for the payment and Guaranteed Obligations. Principal agrees that any notice or directive given at any time by any person to Fuelman which is inconsistent with the waivers in the preceding two sentences shall be null and void and may be ignored by Fuelman. Principal further hereby waives diligence, presentment and demand (whether for non-payment or protest) or notice of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations (including, without limitation, composition, the amount of, or the terms of, the Guaranteed Obligations), notice of material adverse change in Client's financial condition or any other fact which might materially increase the risk to Principal with respect to any of the Guaranteed Obligations or all other demands whatsoever and waives the benefit of all provisions of law which are or might be in conflict with the terms of this Agreement. Principal represents, warrants and agrees that Principal's obligations under this Agreement are not and shall not be subject to any counterclaims, offsets or defenses of any kind against Fuelman or Client now existing or which may arise in the future. The Principal further agrees that the Guaranteed Obligations may be amended, modified, increased, extended or renewed, in whole or in part, without notice to or further assent from Principal, and that

Paragraph 10.3 states that payments made by 7:00 a.m. Eastern Time on the due date "will be credited to your Account as of the date received.  Otherwise, payments will be credited to your Account as of the next business day."  In other places, however, such as the company's website, FleetCor provides later payment cut-offs, such as 2:00 p.m. Eastern Time.  As a result, customers who have paid in the morning on the due date, believing their payments timely, have sometimes been charged Late Fees.  Customers who have paid before the due date have also been charged Late Fees.  Further, customers who have paid the amount quoted on their billing invoice by the due date have been assessed Late Fees because FleetCor has listed on the invoice a total amount due that the company later deemed incorrect, and has subsequently assessed Late Fees to those customers because they paid the amount they were invoiced, as discussed below.

45.    Customers have complained extensively about this practice:

- "Our recent and most egregious issue was related to paying late fees and finance charges… I made a payment, through their website, for the balance on our statement in the morning on June 2, 2016. The bill was due June 2, 2016. Their website states that 'Payment must be received by 2PM EST on or before the business day it is due to be credited to your account on time.' The payment

was not posted to the account until June 3, 2016. Our next statement had a late fee of $963.80 and a finance charge of $83.44. I contacted the company today (6/29/2016) and the agent told me that in order for an online payment to be considered 'on time' it must be made two days before the due date."

- "The billing procedure for this company GUARANTEES fees will be charged to your account… We started to notice that ALL of our payments were being posted to our account 1 day after the due date resulting in VERY HIGH FEES. We then sent the payments in via certified mail to track the postmarks. According to the postmark, Fleetcor would receive the checks days before the due date, and still post them to our account 1 day late. When we called to find out why, we were told that postmarks don't matter and fees were based on when they processed the payment. I called to discuss this issue and no fees were credited."

- "We mailed a check on March 5th and the check was posted to our account and the bill was paid or so we thought. The payment was MAILED March 5th and POSTED March 15th, 1 day after it was due and their billing office where it mails is a 3 hour drive from

me, we were [assessed] a $231 late fee on a $647 fuel bill. When contacting Fuelman they told me once they receive a check in the mail they have 7-10 days to process it and the date [it's] received in the mail is irrelevant and if I want to avoid a late fee to pay my bill online."

- "They would put these [late] fees on and say the online payment did not process by the due date. They told me to pay a day early, etc all types of things… Every month I got my statement I spent time on the phone due to interest and late fees charged although I had always paid the card off in full monthly. It always had these exorbitant late fees that were usually 50% of my statement amount. I would always get the run around about why the online payment did not process or how I should pay all the fees anyway until they show up as a credit the following month or so to process another late fee and charge on the previous late fees!! … WHO can pay thousands of dollars in late fees that were not legitimate just to accommodate a suspicious system?"

- "Fleetcor statements are received less than 10 days before their due date (if [you're] lucky to even get them delivered!) Half the time they are

never received! And when received, even when mailing out complete

payment next business day, they determine your payment as 'late' even

when received by the due date. When we called to complain about their

'late fees' which are hundreds of dollars they stated that even if they

received the payment before due date, the date of acceptance into the

system is what they go by to determine when we paid our bill. This is

unacceptable and it is causing us as a business along with other

consumers to get ripped off with their late fees! On top of a late fee, you

then get hit with a 'high risk fee' because you were late!!"

