1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA

2                  ATLANTA DIVISION

3  FEDERAL TRADE COMMISSION,      :
                         :

4        PLAINTIFF,        :
                         :

5  vs.                  :  DOCKET NUMBER
                         :  1:19-CV-5727-AT

6  FLEETCOR TECHNOLOGIES, INC.,   :
  AND RONALD CLARKE,         :

7                         :
        DEFENDANTS.       :

8

9

10      **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11        **BEFORE THE HONORABLE AMY TOTENBERG**

12          **UNITED STATES DISTRICT JUDGE**

13              **APRIL 2, 2020**

14               **10:32 A.M.**

15

16

17

18

19

20    *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

21             *TRANSCRIPT PRODUCED BY:*

22

    *OFFICIAL COURT REPORTER:*      *SHANNON R. WELCH, RMR, CRR*
23                         *2394 UNITED STATES COURTHOUSE*
                          *75 TED TURNER DRIVE, SOUTHWEST*
24                          *ATLANTA, GEORGIA  30303*
                          *(404) 215-1383*

25

```
 1                A P P E A R A N C E S   O F   C O U N S E L

 2

 3     FOR THE PLAINTIFF:

 4
           THOMAS CHARLES KOST
 5         MICHAEL A. BOUTROS
           BRITTANY K. FRASSETTO
 6         GREGORY J. MADDEN
           FEDERAL TRADE COMMISSION
 7

 8     FOR THE DEFENDANT FLEETCOR TECHNOLOGIES, INC.:

 9
           BENJAMIN M. MUNDEL
10         MARK D. HOPSON
           SIDLEY AUSTIN LLP
11
           JESSICA A. CALEB
12         CAPLAN COBB LLP

13
       FOR THE DEFENDANT RONALD CLARKE:
14
15         JOHN E. VILLAFRANCO
           KELLEY DRYE COLLIER SHANNON
16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                    P R O C E E D I N G S
 2      (Atlanta, Fulton County, Georgia; April 2, 2020.)
 3               THE COURT:  Good morning.  This is Judge Totenberg.
 4               MR. KOST:  Good morning, Your Honor.
 5               MS. CALEB:  Morning, Judge.
 6               THE COURT:  Is Harry there?
 7               COURTROOM DEPUTY CLERK:  Yes, ma'am, I'm here.
 8               Would you like me to call the case?
 9               THE COURT:  Sure.  Thank you very much.
10               COURTROOM DEPUTY CLERK:  Okay.  Good morning,
11      everyone.  We are here for the teleconference in the case of
12      the Federal Trade Commission vs. FleetCor, et al., Civil Action
13      Number 19-CV-5727.
14               Beginning with plaintiff, would counsel make your
15      appearance for the record.
16               MR. KOST:  Good morning, Your Honor.
17               MR. BOUTROS:  I'm sorry.  This is Michael Boutros for
18      the Federal Trade Commission.  And with me -- I'm local
19      counsel.  With me is lead counsel, Thomas Kost, and also
20      Brittany Frassetto and Greg Madden.
21               COURTROOM DEPUTY CLERK:  Thank you, sir.
22               THE COURT:  Thank you.
23               COURTROOM DEPUTY CLERK:  FleetCor?
24               MS. CALEB:  Good morning, Judge.  This is Jessica
25      Caleb.  I hope you are doing well.  I, along with Mike Caplan,
```

1    of Caplan Cobb represent defendants FleetCor Technologies and

2    Ron Clarke.  And with me today are Mark Hopson and Benjamin

3    Mundel from Sidley Austin of Washington.

4              And John Villafranco, did you join yet?

5              MR. VILLAFRANCO:  Yes, I'm here.

6              MS. CALEB:  Hi, John.  Good morning.

7              John is with us as well, Your Honor, from Kelley Drye

8    & Warren out of Washington, D.C., representing Ron Clarke.

9              THE COURT:  Great.  Thank you very much.

10             Well, first of all, I hope all of you are well under

11   the circumstances as well with very scary, challenging times.

12   And I appreciate your challenges that you may be facing as you

13   proceed here and proceed in life as a whole that we all face at

14   this moment.

15             I read the joint preliminary report and discovery

16   plan obviously in preparation for our conference today.  And I

17   thought maybe if we could step back a little bit it would be

18   helpful to me if I could understand from the FTC whether you

19   have brought a similar case that I might be able to, you know,

20   look at -- if there is any reported decisions involving any

21   similar cases or even if it is not a reported decision, which

22   is -- really the main point is to be able to see the scheduling

23   orders or preliminary discovery plan in any similar cases to

24   the instant one.

25             I understand the turf of the FTC, have other FTC

1    cases.  But it really was the question of the nature of this

2    case that I was looking for, whether you had anything else you

3    want to --

4            MR. KOST:  Good morning, Your Honor.  This is Thomas

5    Kost from the FTC.  I don't have any cases for you out of the

6    the Northern District of Georgia.

7            THE COURT:  Oh, I don't care where they are from.

8            MR. KOST:  I think the best analog for a case that is

9    proceeding now may be the LendingClub litigation in the

10   Northern District of California.  (Electronic interference) on

11   the eve of trial.  I don't have a citation to it on hand.  Of

12   course, we can provide that.

13           That is a matter that is being led by our division.

14   It involves a large public company with complex discovery and

15   ESI.  The nature of the case is slightly different.

16   LendingClub is a loan provider.  But I think that is a great

17   starting point.

18           THE COURT:  Okay.  Well, if you, when we are through

19   later on today, would send us the -- we can pull up the docket.

20   But also if you have it -- if you want to just shoot us the

21   case number.  I have on the phone my law clerk, Nathan Juster.

22   He could look on PACER if it is not too large, particularly

23   documents that they are referencing.

24           LAW CLERK JUSTER:  This is Nate.  Did you say

25   LendingClub?

1          MR. KOST:  That's correct.  Maybe one of my

2    colleagues, either Brittany or Greg, could find a case citation

3    shortly here so you can have it.

4          THE COURT:  Great.  And is it -- if it has a large

5    docket, tell us which documents you think would be most

6    helpful.

7          MR. KOST:  It does have a large docket.  I'll have to

8    look.

9          THE COURT:  Okay.  I understand.

10         What are the ultimate objectives here of the FTC in

11   bringing the case?  Are you looking to shut down the company?

12   Are you looking for them to change practices?  Are you

13   looking -- I mean, is it primarily injunctive, monetary?  What

14   is the -- what are the relief objectives?

15         MR. KOST:  Sure.  Again, for Shannon, this is Thomas

16   Kost.

17         Your Honor, we're not looking to shut down the

18   company.  This is a large publicly traded company.  I think our

19   goals, among those that you listed, are both injunctive relief

20   and equitable monetary relief for customers who have been

21   harmed by the practices that we outlined in the complaint.

22         Of course, in addition to compensating those

23   customers, we would like to see the company change its

24   practices so that it complies with Section 5 and no longer

25   continues the practices that we allege are deceptive and

unfair.

THE COURT:  And did you -- in the course of the almost two years that you were all doing basically pre-suit discovery of some variety, did you have any discussions about settlement at all?

MR. KOST:  We did, Your Honor.  In fact, I think we -- we engaged in varying levels of settlement discussions for several months in the period leading up to the filing of the suit.

I should also say we have met with the company many times in person and on the phone.  We have been actively engaged.

THE COURT:  Okay.  So I assume, you know, you are all seeking the conference because you couldn't agree on a discovery length and the number of depositions it looked like.

Is there -- and the question of expert discovery too seemed to be -- the timing of it or perhaps whether it was necessary.  I wasn't sure about that.

Is that correct?

MR. KOST:  That's correct, Your Honor.  I would say broadly there are three issues we're looking to the Court for help in resolving.  We agree on a large number of issues.  But the length of the discovery period, the proposed case schedule including key discovery events and time for filing summary judgment, and the number of depositions are the primary issues

1   that we are -- we remain apart on.

2           THE COURT:  How do you think that the public health

3   emergency will affect the timing issues and disputes that are

4   addressed in your proposed scheduling order?

5           MR. KOST:  We have thought a lot about that.  It is

6   very hard to say, given the evolving nature of the outbreak.

7   Just recently the social distancing guidelines were extended

8   from early May -- or early April to the end of April.  Schools

9   remain closed.  It is looking increasing likely that we will

10  lose the entire school year.

11          We appreciate the Court's 30-day extension and feel

12  it is very appropriate.  I think maybe -- I hazard to take a

13  guess without knowing how long the emergency is going to

14  continue.  We have set a schedule that we feel is very

15  challenging but achievable now with no padding built in.

16          So to the extent that the disruptions continue, it

17  may be longer than anticipated.  And right now -- I mean, I

18  initially thought it would be early May.  But it is looking

19  longer.

20          Perhaps the best way to deal with it is to set a date

21  for a status conference in 60 days or so, and we can check back

22  in with the Court.  That may be a better way than, you know,

23  speculating now and building in too much time or too little

24  time.

25          THE COURT:  I wasn't clear from reviewing the

1    scheduling order how much -- how many depositions that the

2    Government was really looking for.  I mean, I heard this

3    discussion of 10 and 15.  I wasn't sure -- then I also heard

4    about 60 witnesses.

5         So what is it that the FTC actually wants in terms of

6    the number of depositions?

7         MR. KOST:  We would like 15 depositions, including a

8    30 day -- three-day 30(b)(6).  The 60 witnesses is the number

9    of individuals with potentially discoverable information that

10   we identified in our initial disclosures.  Of course, we're not

11   seeking to depose all 60.

12        We have also, you know, gone through the exercises of

13   slotting in potential deponents by category just to illustrate

14   the 15 is even an aggressive number in our view.  And I mean,

15   we would be happy to share that with you or discuss the reasons

16   for seeking additional depositions.

17        THE COURT:  Well, I guess you should.  I mean, if you

18   could tell me the categories and does that -- and whether that

19   includes expert witnesses or not and how many expert witnesses

20   you are thinking about.

21        MR. KOST:  Sure.  Broadly speaking, our request for

22   additional depositions is motivated by the evolving and complex

23   nature of FleetCor's fuel card business, the number of units

24   and departments that have responsibilities relating to that

25   business, and the need to have deponents who can speak to

1    different time periods because these practices go back to at

2    least 2014 and have changed at times in between as the

3    employees are seeing those practices.

4           To get down to a more granular level, we see the need

5    to depose, of course, the defendant -- the individual defendant

6    Ron Clarke, CEO; business line leaders from the period before

7    doing the major reorganization around 2017 -- the business line

8    leaders both before and after 2017.

9           We see the need to depose individuals who led the

10   company's product growth and strategy department who can speak

11   about yields and rate initiatives, which are generally the

12   folks who are proposing new fee initiatives and implementing

13   them; individuals who are responsible for fee revenue in the

14   fuel card business.

15          THE COURT:  I'm sorry.  I lost you for one second.

16          MR. KOST:  Sure.

17          THE COURT:  I'm sorry.  Give me the first category

18   again.

19          MR. KOST:  Well, the defendant, Mr. Clarke.

20          THE COURT:  Right.

21          MR. KOST:  We would like to speak to the business

22   line leaders, the executives with policy-making authority for

23   the fuel card business.  We'll need to depose at least two,

24   given that there was a major reorganization in 2017, the leader

25   pre-2017 who is now a former employee and the leader after the

1    reorganization.

2         FleetCor has a product growth and strategy executive

3    for the fuel card business who we would like to depose.

4    Another category is yield and rate initiatives, which relate

5    to -- rate initiatives include fee initiatives, both proposed

6    and enacted.

7         FleetCor has a fee revenue management unit that is

8    responsible for fee revenue.  We would like to speak to the

9    department responsible for setting the terms and conditions and

10   managing any changes to those terms and conditions.

11        We would like to speak to a number of individuals

12   with sales responsibilities.  They have a -- FleetCor has a

13   vast sales infrastructure, including the head of sales.  Their

14   sales are generally divided -- their unit is divided according

15   to the channel through which they are making their sales

16   efforts.

17        We would like to speak to individuals who manage the

18   field sales efforts, the telesales efforts.  And they also have

19   regional sales employees who interact directly with customers.

20   Of course, we wouldn't speak with all of the regional sales

21   employees.  But it would be important to have at least one

22   representative.

23        We would like to speak with an employee with customer

24   service responsibilities and an employee with training

25   responsibilities, especially for the customer-facing employees,

1    the individuals who train them, provided them with scripts and

2    guidance in their contacts with customers.  So that's 13.

3            And our 15 would include the experts which haven't

4    been -- haven't been designated because I don't think either of

5    the parties have committed to using experts yet.  Though I will

6    say it seems likely.  So there -- we're assuming that there

7    will be at least two expert depositions, which takes us to 15.

8            Now, of course, that is one more than -- that doesn't

9    account for the 30(b)(6) and a number of other categories that

10   I haven't listed where we would have some interest in talking

11   to folks but recognize that, you know, 15 is already a large

12   ask but in our view absolutely critical.

13           THE COURT:  Well, is Mr. Clarke going to be

14   functioning both on his individual behalf and as a 30(b)(6)

15   witness or not?

16           MR. KOST:  I would not think that Mr. Clarke would be

17   the company's 30(b)(6) witness.  There's a possibility that an

18   individual deponent is also going to be designated as a

19   30(b)(6) witness.  But the individual deponents are even -- are

20   still going to be -- will not be able to speak to everything

21   that we would need to get out of the 30(b)(6), which is one of

22   the reasons that we're asking for a longer 30(b)(6).

23           As I mentioned, there is a long time period to cover.

24   There's changing practices.  There is a number -- there is a

25   vast range of card products.  And any individual is unlikely to

1    be able to speak across their -- across FleetCor's card

2    products and customer base.

3            We also, you know, want to speak to the 30(b)(6)

4    deponent about categories that I haven't outlined as necessary

5    for an individual deponent, for instance, complying --

6            THE COURT:  So you're thinking -- I guess the

7    question -- all right.  The question I have about the 30(b)(6)

8    is you talked about three days.

9            Are you thinking that there will be several different

10   people as a 30(b)(6) witness?

11           MR. KOST:  It seems likely, given the nature of the

12   defendants' business and vast operations.  It seems unlikely to

13   me that there will be one person who can speak to all of the

14   topics.

15           THE COURT:  So when you say vast operation, give

16   me -- since I'm really not familiar with the defendants'

17   corporation, can you give me an idea what you mean by that or

18   the --

19           MR. KOST:  Sure.  So, you know, specifically focusing

20   on FleetCor's fuel card business -- of course, they offer a

21   range of other products and services that aren't at issue in

22   this case.

23           The fuel card business alone generated over a billion

24   dollars in revenue in the last year.  So they do a lot of

25   business.  They have a lot of employees.  They offer over 20

1    card products.  And each of those card products have different

2    marketing, have different pricing, have different terms, access

3    different networks.  For instance, you know, the familiar

4    networks are -- MasterCard is a familiar network that

5    FleetCor's cards access.  But also they have their own

6    proprietary networks.

7         These are all layers of complexity that we're going

8    to need to deal with.  And they have over -- they represented

9    to us that they have over 140,000 active fuel card accounts --

10   active fuel card accounts in the United States right now.  That

11   doesn't include a count of any accounts that were opened at

12   some point since 2014 but are now closed.

13        You know, they market and sell these fuel cards in a

14   variety of different ways:  Through field reps who show up and

15   meet potential customers face-to-face, over the phone through

16   outbound calling on the web, via mail.

17        And there's people -- there are different employees

18   who have responsibilities for all of these different sales

19   channels and those different marketing materials.  So there are

20   a number of different representations they made to customers

21   that it is important for us to have those materials.

22        And that is not to mention, of course, customer

23   service for their existing customer base who have frequent

24   interactions with their customers through mailings, over the

25   phone.  I mean, they operate over ten call centers.  They in

1    theory have scripting and training for all of those employees

2    who are interacting with customers.  It is important for us to

3    have access to those materials too to understand what the

4    company is saying to their customers.

5            THE COURT:  Okay.  I note -- Mr. Juster just went to

6    PACER and saw that at least originally you had -- in the

7    LendingClub case you had 12 depositions and -- and I don't know

8    really how large the corporation was compared to this or the

9    case.  And that was inclusive of nonparty witnesses but

10   exclusive of expert depositions.  And I guess you had 17.5

11   hours in that case for the 30(b)(6) deposition which look to be

12   a little bit like two and a half days or something like that.

13           Is that what it ended up being?

14           MR. KOST:  That sounds right.

15           THE COURT:  And did you -- did that number change at

16   all over the course of the case?

17           MR. KOST:  I cannot speak personally to that.  I can

18   find out the answer very quickly.

19           THE COURT:  All right.

20           MR. HOPSON:  Your Honor?

21           THE COURT:  Yes.

22           MR. HOPSON:  Mark Hopson from Sidley Austin for

23   FleetCor.  Just going back to the beginning of the call, we

24   represented DirecTV in a very similar case out in California.

25   And if you like, we could submit to you or your law clerk the

1   document in that case and point out the relevant scheduling

2   orders and so forth.

3           THE COURT:  Okay.  Would you send it to Mr. Juster.

4   That would be great.  And he will send you his email.

5           MR. HOPSON:  Terrific.  Thank you.

6           THE COURT:  It might be only -- because things change

7   at times, send it to him.  But I think if everyone just simply

8   files their letter on the docket, that actually -- at least

9   then if we get -- you know, things can get a little hairy right

10  now about where something comes in.  So it would be -- actually

11  send an email to him but also file the email on the docket.

12          MR. HOPSON:  We'll do that, Your Honor.  Thank you.

13          THE COURT:  All right.  And if the FTC will do that

14  as well.

15          When you say it was a similar case -- maybe you

16  weren't saying that.  But it was a large case.  Tell me a

17  little bit about that case and what you did on discovery in

18  that case and how is it comparable.

19          MR. HOPSON:  Sure.  It is comparable because, again,

20  it was a large publicly traded company.  DirecTV, the satellite

21  television provider, was acquired by AT&T in the middle of the

22  investigation.  And the case went forward.  It went all the way

23  through trial.

24          It is very similar in the sense that there were

25  claims about undisclosed fees.  There were complaints about the

1   advertising being deceptive and misleading.  And, you know, I

2   don't have in front of me the scheduling order in that case.

3   But I don't think we went exceptionally beyond what is provided

4   in the Federal Rules of Civil Procedure, ten depositions.

5         Mr. Mundel was actively involved in that case as

6   well.  And he may have a better recollection than I do.

7         MR. MUNDEL:  My recollection there, Your Honor, is

8   that the schedule just was less than a year for fact

9   discovery -- for discovery.  I think about ten months.  And

10  putting aside expert depositions, I believe that we did not go

11  beyond what was laid out in the Federal Rules for the number of

12  fact witnesses.

13        On 30(b)(6) witnesses, both sides worked together.

14  Because of the topics that were proposed in that case, it did

15  require a number of 30(b)(6) depositions.  But most of them did

16  not go an entire day.  But it was very short one- or two-hour

17  depositions for some of the witnesses to cover all the topics.

18  But the parties were able to work together without expanding

19  what is permitted in the Federal Rules is my recollection.

20        THE COURT:  And that was in the Northern District Of

21  California?

22        MR. MUNDEL:  Yes, Your Honor.

23        THE COURT:  So what is the -- I mean, the number is

24  not exactly overwhelming for a large case.  So tell me from the

25  defendants' perspective why this is excessive.

1          MR. HOPSON:  Your Honor, this is Mark Hopson first.

2    I just want to make one brief point here.  If it turns out at

3    the end of the day that the FTC can't complete its discovery

4    with ten depositions, then the time will come where they can

5    come to us and explain that.  And if it seems reasonable, we'll

6    agree to it.  Or if not, they can come to you and we can decide

7    it.

8          But I think they ought to try to take their

9    depositions within the limits provided by the Federal Rules and

10   see how it works out.  For example, there's one person in

11   charge of all marketing and sales.  They understand the

12   training because they are in charge of the training of their

13   sales.  And they can talk to sales through all channels.  You

14   don't need three or four different people to talk about our

15   sales efforts.  There's one person who oversees revenue

16   management and fee initiatives.  It is not three people.  It is

17   one.

18         So I think that with some actual practical effort

19   going into this some of these issues are likely to resolve and

20   don't need to be addressed on day one or thereabouts.

21         THE COURT:  And are you still in the position that

22   the discovery shouldn't last more than -- is it seven months?

23   Or what is your -- I can't remember whatever -- the six or

24   seven months that you were advocating.

25         MR. HOPSON:  I think we advocated seven, and they

1  advocated nine.  I think COVID-19 has probably made that debate

2  a little bit moot now because I do agree with Mr. Kost that

3  we're probably going to have to revisit where we are when we

4  see how long this circumstance persists and how long the courts

5  are shut down and how long our offices are shut down.

6  THE COURT:  Okay.  And as I understood, the problem

7  about the expert witnesses was that the FTC pointed out that

8  the Government had a bureaucratic problem about how they go

9  about identifying the findings for their experts so that they

10  need to -- if I understood correctly, they need to begin pretty

11  early on so that they, in fact, have the money in place and

12  that the experts can actually provide information on a timely

13  basis.

14  Is that what the Government's issue is, Mr. Kost?

15  MR. KOST:  That's correct, Your Honor.  This is

16  Thomas Kost.  That is correct, Your Honor.  And I'll say that

17  the contracting proceedings has only gotten more difficult as

18  we are all required to telework.

19  But, generally, our approach to the experts is that

20  we see it as simply operationalizing the local rules.  Local

21  Rule 26.2(c) only requires the parties to designate their

22  experts sufficiently early in the discovery period.  We just

23  feel that it would be prudent to put a date on that, especially

24  given the length of time that -- the red tape that we have to

25  deal with on our side to retain our experts.

1    THE COURT:  So were you asking for immediately at

2    this juncture, or are you talking about 30 days after the

3    formal commencement of discovery?

4        MR. KOST:  So we have -- in our proposal, we have

5    asked or proposed -- excuse me -- to have both parties identify

6    expert report subject matter by September 17, which is about a

7    month before the initial expert reports would be due.

8        MR. MUNDEL:  Your Honor, this is Ben Mundel from --

9    I'm sorry to interrupt, Your Honor -- from FleetCor.  We

10   actually propose having the expert reports come earlier, which

11   I think will both be responsive to Mr. Kost's concern about the

12   timing.  You know, we'll do it early.  We proposed July 17 to

13   have the disclosure and the initial expert reports to be due

14   the same day.

15       We don't think we need to wait all the way until

16   September to disclose the identity and then in October to

17   disclose the actual reports themselves.  Pursuant to Rule 26,

18   the disclosure of the identity and the report could be done the

19   same day in late July as opposed to drawing it out even longer.

20       MR. KOST:  Your Honor, this is Thomas.  If I may?

21       THE COURT:  Yes.

22       MR. KOST:  Our issue with that approach -- well,

23   Mr. Mundel accurately states the rule.  To the extent that the

24   initial expert report is provided on the same day that the

25   subject matter is identified, that is where we begin to run

1    into issues with retaining a rebuttal expert within the -- who

2    can then craft the report.  So both retaining the expert and

3    crafting the report in a period of four weeks becomes very

4    difficult for us and could be avoided by the parties agreeing

5    to identify the expert report subject matter a month ahead of

6    time so we can begin our efforts to retain a rebuttal expert

7    without, you know, having seen the full initial report.  But we

8    can get the wheels moving.  And I think that that would keep

9    this matter moving forward more efficiently.

10           MR. MUNDEL:  Your Honor, this is Ben Mundel.  One way

11   to perhaps deal with that concern would be to not wait until

12   later into the year but to keep the deadlines for the expert

13   reports in July of 2020.  But we would have no objection if

14   they would want us to disclose and they would disclose the

15   identity of the experts a few weeks before that.  We would be

16   amenable to that.

17           But we just don't think it makes sense to kind of

18   push everything towards the end of discovery and the end of the

19   year and then have a schedule very cramped at the end.  We

20   would rather spread it out and start earlier exchanging this

21   information.

22           THE COURT:  Well, here is the thing.  The thing --

23   what I'm thinking about though is that if you are wanting the

24   expert to consider the evidence that has been developed and

25   we're now at April 2nd I'm just concerned how will -- how

```
1    will -- does the FTC have enough based on the pre-suit

2    investigation for the expert to be able to reasonably opine

3    about anything?

4              MR. KOST:  Your Honor, this is Thomas Kost.  We share

5    your concern.  And we don't think it is realistic to have

6    expert reports beginning three months from now.  Of course, we

7    do have a volume of materials in the pre-suit investigation.

8    But for a number of reasons, those materials are not sufficient

9    for us to begin retaining an expert and having the expert

10   assess those materials.

11             I would be happy to explain those.  I don't want to

12   start down a meandering path.  But if it would be helpful, I

13   would be happy to go into them.

14             THE COURT:  Well --

15             MR. MUNDEL:  Your Honor --

16             THE COURT:  Yes.  Go ahead.

17             MR. MUNDEL:  Ben Mundel, Your Honor.  I'm sorry to

18   interrupt.

19             THE COURT:  That's all right.

20             MR. MUNDEL:  If I may.  We have already produced

21   94,000 pages of documents and 200 gigabytes of data.  And a

22   substantial amount more are coming in the very near future

23   subject to the requests that the FTC just proposed.

24             So I don't think -- while the reports cannot be

25   completed now, if they have a lot of information, two and a
```

1    half years of an investigation, surely the FTC, just like

2    FleetCor, is in a position to know what category of experts we

3    may need to get those experts started.  So I think we could at

4    least start the process of identifying the experts and what

5    their topics will be.

6            But we do have no objection -- we propose July 17 for

7    the expert reports to be due.  If we need to push that to

8    August, you know, we would, of course, be amenable to that or

9    even a little bit later if need be.  But we don't want to wait

10   until the end of discovery if we can avoid it.

11           THE COURT:  All right.  What I don't understand is

12   this:  Why couldn't you-all at least identify the subject

13   matter of your expert testimony by the end of July?  Whether it

14   is the 17th or the 30th doesn't -- you know, if there is some

15   reason why that two weeks makes a difference, you can let me

16   know and then have a separate date for the actual reports.

17           But then at least the Government knows -- it would

18   seem like you want to know the topic matter of their reports by

19   mid-July so you could do the contracting process for the

20   rebuttal reports.

21           MR. KOST:  Your Honor, this is Thomas.  We are happy

22   to identify the expert report subject matter by the end of

23   July.

24           THE COURT:  Okay.  And then really at that point if

25   you want to pick something like mid-September for a report,

```
 1   then it will -- it won't jam you up so completely.  The
 2   rebuttal report could still come up a little -- would still
 3   have to be after that.  But you would have the contracting in
 4   place at least it would seem.
 5           MR. KOST:  Yes.  I agree that it would be helpful,
 6   and that makes sense to me.
 7           MR. MUNDEL:  That sounds great from the defendants'
 8   perspective as well, Your Honor.
 9           THE COURT:  All right.  All right.  Well, we talked
10   about the 17th.  Do you want a week more until the 24th?  Are
11   you feeling that you're going to be jammed up on the --
12   Mr. Kost, that you want an extra week?
13           MR. KOST:  Your Honor, I would appreciate the 24th.
14           THE COURT:  All right.
15           MR. KOST:  Thank you.
16           THE COURT:  That is fine.  That is fine.
17           All right.  You know, this is rather just simply a
18   question of a jigsaw puzzle that without everyone knowing what
19   is going on really with our world it is very difficult to
20   know -- so why don't you then produce the report two months
21   from then, which is the 25th of September.
22           MR. KOST:  Your Honor, that is -- that sounds good to
23   the FTC.
24           THE COURT:  And then the rebuttal --
25                   (Unintelligible cross-talk)
```

1          THE COURT:  And the rebuttal reports -- you hopefully

2     have an expert.  And when do you think you can get the expert

3     reports in by?  A month from then or five weeks?

4          MR. KOST:  We proposed -- this is Thomas.  We

5     proposed a month in our proposal.  And I think we stand by

6     that, that we could submit a rebuttal report within a month of

7     the initial report.

8          THE COURT:  Okay.  Does that work out for the

9     defendants?

10          MR. MUNDEL:  That does, Your Honor.

11          THE COURT:  All right.  So that's the 23rd basically.

12     You know, there is no difference between -- why don't we just

13     say Monday the 26th because then you'll have the weekend to do

14     whatever you want -- to work or to finalize it.  So 10/26 the

15     rebuttal reports are due.

16          So given all -- tell me what was the date your formal

17     discovery was going to commence or had -- already did.

18          MR. KOST:  This is Thomas.  Formal discovery began on

19     the 19th of March.

20          THE COURT:  And I know you-all gave different dates

21     on summary judgment.  And I'm always very careful about -- just

22     putting aside the COVID-19 virus, you know, with the holidays

23     and Thanksgiving and Christmas and people have had a lot of

24     time, of course, stuck at home already, but it would be very

25     dicey to think that people are actually getting things done

1  during some of those days.

2          You really can't consider a real day at least the

3  week around Christmas and the week of Thanksgiving.  But if, in

4  fact, everyone now thinks -- I mean, if it was nine months, it

5  would be, as it is, approximately ending discovery essentially

6  in January sometime -- it seems to me taking that into account

7  and taking into account the fact that everything is a little

8  bit in slow motion.

9          Does that seem correct as a count?

10          MR. KOST:  Yes, Your Honor.  This is Thomas.  And I

11  think this is what -- precisely what our considerations were in

12  submitting our proposal.  We have discovery closing in late

13  December in advance -- in advance of the end of the year

14  holidays.  And then with the recognition of the -- that there

15  are multiple issues and complex evidence and disruptions around

16  the end of the year holidays, that is why we proposed a date

17  for having those summary judgment motions due in mid-February

18  to give the parties adequate time to put these issues before

19  the Court in a way that is, you know, most helpful to the

20  Court.

21          THE COURT:  So under the circumstances -- I don't

22  know who is going to -- so is Mr. Mundel going to be speaking

23  to this or somebody else related to the discovery period?

24          MR. MUNDEL:  This is Mr. Mundel.  I can handle that,

25  Your Honor.

```
 1              THE COURT:  All right.  Well, you know your own firm
 2     situation as well and all the issues.  Is there a reason why we
 3     shouldn't end the discovery period around January 15th under
 4     the circumstances?
 5              MR. MUNDEL:  No.  I think that makes sense, Your
 6     Honor.  If the final expert reports are going to be filed at
 7     the end of October, having the month of November and maybe a
 8     week or two in December to finalize the depositions of experts
 9     I think would be sufficient.  So I think fact discovery and
10     expert discovery could end, you know, early December,
11     mid-December, around that time period.
12              THE COURT:  All right.  Well, knowing the way of the
13     world, I'm going to say January 8th because I think that you
14     really -- if you don't allow for a few days to clean up in case
15     everything goes haywire with your vacation and you can't get
16     your expert, then I think that you need to have that time to be
17     able to finish up.
18              No one finishes anything up at -- Christmas falls on
19     the Friday, the 25th.  No one is going to be available the week
20     of the 28th.  People probably aren't going to be available
21     from -- you know, from after the 23rd, which is a Tuesday, on a
22     regular basis -- on a meaningful basis.
23              So I think you could have discovery end the last day
24     on the 8th -- January the 8th, subject to obviously, you know,
25     what else is going on at that point.
```

```
 1                 And -- all right.  So then what is -- the Government

 2      wants how long to file the motion for summary judgment?

 3                 MR. KOST:  Your Honor --

 4                 THE COURT:  Are you asking for more time?

 5                 MR. KOST:  -- we are.  Understanding that the local

 6      rules provide for 30 days, our view is that the -- as I

 7      mentioned earlier, the multiple issues, complex evidence would

 8      warrant at least six weeks for adequately briefing summary

 9      judgment.

10                 THE COURT:  Well, does the -- do the defendants

11      anticipate -- let me just stop a second.

12                 Do the defendants anticipate doing a cross-motion for

13      summary judgment too or not?

14                 MR. MUNDEL:  Your Honor, this is Ben Mundel.  I don't

15      think we have an answer to that yet.  I do believe there will

16      be a motion at least on some issues.  But because of the nature

17      of the case where there are allegations of deception, I think

18      that is something that will likely go at least in part to a

19      trial for the fact finder to make determinations about that.  I

20      do think there may be some subissues that would be proper for a

21      summary judgment motion.

22                 THE COURT:  Okay.  Well, I asked obviously --

23                         (Unintelligible cross-talk)

24                 THE COURT:  -- a lot more complex.  And I have been

25      trying to get people to consider some sort of unified briefing
```

1   so that we don't end up just having just a huge volume that

2   almost makes it impossible for us to be able to write an order.

3   It won't be easy here anyway.  But it seems to be out of

4   proportion.

5          So somebody wanted to say something.  I don't know

6   who it was.

7          MR. MUNDEL:  Ben Mundel --

8          MR. KOST:  Your Honor -- sorry.  Go ahead, Ben.

9          MR. MUNDEL:  I was just making a brief comment about

10  -- I was going to make a brief comment about the amount of

11  time.  Although obviously there is a lot of discovery and the

12  Court has built in a substantial discovery schedule, our plan

13  would not be to wait until the day discovery closes to be

14  drafting discovery -- to be drafting summary judgment motions.

15         We would be doing that, you know, as fact

16  discovery -- the fact depositions and expert reports are coming

17  in.  So we would be prepared to file them shortly after the

18  close of fact discovery.  We could stick to what the local

19  rules require of 30 days.

20         And we would also, of course, be amenable to and I

21  think it would make sense to have some type of process with the

22  FTC if we can figure out a way to streamline the briefing to

23  the Court so the Court doesn't get two big briefs from both

24  sides.

25         THE COURT:  Mr. Kost?

```
 1            MR. KOST:  Your Honor, I think we would be willing --
 2   now that the date for the close of fact discovery has moved
 3   beyond the holidays, of course, the FTC is willing to be
 4   working on its summary judgment before the close of fact
 5   discovery.
 6            That doesn't address the fact that, again, this is a
 7   complex case with multiple issues and a lot of evidence.  But I
 8   think we -- you know, we're reasonable.  We would be willing to
 9   compromise.  Perhaps four weeks makes the most sense.  And the
10   parties can continue to work on a way to streamline the
11   briefing as Mr. Mundel has suggested.
12            THE COURT:  Okay.  Well, why don't we leave it for 30
13   days from then -- from the end of discovery but subject to
14   modification obviously.  And also I would like to emphasize
15   that you should try to figure out -- I mean, on -- how you
16   might deal with -- if there are issues that the defendants may
17   seek partial judgment on that we end up with one set of briefs
18   that help -- I can give you more pages that way as well.  But
19   then I'm not reading kind of redundant briefing in some ways.
20            So why don't you-all work on trying to figure that
21   out as time goes on.  And then we can hopefully have it more
22   manageable both for the parties as well as for the Court set of
23   briefs to be preparing.
24            And that way also you can -- we can have a -- if
25   there is another -- we can also have -- build in an extra reply
```

1    brief so that if the defendants -- you know, they need -- that

2    we have a full set of briefing without anyone saying I need

3    something.

4            But it takes basically obviously also the defendants

5    to identify what type of subject matter you think you might be

6    asking for any type of judgment on.  And it is not that it is

7    so much evidence and both sides figure out how best to manage

8    that with the page limit that you-all can agree on and propose

9    to me.

10           I have done sometimes in a case -- one or two other

11   judges have done as well -- is if there was something -- it can

12   be helpful to get a sort of executive summary of what the --

13   how the briefing is organized and what are the issues.  And

14   that can be, you know, a three-page summary, four-page summary

15   that is separate and apart from the brief itself.  You can give

16   us an overview of how -- how it is all pulled together.  It is

17   not necessary.  But if we end up -- it is something to think

18   about.

19           MR. MUNDEL:  That makes sense, Your Honor, from the

20   defense perspective.  And we would, of course, I think be able

21   to find a way to streamline the briefing and minimize the

22   burden on the Court and the parties.

23           MR. KOST:  This is Thomas.  We agree.

24           THE COURT:  So that sort of gets us back to the

25   witnesses.  I can well imagine -- I mean, we're talking now

1    about -- the Government wants 15 plus its experts.

2          And have you interviewed anyone at this juncture, or

3    was that you only basically had access to the documents?

4          MR. KOST:  Your Honor, this is Thomas.  We have not

5    conducted any investigational hearings in our pre-suit

6    investigation.

7          THE COURT:  Okay.

8          MR. MUNDEL:  Your Honor, this is Ben Mundel from the

9    defense.  We did bring in two employees -- senior level

10   employees to meet with the FTC during the investigation phase

11   that our senior business folks had a presentation and

12   discussion with FTC staff.

13         We were -- you know, we never denied any request to

14   make any person available that the FTC wanted during the

15   investigation.  We met with them and just had, I think,

16   literally hundreds of discussions and conversations with the

17   FTC about documents, employees, and issues.

18         So we were an open book during the investigation.

19   But there were no informal depositions taken.  Although the FTC

20   did have the right to take -- they call them investigational

21   hearings.  But they are, in a sense, depositions.

22         THE COURT:  What was your position about the 30(b)(6)

23   depositions requested?

24         MR. MUNDEL:  We believe that it should stay to one --

25   under the normal rule of one day unless and until we see topics

1    that might require more days.  If the FTC has, you know, five

2    topics that we can find one witness that can handle them in one

3    day, I think we can do it that way.

4         If they come to us and they have more topics, we

5    will, of course, be reasonable.  And if we need more witnesses

6    and more time, we'll make the folks available.

7         But at this point, we have not seen any topics from

8    them.  And we think that the presumption of the Federal Rules

9    should apply so each side tries to streamline their case, tries

10   to do this in the most efficient manner.

11        But, like I said, of course, we will be reasonable if

12   it seems necessary to have a second day.

13        MR. KOST:  Your Honor, if I may respond.

14        THE COURT:  Yes.

15        MR. KOST:  I'll take it in two parts.  I'll address

16   the pre-suit investigation first and then the topics for the

17   30(b)(6) second.

18        But with respect to the pre-suit investigation,

19   Mr. Mundel is correct that FleetCor did bring in senior

20   executives to meet with us in the context of a meeting that

21   FleetCor called its advocate for their side.

22        It wasn't anything approximating an investigational

23   hearing in which we submitted a list of questions that we had

24   to them.  I mean, it was a helpful discussion.  But no

25   substitute for depositions, if that is what defendants are

1    suggesting.

2         More broadly, we vigorously disagree with the

3    suggestion that the FTC doesn't -- gets to conduct its

4    depositions in litigation where we haven't already conducted

5    investigational hearings during the pre-suit process.  That is

6    unsupported by law.  All the wrong incentives -- I mean, if

7    defendants are right about that, yeah, the FTC would be forced

8    in every case to make extensive use of investigational

9    hearings.  And that would, of course, invalidate our

10   prosecutorial discretion and drive up costs for targets in a

11   way that I don't think anybody would appreciate.

12         With respect to the topics for the 30(b)(6), we did

13   lay out broad topics in our joint plan.  And I would be happy

14   to run through those topics in any more granular level right

15   now if it would be helpful to the Court.  I can come up with at

16   least 10 or 15 off the top of my head.  I'm not sure that is

17   the best use of the Court's time.  But I'm happy to do it.

18            THE COURT:  Okay.

19            MR. KOST:  Sorry.  What was that?

20            THE COURT:  I'm wondering whether I should look at a

21   particular set of pages.  I'm looking for the -- doing a search

22   for expert.

23            MR. KOST:  I'm trying to find the page number for

24   you.  We laid out a high level list on Page 25 of the joint

25   report in the -- beginning in the middle of the page.

| | |
|---|---|
| 1 | THE COURT:  Yeah. |
| 2 | **(There was a brief pause in the proceedings.)** |
| 3 | THE COURT:  All right.  Well, I don't have any idea |
| 4 | really at this juncture -- and you are talking about -- |
| 5 | what? -- having a 30(b)(6) witness be towards the conclusion or |
| 6 | in the beginning or when do you think you would be doing the |
| 7 | 30(b)(6) right now? |
| 8 | MR. KOST:  This is Thomas.  Toward the conclusion.  I |
| 9 | would think after all the individual deponents. |
| 10 | THE COURT:  Well, what I think we should do is this: |
| 11 | I can well imagine authorizing two days of something like 14 or |
| 12 | 15 hours.  But I really think that I -- it would be helpful at |
| 13 | that juncture to have an actual 30(b)(6) notice -- have you |
| 14 | sort of negotiating around what exactly is going to happen in |
| 15 | those two days and how many -- you know, I can -- I can well |
| 16 | imagine you would need more than one person. |
| 17 | I haven't ever had a large case and only one person |
| 18 | be able to manage it.  But, again, I would like to see |
| 19 | something a little more specific about it at the time.  But |
| 20 | maybe you will all be all right basically.  So I think, you |
| 21 | know, 15 hours, which would be seven and a half hours each day, |
| 22 | should be enough.  But if there is some reason it is not, then |
| 23 | you need to come back to me. |
| 24 | MR. KOST:  Understood, Your Honor. |
| 25 | THE COURT:  And as to the number of depositions, I |

mean, it seemed like you were trying to get every single
division in some different way.  And it may be that you
actually need to do that.  But right now I don't know exactly
that that is true.  And I don't know how many 30(b)(6)
witnesses there are and how they are all going to interact and
how evasive someone might be or completely forthcoming and be
able to be helpful.  All of that makes a difference.

And I understand how time sequence makes a real issue
and difference too that you wind up sometimes having to have
two different people or either three different people to cover
the categories.

But it makes sense to me to say, all right, let's
start off with 12 depositions that are not expert depositions.
And your 30(b)6 witnesses and depositions weren't even included
in your 15.

So I mean, I'm basically getting -- depending on
where you are at with the experts and the 30(b)(6) on top of
the 12, then I think that that is -- then if you need more,
then you just need to come back and explain why.

We're going to likely have other phone conferences
later.  So let's see how it goes.  And, of course, it is
perfectly conceivable that we're going to have some odd
difficulties that you're going to end up having to have video
depositions, you know, which is -- you know, it is not hard
once you actually have done it.  But it has its awkwardness.

1          So I would suggest that, you know, some of the people

2   you think it is easier to do if you do them earlier in that

3   regard because I don't know that we're going to be able to be

4   sitting in the same room until July or so.

5          So 12, plus the 30(b)(6), plus the experts, and we'll

6   see where we are at if you need more.

7          Anything else I need to deal with or address or that

8   you want to address with me?

9          MR. KOST:  Your Honor, this is -- thank you for that.

10  And to circle back to experts, one thing I don't think that we

11  resolved is the FTC has requested expert replies.  The

12  defendants disagree that expert replies would be helpful, you

13  know, for the reasons stated in our joint plan.  We think that

14  expert replies can be very useful in part because --

15          THE COURT:  You mean --

16          MR. KOST:  You know, experts often need to modify

17  their findings in response to issues raised in the rebuttal

18  report.  And doing that proactively limits the number of issues

19  the Court needs to address and really puts the issues before

20  the Court in a more precise way.

21          And given that there are -- with the schedule we have

22  set so far -- there is a fair amount of time between the expert

23  rebuttal being due on October 26th and the discovery ending in

24  January -- I think is all the more reason to set a date for

25  expert replies.

1          THE COURT:  And what do you see is the difference

2     between -- you are considering a reply different than a

3     rebuttal?  But you are talking about a reply being --

4          MR. KOST:  Reply of the initial expert, right, to the

5     points raised in the rebuttal report.

6          THE COURT:  Yeah.

7          MR. HOPSON:  You know, Your Honor, I have done a lot

8     of these cases.  This is Mark Hopson from Sidley Austin.  I

9     can't recall a case I have ever tried where you had three

10    rounds of expert reports.  And to the extent you allowed three

11    rounds of expert reports -- report rebuttal and reply, it is

12    not going to simplify the issues.  It is just going to add

13    experts out there kind of retraining their prior opinions and

14    adding more layers of complexity to what is really at the end

15    of the day a pretty straightforward allegation of fraud or

16    deception.

17         We just think it is -- the cost and the burden in

18    having all of this additional time and money spent on experts

19    is really not that critical.  Experts aren't going to decide

20    this case.

21         THE COURT:  Well, if you want to have -- if the

22    Government feels that it needs to have a reply -- we're talking

23    about how many experts?

24         MR. KOST:  I think -- this is Thomas.  I think the

25    assumption has been -- that we have been making is that each

1   side will have one expert and then perhaps retain -- each side

2   will retain a rebuttal expert in addition.

3          THE COURT:  Okay.  Well, if you want -- if anyone

4   wants to reply, the reply should be no more than six pages and

5   then -- I think that that should do it.  So if there is

6   something that has been misperceived, something else, then it

7   can be addressed that way.  So if there is some fundamental

8   problem with the way the -- an issue has been raised, at least

9   it will be flagged and the Court is always certainly capable of

10  saying there should be more pages because now I'm confused.

11         MR. KOST:  Your Honor, this is Thomas.  That makes

12  sense to us.

13         Would you like to set a date on which those replies,

14  if necessary, would be due?

15         THE COURT:  Well, I mean -- it seems to me that -- I

16  mean, if there is something -- you are dealing with an expert.

17  So I don't know always what their schedules are.  So if they

18  end up being -- it can be difficult.

19         But is there any reason a reply couldn't be done in

20  ten days?

21         MR. KOST:  I wouldn't object to that.

22         THE COURT:  All right.  Anything else from either

23  side?

24         MR. KOST:  This is Thomas.  I'm actually sorry to

25  keep talking.  I have one more item in my notes.  And that is

whether the Court would like to set dates for the summary

judgment oppositions and replies.

        MR. HOPSON:  Your Honor, this is Mark Hopson.

        THE COURT:  I thought you-all agreed on 30 days.

        Go ahead, Mr. Hopson.

        MR. HOPSON:  I was just going to say we're happy to

abide by the local rules, Your Honor.

        THE COURT:  Well, file the briefs in 30 days.  And

you-all are -- and the responses are basically because of the

volume here 30 and then any -- and the reply is shorter.

        So, you know, the local rules its seems to me in that

way are sufficient.  But I don't remember if the response is 30

days or not.

        But, Nate, are you there?

        LAW CLERK JUSTER:  Yes.

        THE COURT:  The response time is 30 or 20?

        LAW CLERK JUSTER:  I believe for summary judgment it

is 30.

        MS. CALEB:  Your Honor, this is Jessica.  It is 21

days.

        LAW CLERK JUSTER:  Oh, my mistake.

        THE COURT:  Well, I'm just trying to think that every

party should have 30 days because they are all going to ask for

it anyway.  And I'm trying to get you to do a consolidated

briefing.  So I'm going to say 30 and 30.  And any further

1    replies -- that is my concern is I feel a little bit hamstrung

2    with this because I don't know whether you are -- how you are,

3    in fact, going to organize this so that we don't have two sets

4    of motions.

5            I'm trying to not have that happen.  So, you know, I

6    think that any sorts of reply should be shorter.  But let's

7    just say for now the 30 and 30 and you will work out when I --

8    you should work on trying to figure out how we end up having

9    only one set of briefs either if it means each party gets to do

10   two sets of two briefs.  I'm trying to avoid six briefs.  And

11   you-all should be able to figure that out.

12           All right?  And so whatever you put in there, if you

13   agree, is going to be satisfactory to me.  But I think it

14   requires some thought on your part.  You-all know your cases

15   better than I do.

16           Does that work for you?

17           MR. MUNDEL:  Yes, Your Honor, from the defense that

18   works.

19           MR. KOST:  Yes, Your Honor, that works for the FTC as

20   well.

21           THE COURT:  Great.  Well, I haven't had -- I have had

22   Shannon Welch take this down, the court reporter.  And if you

23   need to get a copy of the transcript, obviously you can get it

24   because there are some nuances here.

25           We'll adopt it with these modifications, and we'll

```
 1    specify that you're to work on a schedule and submit it as to

 2    the briefing.  But I really -- I don't know whether it --

 3    whether you're in a position at this point to truly negotiate

 4    that.  But if you are, that is great.  But we'll basically say

 5    at this point you'll submit the briefing schedule 45 days from

 6    now.  I mean, at least that gives you some time to sort of

 7    ponder really where you are going on this.

 8              Does that work?

 9              MR. KOST:  Your Honor, that works for the FTC.

10              THE COURT:  All right.

11              MR. MUNDEL:  Yes, Your Honor, from the defendants as

12    well.

13              THE COURT:  Okay.  All right.  And if you have any

14    discovery issues, be sure to not file motions to compel but to

15    identify the nature of the dispute and submit something to

16    Mr. Martin and follow our local -- my own rules about that so I

17    can sit down with you and we can deal with it informally and

18    not waste time on motions to compel.

19              MR. KOST:  Yes, Your Honor.

20              THE COURT:  Okay.  We can have -- we finally are

21    coming into the 21st century.  So I think they are going to be

22    giving us access to some sort of Webex version of Zoom and

23    though not Zoom.  So we can have a video conference at some

24    juncture here.

25              I mean, everyone -- it worked well.  But if we need
```

1   to do that because of the number of people or something else,

2   we can certainly go ahead and do that.  Or we can -- you know,

3   if one of you has video conferencing capacity and you want to

4   initiate it, that is fine.

5           Right now all I'm having is seeing some things on

6   Zoom with my law clerks independent of the court.

7           So, anyway, anything else for the good of the order?

8           MR. KOST:  Nothing from the FTC, Your Honor.

9           THE COURT:  All right.  Still send me those -- the

10  information that we talked about.  I think it still would be

11  helpful to us about -- even though we have decided almost

12  everything here.  I think just having the citation and maybe

13  these other cases would be helpful.  Thank you very much.

14          MR. HOPSON:  Thank you, Your Honor.

15          THE COURT:  Any document number that you think would

16  be relevant.  It may give us some context and lay of the land.

17          All right.  Well, stay well and stay inside.

18          MS. CALEB:  Thank you, Judge.  You too.

19          MR. KOST:  Thank you, Your Honor.

20          THE COURT:  All right.  Bye-bye.

21              **(The proceedings were thereby concluded at**

22              **11:43 A.M.)**

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    43 pages constitute a true transcript of proceedings had before

10    the said Court, held in the City of Atlanta, Georgia, in the

11    matter therein stated.

12         In testimony whereof, I hereunto set my hand on this, the

13    29th day of May, 2020.

14

15

16

17                       _____
                         SHANNON R. WELCH, RMR, CRR
18                       OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT