# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 1:19-cv-5727-AT |
| FLEETCOR TECHNOLOGIES, INC., *et al.*, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   Introduction................................................................................1

II.  Summary of Material Facts ........................................................1

III. Legal Standard ...........................................................................6

IV.  The FTC Is Entitled To Summary Judgment on Each Count ......................6

    A.   Defendants Deceptively Marketed Their Fuel Cards............................7

        1.   Defendants Deceptively Represented that Customers Would Save a Specific Per-Gallon Amount on Fuel (Count I) ..............8

        2.   Defendants Deceptively Represented that Customers Could Limit Purchases to "Fuel Only" (Count II)...............................15

        3.   Defendants Deceptively Represented that FleetCor Would Not Charge Set-Up, Transaction, or Annual Fees (Count III).........17

    B.   Defendants Charged Customers for Unexpected Fees........................18

        1.   Defendants Engaged in Unfair Practices by Charging Customers Fees Without Consent (Count V) ...........................19

        2.   Defendants Deceived Customers by Representing that Customers Owed Amounts for Unauthorized Fees (Count IV)31

    C.   Clarke Is Individually Liable for FleetCor's Unlawful Practices .......32

        1.   Clarke Had Authority to Control and Participated in the Unlawful Practices ...................................................................33

        2.   Clarke Had Knowledge of the Unlawful Practices...................35

V.   The Court Should Grant Injunctive and Equitable Monetary Relief ............38

    A.   Injunctive Relief Is Warranted ..........................................................39

    B.   Monetary Relief Is Warranted............................................................41

VI.  Defendants' Affirmative Defenses Are Without Merit.................................45

VII. Conclusion ................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Boldstar Tech., LLC v. Home Depot, Inc.*,
  517 F. Supp. 2d 1283 (S.D. Fla. 2007) .................................................45

*CFTC v. Tayeh*,
  2012 WL 794542 (11th Cir. Mar. 2, 2012).........................................42

*Danone US, LLC v. Chobani, LLC*,
  362 F.Supp. 3d 109 (S.D.N.Y. 2019).................................................11

*Fedders Corp. v. FTC*,
  529 F.2d 1398 (2d Cir. 1976)...........................................................40

*FTC v. Alcoholism Cure Corp.*,
  2011 WL 13137951 (M.D. Fla. Sept. 16, 2011) .................................. 8, 15, 25, 33

*FTC v. Amazon.com, Inc.*,
  2016 WL 10654030 (W.D. Wash. July 22, 2016) ..................................... 20, 21, 31

*FTC v. AMG Servs., Inc.*,
  29 F. Supp. 3d 1338 (D. Nev. 2014)...................................................11

*FTC v. Brown & Williamson Tobacco Corp.*,
  778 F.2d 35 (D.C. Cir. 1985) ............................................................10

*FTC v. Capital Choice Consumer Credit, Inc.*,
  2004 WL 5149998 (S.D. Fla. Feb. 20, 2004) .......................................7

*FTC v. Citigroup Inc.*,
  239 F.Supp.2d 1302 (N.D. Ga. 2001)................................................39

*FTC v. Commerce Planet, Inc.*,
  815 F.3d 593 (9th Cir. 2016)............................................................32

*FTC v. Crescent Pub. Grp., Inc.*,
  129 F. Supp. 2d 311 (S.D.N.Y. 2001)............................................ 21, 27

*FTC v. Direct Benefits Grp., LLC*,
  2012 WL 5430989 (M.D. Fla. Nov. 7, 2012) .................................. 13, 20, 21, 39

*FTC v. Direct Mktg. Concepts, Inc.*,
  624 F.3d 1 (1st Cir. 2010) ............................................................ 13, 45

*FTC v. E.M. Sys. & Servs., LLC*,
  2017 WL 8794849 (M.D. Fla. Jan. 17, 2017).....................................12

*FTC v. Figgie Int'l, Inc.*,
  994 F.2d 595 (9th Cir. 1993)............................................................ 7, 41

*FTC v. Five-Star Auto Club, Inc.*,
  97 F. Supp. 2d 502 (S.D.N.Y. 2000)............................................. 12, 17

*FTC v. Gem Merch. Corp.*,
  87 F.3d 466 (11th Cir. 1996)........................................................ 32, 38

*FTC v. Glob. Mktg. Grp., Inc.*,
  594 F. Supp. 2d 1281 (M.D. Fla. 2008)...............................................33

*FTC v. Holiday Enters.*,
  2008 WL 953358 (N.D. Ga. Feb. 5, 2008) .........................................37

*FTC v. Hornbeam Special Situations, LLC*,
  308 F. Supp. 3d 1280 (N.D. Ga. 2018) ...............................................36

*FTC v. IAB Mktg. Assocs.*,
  746 F.3d 1228 (11th Cir. 2014)..................................................... 32, 35

*FTC v. IFC Credit Corp.*,
  543 F. Supp. 2d 925 (N.D. Ill. 2008) ..................................................21

*FTC v. Inc21.com Corp.*,
  745 F. Supp. 2d 975 (N.D. Cal. 2010) .......................................... 21, 32

*FTC v. J.K. Publ'ns, Inc.*,
  99 F. Supp. 2d 1176 (C.D. Cal. 2000) .................................................31

*FTC v. Kennedy*,
  574 F. Supp. 2d 714 (S.D. Tex. 2008) .................................................21

*FTC v. Lanier Law, LLC*,
  194 F. Supp. 3d 1238 (M.D. Fla. 2016)............................... 7, 36, 39, 40

*FTC v. Life Mgmt. Servs.*,
  350 F. Supp. 3d 1246 (M.D. Fla. 2018)...............................................41

*FTC v. Nat'l Urological Grp., Inc.*,
  645 F. Supp. 2d 1167 (N.D. Ga. 2008),........................... 8, 15, 33, 35, 39

*FTC v. Neovi, Inc.*,
  598 F. Supp. 2d 1104 (S.D. Cal. 2008)................................................21

*FTC v. NPB Advertising, Inc.*,
  218 F. Supp. 3d 1352 (M.D. Fla. 2016)................................................8

*FTC v. On Point Glob. LLC,*
   2020 WL 5819809 (S.D. Fla. Sept. 30, 2020) ......................................................42

*FTC v. Partners In Health Care Ass'n, Inc.,*
   189 F. Supp. 3d 1356 (S.D. Fla. 2016) .......................................................... 35, 45

*FTC v. Primary Grp. Inc.,*
   713 F. App'x 805 (11th Cir. 2017) ................................................................35

*FTC v. Simple Health Plans, LLC,*
   801 F. App'x 685 (11th Cir. 2020) .......................................................... 38, 41, 42

*FTC v. Tashman,*
   318 F.3d 1273 (11th Cir. 2003)....................................................................7

*FTC v.* Transnet Wireless Corp.,
   506 F. Supp. 2d 1247 (S.D. Fla. 2007) ...............................................................7

*FTC v. Verity Int'l, Ltd.,*
   443 F.3d 48 (2d Cir. 2006)........................................................................32

*FTC v. Vylah Tec LLC,*
   378 F. Supp. 3d 1134 (M.D. Fla. 2019) ...................................................... 41, 42

*FTC v. Wash. Data Res.,*
   856 F. Supp. 2d 1247 (M.D. Fla. 2012).................................................. 14, 41, 42

FTC v. Wash. Data Res., Inc.,
   704 F.3d 1323 (11th. Cir. 2013)...................................................................42

*FTC v. Windward Mktg., Inc.,*
   1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) .......................... 14, 18, 19, 31, 32

*In re Cliffdale Assocs., Inc.,*
   103 F.T.C. 110, 1984 WL 565319 (1984) .............................................. 14, 16, 17

*In re Int'l Harvester Co.,*
   104 F.T.C. 949, 1984 WL 565290 (1984) ...................................................... 20, 21

*Liu v. SEC,*
   140 S. Ct. 1936 (2020) ..........................................................................42

*McGregor v. Chierico,*
   206 F.3d 1378 (11th Cir. 2000)....................................................................41

*Orkin Exterminating Co. v. FTC,*
   849 F.2d 1354 (11th Cir. 1988)............................................................. 19, 21, 31

iv

*POM Wonderful, LLC v. FTC,*
   777 F.3d 478 (D.C. Cir. 2015) ...................................................................32

*Removatron Intern. Corp. v. FTC,*
   884 F.2d 1489 (1st Cir. 1989) ..................................................................10

*Resort Car Rental Sys., Inc. v. FTC,*
   518 F.2d 962 (9th Cir. 1975) ......................................................................9

**Statutes, Rules & Other Authorities**

15 U.S.C. § 45 ............................................................................................ 7, 19

15 U.S.C. § 53 ...............................................................................................39

 Fed. R. Civ. P. 56 ...........................................................................................6

FleetCor Tech., Inc. 2020 10-K, (Feb. 26, 2021) ...................................42

FTC Staff Report, Effects of Bristol Windows Advertisement with an "Up To"
   Savings Claim on Consumer Take-Away and Beliefs (May 2012) ....................10

I.      **Introduction**

Since 2014, Defendants FleetCor Technologies, Inc. and its CEO Ron Clarke (collectively, "FleetCor" or "Defendants") have enticed small and medium-sized businesses to sign up for their fuel cards by making a number of promises:  that customers will save a specific amount on each gallon of fuel (Count I); that they can limit purchases to "fuel only" (Count II); and that FleetCor will not charge them transaction fees (Count III).  Not only have these promises been false, but FleetCor has then billed customers for a multitude of unexpected fees (Counts IV & V).  The undisputed facts show that Defendants have engaged in textbook "unfair or deceptive practices" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and that the requested injunctive and monetary relief is reasonable and warranted.

II.     **Summary of Material Facts**

FleetCor markets and sells fuel cards to businesses and other organizations that own vehicles and employ people to drive them.[1]  FleetCor's fuel cards generally fall into three categories:  (1) Fuelman cards accepted by participants in FleetCor's proprietary network; (2) Mastercard cards accepted within the Mastercard network; and (3) co-branded cards that are offered in partnership with major fuel retailers (*e.g.*, BP, Kwik Trip) and operate on either the Fuelman or Mastercard network.[2]

The vast majority of FleetCor's customers are small or medium-sized

---

[1] Statement of Material Facts ("SMF") ¶¶ 6; Ex. 187, at slide 6. "Ex." Refers to the exhibits attached to the Declaration of Thomas Kost.

[2] SMF ¶¶ 12, 19, 22-23, 26.

businesses ("SMBs").[3]  FleetCor's own documents describe these customers as
████████████████" and "████████████████████████," who are
"█████████████████████[4]  For these reasons, FleetCor has
treated them as an easy-to-bilk ██████████████[5]

FleetCor reels in these SMB customers by touting the ostensible benefits of its
fuel cards over other payment methods.  Specifically, FleetCor's marketing materials
tell SMBs that its fuel cards provide savings, purchase controls, and no transaction
fees.  But all three of these core marketing claims are false.

*Per-gallon savings.*  FleetCor has represented that customers with certain
Fuelman and Mastercard fuel cards would achieve a specific amount of per-gallon
savings at all locations where the cards were accepted.[6]  But these customers did not
achieve the advertised per-gallon savings because FleetCor imposed a number of
inscrutable restrictions that it buried in fine print.  At times, FleetCor even reduced or
removed customers' discounts altogether with no notice.[7]

*"Fuel only" purchase controls.*  FleetCor has represented that customers with
certain Mastercard cards could restrict them to "fuel only" purchases.  In reality,
FleetCor *knew* it could not restrict these cards to "fuel only" purchases, but

---

[3] SMF ¶¶ 29-38.

[4] SMF ¶¶ 29-38; Ex. 63, FLT_FTC00121178, at slide 8; Ex. 187, FLT_FTCLIT_0771995, at slide 45.

[5] SMF ¶¶ 388-395; Ex. 62, FLT_FTC00126704, at slide 5.

[6] *See infra* pp. 8-10.

[7] *See infra* pp. 11-13.

nonetheless continued making the claim, while numerous customers incurred charges for unauthorized non-fuel purchases.[8]

*No transaction fees.*  FleetCor has represented that customers with certain Fuelman cards would not pay transaction fees. But FleetCor has charged several fees assessed "per transaction" or "per gallon" of fuel purchased in a transaction.[9]

Having signed them up with false promises, FleetCor has then charged its SMB customers numerous and substantial unexpected fees without having obtained their express informed consent.  These fees fall into three categories:  (1) transaction fees; (2) add-on program fees; and (3) late fees for on-time payments.

The transaction fees include the *Minimum Program Administration Fee*, which FleetCor has charged ███████████████████████████████████████████████████ ███████████████████████████████████ *Level 2 Pricing* and the *High Credit Risk Fee*, which FleetCor has charged customers ████████████████ and the *Convenience Network Surcharge*, which FleetCor has charged ██████████████ ████████████████████████████████████████████████████.[10]

The add-on programs include *FleetDash*, *Clean Advantage*, *Accelerator Rewards*, and *Fraud Protector*.  FleetCor automatically enrolls customers in these

---

[8] *See infra* pp. 14-17.
[9] *See infra* pp. 17-18.
[10] SMF ¶¶ 131-145.; *e.g.*, Ex. 23, at FLT_FTCLIT_0833335, FLT_FTCLIT_0833342; Ex. 25, at FLT_FTCLIT_0833506.

programs and keeps charging them unless they catch on and affirmatively opt out.[11]

A wealth of record evidence shows that customers are overwhelmingly unaware of the transaction and add-on program fees. The FTC's expert, Dr. Jon Krosnick, conducted a phone survey of more than 150 current and former FleetCor customers. Using FleetCor's own data, Dr. Krosnick determined which fees each customer paid and asked the customers whether they had been made aware of each fee at the time of sign-up, through any updates sent by FleetCor, or through FleetCor's billing documents. Dr. Krosnick found that *only 7 percent* of customers were informed in advance about all fees FleetCor later charged them.[12] Dr. Krosnick also found that *only 25 percent* of customers saw those fees on bills after they were charged. Dr. Krosnick's findings could not be surprising to Defendants. Indeed, years of customer surveys commissioned by FleetCor have shown the same thing: Customers are not aware of FleetCor's fees and do not expect to be charged them.[13]

Customers are not aware because FleetCor has taken steps to hide these fees both before and after they are charged. *First*, FleetCor has not informed prospective customers about fees during the sales or sign-up process. Sales representatives are uninformed about the fees, and FleetCor's fine-print, confusing terms and conditions ("T&Cs") have not clearly set forth what fees consumers will incur, and in what

---

[11] SMF ¶¶ 146-175; Ex. 23, at FLT_FTCLIT_0833335; Ex. 211, FLT_FTCLIT_0813864, at slides 3-5; Ex. 54, Rachide Dep., at 103:10-105:17; Ex. 8, Miles Decl., tbl. 10.

[12] SMF ¶¶ 187-194; Ex. 41, Krosnick Rep. ¶ 16.

[13] SMF ¶¶ 195-206; *see infra* n.60.

amounts. *Second*, after customers sign up, FleetCor has deliberately delayed charging fees for a few months until customers are "less likely to notice the fees" on their bills.[14]  *Third*, FleetCor has buried fees on its billing documents, often using vague or inaccurate descriptors, or omitting them entirely—knowing that customers are "too busy to look things over carefully."[15]  These practices have led FleetCor's own employees and partners to share customers' frustration about hidden fees.[16]

FleetCor also has charged late fees even when customers paid on time. FleetCor is aware that its chronic failure to timely post both electronic and mailed payments is a "███████████████."[17]  Indeed, Dr. Krosnick found that 38 percent of customers were charged late fees by FleetCor despite having paid on time.[18]

The company's unlawful practices have been overseen and encouraged by Defendant Clarke.  As CEO, Clarke has consistently pushed his subordinates to █████████████████████"[19] and █████████████████████████████ █████████████.[20]  He has communicated to subordinates that he views █████████████ as intolerable "██████s."[21]  In 2017, when customers, partners, and public reports were sounding the alarm about FleetCor's unlawful practices, CEO

---

[14] Ex. 60, Mohlenhoff Decl. ¶ 12; *see also infra* pp. 25-27.

[15] Ex. 60, Mohlenhoff Decl. ¶ 13; *see also infra* pp. 27-29.

[16] SMF ¶¶ 360-387; *see also infra* pp. 22-27.

[17] *See infra* pp. 27-30; Ex. 240, FLT_FTCLIT_0798301-301.

[18] SMF ¶ 194; Ex. 41, Krosnick Rep. ¶ 16.

[19] SMF ¶ 422; Ex. 175, FLT_FTC00311437, at FLT_FTC00311437.

[20] SMF ¶ 414; Ex. 169, FLT_FTC00125619, at FLT_FTC00125619-620.

[21] SMF ¶ 426; Ex. 177, FLT_FTC00206668, at FLT_FTC00206671.

Clarke only scoffed ▮▮▮▮▮▮▮▮▮▮[22] and dismissed the concerns as "fake news."[23]  Even after his subordinates presented Clarke with data showing savings were less than promised, and told him that customers receive no notice before a new fee is implemented, he took no meaningful steps.[24]  Instead, despite his knowledge and authority to put an end to the practices, Clarke has focused on improving the bottom line over lawful treatment of SMB customers.

## III.   Legal Standard

Summary judgment must be granted if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## IV.   The FTC Is Entitled To Summary Judgment on Each Count

The undisputed facts show that Defendants violated the FTC Act.  FleetCor misrepresented that:  (1) customers would receive a specific amount of per-gallon savings by using select Fuelman and Mastercard products; (2) customers with Mastercard products could restrict purchases to "fuel only"; and (3) customers with Fuelman products would not be charged any transaction fees.  FleetCor unfairly charged customers unexpected fees, and deceived those customers by representing that they owed amounts that included those fees.  Finally, along with the Company, Clarke—FleetCor's CEO and Chairman of the Board—is liable for these violations.

---

[22] SMF ¶¶ 439-452; Ex. 165, FLT_FTC00338619 at 619-620.

[23] SMF ¶ 452; Ex. 165, FLT_FTC00338619 at 619-620.

[24] SMF ¶ 451; Ex. 109, FLT_FTC00206764 at 64.

### A. Defendants Deceptively Marketed Their Fuel Cards

Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Proving deception requires that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances[;] and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). Notably, Section 5 does not require proof that individual consumers actually relied on the misleading representation; instead, a "presumption of actual reliance" arises if the defendant's misrepresentations were "widely disseminated" and "consumers purchased the defendant's product." *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993); *see also FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1273-74 (M.D. Fla. 2016) ("[A] 'tendency to deceive' is all that is required, such that proof of actual consumer deception is unnecessary." (citation omitted)); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (proof of "subjective reliance by each victim" not required). Nor does Section 5 require proof that the defendant intended to mislead consumers. *FTC v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5149998, at *33 (S.D. Fla. Feb. 20, 2004).

The undisputed facts show that FleetCor has violated Section 5 by making a series of deceptive advertising claims to entice prospective customers: that they would achieve specific per-gallon savings with certain cards (Count I), that they could restrict purchases made with Mastercard products to "fuel only" (Count II), and that Fuelman products did not have set-up, transaction, or annual fees (Count III).

The Court should grant summary judgment in the FTC's favor, as courts regularly do in cases involving deceptive practices. *E.g.*, *FTC v. NPB Advertising, Inc.*, 218 F. Supp. 3d 1352 (M.D. Fla. 2016); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009).

## 1. Defendants Deceptively Represented that Customers Would Save a Specific Per-Gallon Amount on Fuel (Count I)

FleetCor has violated Section 5 by misrepresenting that customers with certain cards would achieve a specific amount of per-gallon savings at all locations where the cards were accepted. Courts "look to the advertisement's overall, net impression" to determine whether an advertisement conveys a representation. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189. Even where an advertisement "also contains truthful disclosures," it "may be likely to mislead by virtue of the net impression it creates." *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *25 (M.D. Fla. Sept. 16, 2011) (citation omitted). Extrinsic evidence is not required where "the advertisement explicitly states or clearly and conspicuously implies [the] claim." *Id.* (citing *Nat'l Urological Group, Inc.*, 645 F. Supp. 2d at 1189).

Here, FleetCor's advertisements for certain Fuelman and Mastercard products[25] have promised that consumers would realize a specific per-gallon savings everywhere the cards were accepted (the "Fuelman Network" and "Mastercard Network,"

---

[25] FleetCor made the deceptive per-gallon savings representations in advertisements for the following Fuelman products: Diesel Platinum, Commercial Platinum, and Discount Advantage. FleetCor also made these representations in advertisements for the Universal Premium Mastercard product (UNMC). SMF ¶¶ 48, 56-58, 71-72, 81-82; Exs. 6, 7, 9, 10, 11, 12, 13, 18.

respectively).  Fuelman ads have emphasized "everyday savings" in the large-print headline atop the advertisements.[26]  Just below that, the advertisement expressly states:  "Throughout the Fuelman Network, the Fuelman Commercial Platinum FleetCard offers a **5¢ per gallon** discount on both unleaded and diesel fuel.*"[27]  Then, in the middle of the ad—set off from the rest of the text by a blue background—the claim appears again:[28]



Through this repetitive language, potential customers are left with the net impression that they would save five cents per gallon on fuel purchases made with Fuelman cards.  *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (no further evidence needed where a claim is express or its "connotations are obvious").

The Universal Premium Mastercard ("UNMC") ads have conveyed the same message.  The bolded, large-print headline, set above and apart from the rest of a UNMC advertisement, states:  "**Save up to 6¢ per gallon wherever MasterCard is accepted**."[29]  This representation conveys that fuel purchases made with a UNMC

---

[26] *E.g.*, SMF ¶¶ 51, 62, 76, 86; Ex. 11, FLT_FTC00003216.

[27] *E.g.*, *id.*

[28] *E.g.*, *id.*

[29] *E.g.*, SMF ¶ 86; Ex. 13, FTC-Prod-00151586.

card would save six cents per gallon.  The use of "up to" does not alter this net

impression.  Empirical research by the FTC on "up to" advertising claims shows that

the phrase often has no impact and that consumers commonly expect that they will

achieve the maximum savings promised.[30]  In other words, simply including the

words "up to" does not affect the overall takeaway that a consumer can expect to

achieve six cents per gallon on purchases made with a UNMC card.  And even if an

"up to" claim were interpreted differently, as discussed below, it was literally

impossible for consumers to save six cents per gallon at thousands of fueling

locations where Mastercard is accepted.

Although both Fuelman and UNMC ads have contained some disclaimers

denoted by a small asterisk,[31] they appear in fine print relegated to "an inconspicuous

position at the bottom of the advertisements" and thus cannot alter the clear net

impression created by the prominent per-gallon savings claims, including the ad

headlines.  *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir.

1985) (disclaimer did not alter prominent claim); *see also Removatron Intern. Corp.

v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) (disclaimers ineffective "unless they are

sufficiently prominent and unambiguous to change the apparent meaning of the

claims and to leave an accurate impression" (citation omitted)).  Moreover, the text of

---

[30] SUF ¶ 87; Ex. 14, FTC Staff Report, Effects of Bristol Windows Advertisement with an "Up To" Savings Claim on Consumer Take-Away and Beliefs (May 2012).

[31] *E.g.*, SMF ¶¶ 50-51, 60-62, 74-76, 84-86; Ex. 11, FLT_FTC00003216; Ex. 13, FTC-Prod-00151586.

the disclaimers is confusing and contradictory.  For example, the fine print states that accounts must be in "good standing" to receive the discounts, but nowhere explains what might cause a customer not to meet that undefined standard.[32]  Then, in Fuelman ads, one line down, the fine print says that the per-gallon savings are not actually available at numerous brands, including Chevron and Texaco, where Fuelman card are accepted—a caveat that contradicts the prominent, express representations that customers would save on every gallon of fuel purchased "throughout the Fuelman Network."[33]  *See FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1367 (D. Nev. 2014) (fine print contradicting prominent terms in TILA box insufficient to cure deception); *Danone US, LLC v. Chobani, LLC*, 362 F.Supp. 3d 109, 113-14 (S.D.N.Y. 2019) (fine print and asterisks insufficient to alter representation).  And although extrinsic evidence is unnecessary here, FleetCor's own documents ███████████████████████,[34] and FleetCor's internal studies, discussed below, show that ██████████████████████████████████ ███████████████████████████████████████████ ██████████████████████

FleetCor's per-gallon savings representations were likely to mislead because they were false, for multiple reasons.  *First*, Fuelman and UNMC customers have not

---

[32] *E.g.*, SMF ¶¶ 76, 86; Ex. 11, FLT_FTC00003216; Ex. 13, FTC-Prod-00151586.

[33] *E.g.*, SMF ¶ 76; Ex. 11, FLT_FTC00003216.

[34] SMF ¶ 99; Ex. 201, FLT_FTCLIT_0770906, at FLT_FTCLIT_0770907 ("█████████ ██████████████████████████████████████

actually received the advertised savings.  *See FTC v. E.M. Sys. & Servs., LLC*, 2017 WL 8794849, at *1 (M.D. Fla. Jan. 17, 2017) (representation of "significant" savings deceptive because defendant "failed to deliver the promised savings"); *see also FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528, 532 (S.D.N.Y. 2000) (rewards claims were deceptive because they were not "achieved by the typical" consumer). FleetCor's own data shows that the average per-gallon savings actually received by customers fell several cents short of the advertised amounts:[35]



*Second*, FleetCor has made discounts categorically unavailable on transactions at certain fueling locations in the Fuelman and Mastercard networks.[36]  As a result, FleetCor's claims that customers could save on all fuel purchases made "throughout the Fuelman Network" or "wherever MasterCard is accepted" were not true.  *Third*, FleetCor in fact has imposed a number of other vague and confusing conditions on

[35] SMF ¶¶ 52, 63-64, 77, 88; Ex. 8, Decl. of Anne Miles ¶ 39, tbl. 5.
[36] SMF ¶¶ 50, 59, 73, 83; Ex. 48, Chen 30(b)(6) Dep., at 217:21-218:2, 217:21-218:2, 219:22-220:4, 249:25-250:13, 251:12-252:9; Ex. 49, Izquierdo Dep., at 70:20-71:17; Ex. 5, at 5.

the discounts—*e.g.*, requiring accounts to be in "good standing" without explaining

what that means, *see supra*—that made savings unattainable to many customers.[37]

*Fourth*, ███████████████, FleetCor often ████████████████████████

████████.[38]

Moreover, their falsity aside, the representations also were likely to mislead

because FleetCor "lack[ed] adequate substantiation evidence." *See FTC v. Direct*

*Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010) (such claims are deceptive as a

matter of law). FleetCor has not possessed any evidence showing that customers

actually achieve the promised per-gallon savings on fuel purchases made everywhere

the cards at issue are accepted. To the contrary, FleetCor's own data shows that it did

not have a reasonable basis for promising the specific savings it touted.

Although proof of actual deception is not required, it is "highly probative" of a

deceptive practice. *FTC v. Direct Benefits Grp., LLC*, 2012 WL 5430989, at *3

(M.D. Fla. Nov. 7, 2012). Here, a cavalcade of studies commissioned by FleetCor

confirm that customers have been deceived by FleetCor's savings representations.

For example, a 2018 study found that "████████████████████████████

████████████████████████████████[39] and analyses well into 2020 have found

---

[37] *See*, *e.g.*, SMF ¶¶ 76, 86; Ex. 11, FLT_FTC00003216; Ex. 13, FTC-Prod-00151586; Ex. 6, FLT_FTC00238850; Ex. 9, FLT_FTCLIT_0000422; Ex. 11, FLT_FTC00000191; Ex. 12, FLT_FTC00001140; Ex. 200, FLT_FTCLIT_0003175, 177.

[38] SMF ¶¶ 66-70, 92-93; Ex. 193, FLT_FTCLIT_0802693; Ex. 194, FLT_FTCLIT_0798103; Ex. 69, FLT_FTC00003033; Ex. 198, FLT_FTCLIT_0786416; Ex. 70, FLT_FTC00309832; Ex. 199, FLT_FTCLIT_0786331; Ex. 186, FLT_FTC00313871.

[39] SMF ¶¶ 102-103; Ex. 189, FLT_FTCLIT_0814942 at slide 16.

██████████████████████████████████████████████

████████████████████████  .'"[40]  Thus, the record shows that customers in the target

audience not only were likely to be misled, but were actually misled.  *See FTC v.*

*Wash. Data Res.*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012) (deception looks to

"average" person, including the "unsophisticated and unwary") (citation omitted)).

FleetCor's per-gallon savings representations have been material.  A

representation is material if it "involves information that is important to consumers

and, hence, likely to affect their choice of, or conduct regarding a product."  *Id.*

(quoting *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 1984 WL 565319, at *37

(1984)).  That standard is easily met here.  FleetCor's own studies have found that

██████████████████████████████████████

████████  "[41] and as noted above, FleetCor's own studies found that  ████████

█████████████████████████████████████  Further, FleetCor's

promises that customers would save specific amounts on every fuel purchase are

material because they "concern[ed] the price of [a] product" and also were

"[e]xpress" or at least "deliberately-made implied claims" that served as headliners in

advertisements "used to induce the purchase of" Fuelman and UNMC products.  *FTC*

*v. Windward Mktg., Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997).

---

[40] SMF ¶¶ 104-105; Ex. 205, FLT_FTCLIT_0825603, at slides 8, 10 ███████████████

████████████████

[41] SMF ¶¶ 37, 101-102; Ex. 63, FLT_FTC00121178 at slide 5; *see also* Ex. 17, HRC000283 at 5

████ FLT_FTCLIT_0814942 at 41.

### 2. Defendants Deceptively Represented that Customers Could Limit Purchases to "Fuel Only" (Count II)

FleetCor has violated Section 5 by misrepresenting that purchases made with its Mastercard cards[42] could be restricted to "fuel only" purchases when, in fact, the cards could not be restricted that way and have been used to purchase non-fuel items.

FleetCor's "fuel only" representations have been express, and thus the Court needs no extrinsic evidence to determine their net impression. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1189; *Alcoholism Cure Corp.*, 2011 WL 13137951, at *25. Indeed, advertisements for FleetCor's Mastercard products have conveyed a consistent and unqualified message that customers could:

- "restrict card purchasing to fuel or fuel and maintenance only,"[43]

- restrict "purchasing functionality" to "fuel only,"[44] and

- "restrict purchasing to fuel only."[45]

This message has been reinforced by FleetCor's applications for these products, which have presented "Fuel Only" as one of the "Card Access" options available to customers.[46]  The clear net impression is that consumers could restrict FleetCor's

---

[42] Universal Premium FleetCard Mastercard and BuilderPro Mastercard.

[43] SMF ¶¶ 106-111; Ex. 18, FTC-Prod-00151582 to FTC-Prod-00151586

[44] SMF ¶¶ 106-111; Ex. 19, FLT_FTC00000034, FLT_FTC00000036, FLT_FTC00000163, FLT_FTC00000165, FLT_FTCLIT_0764528, FLT_FTCLIT_0764546.

[45] SMF ¶¶ 106-111; Exs. 18, FTC-Prod-00151520 to FTC-Prod-00151527.

[46] SMF ¶¶ 112-115; Ex. 71, FLT_FTC00000233; Ex. 26, FLT_FTC00000315; Ex. 73, FLT_FTC00001162; Ex. 74, FLT_FTC00000260; Ex. 75, FLT_FTC00000291; Ex. 206, FLT_FTCLIT_0764480; Ex. 76, FLT_FTC00238784; Ex. 77, FLT_FTC00000948; Ex. 72, FLT_FTC0000315; Ex. 207, FLT_FTCLIT_0000155.

Mastercard products to prevent purchases of anything other than fuel. *See In re Cliffdale Assocs.*, 1984 WL 565319, at *46 ("In cases of express claims, the representation itself establishes the meaning."). And although extrinsic evidence is not necessary to prove an express claim, here, FleetCor's customers complained that they took the claim that they could "restrict purchasing to fuel only" at face value.[47]

FleetCor's "fuel only" representation has been likely to mislead consumers because it was false. FleetCor's internal documents acknowledge as much. For example, █████████████████████████████████████████████████████ █████████████████████████████████████████████████████."[48] Instead, ███████████████████████████████████████████████████ ███████████████████████████████████████████████.[49] FleetCor's corporate testimony ████████████████████████████ ████████████████████████.[50]

Although proof of actual consumer deception is not necessary, *see supra*, the facts show that FleetCor's customers actually were deceived by FleetCor's "fuel only" representation. Customers frequently have complained when charges for non-

---

[47] SMF ¶¶ 106-115, 120; Ex. 79, FLT_FTC00138947; *see also, e.g.* Ex. 81,FLT_FTC00159756 (customer complaint to FleetCor that ████████████████████████.' Ex. 80, FLT_FTC00163034; Ex. 82, FLT_FTC0013688 (█████████████████ ████████████████████████████████████).

[48] SMF ¶¶ 116-117 ; Ex. 78, FLT_FTC00326534 (emphasis added).

[49] SMF ¶¶ 116-117 ; Ex. 78, FLT_FTC00326534 at 32 ██████████████████ ████████████████████████).

[50] SMF ¶¶ 117; Ex. 51, Thekkekara 30(b)(6) Dep. Tr 177:4-7.

fuel items showed up on the bills for their ostensible "fuel only" cards.[51]

This representation has been material because it was express, *supra*, and was "at the heart of" FleetCor's marketing strategy for its fuel cards—namely, that customers would have access to purchase controls not available with general purpose credit cards or cash.[52]  *See Five-Star Auto Club*, 97 F. Supp. 2d at 529.  Indeed, one customer said that he "███████████████████████████████████ ███████████████████████████████████████████████████ [53]

### 3. Defendants Deceptively Represented that FleetCor Would Not Charge Set-Up, Transaction, or Annual Fees (Count III)

Finally, FleetCor has violated Section 5 by misrepresenting that customers with Fuelman products would not pay any set-up, transaction, or annual fees, when, in fact, FleetCor did charge such fees.

In Fuelman advertisements from 2010 to 2017, FleetCor expressly represented without qualification that customers would "pay no set-up, transaction or annual fees."[54]  The meaning of this representation is plain.  *See In re Cliffdale Assocs.*, 1984 WL 565319, at *46 ("In cases of express claims, the representation itself establishes

---

[51] SMF ¶¶ 119-120; Ex. 80, FLT_FTC00163034 ("██████████████████████ ██████████████████████████████████████████████████████████████ ████████████"); Ex. 81, FLT_FTC00159756 ██████████████████████"); Ex. 82, FLT_FTC0013688 ("██████████████ .

[52] *E.g.*, SMF ¶ 118-119; Ex. 208, FLT_FTCLIT_0811658.

[53] SMF ¶¶ 120; Ex. 79, FLT_FTC00138947; *see also, e.g.*, Ex. 81, FLT_FTC00159756 (customer ████████████████████████████████████████

[54] SMF ¶¶ 121-123; Exs. 20, 21.

the meaning.").

The representation is false because FleetCor in fact charged several types of transaction fees.[55]  These fees include:

- Convenience Network Surcharges, ███████████████████
  ████████████████████████████████████████
  ████████████;
- Minimum Program Administration Fees, ██████████████
  ████████████████████████████████████████ nd
- Level 2 Pricing, ████████████████████████████████
  ████████████████████████████████████████
  ███████████████████

Finally, the express "no fee" representation is unquestionably material because it "concern[s] the price" that customers pay for using Fuelman cards.  *Windward Mktg.*, 1997 WL 33642380, at *10.  A study of small fleet customers confirmed that ████
██████████████████████████████████████████████████
██████████████████████r.[57]

## B. Defendants Charged Customers for Unexpected Fees

FleetCor also has violated Section 5 of the FTC Act by charging its customers—overwhelmingly SMBs—half a billion dollars in various fees over several years without obtaining express informed consent.  According to FleetCor's

---

[55] SMF ¶¶ 125-126; Ex. 8, Miles Decl. ¶¶ 46 tbl. 7, 54 tbl. 10.

[56] SMF ¶ 125; Ex. 23, FLT_FTCLIT_0833330, FLT_FTCLIT_0833333, FLT_FTCLIT_0833335; Ex. 234, FLT_FTCLIT_0819955.

[57] SMF ¶ 124; Ex. 189,  FLT_FTCLIT_0814942 at 41.

studies and Dr. Krosnick's survey, customers largely did not know these fees existed.[58]  In many instances, FleetCor also charged late fees when customers actually paid their bills fully and on time.  The undisputed facts show that these practices were unfair.  And FleetCor's representations on bills that customers actually owed these fees were deceptive because customers never authorized the fees in the first place.

### 1. Defendants Engaged in Unfair Practices by Charging Customers Fees Without Consent (Count V)

Section 5 of the FTC Act prohibits "unfair … acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1), (n).  To prove unfairness, the FTC must show that (1) the conduct "result[ed] in substantial consumer injury," (2) the injury was "not reasonably avoidable," and (3) the injury "is not outweighed by any countervailing benefits to consumers or to competition."  *Windward Mktg., Inc.*, 1997 WL 33642380, at *10; *see also Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1364 (11th Cir. 1988).  Here, FleetCor's practice of billing customers without obtaining express informed consent satisfies each element.

### a)  Charging Unexpected Fees Caused Substantial Injury

There is "substantial injury" where "consumers … were injured by a practice for which they did not bargain."  *Windward Mktg., Inc.*, 1997 WL 33642380, at *11.  This includes "do[ing] small harm to a large number of consumers" or "severe harm to a small number" of consumers."  *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1984 WL

---

[58] Minimum Program Administration Fee, Level 2 Pricing/High Risk Credit Fee, Convenience Network Surcharge, Accelerator Rewards, Clean Advantage, FleetDash, Fraud Protector.

565290, at \*90 & n.55 (1984); *see also Direct Benefits Grp., LLC*, 2013 WL 3771322, at \*13.  Billing customers for unauthorized charges causes substantial injury.  *See, e.g.*, *FTC v. Amazon.com, Inc.*, 2016 WL 10654030, \*8 (W.D. Wash. July 22, 2016) (collecting cases).

Here, FleetCor's practices unquestionably have caused substantial injury by any measure.  FleetCor charged thousands of customers an estimated $320 million in transaction and add-on fees without obtaining express informed consent.  *See infra* Part V.B.  Dr. Krosnick surveyed FleetCor customers who were actually charged the specific fees at issue and found that few of them were aware that the fees even existed prior to being charged—as few as *6 percent* for one fee.[59]  These findings confirm what FleetCor has long known from its own studies showing that ██████████" and ██████ fees were ██████████████████████████████[60]

FleetCor also has charged customers late fees when customers paid on time, resulting in an estimated $213 million in unlawful charges.  *See infra* Part V.B.  FleetCor's employees characterized posting delays as a "████████████[61] a characterization corroborated by Dr. Krosnick's finding that 38 percent of customers

---

[59] SMF ¶¶ 187-194; Ex. 41, Krosnick Report ¶ 17.

[60] SMF ¶¶ 195-206, 360-374; Ex. 204, FLT_FTCLIT_0769543, at 552; Ex. 37, JABIAN – CONFIDENTIAL 05, at slide 30; Ex. 87, FLT_FTC00149089, at slides 15, 18, 19; Ex. 63, FLT_FTC00121177, at slide 5; Ex. 90, FLT_FTC00133457, at slide 12; Ex. 189, FLT_FTCLIT_0814941, at slides 14-15; Ex. 17, HRC000283, at slides 22-23; Ex. 217, FLT_FTCLIT_0769157, at slide 21; Ex. 205, FLT_FTCLIT_0825597, at slides 9, 19.

[61] SMF ¶¶ 314-324  ; Ex. 240, FLT_FTCLIT_0798301-301; *see also* Ex. 241, FLT_FTCLIT_0798307; Ex. 242, FLT_FTCLIT_0798325; Ex. 240, FLT_FTCLIT_0798304.

had been charged late fees when they paid their entire bill on time.[62]

Even if a customer noticed one of these fees before paying, FleetCor often required customers to ███████████████████████████████████████

████████████████████████████████.[63]  To the extent customers were refunded, the figures cited above exclude such refunds, *see infra* Part V.B, but the time spent pursuing refunds is an additional injury.  *Amazon.com*, 2016 WL 10654030, at *8.

### b) FleetCor's Customers Could Not Have Reasonably Avoided Unexpected Fees

An injury is not reasonably avoidable where consumers lack a "free and informed choice" to avoid it.  *Neovi*, 604 F.3d at 1158.  Consumers cannot avoid injury if they do not "have reason to anticipate the impending harm and the means to avoid it."  *Orkin*, 849 F.2d at 1365; *see also FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 948 (N.D. Ill. 2008) (quoting *In re Int'l Harvester Co.*, 1984 WL 565290, at *80); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 720 (S.D. Tex. 2008); *FTC v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001).  After-the-fact mitigation also is insufficient when companies charge fees that consumers never authorized.  *See FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008); *see also Amazon.com*, 2016 WL 10654030, *9; *Direct Benefits Grp.*, 2013 WL 3771322, at *14; *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010), *aff'd*, 475

---

[62] SMF ¶ 194; Ex. 41, Krosnick Rep. ¶ 16.

[63] SMF ¶¶ 344-352; Ex. 51, Thekkekara 30(b)(6) Dep. Tr. 206:12-25; 214:6-18;  Ex. 246, FLT_FTCLIT_0785639 at same; Ex. 155, FLT_FTC00227870 at 871; Ex. 251, FLT_FTCLIT_0808613 at 613; Ex. 247, FLT_FTCLIT_0788923; Ex. 248, FLT_FTCLIT_0803587; Ex. 249, FTCLIT_0798654.

F. App'x 106 (9th Cir. 2012).

**Unexpected Fees.**  FleetCor's customers could not have avoided the fees at issue because they largely had no idea those fees existed.  Dr. Krosnick's survey results confirm that the vast majority of FleetCor's customers who were charged the specific fees at issue were unaware of their existence:  *only 7 percent* of customers were informed in advance about all of the fees that FleetCor later charged them and *only 25 percent* of customers saw those fees on their bills.[64]  Dr. Krosnick's findings are consistent with the findings of years upon years of studies—conducted by FleetCor or on FleetCor's behalf—that uniformly have found ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[65]

That actual customers did not expect to be charged the fees at issue is itself dispositive—consumers cannot reasonably avoid fees they do not expect.  But the record also shows that FleetCor has taken a number of steps to hide the existence of the fees, both before and after charging them.

<u>FleetCor hid fees before charging them</u>.  FleetCor has employed various strategies to hide fees such that customers could not anticipate them.

i. FleetCor has not informed prospective customers about fees during the sales or sign-up process.  FleetCor's sales representatives were of ▮▮▮▮▮▮▮▮▮▮▮

---

[64] SMF ¶¶ 187-194; Ex. 41, Krosnick Rep. ¶ 16.  Those figures varied slightly depending on the fee in question.  For example, only 6% of customers were aware of fees for Clean Advantage before being charged, whereas only 30% of customers were similarly aware of the Convenience Network Surcharge/Special Network Pricing.  *Id.* ¶ 17.

[65] *See supra* n.60.

██████████████████████████████[66]  Indeed, in response to a customer complaint about the Convenience Network Surcharge, the Head of Field Sales said that █████████████████████████████████████[67]  To the extent that FleetCor has trained its sales reps at all, the training has ██████████████[68]  Even senior FleetCor employees have recognized that the lack of training "█████████████████████████████████████████████████████████████"[69]  Moreover, untrained sales reps often have ████████████████████████████████████████[70]

FleetCor has strictly limited prospective customers' access to fee information from other sources.  Although the T&Cs are the ██████ [sic]" way FleetCor claims to communicate about fees,[71] FleetCor did ███████████

---

[66] SMF ¶¶ 207-213 ; *E.g.*, Ex. 220, FLT_FTCLIT_0799817; Ex. 91, FLT_FTC00304953 ("███████████████████████████████████████████████

[67] SMF ¶ 211; Ex. 221, FLT_FTCLIT_0799873 at 873.

[68] SMF ¶¶ 214-216; Ex. 218, FLT_FTCLIT_0796216, at 216-217 (█████████████████████████████;  If customers asked about fees, at times FleetCor ████████████████████████████████████████████ Ex. 224, FLT_FTCLIT_0810002 at 011; Ex. 225, FLT_FTCLIT_0001102 at 10; Ex. 52, Panhans Depo. Tr. 181:14-22.

[69] SMF ¶ 207; Ex. 91, FLT_FTC00304953

[70] SMF ¶¶ 218, 249; *E.g.*, Ex. 93, FLT_FTC00319437 ("████████████████████████████████████████); Ex. 63, FLT_FTC00121178 at 15 ████████████████████████████████████████████████.

[71] SMF ¶¶ 226-227; Ex. 96, at Slide 9; Ex. 227, FLT_FTCLIT_0835003 at 010.



,[72] and ███████████████ [73] at least until public reports shined a light on FleetCor's practices in 2017.  Instead, FleetCor █████████████████████████[74]  Even since 2017, in the online application for FleetCor's proprietary products, █████████████████████████████████████ .[75]

Access notwithstanding, the T&Cs have not effectively informed customers about the fees that FleetCor will charge them.  For years, the T&Cs were practically illegible,[76] and even FleetCor employees admit that ████████████████[77]  Indeed, the font is so small that FleetCor employees █████████████████████████[78]  For any customers who have actually received and been able to read the T&Cs, the provisions ostensibly covering the specific fees at issue are written in vague, confusing, and indefinite language.  Specifically, the

---

[72] SMF ¶¶ 228-234; Ex. 181, FLT_FTC00133516.

[73] SMF ¶¶ 229-231; Ex. 97, FLT_FTC00204612, at 613 ████████████████ Ex. 99, FLT_FTC00200455 ████████████████████ .

[74] SMF ¶¶ 228-234; Ex. 96, FLT_FTC00338315 at slides 15-16; Ex. 97, FLT_FTC00204612, at 613; Ex. 99, FLT_FTC00200455.

[75] SMF ¶ 234; Ex. 264, FleetCor's Response to Interrogatory No. 13 of the FTC's Fourth Set of Interrogatories, at 6.

[76] SMF ¶¶ 235-239; *e.g.*, Ex. 23, at FLT_FTCLIT_0833330-336.

[77] SMF ¶¶ 235-238; Ex. 103, FLT_FTC00133042, Ex. 68, FLT_FTC00218916.

[78] SMF ¶¶ 239; Ex. 230, FLT_FTCLIT_0798589; *see also* Ex. 230, FLT_FTCLIT_0798598 ("read friendly" T&C version).

provisions do not inform customers which of the fees apply to them, the circumstances under which FleetCor would actually charge those fees, and how customers could avoid them—a practice FleetCor's Head of Field Sales ███████ ████████████████[79] *See Alcoholism Cure Corp.*, 2011 WL 13137951, at *55. For example, the Fuelman T&Cs state that FleetCor ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████.[80]

Further, the Court need not speculate over how uninformative the T&Cs have been: when FleetCor ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████.[81]

  ii. FleetCor has continued to hide fees after customers signed up. FleetCor has not provided fee information during the onboarding process, when customers are educated on how to use their cards.[82] FleetCor also has kept new customers unaware

---

[79] SMF ¶¶ 240-247; Ex. 218, FLT_FTCLIT_0796216, at 216.

[80] SMF ¶¶ 242-244; *E.g.*, Ex. 23, FLT_FTCLIT_0833335; Ex. 25, FLT_FTCLIT_0833506; *see also* Ex. 57, Regions_05.13.2020-FTCSubpoena_000023169 at 171 (" ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████).

[81] SMF ¶¶ 246-249; Ex. 231, FLT_FTCLIT_0804132, 133.

[82] SMF ¶¶ 250-251; Ex. 233, FLT_FTCLIT_0804111; Ex. 231, FLT_FTCLIT_0804132; *see also* Ex. 233, FLT_FTCLIT_0804112-118 (████████████████████).

of fees by ███████████████████████████████████████████

███████ [83] Indeed, FleetCor's studies showed that ██████████████████

█████████████████████████████████.[84] And FleetCor understood

that not charging fees when "customers were more likely to pay close attention to

their bills" lowered attrition, and would allow FleetCor to later charge fees when

"customers would be less likely to notice the fees and complain or leave."[85]

When FleetCor began charging fees, including the specific fees at issue, it did

so without providing advance notice to customers.  Indeed, FleetCor's standard

practice has been ████████████████████████████████████████

███████████████████████████████.[86] FleetCor has facilitated

this practice by deliberately crafting its T&Cs to ███████████████████

██████████████████████████████████████████████████████████.[87]

But if it did change the T&Cs to add a new or higher fee, FleetCor often has not

███████████████████████████████████████████████████ leaving

---

[83] *See* SMF ¶¶ 252-262; Ex. 234, FLT_FTCLIT_0819956 at 3-6; Ex. 108, FLT_FTC00231801 at 3-4.

[84] SMF ¶¶ 253-254; Ex. 37, JABIAN - CONFIDENTIAL 000005 at JABIAN - CONFIDENTIAL 000006, at Slide 12.

[85] SMF ¶¶ 252; Ex. 60, Mohlenhoff Decl. ¶ 12.

[86] SMF ¶¶ 263-269; Ex. 110, FLT_FTC00204163; FLT_FTC00204165; Ex. 111, FLT_FTC00114096 at 101; Ex. 112, FLT_FTC00125887; Ex. 114, FLT_FTC00124676; Ex. 119, FLT_FTC00125955; Ex. 115, FLT_FTC00079760 at 762; Ex. 116, FLT_FTC00204461; Ex. 109, FLT_FTC00206764 (█████████████████████.

[87] SMF ¶¶ 269; Ex. 235, FLT_FTCLIT_0809391.

customers oblivious to what changes were made or why they mattered.[88]

Customer service has been similarly unhelpful.  FleetCor has instructed its customers service reps to



[89] [90] or [91]

iii.  FleetCor also has automatically enrolled customers in add-on programs they did not ask for, and charged them recurring fees for those programs unless customers discovered the fees and took affirmative steps to opt out.[92]  *Crescent Pub. Grp.*, 129 F. Supp. 2d at 322 (consumers unlawfully charged for failing to cancel "free tour").  FleetCor specifically chose this "opt out" model—rather than asking for affirmative consent to be enrolled—

---

[88] SMF ¶¶ 270-277; Ex. 120, FLT_FTC00114081 ( "); *id.*, FLT_FTC00114083 (sample cover letter).

[89] SMF ¶¶ 278-285; Ex. 140, FLT_FTC00097502 at 502 ( ).

[90]  SMF ¶¶ 266, 278, 280; Ex. 106, FLT_FTC00080710 (" ); Ex. 111, FLT_FTC00114096 (" ; Ex. 112, FLT_FTC00124405 at 406

[91] SMF ¶¶ 284; Ex. 229, FLT_FTCLIT_0787011 at 012 (

[92] SMF ¶¶ 286-292; Ex. 234, FLT_FTCLIT_0819955 at 3, 4, 6; *See also e.g.,* Ex. 126, FLT_FTC00206249 at FLT_FTC00206251-52 ( ).
[93] SMF ¶¶ 289; Ex. 127, FLT_FTC00314847.

because it ███████████████████████████████.[94]

   FleetCor hid fees on billing documents.  Even after charging fees, FleetCor has continued to hide those fees from customers in at least two ways.

   i.  FleetCor has made it difficult for customers to tell whether and how much they have been charged. ████████████████████████████████



███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████.[95]
██████████████████████████████.[96]  In all cases, fees generally appeared
███████████████████████████████████████████████████
████████████████████████  This practice reflected FleetCor's concern that
customers ██████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████.[97]  FleetCor's employees know that burying the fees is important

because "FleetCor's bread-and-butter customer is a mom-and-pop business where the

---

[94] SMF ¶¶ 289; *Id.* ( ████████████████████████████████████
██████████████

[95] SMF ¶¶ 293-312; Ex. 210, FLT_FTCLIT_0001045 at 1045.

[96] SMF ¶¶ 293-312; *Compare, e.g.,* Ex. 133, FLT_FTC00092738 at 740 ( ███████
████████ ) with *id.* at 743 ████████████████████████████ ).

[97] SMF ¶¶ 294-295; Ex. 266, FLT_FTC00126131 at FLT_FTC00126133("██████
████████████████████ ); *Id.* ( █████████████████████████

wife handles the bills and is too busy to look things over carefully, so she just pays without questioning any of the charges."[98]

ii.  To the extent that the billing documents have included any information about the fees charged, they have done so using vague or inaccurate descriptors—*e.g.*, the Minimum Program Administration Fee as ███████████ or a high risk fee as ████████ ."[99]  For yet other fees, FleetCor has not itemized the fee at all, including ████████████████████████████████████████████ ████████████████████████████[100]

**Late Fees**.  Consumers could not avoid FleetCor's improper late fees (and finance charges) because customers who paid their entire bills on time had done everything necessary to avoid them.  FleetCor has long known that "███████████ █████████████████████████[101] leading to improper late fees for customers who pay online or by paper check.  One senior leader even reported that she had "████████████████████████████ ██████████████████████████████ ████████[102]  Whatever the motivation, the record is clear that late fees resulting from

---

[98] SMF ¶ 388 Ex. 60, Mohlenhoff Decl. ¶ 13.
[99] SMF ¶¶ 307-312; Ex. 139, FLT_FTC00194333; Ex. 140, FLT_FTC00097502; Ex. 142, FLT_FTC00120358; Ex. 141, FLT_FTC00231070; Ex. 239, FLT_FTCLIT_0796550 ████ ████████████████
[100] *See* SMF ¶¶ 136, 306; Ex. 83, FLT_FTC00310569 (slide 50); Ex. 138, FLT_FTC00081391 at 393.
[101] SMF ¶¶ 314-324; Ex. 240, FLT_FTCLIT_0798301 at 301; *see also* Ex. 146, FLT_FTC00135286 ███████████████████████████
[102] SMF ¶315; Ex. 240, FLT_FTCLIT_0798301 at 301.

29

FleetCor's failure to timely post payments are not reasonably avoidable.

Dr. Krosnick found that *more than one-third* of survey respondents reported that FleetCor had charged them a late fee for payments that they had made on time.[103] Some of these customers have had to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," incurring erroneous late fees ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮"[104]  These mistakes often result in mailed check payments taking ▮▮▮ ▮▮▮▮▮▮▮.[105]  Other customers have incurred late fees because of FleetCor's ▮▮▮▮" payment posting policies.[106]  For example, inexplicably, FleetCor's policy has been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[107]  FleetCor also has set ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[103] SMF ¶ 313; Ex. 41, Krosnick Rep. ¶ 2.

[104] SMF ¶¶ 325-327; Ex. 216, FLT_FTCLIT_0769369 at 387 (▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 148, FLT_FTC00336649, slide 11.

[105] SMF ¶¶ 328-338; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 151, FLT_FTC00307789 at FLT_FTC00307800.

[106] SMF ¶¶ 332-338; Ex. 216, FLT_FTCLIT_0769369 at 387 (▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 148, FLT_FTC00336649 at slide 11.

[107] SMF ¶¶ 328-331; Ex. 88, FLT_FTC00003046 at 048; Ex. 243, FTCLIT_0787318 at 320; Ex. 216, FLT_FTCLIT_0769369 at 387; Ex. 23, FLT_FTCLIT_0833338 (Fuelman T&C, Section 10.5.2, up to 2 business days if received after 4:00 p.m.); Ex. 25, FLT_FTCLIT_0833510 (UNMC T&C, Section 5.b, by next business day if received after 4:00 p.m.).

███ .[108]  And FleetCor has ████████████████████████████████████

████████████████████████████████████████ which is less prone to these

issues, "so that FleetCor could continue to generate late fee revenue."[109]

### c) The Benefits of Charging Unexpected Fees Do Not Outweigh the Costs

The cost-benefit prong is "easily satisfied" where, as here, "a practice produces

clear adverse consequences for consumers that are not accompanied by an increase in

services or benefits." *FTC v. J.K. Publ'ns, Inc.,* 99 F. Supp. 2d 1176, 1201 (C.D. Cal.

2000); *see also Windward Mktg.*, 1997 WL 33642380, at *11.  FleetCor has

acknowledged that ███████████████████████████████████████████████

████ "[110]  And even if increased fees had benefited consumers, those benefits are not

"incompatible with … affirmatively seeking a customer's authorized consent" to

charges.  *Amazon.com*, 2016 WL 10654030, at *10.  FleetCor of course remains free

to charge fees for which it has obtained customers' express informed consent.

### 2. Defendants Deceived Customers by Representing that Customers Owed Amounts for Unauthorized Fees (Count IV)

FleetCor's fee practices also were deceptive.  *See Orkin*, 849 F.2d at 1367 ("A

practice may be both deceptive and unfair").  By placing charges for unauthorized

---

[108] SMF ¶¶ 332-333; Ex. 151, FLT_FTC00307789, FLT_FTC00307800 (███ Ex. 88, FLT_FTC00003046 ██████████████ ).

[109] SMF ¶¶ 339-343; Mohlenhoff Decl. ¶ 11.; *see also* FLT_FTC00081287 at 9 (██████████

[110] SMF ¶¶ 388-395; Ex. 62, FLT_FTC00126704 at slide 14.

fees on customers' billing statements (and including fees in "█████████████████"[111]

Defendants expressly represented that customers owed amounts for these fees. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006); *Inc21.com*, 745 F. Supp. 2d at 1001. The representation is likely to mislead because it is false; consumers did not owe these fees because FleetCor did not obtain express informed consent before charging them. *See supra*. And the representation is material because it "concern[s] the price of a product or service," *Windward Mktg.*, 1997 WL 33642380, at *10.

### C. Clarke Is Individually Liable for FleetCor's Unlawful Practices

Ronald Clarke—FleetCor's Chairman and CEO—is liable for FleetCor's unlawful marketing and fee practices. An individual defendant may be held liable for injunctive and equitable monetary relief where the individual "participated directly in the practices or acts or had authority to control them. The FTC must then demonstrate that the individual had some knowledge of the practices." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (cleaned up); *see also FTC v. IAB Mktg. Assocs.*, 746 F.3d 1228, 1233 (11th Cir. 2014).[112] To establish the knowledge requirement, the FTC may show "that an individual had 'actual knowledge of

---

[111] SMF ¶¶ 293-294; *E.g.*, Ex. 237, FLT_FTCLIT_0001051 (Fuelman invoice); Ex. 209, FLT_FTCLIT_0001055 (corresponding FMR); Ex. 133, FLT_FTC00092738 (UNMC billing document); Ex. 84, FLT_FTC00085420 (UNMC Invoice and FMR).

[112] The Eleventh Circuit has not directly addressed whether knowledge is required to obtain injunctive relief without equitable monetary relief. *See IAB Mktg. Assocs.*, 746 F.3d at 1232-33 (injunctive relief and asset freeze); *Gem Merch. Corp.*, 87 F.3d at 470 (monetary relief). Courts that have considered injunctive relief and monetary relief separately generally agree that proof of knowledge is not required for injunctive relief. *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015).

material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of truth.'" *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1207; *see also Alcoholism Cure Corp.*, 2012 WL 12903173, at *5 n.7.

### 1. Clarke Had Authority to Control and Participated in the Unlawful Practices

There is no question that Clarke had the authority to control the unlawful marketing and fee practices at issue.  Clarke is and has been the CEO of FleetCor throughout the relevant period.[113]  He supervises and sets Company policy, including with respect to fuel cards, and ████████████████████████████████

████████████████████.[114]  *See FTC v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1289 (M.D. Fla. 2008) ("Authority is established by proof that the individual participated in corporate activities by performing the duties of a corporate officer.").

Although Clarke's apex position in the organization is itself sufficient to confer individual liability, the undisputed facts also show that Clarke has directly participated in critical business decisions relating to the specific practices at issue here.  Clarke himself acknowledges that ███████████████████████████

█████████████████████████████,[115] and has been involved in ███████████

██████████████████████████████████████████

---

[113] SMF ¶¶ 3-4; Ex. 1, Response to RFA 5.
[114] SMF ¶¶ 403-407; Ex. 1, Response to RFAs 6, 9, 10; Ex. 46, Clarke Dep. 16:8-10.
[115] SMF ¶¶ 405; Ex. 46, Clarke Dep. 16:24 – 18:13.



[116] For example, in late 2014 or early 2015, Clarke not only █████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████.[118] Moreover, at various times throughout the relevant period, Clarke personally participated in business decisions to ███████ ████████████████████████████████████████████ ████████████████████[119] Clarke has been especially attentive to late fees. He frequently ██████████████████████████████ █████████,[120] and has even told subordinates he was █████████ ████████████████████████████████████████████[121]

Clarke has made these decisions knowing that the historical success of FleetCor's fuel card business owed in part to its █████████████████ ████████████████████"[122] In particular, he has known that ████████ ████████████████████████████████████████████

---

[116] SMF ¶¶ 410-426; Ex. 46, Clarke Dep., 60:14-62:20, 71:7-72:11; Ex. 167, FLT_FTC00079489, at 7, 10; Ex. 170, FLT_FTC00080072; Ex. 175, FLT_FTC00311437, at 437.

[117] SMF ¶ 413; Ex. 167, FLT_FTC00079489 at slides 7, 10; Ex. 46, Clarke Dep., at 108:17-109:7; Ex. 50, House Dep., at 181:24-182:6.

[118] SMF ¶ 413; Ex. 168, FLT_FTC00079619 at 619-620.

[119] SMF ¶¶ 420-421; Ex. 173, FLT_FTC00310505 at slides 6-17, 20-22; *see also* Ex. 259, FLT_FTCLIT_0806021, FLT_FTCLIT_0806022.

[120] SMF ¶¶ 421-424; Ex. 261, FLT_FTCLIT_0786874, at 74; Ex. 260, FLT_FTCLIT_0803679; Ex. 259, FLT_FTCLIT_0806021, FLT_FTCLIT_0806022.

[121] SMF ¶ 422; Ex. 175, FLT_FTC00311437 at 437.

[122] SMF ¶¶ 416; Ex. 172, FLT_FTC00206761 at slide 5; *see also* Ex. 65, FLT_FTC00204544 at slide 52.

[REDACTED] .[123]

## 2. Clarke Had Knowledge of the Unlawful Practices

There also is no question that Clarke had the requisite degree of knowledge. *See Nat'l Urological Grp.*, 645 F. Supp. 2d at 1207. "An individual's degree of participation in the business is probative of knowledge," *FTC v. Partners In Health Care Ass'n, Inc.*, 189 F.Supp.3d 1356, 1367 (S.D. Fla. 2016), and as described above, Clarke was deeply involved in the fuel card business, especially when it came to FleetCor's fee and discount practices. *See supra.*

Not only did Clarke participate in those practices, he had specific knowledge that they were unlawful through numerous warnings and external reports. *IAB Mktg. Assocs.*, 746 F.3d at 1233 (individual defendant received a report of sales representatives' misrepresentations); *FTC v. Primary Grp. Inc.*, 713 F. App'x 805, 807-08 (11th Cir. 2017) (receiving BBB complaints evidenced knowledge).



[REDACTED] [124] Clarke likewise was aware that [REDACTED] [125] And Clarke admits that [REDACTED]

---

[123] SMF ¶ 421; Ex. 259, FLT_FTCLIT_0806021, FLT_FTCLIT_0806022 at 034-036.
[124] SMF ¶¶ 433-438; Ex. 263, FLT_FTCLIT_0788608 at 608; Ex. 179, FLT_FTC00087120 at 122-123 [REDACTED]
[125] SMF ¶ 430; Ex. 172, FLT_FTC00206761 at slide 17.

████████████████████████ discussed in Parts IV.A & B, *supra*.[126]

Clarke's knowledge was solidified through specific requests to his subordinates for additional information about the reports and complaints. *See FTC v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d 1280, 1289-90 (N.D. Ga. 2018); *see also Lanier Law*, 194 F. Supp. 3d at 1286 (knowledge where individual "was frequently copied on emails discussing how to respond to ... investigations and complaints"). Among other things, Clarke ████████████████████████████████████████████████████████████████████████████████████████████████████████[127] Clarke also asked subordinates for ██████████████████████████████████████████████████████████████████████████████████████████[130] In response, Clarke learned ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[126] SMF ¶¶ 439-452; Ex. 165, FLT_FTC00338619 at 620-624; Ex. 44, Response to RFAs 2, 4.
[127] SMF ¶¶ 444; Ex. 183, FLT_FTC00194340 at 41-42.
[128] SMF ¶¶ 440-445, 445; As part of this follow-up, Clarke was specifically told that ███████████ ███████████████████████████████████████████ Ex. 181, FLT_FTC00133516 at 16-17.
[129] SMF ¶ 451; Ex. 109, FLT_FTC00206764.
[130] SMF ¶ 444; Ex. 183, FLT_FTC00194340, at FLT_FTC00194341-342 (███████████████████████ █████████████████████████████████████████████).
[131] SMF ¶ 445; Ex. 184, FLT_FTC00238145 at 45-46.  Clarke received the following invoices:  Ex. 184, FLT_FTC00238154, FLT_FTC00238157, FLT_FTC00238159, FLT_FTC00238161, FLT_FTC00238164, FLT_FTC00238166.

███████████████████████████ █████████████████████████

█████████████████████████████████████████████[133]

Rather than act meaningfully on this information, Clarke led FleetCor's efforts to downplay the problems. He publicly dismissed the reports as "fake news" even though ██████████████████████████████████████████████████ ███████████████████████████████[134] Clarke's response internally was no different. For example, in response to a second public report critical of FleetCor's fee practices, Clarke responded████████████████" He then directed others to ████████ ████████████████ but said and did nothing to address the root cause(s) of the criticism.[135] These instances are emblematic of Clarke's focus on fixing public perception, but not the underlying unlawful practices, and further confirm that he possessed the requisite knowledge. *See, e.g.*, *Lanier Law*, 194 F. Supp. 3d at 1287 (individual directly participated in wrongful practices through involvement in responses to consumer complaints and government inquiries); *FTC v. Holiday Enters.*, 2008 WL 953358, at *10 (N.D. Ga. Feb. 5, 2008) (CEO had knowledge because he received and responded to consumer complaints and "knew that consumers were not receiving [a] disclosure document and did not correct").

And Clarke knows that the problematic practices have persisted. More than

---

[132] SMF ¶ 451; Ex. 109, FLT_FTC00206764 at 64.
[133] SMF ¶ 449; Ex. 186, FLT_FTC00313871 at 71; *see also* Ex. 183, FLT_FTC00194340 at 41-42.
[134] SMF ¶ 452; Ex. 58, FTC-Prod-00130085, at FTC-Prod-00130087; Ex. 166, FLT_FTC00124842 at 842.
[135] SMF ¶ 446; Ex. 165, FLT_FTC00338619 at 619-620.

two years after the reports were published—and almost one year after the FTC issued

its first civil investigative demand to FleetCor—Clarke asked senior FleetCor

employees "█████████████████████████████████████████[136] They

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████  The presentation also showed that ████████████████

███████████████████████████████████████[137]

## V.   The Court Should Grant Injunctive and Equitable Monetary Relief

Under Section 13(b) of the FTC Act, the Court has the power to grant equitable

monetary and injunctive relief to address Defendants' unlawful conduct. *Gem

Merch. Corp.*, 87 F.3d at 468-70. This includes the power to grant the "full range of

equitable remedies, including the power to grant consumer redress and compel

disgorgement of profits." *Id.* at 468; *see also FTC v. Simple Health Plans, LLC*, 801

F. App'x 685 (11th Cir. 2020) (upholding FTC's authority to seek monetary relief in

the form of disgorgement or restitution). A permanent injunction and equitable

monetary relief are necessary and appropriate here. The FTC's proposed order,

modeled on other orders routinely entered by courts in FTC actions, contains

provisions that would prevent Defendants from engaging in the type of harmful

conduct described above and provide monetary redress for injured consumers.

---

[136] SMF ¶ 431; Ex. 255, FLT_FTCLIT_0814929 at 929-930.
[137] SMF ¶¶ 431-432; Ex. 255, FLT_FTCLIT_0814937 at slide 15.

### A. Injunctive Relief Is Warranted

A permanent injunction is appropriate to prevent future violations of the FTC Act, 15 U.S.C. § 53(b), where "there is some cognizable danger of recurrent violation, something more than a mere possibility," *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (cleaned up).  An injunction is not moot just because the "illegal conduct has ceased."  *FTC v. Citigroup Inc.*, 239 F.Supp.2d 1302, 1306 (N.D. Ga. 2001).  "The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct," including "whether the violative act was isolated or recurrent" and "the degree of harm consumers suffered from the unlawful conduct."  *Direct Benefits Grp.*, 2013 WL 3771322, at *20.

Here, there is a high likelihood that Defendants will violate the FTC Act absent injunctive relief.  For years, FleetCor misrepresented key aspects of its fuel cards and obscured the fees it charged, despite awareness that the claims were false and that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  *See supra.*  As just one example, FleetCor prominently represented that its Mastercard products could be limited to "fuel only" despite ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓  And Defendants "continue to deny the wrongful nature of their conduct," giving the Court no reason to believe they will not resume in the future. *Lanier Law*, 194 F. Supp. 3d at 1289.  Defendants claim that these practices have ceased, but the changes were too little, too late—they started only after intense public

---

[138] SMF ¶ 116; Ex. 78, FLT_FTC00326534.

scrutiny and many changes were not made until the filing of the FTC's Complaint in this litigation was imminent more than three years later.  *See Fedders Corp. v. FTC,* 529 F.2d 1398, 1403 (2d Cir. 1976) (not "voluntary" if conduct ceased because of awareness of investigation).  Of course, no matter how much Defendants tout recent changes, FleetCor's customers ███████████████████████████████████ ████████████████████████████████████████████  Indeed, even after ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██ [140]  And FleetCor still buries time restrictions on per-gallon savings in fine-print. [141]

Accordingly, Parts I-III of the FTC's proposed order would restrain Defendants from violating the law through the specific practices at issue or through similar practices.  *See Lanier Law*, 194 F. Supp. 3d at 1288 (courts impose "fencing-in" relief if the provisions "bear a reasonable relation to the unlawful practices found to exist").  Part I.A would prohibit Defendants from misrepresenting various material aspects of their products.  Part I.B.1 would require Defendants to clearly and conspicuously disclose material information regarding fees before charging those fees.  Part I.B.2

---

[139] SMF ¶¶ 205-206, 396-402; Ex. 205, FLT_FTCLIT_0825603 at slide 8-9 (███████ ██████████████████); Ex. 217, FLT_FTCLIT_0769157 (2019 ████████").

[140] SMF ¶¶ 232; Ex. 232, FLT_FTCLIT_0824914 ████████████████████ ████████████████████████████████████████████████████████).

[141] SMF ¶¶ 94-100; *See, e.g.*, Ex. 200, FLT_FTCLIT_0003175, at 177; Ex. 49, FTC-Prod-00157378.

would prohibit Defendants from making any savings claims without adequate substantiation.  Part II would prohibit Defendants from charging any consumer without obtaining express informed consent.  And Part III prohibits Defendants from charging customers for any payment received on or before the applicable due date. The remaining parts address equitable monetary relief, discussed below, and monitoring and recordkeeping provisions common in FTC law enforcement matters.

### B. Monetary Relief Is Warranted

The Court also should order Defendants to pay equitable monetary relief based on the deceptive and unfair practices described above.  Binding Eleventh Circuit precedent has long held that Section 13(b) allows the FTC to obtain monetary relief[142] via a two-step framework.  *Gem Merch. Corp.*, 87 F.3d at 469; *Simple Health Plans*, 801 F. App'x at 687-88.  First, "[t]he FTC bears the burden to show the 'reasonably approximate' amount of the defendant's unjust gain."  *Wash. Data Res.*, 856 F. Supp. 2d at 1281.  "Exactitude is not a requirement" at this step, *FTC v. Vylah Tec LLC*, 378 F. Supp. 3d 1134, 1139 (M.D. Fla. 2019), and the calculation "may be properly based on estimates," *FTC v. Life Mgmt. Servs.*, 350 F. Supp. 3d 1246, 1274 (M.D. Fla. 2018).[143]  "The correct measure of unjust gains is the amount of net

---

[142] Defendants may argue that the fact that the Supreme Court has heard oral argument on this issue, *AMG Capital Mgmt., LLC v. FTC*, No. 19-508, undermines this precedent.  But the law controlling the FTC's authority under Section 13(b) of the FTC Act has not changed in the Eleventh Circuit, and district courts in the Eleventh Circuit cannot depart from that holding unless the Supreme Court rules otherwise.

[143] In the case of remedies for deceptive conduct, the FTC need not show "individual reliance by each" consumer, but rather the same "presumption of actual reliance" discussed *supra*.  *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) (citing *Figgie Int'l*, 994 F.2d at 605-06).

revenue, or gross receipts minus refunds." *Vylah Tec,* 378 F. Supp. 3d at 1139; *see also FTC v. Wash. Data Res., Inc.,* 704 F.3d 1323, 1327 (11th. Cir. 2013) (starting point for unjust gains is gross receipts without reduction for expenses). Second, the burden of proof shifts to the defendant "to show the inaccuracy of the FTC's figure." *Wash. Data Res.*, 856 F. Supp. 2d at 1281.[144]

FleetCor's fuel card business generates more than $1,000,000,000 in net revenue *each year*.[145] Here, the FTC is seeking a fraction of that amount for unjust gains that FleetCor has accrued over a period of nearly seven years through widespread misconduct. In particular, monetary relief of $553,213,354.00—based on three discrete calculations addressing FleetCor's misconduct—is a reasonable approximation of Defendants' unjust gains. All of these calculations are based on FleetCor's own transaction data. To ensure that the overall calculation did not overstate the amount of Defendants' unjust gains, the FTC took care to eliminate from consideration all records of non-U.S. customers, customers with individually negotiated contracts, invoices that were never actually billed to customers, and

---

[144] The Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), does not change this analysis, *see CFTC v. Tayeh*, 2012 WL 794542, at *2 (11th Cir. Mar. 2, 2012). As courts in this Circuit have held, *Liu*'s explanation of the SEC's authority to obtain "equitable" relief does not disturb existing circuit law on the FTC's authority because *Liu* "dealt with the wrong agency, the wrong statute, and the wrong remedy." *FTC v. On Point Glob. LLC*, 2020 WL 5819809, at *4 (S.D. Fla. Sept. 30, 2020); *see also Simple Health Plans*, 801 F. App'x 685 (cases on limitations for SEC disgorgement did affect precedent on FTC monetary authority). And the relief sought here is appropriate in any event. As explained below, the total amount the FTC is seeking for a period of nearly seven years is less than FleetCor's net revenue in any of one of those years. In addition, the funds collected from FleetCor will be returned to injured consumers. *See* Proposed Order at IV.H.

[145] SMF ¶ 8, *See* Ex. 2 at 32 (FleetCor 2020 10-K).

duplicate records.[146]  Further, wherever the FTC encountered ambiguity in FleetCor's data, the FTC gave Defendants the benefit of the doubt, including by using data ending as of the date of the Complaint, as described below.

*First*, the FTC's estimate includes $20,003,163 for the deceptive per-gallon savings claims (Count I).  This calculation is limited to customers who had the specific Fuelman and UNMC fuel cards at issue,[147] and who signed up during the times that FleetCor made the relevant per-gallon savings claim.[148]  The FTC then summed all discounts and relevant gallons each such customer actually received and purchased, respectively.[149]  Significantly, because FleetCor's discount data also included short-term promotional discounts that were advertised separately, the FTC's "discount" calculation includes both forms of discounts, and thus credits FleetCor for discounts that might have nothing to do with Count I's per-gallon savings claims.  Then, the FTC determined the savings that each customer was promised by multiplying the amount of the advertised per-gallon discount by the total gallons purchased by the customer.[150]  Defendants' unjust gains are equal to the difference between the total promised savings and the actual discounts received:  $20,003,163.

*Second*, the FTC's total estimate includes $319,901,900 for deceptive and unfair billing associated with FleetCor's transaction fees and fees for add-on

---

[146] Ex. 8, Miles Decl. ¶¶ 41 tbl.6, 54 tbl.10, 69; *see also id.* ¶¶ 9-22, 42.

[147] Ex. 8, *Id.* ¶ 24-26

[148] Ex. 8, *Id.* ¶ 27-29

[149] SMF ¶¶ 52, 63, 64, 77, 88; Ex. 8, *Id.* ¶¶ 31-34, 35-38.

[150] Ex. 8, *Id.* ¶ 40.

programs. ████████████████████████████████████████,[151] and the FTC's

figure sums each of these fees from May 15, 2014 through December 20, 2019 (the

Complaint filing date, even though, as noted above, customer complaints about fees

████████████).[152]  To avoid overcounting, the FTC subtracted any identifiable

refunds that FleetCor issued for these fees, including "████████████."[153]

   *Finally*, the FTC's total estimate includes $213,308,282 for unlawful billing

associated with late fees FleetCor charged for timely payments.  FleetCor has failed to

provide data indicating when it actually receives customer payments despite repeated

requests from the FTC.  The FTC thus had to rely on the date on which a payment

"posts" in FleetCor's systems, which FleetCor uses to assess late fees.  But the

undisputed facts show that payments take at least days to post after FleetCor receives

them. *Supra* pp. 29-31.  FleetCor's own documents show that el███████████████

████████████.[154]  For mailed check payments, the evidence shows more substantial

posting delays, even ████████████.[155]  FleetCor's own documents provide a

conservative estimate that ████████████████████.[156]  As a result, the

FTC's calculations assumed that any late fee was improperly assessed if the electronic

---

[151] Ex. 8, *Id.* ¶¶ 46, 50, 53.

[152] SMF ¶¶ 131-175; Ex. 8, *Id.* ¶ 54.

[153] Ex. 8, *Id.* ¶¶ 42, 54.

[154] SMF ¶¶ 177; Ex. 214, FLT_FTCLIT_0000424, at 425; Ex. 88, FLT_FTC00003046, at 3047; Ex. 37, JABIAN - CONFIDENTIAL 000005, at 31.

[155] *E.g.*, SMF ¶¶ 328-338; Ex. 15, PNC0000188 ████████ Ex. 40, PNC0000175 (6████

████

[156] SMF ¶¶ 178, 336-338,  ; Ex. 215, FLT_FTCLIT_0802752, at 802763 (████████████████

████ ); Ex. 245, FLT_FTCLIT_0798411 (████████████████

payment posted 2 days after the due date, or 5 days after for a check payment.  Given FleetCor's failure to maintain records of when it actually received payments, the Court should accept this approximation as reasonable.  *See Direct Mktg. Concepts, Inc.*, 624 F.3d at 18; *Partners in Health Care Ass'n*, 189 F. Supp. 3d at 1370-71.

## VI.    **Defendants' Affirmative Defenses Are Without Merit**

Each of FleetCor's three affirmative defenses should be dismissed.  *First*, FleetCor pleads that Section 13(b) of the FTC Act does not authorize monetary relief, Dkt. 8, First Aff. Def., but the Eleventh Circuit has rejected that position.  *See supra* Part V.B.  *Second*, FleetCor asserts "the FTC's Complaint fails to state a claim upon which relief can be granted," Dkt. 8, 2d Aff. Def., but that is not a proper affirmative defense, *Boldstar Tech., LLC v. Home Depot, Inc.*, 517 F. Supp. 2d 1283, 1291 (S.D. Fla. 2007).  *Finally*, FleetCor asserts "the requested relief … would not be in the public interest," Dkt. 8, 3d Aff. Def., but the FTC has shown the contrary.

## VII.    **Conclusion**

The FTC requests that the Court grant this motion.

Dated:  April 16, 2021                    Respectfully submitted,

/s/ Thomas C. Kost
THOMAS C. KOST
Tel: (202) 326-2286
E: tkost@ftc.gov
BRITTANY K. FRASSETTO
Tel: (202) 326-2774
E: bfrassetto@ftc.gov
THOMAS E. KANE
Tel: (202) 326-2304
E: tkane@ftc.gov

GREGORY J. MADDEN
Tel: (202) 326-2426
E: gmadden@ftc.gov
CHRISTOPHER B. LEACH
Tel: (202) 326-2394
E: cleach@ftc.gov

Federal Trade Commission
Division of Financial Practices
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, DC 20580
Fax: (202) 326-2752

MICHAEL A. BOUTROS
Ga. Bar No. 955802
Federal Trade Commission
Southeast Region
225 Peachtree Street NE, Suite 1500
Atlanta, GA 30303
Tel: (404) 656-1351
E: mboutros@ftc.gov
Fax: (404) 656-1379

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## LOCAL RULE 5.1 CERTIFICATION

Pursuant to LR 7.1(D), I hereby certify that the foregoing was prepared with

14-point Times New Roman font in accordance with LR 5.1(C).

/s/ Thomas C. Kost
—————————————————————
THOMAS C. Kost
Federal Trade Commission
Division of Financial Practices
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 326-2286
Fax: (202) 326-2752
Email: tkost@ftc.gov

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record through this Court's electronic filing system on this 16th day of April 2021.

/s/ Thomas C. Kost

THOMAS C. KOST
Federal Trade Commission
Division of Financial Practices
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 326-2286
Fax: (202) 326-2752
Email: tkost@ftc.gov

*Counsel for Plaintiff*