*High Credit Risk Account Fees*

46.    In numerous instances, FleetCor has charged customers High Credit

Risk Account Fees ("HCRAFs"), including a High Risk Fee ("HRF") and Level 2

Pricing Fee ("Level 2 Fee").  FleetCor has charged these fees without notice.

FleetCor has charged customers at least $108 million in HCRAFs.

47.    To the extent a customer has been able to find any information about

the HCRAFs, it appears in the Ts&Cs, an example of which appears below:

Paragraph 15 states that accounts may be classified as "High Credit Risk Accounts" and charged associated fees.  Paragraph 16.6 states that FleetCor may charge fees if the customer meets the criteria defined in the High Credit Risk Account section.

48.     Even if customers read and understood the Ts&Cs, they could not know whether or how HCRAFs could be avoided, or the amount of the HCRAFs. FleetCor charged HCRAFs in circumstances that customers would not expect to trigger a "high risk" fee.

49.     One circumstance under which some FleetCor Ts&Cs mention it might charge these fees is if the customer operates in the trucking or transportation industry.  FleetCor's fuel cards, however, are marketed primarily to the trucking industry and many customers fall into this category.  Indeed, FleetCor charged customers at least $1.7 million in HCRAFs solely because they operate in the trucking industry.  In some instances, FleetCor even miscategorized customer accounts and assessed the HCRAFs because the accountholder supposedly operated in the trucking industry, even though it operated in another industry altogether.  Only when customers read a report separate from their invoice would they see charges for this fee.  One customer complained, "We are an Investigative Service and have absolutely NO association to a Trucking Co.  How did this happen? … This is 3 times this has happen[ed].  Is this how [FleetCor] treats all their clients?"

50.     Further, FleetCor has imposed HCRAFs on customers who have "missed" a payment.  However, numerous customers deemed to have "missed" a

payment in fact paid their balance in full by the due date and were charged HCRAFs (in addition to a Late Fee and Finance Charges) because FleetCor did not post the payment to their account in a timely fashion or because FleetCor at times has stated that it has quoted the balance incorrectly on the invoice, as discussed below.

51.     When FleetCor has imposed HCRAFs, it has sometimes added a fee for *each transaction* made using its fuel cards.  Given the high transaction volume for a typical FleetCor customer, this fee has been particularly costly—for example, one "high risk" customer incurred more than $999.99 in a single billing cycle for this fee alone.  These fees are also unexpected given FleetCor's promise of "No fees for set-up, transactions or annual membership" in its marketing materials.

52.     FleetCor has also made it difficult for customers to know when they have been charged HCRAFs after the fact.

53.     FleetCor has charged "high risk" customers a per-gallon Level 2 Fee for each gallon of fuel purchased and has obscured this fee even after charging it. In describing the policy, one FleetCor employee said, "[W]e haven't disclosed Level 2 [Fees] we charge customer[s] on their FMR [a customer purchase activity document separate from the invoice] and the only way they notice the price difference is to compare the amount we invoice them to their receipts."

54.     On the same customer purchase activity document, FleetCor has listed HRCAFs as "MISC-2 – Transaction Fee," rather than explaining that it is a high risk fee.  Moreover, FleetCor has specifically instructed its customer service representatives to call the fee a "transaction fee" and to avoid calling it a "high risk" fee.  The Director of Operations for FleetCor stated in an email, "I just want to emphasize the importance of avoiding any mention of 'high risk fee' and definitely stick to calling it a 'transaction fee.'"

55.     At one point, employee error led to FleetCor accidentally listing the HRF on the customer invoice.  The President of FleetCor's North America Partner division, in response to finding out that the HRF was going to be on a customer invoice said, "Crap! Please keep me informed."  Another employee said, "This will cause a lot of noise and our odds of keeping this fee will go down and our odds of losing customers will go up."  FleetCor has used the term "noise" in internal documents to discuss customer complaints.

56.     FleetCor customers have complained about the HCRAFs:

- "When I called and asked for full disclosure as to how they determine the [HRF] they at first refused to share the information until I acknowledged we were on a recorded call. They said I should receive something within 72 hours about this matter."

30

- "[T]hey never contact[ed] us after they changed our billing or when our agreement changed. There are several factors that will trigger activity on our account. None of which can be discussed with anyone. Placing an account on Level 2 Pricing happens whether or not [we have] [d]elinquent behavior including late and short payment on the account, non-payment or non-sufficient (NSF), or low credit score or credit score deterioration. We have never fallen within any of the above mentioned criteria but it does NOT matter to this company. They will charge whatever they can however they can."

- "While cross-checking our gas receipts with the Universal bi-weekly bills, we noticed that starting on November 1, 2016, we were charged an additional 5% on each transaction, so far totaling almost $200. We attempted to address this matter, but upon calling [FleetCor], we were met with hostility… She indicated that after years of business with our company, we were flagged as 'high-risk' and were told to call Dunn & Bradstreet to address any credit concerns, when we have never once had to contact this company as a liaison through Universal."

- "Unfortunately, this company has charged an outrageous (and questionably [il]legal) late fees, ranging from $162.09 - $603.18….for a

31

cc balance that is payable weekly….on balances that rarely exceeded $4,000. Then, due to these issues, a [HRF] was also assessed on each transaction. After calling Customer Support, 2 weeks' late fees ($1,184.10) and 4 weeks' [HRFs] ($288) were reversed and credit applied to the account. The company claims they [cannot] credit anything further back in time. There are still over $2500 in ridiculous fees still on the account. How in the world these fees can be legal is beyond me."

*Convenience Network Surcharge and Out of Network Fee*

57.    FleetCor has charged customers at least tens of millions of dollars in unexpected "Convenience Network Surcharge" and "Out of Network" fees.  In ads, FleetCor has claimed that there are no transaction fees and customers can "fuel at over 50,000 locations nationwide," or that customers can "[a]void wasting time searching for fuel" by "us[ing] the card at any fuel location that accepts MasterCard."  Nevertheless, FleetCor has imposed this charge for transactions at certain "non-preferred" and "out-of-network" fueling stations.

58.    To the extent a customer could find any information about this fee, it appears in the small-print Ts&Cs.  Example Ts&Cs appear below:

> Transaction is equal to the prevailing Merchant Location's retail price plus or minus a fixed adjustment factor but never below Fuelman cost. In the event there is no established retail price (e.g., unattended fueling sites, mobile refueling), the retail price will be established by Fuelman.
>
> 9.3  Merchant National Account-Based Pricing.  Client price for each Fuel or Maintenance Transaction is equal to the Merchant's prevailing national account price.
>
> 9.4  Fuelman Cost-Based Pricing.  Client price for each Fuel or Maintenance Transaction is equal to Fuelman's delivered cost plus a mark-up. Fuelman's cost is dependent on a variety of factors and can include any or all of the following components: wholesale cost; merchant freight; dealer adjustment; network operation costs, merchant commission, and applicable taxes. Under no circumstance will Client's price be below Fuelman's cost.
>
> 9.5  Special Network Pricing.  Fuelman reserves the right to charge for the use of select sites/merchants. The added charge to use these sites will not exceed the greater of ten cents ($0.10) per gallon or two dollars fifty cents ($2.50) per transaction. The list of select sites/merchants is available upon request by calling Fuelman Customer Service.
>
> 9.6  Universal Pricing. Client price for each Fuel or Maintenance Transaction is equal to an index price established by surveying a subset of transactions in the fueling area. This index can vary from posted retail price and may include a mark-up, but will never be below Fuelman cost. The markup and index calculation basis may vary by region and can change at any time.
>
> 9.7  Level 2 Pricing.  Fuelman may deem the Client to be High Credit Risk Account and reserves the right to invoke Level 2 Pricing in the event that the Client's Commercial and/or Consumer Credit Score as reported by a credit reporting agency utilized at Fuelman's discretion is below Fuelman's standard threshold for creditworthiness (this threshold is five hundred and twenty (520) for commercial credit scores and six hundred and sixty (660) for individual credit scores), or the score drops by fifty-one (51) points or more in any 3 month rolling period, or the Client incurs more than one late fee in any 12-month rolling period, or is 30 days or more delinquent in any 12-month rolling period, or makes a payment that is not honored by Customer's bank, or the Client operates in the trucking or transportation industry. Level 2 Pricing is an incremental charge

Paragraph 9.5, labeled "Special Network Pricing," states that FleetCor may charge a fee for use of certain sites and merchants.  Customers who see this disclosure would not know that FleetCor would charge them for using nationwide fueling stations used frequently by FleetCor's customers' drivers or the amount of the fee. Instead, they would have to call customer service to get a list of locations where the Convenience Network Surcharge will not apply or make purchases only at the fueling station associated with their card (*e.g.*, BP) to avoid the Out of Network Fee.

59.     Customers have complained about the Convenience Network Surcharge and Out of Network Fee:

- "We were told when we signed up with this company that we would not incur fees for set-up, transactions, or annual membership. [M]ystery fees such as [Convenience] Network Fees or Fraud Protection Fees began to appear."

- "We are [] being charged a convenience network surcharge which Fuelman says is charged by certain gas stations, not sure I believe that since they are always trying to slip something in!"

- Another customer complained that FleetCor told them there were no fees associated with the card when they signed up, yet repeatedly charged the Convenience Network Surcharge, among other fees, stating, "I do not think it is fair to be charged fees after you told me we wouldn't be charge[d] any."

- "[In] May 2018, I contacted customer service again regarding the strange charge. Customer service finally informs me that the strange charge is an out of network fee and that every time I use another brand other than bp I have to pay $2. I'm like wow I was never disclosed this information prior to signing up for the account or during my lifetime of the account until that day."

*Minimum Program Administration Fee*

60.     In numerous instances, FleetCor has charged customers a Minimum

Program Administration Fee ("MAPF").  FleetCor has charged customers at least

$40 million in MAPFs.

61.     To the extent customers can find information about the MAPF, it is

mentioned in the small-print Ts&Cs:

> 9.7   Level 2 Pricing.  Fuelman may deem the Client to be High Credit Risk Account and reserves the right to invoke Level 2 Pricing in the event that the Client's Commercial and/or Consumer Credit Score as reported by a credit reporting agency utilized at Fuelman's discretion is below Fuelman's standard threshold for creditworthiness (this threshold is five hundred and twenty (520) for commercial credit scores and six hundred and sixty (660) for individual credit scores), or the score drops by fifty-one (51) points or more in any 3 month rolling period, or the Client incurs more than one late fee in any 12-month rolling period, or is 30 days or more delinquent in any 12-month billing period, or makes a payment that is not honored by Customer's bank, or the Client operates in the trucking or transportation industry. Level 2 Pricing is an incremental charge above Client's current pricing and the maximum increase is twenty cents ($0.20) per gallon purchased.  Level 2 Pricing remains in effect until such time that Client is no longer considered High Credit Risk Account. Fuelman will review each High Credit Risk Account at least once every three months for changes in creditworthiness. This decision is made solely by Fuelman based on information provided by the credit reporting agency along with the Account's payment history. The credit reporting agency does not participate in the decision.  Client questions concerning their commercial and/or consumer credit scores should be directed to the applicable reporting agencies directly:  D&B may be contacted at 800-234-3867 or by mail to Dun and Bradstreet Corporation, 103 JFK Parkway, Short Hills, NJ 07078.  Equifax may be contacted at 800-727-8495 or at sbfe@equifax.com.  Experian may be contacted at 888-397-3742 or online at www.experian.com/reportaccess.
>
> 9.8   Minimum Program Administration Fee.  Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may charge a Minimum Program Administration Fee of up to 10 cents per gallon or $2 per transaction to cover ongoing program operation costs.
>
> 9.9   Rebate/Volume Discount. Fuelman may provide rebate or volume discount off retail price for fuel and nonfuel purchases under certain customer pricing.  Such rebate or volume discount could be at transaction level or as separate credit. The rebate program, if applicable to the Client, is only available if the Account is open, in good standing, and is not in default of the payment terms provided within these card client agreement terms and conditions.  Please refer to the account pricing documentation for specifics regarding the rebate program detail. Aviation purchases, bulk fuel purchases, international fuel purchases, transactions at non-qualifying gasoline merchants, and any account in default of the payment terms provided within these card client agreement terms and conditions are excluded from the rebate program. Fuelman reserves the right to charge a Rebate Program Fee of up to ten dollars ($10) per card per billing cycle. Fuelman also reserve the right to change or terminate the rebate program at any time and in any manner with prior notice.  Changes may include, among other things, changing the benefits, imposing additional restrictions, or terminating the program. In addition, reserve the right to remove any account from the rebate program in the event of any fraud or abuse.  Participation in the rebate program will be suspended if the account is suspended. Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may change, suspend, or terminate this rebate program without notice.
>
> 10    Billing & Payments.

Paragraph 9.8 of this card's Ts&Cs states that under certain circumstances

FleetCor may charge either a per-gallon or per-transaction fee when fuel prices fall

below $3.25 per gallon (which they have regularly been since 2014).  FleetCor

customers would not know from this statement when FleetCor may elect to impose the fee, whether the fee would be a per-transaction or per-gallon fee, or what the amount of the fee would be.  These fees are also unexpected given FleetCor's promise of "No fees for set-up, transactions or annual membership" in its marketing materials.

62.    Customers have complained about the MAPF:

- "After being charged the MAPF without notice, a customer complained, 'I called and they stated they would credit this amount back and send me a cancellation form. Their system is designed to force companies to pay fees without recourse.'"

- "This company charges outrageous, unexplainable fees that are unethical. They claim to refund charges at a later [date] but want you to go ahead and pay the fees. We have been charged a total 'minimum program administration fees' of $8438.58 since August 2015. Customer service is unable to explain the charges except to say that fuel we charged to the account was cheaper; therefore, we have to pay them the difference."

- "I received our invoice and statement for last month, and noticed we are being charged a 'Minimum Program Administration Fee' in the amount of $129.65. We were not supposed to be charged fees… I do not think it

is fair to be charged fees after you told me we wouldn't be charge[d] any."

- "[W]e started out with the company and for the first few months everything seemed fine. But for the last three months they have tacked on fees. Their only explanation of the fees is 'The Min Admin Program Fee is as a fee that is assessed when the previous month's fuel price is below $3.25 dollar per gallon. We charge this fee up to 10 cents per gallon or $2 per transaction to cover ongoing program operation costs.' This explanation makes absolutely NO SENSE since the price of [f]uel has been well below $3.25 for much longer than we have even been customers of theirs. This seems to be just an easy way for them to get away with tacking on some extra fees whenever they want or need to boost their revenues… We joined with Fleetcor because they state that you can save up to .10 per gallon on your fuel…but then they get you with the [b]ogus fees that end up costing you more money."

*Reimposing Fees and Fee-Swapping*

63.    In numerous instances, when customers have noticed unauthorized fees on their accounts and called FleetCor to complain, the company has stopped

charging those specific fees only temporarily (anywhere from one month to one year), before re-imposing them without notice.

64.     In numerous instances, when customers have succeeded in complaining about one fee and getting it removed, FleetCor has swapped it with another fee to make up for the lost revenue.  Internal communications reflect, for example, that in 2016 FleetCor began charging a Card Fee of $2.00 per card per month to customers who had complained about the Minimum Program Administration Fee.  FleetCor has waived the Card Fee if a large business notices it and complains about it.  When smaller businesses have called to complain about the Card Fee, FleetCor often has reduced the Card Fee to $1.00 per card.

### *Billing Procedures*

65.     FleetCor's billing procedures make it difficult for customers to know they have been charged unexpected fees.  To bill customers, FleetCor issues a short (typically one-page) customer invoice.  FleetCor's customer invoice provides the payment due date and the total balance due, but does not include a description of the fees FleetCor has charged the customer during that billing cycle or even a separate line item indicating the total amount of the fees charged.  An example of a FleetCor customer invoice is below:



**CUSTOMER INVOICE**

**Fuelman Fleet Program**
PO BOX 923928
NORCROSS, GA  30010

**Fuelman**

For Customer Service Inquires call:   (800) 553-5131

6

**Account Number** ▮▮▮▮
*Please reference your account # on all payments*

| | |
|---|---|
| **PERIOD STARTING** | 02/16/2016 |
| **BILLING DATE** | 02/23/2016 |
| **DUE DATE** | 02/29/2016 |
| **TOTAL BALANCE DUE** | $11,382.05 |
| **SPEND LIMIT** | $170,000 |

| Account Statement for Activity from 02/16/2016 - 02/22/2016 |
|---|

**Payments and Adjustments**

| Date | Description | | Amount |
|---|---|---|---|
| 02/20/2016 | PAYMENT/ADJUSTMENT | | -$6,157.60 |
| | | **Total:** | **-$6,157.60** |

Access to working capital has never been easier!  Get **up to $100,000** business line of credit powered by Kabbage in as little as **7 minutes!**  Apply online at www.fleetcardsUSACredit.com or call us at 1-888-998-3007.

| Previous Statement Date | Prior Balance | Payments and Adjustments | Current Activity | Total Balance Due |
|---|---|---|---|---|
| 02/16/2016 | $6,157.60 | -$6,157.60 | $11,382.05 | $11,382.05 |

**FOR PROPER PAYMENT POSTING, PLEASE INCLUDE ONLY CHECK AND REMITTANCE COPY BELOW IN THE ENVELOPE PROVIDED. ANY ADDITIONAL CORRESPONDENCE SHOULD BE DIRECTED TO THE ADDRESS IN THE TOP LEFT AREA OF THIS STATEMENT.**

- - - - - - - - - - ✂ - - - - - - - - - -

REMITTANCE COPY – RETURN THIS STUB WITH PAYMENT      **Account** ▮▮▮▮ (1427000001)

**Fuelman**

PLEASE MAKE CHECKS PAYABLE TO
**Fuelman Fleet Program**

| | |
|---|---|
| **BILLING DATE** | 02/23/2016 |
| **DUE DATE** | 02/29/2016 |
| **NEW BALANCE** | $11,382.05 |
| **PAYMENT AMOUNT** | $ |

**REMIT TO:**

Fuelman Fleet Program
P. O. Box 70995
Charlotte NC  28272-0995

99999999991427000001200011382053

66.     FleetCor has required customers to take extra steps to find information regarding the fees FleetCor charged during the billing cycle.  Specifically, customers must access their Fleet Management Report ("FMR") through an online portal (delivery of the FMR via email, fax, or mail delivery incurs a fee).  In it, FleetCor lists some, but not all, of the individual fees that have been assessed.

67.     The content and appearance of the FMR has varied by fuel card.  On the first page of some FMRs, there has been a product purchase summary labeled "Summary of Transactions This Reporting Period for all Vehicles in Your Fleet":

**FLEET MANAGEMENT REPORT FOR 10/1/2016 – 10/31/2016**
SUMMARY OF TRANSACTIONS THIS REPORTING PERIOD FOR ALL VEHICLES IN YOUR FLEET

| PRODUCT | QUANTITY | BASE PRICE | FED TAX | ST TAX | OTH TAX | OTH CHARGES | TOTAL |
|---------|----------|-----------|---------|--------|---------|-------------|-------|
| UNL | 142.355 | $242.97 | $26.48 | $30.58 | $0.00 | | $300.03 |
| PREM | 79.060 | $181.11 | $14.69 | $16.27 | $0.00 | | $212.07 |
| UDSL* | 1,496.307 | $2,916.78 | $367.95 | $341.18 | $0.00 | | $3,625.91 |
| Total | 1,717.722 | $3,340.86 | $409.12 | $388.03 | $0.00 | $1,055.90 | $5,193.91 |

This report is for information only.
Please see remittance copy on the statement for the total payment amount.

68.     This summary has contained an "OTH CHARGES" column, which has provided only a total amount.  "OTH CHARGES" has not been accompanied by any description of what charges it includes.  Generally, this column has been populated only with an amount in the "Total" line.  Although not stated in the summary, the Total in this particular FMR consists of the fees that FleetCor has assessed.  An example of an FMR is attached as Exhibit H.

40

69.     Some FMRs, however, have contained a "Total" on the first page that has not included fees.  In those instances, the actual amount due has not been listed until the last page, where the fees have been itemized.  The totals listed on the first and last page of the FMR can differ by hundreds of dollars.  For example, one customer received an FMR where the "Total" reflected on the first page of the report and the "Total" reflected on the last page of the report differed by $775.79 because the total on the first page did not include the fees FleetCor charged this customer.  The FMR is attached as Exhibit I, and excerpts from the first and last page appear below:

First Page (Total $14,207.64):



Last Page (Total $14,983.43):



70.     Defendant Clarke frequently educated himself on company practices,

including how fees appeared on billing documents.  In one internal email exchange

about how fees are presented to customers, Clarke asked to see the billing

documents himself, writing, "pls forward me an actual invoice or statement …. so

that I can see how we display [the Minimum Program Fee]."  In response, he

received three customer invoices and three FMRs (which FleetCor has not

provided to customers along with their invoices).  The invoices – the billing

documents reflecting the total balance due – did not disclose any of the fees being

charged.  Nevertheless, Clarke did not direct any changes to the Company's billing

practices.

### *Inaccurate and Unavailable Invoices*

71.     Numerous customers were unable to view or pay their bills when FleetCor migrated to a new payment and billing platform in December 2016, Global Fleetnet ("GFN").

72.     In numerous instances, when customers could view their bills, those bills had significant errors.  For instance, at least 18,000 customers have received invoices that reflected a lower balance than FleetCor claims they actually owed, causing FleetCor to deem those customers as having underpaid.

73.     Despite failing to provide timely invoices or invoices it deems accurate, FleetCor has assessed late fees and finance charges to the customers who have made payments when they received those invoices or based on those invoices. FleetCor did not automatically refund customers for the fees and finance charges that were improperly assessed.  Instead, FleetCor put the onus on customers to call and complain.  Customers who did not notice the charges and did not call to complain never received refunds for the improper fees.

74.     FleetCor's customers continued to experience a variety of problems accessing and paying their bills even after the GFN transition was completed.  In February 2017, FleetCor employees noticed that the company had assessed an abnormally high volume of late fees and finance charges to customers.  Upon

further inquiry, the employees determined that FleetCor had assessed the fees

against customers who had not received their bill before the due date.  Despite

becoming aware of the error, FleetCor determined that it would not proactively

refund late fees.  Indeed, in an internal email, the Director of Revenue

Management stated, "There is nothing we can do now, so we think we will let the

Call Center know th[ere] could be some noise coming from this and they can

follow a lenient waiver policy for those late fee & finance charge[s]."

75.    Problems continued into May 2017, when FleetCor was late in

mailing and posting customer invoices online, and invoice amounts did not reflect

the actual amount FleetCor deemed the customer to have owed.  Rather than credit

any customer who incurred a late fee as a result, FleetCor again put the onus on

customers to call and complain, despite FleetCor employees flagging a sudden 17

percent increase in the number of customers who paid their invoices late.  FleetCor

assessed one customer over $15,000 in late fees despite FleetCor employees

internally acknowledging that "[t]he posting and billing errors are our fault.  We

were not providing the client with the appropriate information to make payments[,

and t]he client has made multiple payments that [are] not reflect[ed] in the

account."

76.     Eventually, FleetCor began refunding certain customers' late fees and finance charges without requiring customers to first complain to FleetCor about the fees, but did not do so for all affected customers.  Long after the transition to the GFN platform, some customers continued to experience issues with wrongly assessed fees.  For example, in December 2017, one FleetCor customer complained that she still had over $67,000 in inaccurately assessed late fees and finance charges on her account due to GFN invoicing issues.  After she continued complaining, the company ultimately refunded the fees.

77.     When FleetCor refunded fees due to GFN billing issues, the refund did not automatically appear on customer invoices.  Instead, in numerous instances, the credit took one to two billing cycles to appear on the bill.  In the meantime, FleetCor required customers to pay the entire amount listed on the invoice, including late fees and finance charges, until the credits appeared.

78.     FleetCor also categorized customers as "high risk" if they incurred GFN-related late fees, and FleetCor charged those customers HRCAFs.

79.     GFN-related invoice problems also caused customers to more carefully review their bills.  A June 2017 communication from the Vice President of Customer Solution Center Operations noted that, "With so much attention on

invoices (missing payments, bad balance due, mixed us [sic] terms) customers took a closer look at invoices and noticed fees for the first time."

### Recurring Unauthorized Charges for Unwanted Programs

80.     FleetCor has charged customers without authorization for a number of programs, including programs the company calls "FleetDash," "FleetAdvance," and "Clean Advantage."  FleetCor has charged customers monthly, quarterly, or per-gallon fees, including fees ranging from $9.95 to $29.97 per month, $50 per quarter, or 5¢ per gallon for these programs on a recurring basis, and has charged customers at least tens of millions of dollars for the programs without their consent.

81.     As with card fees, sometimes FleetCor has not initially charged for program membership, and then later has begun imposing charges.  Internal documents reflect that FleetCor understood that this approach would be much more profitable than having customers take action to choose to be in any of these programs.  For example, when implementing the Clean Advantage Program, internal documents reflect that there would be a: "[P]lanned $1.5MM revenue initiative in 2018 [to enroll certain customers into the Clean Advantage] program under 'Free Trial' approach which could not be realized through 'Opt in' approach."

82.     The only information FleetCor has provided about these programs are in mailers and emails.  In some materials, FleetCor has not disclosed that there is a fee associated with the programs.  *See* Exhibit J.  In other materials, FleetCor has included information about costs and what the customer must do to avoid automatically incurring the charge in very small type at the bottom of the page or in the middle of the mailer.  Examples of the mailers that customers received are attached as Exhibits J, K, and L.

83.     Even FleetCor employees looking for information about the costs associated with the programs have missed disclaimers.  One employee who reviewed a letter sent for the Clean Advantage Program could not find any description of how customers opt out of the program and asked, "[W]here is the opt-out language going to be, didn't look like it was in the letter, will it be on the website?"  Another employee responded, "The opt-out language is in the footer of the letter[]."

84.     Regardless of whether a customer takes any action, such as opening the mailer or email, or notices and reads any disclosures about charges, FleetCor charges the customer on a recurring basis for the program.

85.     Customers who have become aware of the charges for these programs have complained to FleetCor that they did not authorize the charges:

47

- "[M]y statement balance reflects…an additional $29.97 charge for the 'fleet dash service' which I was automatically 'enrolled in' without my knowledge[.]"

- "Fuelman added, without my consent, a total of $115 to my bill. This was for a clean air fee. I never requested it. [I]t was added to several bills and they had to go back and credit my account. They constantly add fees without the customer[']s knowledge or agreement"

- "I go online to pay my statement… my statement balance reflects…an additional $29.97 charge for the 'fleet dash service' which I was automatically 'enrolled in' without my knowledge" and

- "[FleetCor] added a Clean Advantage program for a fee which I have never opted into nor requested. I have asked numerous times to be removed. Come to find out they will add it to your account every year without authorization and YOU have to call to cancel."

86.     FleetCor has discussed steps to make it difficult for customers who notice the charges to opt out of these programs.  For example, one FleetCor employee queried whether opt-outs should be handled the same as they have been for other fees: "I would assume that we do not want to allow a client to opt-out of fees without speaking to a rep so that we can keep the opt-out rate as low as

possible."  In many instances, customers who have noticed the charges have been unable to cancel without calling and speaking to a FleetCor representative.

87.     Based on the facts and violations of the law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

88.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."  Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

89.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### Deceptive Savings Claims

90.     Defendants have represented, expressly or by implication, that consumers will achieve specific per-gallon savings by using FleetCor's fuel cards.

91.    In truth and in fact, in numerous instances in which Defendants have made the representations described in Paragraph 90, the representations were false or unsubstantiated.  These representations are material to consumers.

92.    Defendants' representations as set forth in Paragraph 90 are likely to mislead reasonable consumers and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Deceptive Fraud Control and "Fuel Only" Claims

93.    Defendants have represented, directly or indirectly, expressly or by implication, that FleetCor's fuel cards have fraud controls that prevent unauthorized purchases and consumers can restrict cards to "fuel only" purchases.

94.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 93, FleetCor's fraud controls have allowed unauthorized purchases, and the cards consumers have restricted to "fuel only" purchases have permitted non-fuel purchases.  These representations are material to consumers.

95.    Defendants' representations as set forth in Paragraph 93 are likely to mislead reasonable consumers and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Deceptive Fee and Convenience Claims

96.     Defendants have represented, directly or indirectly, expressly or by implication, that FleetCor charges no fees for set-up, transactions, or membership.

97.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 96, FleetCor has charged fees for set-up, transactions, or membership, including "convenience" transaction fees for using FleetCor's fuel cards to fuel at certain locations.  These representations are material to consumers.

98.     Defendants' representations as set forth in Paragraph 96 are likely to mislead reasonable consumers and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Deceptive Fee and Billing Practices

99.     In numerous instances, Defendants have represented, directly or indirectly, expressly or by implication, that consumers owe the total amount due on their bills.

100.    In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 99, the amount includes fees,

interest, and finance charges that the consumers do not owe.  This representation is material to consumers.

101.   Defendants' representations as set forth in Paragraph 99 are likely to mislead reasonable consumers and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Unfair Fee and Billing Practices

102.   In numerous instances, Defendants have billed consumers for fees, interest, and finance charges, and programs for which consumers have not provided express, informed consent.

103.   Defendants' actions as described in Paragraph 102 have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

104.   Defendants' practices as set forth in Paragraph 102 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

## CONSUMER INJURY

105.   Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

106.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other such relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and to the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency

53

of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an evidence preservation order, and expedited discovery;

B.  Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.  Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: 12/20/19

MICHAEL A. BOUTROS
Ga. Bar No. 955802
Federal Trade Commission
Southeast Region
225 Peachtree Street NE, Suite 1500
Atlanta, GA 3033
Phone: (404) 656-1351
Email: mboutros@ftc.gov
Fax: (404) 656-1379

THOMAS C. KOST
THOMAS E. KANE
Federal Trade Commission
Division of Financial Practices
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 326-2286 (Kost)
Phone: (202) 326-2304 (Kane)
Email: tkost@ftc.gov
Email: tkane@ftc.gov
Fax: (202) 326-2752

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION