# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FEDERAL TRADE COMMISSION,

       *Plaintiff,*

   v.

FLEETCOR TECHNOLOGIES, INC., *and*
RONALD CLARKE,

       *Defendants.*

Case No. 1:19-cv-5727-AT

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants FleetCor Technologies, Inc., and Ronald Clarke submit the following Statement of Additional Material Facts relevant to the FTC's Motion for Summary Judgment.

As explained in Defendants' concurrently filed Opposition to the FTC's Motion for Summary Judgment and Response to the FTC's Statement of Material Facts, the FTC has sought summary judgment based on factual assertions that it knows are hotly disputed and simply ignores all of the evidence contrary to its position.  In this statement, Defendants demonstrate the many material facts that the FTC failed to disclose to the Court. However, Defendants are mindful of the Local Rules' requirement that the

parties be "concise." *See* Local Rule 56.1(B)(2)(b). Therefore, Defendants set forth below evidence sufficient to show the existence of material disputes of fact, but do not set forth every fact in dispute.

## Material Facts Concerning FleetCor's Cards and Customers

1.    FleetCor has over 200,000 business customers and 8,000 employees, and it offers payment services that are accepted by hundreds of thousands of merchants in more than 100 countries. FleetCor 10-K (2020) (Ex. 2), at 4, 34.

2.    FleetCor markets and sells its fuel cards to businesses, not individual customers. Wind Report (Ex. 270-A) ¶ 53.

3.    FleetCor's customers are business of all sizes, ranging from some of the largest trucking companies in the United States and well-known companies such as FedEx, UPS, Coca-Cola, Pepsi, Lowe's, and Sysco, to small- and medium-sized businesses that maintain a fleet of vehicles (*e.g.*, florists, moving companies, houses of worship). Schoar Liability Report (Ex. 269-A) ¶ 31; Thekkekara 1-13-21 Dep. (Ex. 293) at 39:10–18; Chen Decl. (Ex. 272) ¶ 6.

4.    FleetCor business customers use fuel cards to manage their fuel spend, *i.e.*, to allow their drivers to purchase fuel for work purposes that is paid for by the company. Wind Report (Ex. 270-A) ¶ 66.

5.      FleetCor defines its small- and medium-size business customer segment to include very sizable businesses of up to a $100,000 credit limit or up to 100 drivers.  Thekkekara 1-13-21 Dep. (Ex. 293) at 39:10–18; Chen Decl. (Ex. 272) ¶ 6.

6.      The benefits of using a fuel card (and a FleetCor fuel card in particular) are manifold and include:

  a.    detailed reports that enable businesses to monitor and control spending;

  b.    replacing cumbersome and vulnerable reimbursement or petty cash policies with a single payment;

  c.    tracking fuel economy and spending;

  d.    obtaining access to credit for fuel purchases, which are a major business expense for business with fleets of vehicles; and

  e.    paying fuel costs with a single payment.

Schoar Liability Report (Ex. 269-A ) § IV.A; Wind Report (Ex. 270-A) Figure 13 (listing credit, controls, convenience, transaction level reporting, fraud monitoring, and discounts as primary fuel card benefits).

7.      Independent studies have found that use of a fuel card can save companies up to 15% in efficiency gains, spending controls, and preferred pricing.  Schoar Liability Report (Ex. 269-A) ¶¶ 48–56.

8.      To meet the needs of this diverse customer base, FleetCor has offered more than 97 different fuel card options from 2014–2020.  Wind Report (Ex. 270-A) ¶ 68; Wind Report (Ex. 270-B) App. L.

9.    FleetCor's different fuel cards have different costs and benefits, and the diverse offerings allow potential FleetCor customers to pick the card that has the attributes that are most well suited to their business needs. Wind Report (Ex. 270-A) ¶ 75; Chen Decl. (Ex. 272) ¶ 6.

10.    FleetCor's business customers have "professional buying centers that make purchase decisions," which are experienced at making business purchase decisions and are "very likely to pay attention to FleetCor's disclosed terms." Wind Report (Ex. 270-A) ¶ 3.

11.    Academic research confirms that "small and medium business owners are, on average, more financially literate than retail consumers." Schoar Liability Report (Ex. 269-A) ¶ 44.

12.    FleetCor cards have no contract term or cancellation fee, meaning customers can leave at any time for any reason. *See, e.g.*, Clarke Dep. (Ex. 279) at 162:5–9; Coan Dep. (Ex. 280) at 197:24–198:7.

**Material Facts Concerning FleetCor's Marketing**

13.    FleetCor sells fuel cards through four different sales channels: web, outbound phone sales, inbound phone sales, and field sales. Wind Report (Ex. 270-A) ¶¶ 81–86.

14.    **Web Sales:** FleetCor had eight different websites where customers could research fuel card options, learn about the costs and benefits, and select a card to apply for. Wind Report (Ex. 270-A) ¶ 80.

4

15.     FleetCor's websites all have complete disclosures, including the Terms and Conditions.  *E.g.*, Wind Report (Ex. 270-A) ¶¶ 172–79.

16.     **Outbound Phone Sales:**  FleetCor has a team of sales representatives that make outbound calls to potential customers.  Wind Report (Ex. 270-A) ¶ 83; Wind Report (Ex. 270-B) App. O; Beagles Decl. (Ex. 271) ¶ 3.

17.     The outbound sales teams engage with potential customers and also make disclosures about costs and fees.  Wind Report (Ex. 270-A) ¶ 83; Beagles Decl. (Ex. 271) ¶ 3.

18.     **Inbound Phone Sales:**  FleetCor also has inbound sales representatives that take incoming calls from customers who learned about FleetCor from a trusted source or from a web review of a FleetCor product. Wind Report (Ex. 270-A) ¶ 84.

19.     These inbound representatives answer questions, provide disclosures, and take applications directly over the phone.  Wind Report (Ex. 270-A) ¶ 84.

20.     **Field Sales:**  FleetCor has a team of in-person sales representatives that visit businesses to provide information and take applications from customers.  Wind Report (Ex. 270-A) ¶ 85.

21.    In addition to these channels, FleetCor used *more than* 40,000 different print and web ads during the relevant time period.  Wind Report (Ex. 270-A) ¶¶ 78–79.

22.    The ads involve many different cards and emphasize different costs and benefits.  Wind Report (Ex. 270-A) ¶ 78 & Figure 15 (at page 36); Wind Report (Ex. 270-B) App. M.

23.    In addition to receiving information directly from FleetCor, most of FleetCor's customers engage in "substantial, independent research" and "due diligence" before signing up."  Wind Report (Ex. 270-A) ¶¶ 90–91.

24.    Of those customers that do independent research, 75% researched the "cost/terms," 26% researched the benefit, and more than 31% spent more than one day researching fuel card options.  Wind Report (Ex. 270-A) ¶ 92.

25.    FleetCor customers also obtain information from independent and trusted third parties.  43% of FleetCor customers "found out" about FleetCor fuel cards from a non-FleetCor source, like a referral from a friend or a third-party review.  Wind Report (Ex. 270-A) ¶ 89.  Only 24% of customers relied only on information from FleetCor.  *Id.* ¶ 95.

**Material Facts Concerning FleetCor's Disclosure of Fees**

26.    FleetCor ensured that all of its fees were clearly disclosed to its customers.  *See, e.g.*, Rachide Dep. (Ex. 291) at 109:3–19, 156:10–20; Chen 1-

27-21 Dep. (Ex. 276) at 117:9–24, 212:1–9; Chen 2-19-21 30(b)(6) Dep. (Ex. 277) at 46:21–47:25; Chen Decl. (Ex. 272) ¶¶ 3–4.

27.     Ms. Chen testified that at "FleetCor [we] make sure we provide **full and detailed disclosure** to [] customers in terms of fee and pricing details." Chen 1-27-21 Dep. (Ex. 276) at 116:10–12.

28.     In particular, FleetCor trained both its phone and field sales representatives to disclose fees to customers and provided instructions on the best way to make these disclosures.  *See* Wind Report (Ex. 270-A) ¶¶ 155–62, 163–66; Panhans Dep. (Ex. 289) at 182:10–21; Beagles Decl. (Ex. 271) ¶¶ 3–9; *see also, e.g.*, FLT_FTC00340153 (Ex. 299), at 10.

29.     FleetCor specifically trained sales representatives to communicate that fees may be incurred based on the customer's "choices and actions" and that all of the fee details can be found in the Terms and Conditions.  FLT_FTC00340153 (Ex. 299), at 10.

30.     The head of FleetCor's field sales team, Chet Panhans, testified that "I train my field sellers to . . . let our prospective customers know that we have choice-based and action-based fees . . . ."  Panhans Dep. (Ex. 289) at 182:10–21.

31.     The head of FleetCor's phone sales team, Valencia Beagles, similarly stated that phone sales representatives "are taught not to shy away from conversations about fees, but rather to explain to customers that there

are fees and what type of fees may apply." Beagles Decl. (Ex. 271) ¶¶ 2, 4.

Ms. Beagles also "walk[s] the floor" to listen into calls to make sure the phone

sales representatives are properly disclosing fees. *Id.* ¶ 9.

32.    In addition, all sales representatives are trained on a series of

affirmative disclosures they must make at the end of every phone sale

process, FLT_FTCLIT_0772015 (Ex. 305), at 3, and provided with training on

specific statements they should <u>not</u> make to avoid confusion, *see, e.g.*, Wind

Report (Ex. 270-A) Figure 36; Beagles Decl. (Ex. 271) ¶ 7.

33.    FleetCor also uses sales call monitoring to ensure that sales

representatives comply with their training and disclose fees, and to address

any errors through additional training or disciplinary measure. Beagles

Decl. (Ex. 271) ¶ 9.

34.    If a sales representative fails to disclose fees or gives incorrect

information to a prospective customer, FleetCor policy is to deal with that

swiftly through additional training or, where appropriate, termination.

Beagles Decl. (Ex. 271) ¶ 9.

35.    Since at least 2017, FleetCor has included a link to its Terms and

Conditions on every page of its website. Chen 2-19-21 30(b)(6) Dep. (Ex. 277)

at 17:8–20:6.

36. Prior to 2017, the Terms and Condition were available online but there was not a link on every page.  Chen 2-19-21 30(b)(6) Dep. (Ex. 277) at 17:8–20:6.

37. FleetCor also mails a copy of its Terms and Conditions to every prospective customer so they can read them before becoming a customer and using the card.  Thekkekara 1-13-21 Dep. (Ex. 293) at 147:15–18 ("All new customers would automatically get the terms and conditions as part of the card package.  So they . . . get all the cards and the terms and conditions are included in that package."); Panhans Dep. (Ex. 289) at 213:5–11; Sale Dep. (Ex. 292) at 246:22–247:5.

38. Although the precise content of the terms and conditions varies among programs and over time, since at least 2017, FleetCor has included a summary fee box that disclosed all important fees.  FLT_FTCLIT_0833337 (Ex. 23), at 4; FleetCor's Supplemental Responses to FTC's First Set of Interrogatories (Ex. 22), at Response to Integratory No. 1 (listing various Terms and Conditions).

39. That fee box is even more prominent today:

**Fuelman**

**FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC**
**FUELMAN FLEET CARD CLIENT AGREEMENT**

**Summary of Rates, Fees, and Other Costs**

| Category | Fee / Rate |
|---|---|
| **Important Note:** Please review all of these materials so that you are fully informed about your terms and conditions. We may change the rates, fees, and terms summarized below at any time by giving you written notice of such changes. | |
| **Program Fees** | |
| Card Program Packages | We offer three Card Program Packages: <br>• Regular - **$4** per card per month <br>• Plus - **$8** per card per month <br>• Premium - **$12** per card per month |
| **Other Fees & Charges** | |
| Late Payment | • Greater of **$75** or **12.25%** of New Balance |
| Finance Charge | • **32%** APR or maximum allowed by applicable law |
| High Credit Risk Account (Level 2 Pricing) | • Incremental charge of up to **30¢** per gallon |
| Returned Payment | • **$50** per occurrence |
| Non-Standard Payment Option | • **$50** for checks not sent to address indicated on invoice <br>• **$15** per Representative assisted Check by Phone payment <br>• **$10** per Fuelman initiated EFT/ACH debit <br>• **$50** per Client initiated ACH/Wire payment |

FLT_FTCLIT_0833366 (Ex. 23), at 1.

40.     FleetCor also discloses its fees to customers in welcome packets, onboarding emails, and notices that are sent to existing customers.  *See, e.g.*, Chen 2-19-21 30(b)(6) Dep. (Ex. 277) at 13:15–15:12; Clarke Dep. (Ex. 279) at 181:5–183:5; Izquierdo Dep. (Ex. 285) at 78:11–79:24; Wind Report (Ex. 270-A) ¶¶ 180–93.

41.     At the conclusion of every payment cycle (monthly or bi-weekly), FleetCor sends every customer a Fleet Management Report and invoice (together).  Wind Report (Ex. 270-B) App. T; Chen Decl. (Ex. 272) ¶ 31.

42.     The Fleet Management Report is used by business owners and fleet managers to monitor and control their fuel spend.  Chen Decl. (Ex. 272) ¶ 31.

43.    Every transaction and every fee charged is set forth in the Fleet Management Report.  Wind Report (Ex. 270-A) ¶¶ 189–92; Wind Report (Ex. 270-B) App. T; Chen Decl. (Ex. 272) ¶ 31.

44.    The "invoice" is a single page statement of the amount due and the payment due date.  The invoice is the remittance slip for customers who pay by mail.  *See* Wind Report (Ex. 270-A) ¶¶ 189–92.

45.    On the back of invoices, FleetCor includes a "summary" of key fees from its Terms and Conditions to remind customers about the important fees.  Wind Report (Ex. 270-B) App. T, at 2; Chen 2-22-21 30(b)(6) Dep. (Ex. 278) at 117:22–119:10.

46.    Professor Wind analyzed FleetCor's disclosures and sales rep training and reached the following conclusions:

a.    "FleetCor discloses the terms challenged by the FTC multiple times during a customer's journey to sign up for a fuel card, including on the web, over the phone, and through the mail." Wind Report (Ex. 270-A) ¶ 5; *see also id.* at Figure 71.

b.    "FleetCor's advertising and disclosure methodology is consistent with the industry, and thus not likely to deceive customers."  *Id.*

c.    "FleetCor trains its sales representatives on proper selling techniques . . . instructs representatives to disclose fee and pricing terms, and prohibits misstatements. FleetCor also has an audit program in place to enforce its rules."  *Id.*

47.    In addition, in the past, FleetCor has offered certain "optional programs" on a free trial basis to customers.  FleetCor obtained consent for

these programs at the time customers signed up.  Chen Decl. (Ex. 272) ¶ 10-12.

48.     For example, FleetCor launched Clean Advantage, an eco-conscious program that purchased carbon offsets based on how many miles customers drive, as a free trial program.  Chen Decl. (Ex. 272) ¶ 11.

49.     During the time period that FleetCor used free trial programs, it would disclose that fact in the customers Terms and Conditions and obtain consent for those programs at the time a customer signed up.  Chen Decl. (Ex. 272) ¶ 12.

50.     When FleetCor launched an optional program, it provided specific disclosures about it.  Chen Decl. (Ex. 272) ¶ 13.

51.     In particular, before any customer would even be enrolled in a free trial program, FleetCor would send a mailer and/or email announcing the program and clearly advise the customer of when the program would begin, what benefits they would get from the program, how long the free trial would last, that they would remain in the program unless they opted out, how much they would pay after the free trial ends, and how they could opt out of the program.  Chen Decl. (Ex. 272) ¶ 13.

52.     FleetCor continued to make disclosures during the life of the free trial period to the customer.  Chen Decl. (Ex. 272) ¶ 14.

53.     In particular, FleetCor would provide customers with more information about the program and the associated charge—including putting offsetting charges and free trial credits on customers' Fleet Management Reports.  Chen Decl. (Ex. 272) ¶ 14.

54.     Finally, when the free trial period ends, if the customer chooses not to opt out, FleetCor itemizes the charge on every Fleet Management Report, and the customer can still choose to opt out at any time.  Chen Decl. (Ex. 272) ¶ 15.

55.     For example, in a mailer used to disclose the Clean Advantage program, FleetCor informed customers:

a.     When the fee would be assessed ("Beginning Nov 1st . . . .");

b.     How much the fee would be ("$0.05 per each gallon");

c.     What customers would receive for that fee ("invest proportionately in certified emission reduction projects"); and

d.     How customers could opt out of the program ("call customer service at 1-800-771-6075 . . . at any time").

FLT_FTC00231631 (Ex. 310), at 1; *see also* Compl. Ex. K (Dkt. 1-11) (same information in an earlier mailer).

56.     FleetCor would also include optional programs in customer Terms and Conditions.  *See, e.g.*, FLT_FTCLIT_0004727 (Ex. 300) (listing three optional programs in the fee box: Clean Advantage, Accelerator Rewards, and FleetDash).

57.     Based on actual customer feedback and behavior, evidence shows that customers were not deceived by these optional programs and that customers valued these programs.  Wind Report (Ex. 270-A) ¶¶ 181–82, 267–69; Schoar Liability Report (Ex. 269-A) ¶¶ 158–64.

58.     There is economic benefit to offering programs on a free trial, opt-out basis.  Schoar Liability Report (Ex. 269-A) ¶¶ 98–101, 158–64.

59.     The FTC has never prohibited the use of opt-out programming except in discrete categories not relevant here.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 449:7–15.

60.     FleetCor no longer provides these optional programs on a free trial opt-out basis.  Chen Decl. (Ex. 272) ¶ 12.

**Material Facts Concerning FleetCor's Fee Structure**

61.     Although FleetCor's fee structure for each card program is different, up until 2019, FleetCor did not charge an across-the-board annual or card fee, as many of its competitors did.  Chen Decl. (Ex. 272) ¶ 7.  Instead, FleetCor had a variable fee structure that depended upon how customers used the cards.  *See, e.g.*, Panhans Dep. (Ex. 289) at 167:9–168:4, 170:17–171:18; Schoar Liability Report (Ex. 269-A) ¶¶ 106–08; Chen Decl. (Ex. 272) ¶ 8.

62.    FleetCor's fees were primarily choice based (*e.g.*, fees for additional services) and action based (*e.g.*, fees for paying late).  Chen Decl. (Ex. 272) ¶ 8.

63.    This meant that approximately 36% of FleetCor customers actually paid no fees for their cards each month.  Wind Report (Ex. 270-A) ¶ 255.  Other customers did pay fees, *e.g.*, for optional services.  Chen Decl. (Ex. 272) ¶ 8.

64.    About 50% of FleetCor's revenues come from interchange fees which are fees paid by the merchants (gas stations) and about 50% are fees from FleetCor's customers.  Schoar Liability Report (Ex. 269-A) ¶¶ 23–27. FleetCor does not offer "revolving" credit and does not charge interest like many consumer credit cards.  *Id.* ¶ 110.

65.    A fee-for-service or choice/behavior-based fee model is "economically sound," advantageous to many customers, and ensures that customers with low credit risk do not subsidize riskier customers.  Schoar Liability Report ¶¶ 92–108; *see* Wind Report (Ex. 270-A) ¶ 250.

66.    FleetCor discloses all of its fees and the discount terms throughout the process of a customer's acquisition of a fuel card.  Chen Decl. (Ex. 272) ¶¶ 3, 4, 9; Chen 1-27-21 Dep. (Ex. 276) at 116:7–23.

67.    FleetCor's advertisements and websites have various disclosures. *See, e.g.*, Wind Report (Ex. 270-A) ¶¶ 153–79.

68.     FleetCor, like many credit card companies, discloses all of the fees and terms in the card's Terms and Conditions.  Wind Report (Ex. 270-A) ¶¶ 177–79, 210–23.

69.     Terms and conditions are a common means of disclosing terms and fees applicable to a credit card.  Morwitz Dep. (Ex. 288) at 216:14–221:5.

70.     The FTC has not issued any regulations or guidance prohibiting, discouraging, or regulating the use of terms and conditions.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 398:18–400:8, 404:22–409:21.

71.     FleetCor mails Terms and Conditions to customers with every card, so that they can be reviewed before a business becomes a FleetCor customer.  *See, e.g.*, Chen 1-27-21 Dep. (Ex. 272) at 118:24–121:9.

72.     The Terms and Conditions are also made available online, and FleetCor will mail or email a copy upon request.  Chen 1-27-21 Dep. (Ex. 276) at 118:24–121:9.

## Material Facts Concerning Late Fees and Payment Processing

73.     Consistent with generally accepted practice, FleetCor imposes a late fee when customers do not pay on time.  Chen 1-27-21 Dep. (Ex. 276) at 112:5–10; Schoar Liability Report (Ex. 269-A) ¶ 103.

### Check Payments

74.     All FleetCor customers have the option of paying their bill by mail.  Pisciotta Decl. (Ex. 275) ¶ 4.

16

75.    In their terms and conditions and on each invoice they receive, customers are instructed to mail their payments to a P.O. Box that is managed by a third-party lockbox company (*e.g.*, PNC Bank).  Pisciotta Decl. (Ex. 275) ¶ 4.

76.    It is the lockbox company that receives, cashes, and processes the mailed check.  Pisciotta Decl. (Ex. 275) ¶ 4.

77.    The lockbox company processes conforming check payments on the date they are received (as long as they are received by the disclosed cut off time).  Pisciotta Decl. (Ex. 275) ¶ 5.

78.    Currently, the cut off time for most card programs is 4:00 p.m. Pisciotta Decl. (Ex. 275) ¶ 5.

79.    If a payment is not received by the cut off time, it may not be processed until the next business day.  Pisciotta Decl. (Ex. 275) ¶ 5.

80.    Because FleetCor's lockboxes are P.O. accounts, those payments are typically delivered overnight.  Pisciotta Decl. (Ex. 275) ¶ 6.

81.    It would be very rare for a payment to be received after 4:00 p.m. because the lock boxes receive the vast majority of their mail overnight or early in the morning.  Pisciotta Decl. (Ex. 275) ¶ 6.

82.    Therefore, in practice, the cutoff time has very little effect on whether a payment is credited the day it is received.  Pisciotta Decl. (Ex. 275) ¶ 6.

83.     FleetCor advises its customers on what it means for a payment to be conforming, and warns that non-conforming payments may result in delays in payment posting.  Pisciotta Decl. (Ex. 275) ¶ 7.

84.     On the invoice, right above the payment slip, there is a notice advising customers that payments must be conforming to ensure proper posting.  Pisciotta Decl. (Ex. 275) ¶ 7.

85.     Payments are non-conforming when the payment is not in the proper envelope, does not have the payment slip, or has material other than the check and the payment slip in the envelope.  Pisciotta Decl. (Ex. 275) ¶ 8.

86.     The reason a non-conforming payment can be delayed is because the lockbox company cannot process it automatically (through automated scanners) but must process it manually, which takes more time.  Pisciotta Decl. (Ex. 275) ¶ 8.

87.     Even for non-conforming payments, the payment typically is posted on the day of receipt as long as the lockbox company can identify the account associated with the payment.  Pisciotta Decl. (Ex. 275) ¶¶ 8–9.

88.     Only if the lockbox company has no way of identifying the account holder—*e.g.*, when there is not an account number and not enough information to determine the account number—is the payment moved to a suspense account.  Pisciotta Decl. (Ex. 275) ¶ 9.

89.     When payments are placed into a suspense account, FleetCor has to investigate to identify the account to determine which account the payment should be credited to.  In those circumstances, the payment is not posted until the investigation is complete and the account is identified. Pisciotta Decl. (Ex. 275) ¶ 9.

90.     Typically, less than five percent of payments end up in the suspense account—the remaining 95%, whether conforming or non-conforming, are processed that day.  Pisciotta Decl. (Ex. 275) ¶ 9.

91.     Typically less than 0.5% of payments are in suspense for more than a day.  Pisciotta Decl. (Ex. 275) ¶ 9.

92.     Once the lockbox company cashes the check and processes the payment, it sends a daily file to FleetCor.  Pisciotta Decl. (Ex. 275) ¶ 10.

93.     That file includes the customer account number and the payment amount.  Pisciotta Decl. (Ex. 275) ¶ 10.

94.     FleetCor processes the payment file from the lockbox company daily to ensure that payments are credited to FleetCor accounts the same day that the file comes from the lockbox company.  Pisciotta Decl. (Ex. 275) ¶ 10.

**Online Payments**

95.     FleetCor also accepts online payments.  Pisciotta Decl. (Ex. 275) ¶ 11.

96.    FleetCor has always disclosed its cut off time for online payments in customer Terms and Conditions and also on the online payment portals. Pisciotta Decl. (Ex. 275) ¶ 11.

97.    Previously on some of FleetCor's third-party payment systems, FleetCor could not post payments until 24 hours after the online payment was made.  Pisciotta Decl. (Ex. 275) ¶ 11.

98.    FleetCor always disclosed this in its online payment portals at the point and time of payment.  Pisciotta Decl. (Ex. 275) ¶ 11.

99.    If a customer wanted a payment to post sooner, they were told to call and pay by phone.  Pisciotta Decl. (Ex. 275) ¶ 11.

100.    As more of FleetCor's customers moved to online payment, FleetCor invested in a new online payment vendor, Bill Trust, that offered, among other benefits, same-day posting of all online payments.  Pisciotta Decl. (Ex. 275) ¶ 12.

101.    Currently, FleetCor processes all online payments on the day the payment is made.  Pisciotta Decl. (Ex. 275) ¶ 13.

102.    At all times (before and today), FleetCor processed the payment on or before FleetCor received the funds.  Pisciotta Decl. (Ex. 275) ¶ 13.

103.    This means if the online payment was received by the 5:00 p.m. cut off it will be processed and posted that same day.  Pisciotta Decl. (Ex. 275) ¶ 13.

104.   FleetCor has never had a policy of delaying posting payments received online.  Pisciotta Dep. (Ex. 290) at 22:9–30:12.

105.   To confirm that FleetCor does not delay posting payments received by check or online, Professor Schoar analyzed random samples of 9,921 checks and 400 online payments.  Schoar Rebuttal Report (Ex. 269-B) ¶ 99.

106.   Professor Schoar found that all online and conforming check payments (99.2% of all check payments) were posted on the day they were received.  Schoar Rebuttal Report (Ex. 269-B) ¶ 99.

107.   Only "0.8% [of checks received] were flagged as non-conforming payments . . . [which] were credited to the customer account the next day." Schoar Rebuttal Report (Ex. 269-B) ¶ 99.

**Material Facts Concerning FleetCor Pricing**

108.   FleetCor also offered a variety of different per gallon  discounts for some of its cards.  *See* Chen 1-27-21 Dep. (Ex. 276) at 200:19–205:10.

109.   FleetCor's per gallon discounts come with industry-standard limits, all of which were disclosed.  *See* Wind Report (Ex. 270-A) ¶¶ 219–21 & Figure 69; Wind Report (Ex. 270-B) App. V.

110.   Professor Schoar analyzed a sample of FleetCor customers and the savings they received.  She determined, based on her analysis, that

FleetCor customers obtained the exact savings that was advertised.  Schor

Rebuttal Report (Ex. 269-B) ¶¶ 114–19.

**Material Facts Concerning Changes to FleetCor's Business Practices**

111.   Years before the FTC began investigating FleetCor, FleetCor's

CEO tasked a senior executive (Mary Rachide) to review FleetCor's business

from top to bottom and to recommend any pro-consumer changes she could

identify that would help improve customer retention and satisfaction.  *See,*

*e.g.*, Rachide Dep. (Ex. 291) at 26:23–27:7, 61:17–67:9.

112.   FleetCor has followed through on this commitment, and it has

implemented a series of "customer experience initiatives" to improve

customers' understanding of and satisfaction with the FleetCor fuel card

programs.  FLT_FTCLIT_0833122 (Ex. 306).

113.   FleetCor's recent customer experience initiatives have included:

   a. revising its terms and conditions to include a prominent
      summary fee box on the first page of all terms and conditions,
      Wind Report (Ex. 270-A) ¶¶ 117, 287; FLT_FTCLIT_0833122 (Ex.
      306), at 5; FLT_FTCLIT_0833344 (Ex. 23)

   b. using a new payment processing vendor to provide customers
      with an easier and faster way to pay, Wind Report (Ex. 270-A)
      ¶ 290; *see also* FLT_FTCLIT_0763215 (Ex. 304), at 130;

   c. redesigning its customer portal/interface to improve the customer
      experience, Rachide Dep. (Ex. 291) at 173:19–174:15; Wind
      Report (Ex. 270-A) ¶ 290;

   d. reviewing all of its advertising to enhance disclosure, Wind
      Report (Ex. 270-A ¶ 291; FLT_FTCLIT_0833122 (Ex. 306), at 15;

    e.  making terms and conditions more readily available online, Wind Report (Ex. 270-A) ¶ 293; FLT_FTCLIT_0833122 (Ex. 306), at 20; and

    f.  improving customer service training, Wind Report (Ex. 270-A) ¶ 293.

*See also* FLT_FTCLIT_0833122 (Ex. 306).

114.   In 2019, FleetCor decided to no longer primarily rely on a variable fee structure, but switched to a monthly per card fee for its accounts. *See, e.g.*, Wind Report (Ex. 270-A) Figures 39 & 41; Izquierdo Dep. (Ex. 285) at 68:25–70:23; Chen Decl. (Ex. 272) ¶ 7.

115.   This card fee is prominently disclosed on FleetCor's website, its advertising materials, and in customers' terms and conditions.  *See, e.g.*, Wind Report (Ex. 270-A) Figures 39 & 41; Izquierdo Dep. (Ex. 285) at 68:25–70:23.

116.   FleetCor also stopped using free trial optional programs for its new accounts.  Izquierdo Dep. (Ex. 285) at 63:6–68:18; Chen Decl. (Ex. 272) ¶ 12.

## **Material Facts Concerning Empirical Evidence of No Deception**

117.   FleetCor has provided testimony from three experts on the issue of deception:

    a.  **Professor Jerry Wind:** Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania.  Wind Report (Ex. 270-A) ¶ 10.

b. **Professor Antoinette Schoar:**  Michael M. Koerner ('49) Professor of Finance and Entrepreneurship at the MIT Sloan School of Management and the former Chair of the MIT Sloan finance department.  Schoar Liability Report (Ex. 269-A) ¶ 2.

c. **Professor Michael Kahana:**  Edmund J. and Louise W. Kahn Term Professor of Psychology at the University of Pennsylvania. Kahana Rebuttal Report (Ex. 268-A) ¶ 2.

118. Professor Wind, one of the world's leading experts on consumer marketing, conducted or reviewed multiple different analyses to assess whether FleetCor's customers are deceived.  Wind Report (Ex. 270-A) ¶ 15 & § V.

119. **First**, Professor Wind conducted an empirical study of more than 1,000 actual FleetCor customers.  Professor Wind concluded:

a. "FleetCor's customers are not deceived regarding fees, discounts, overall cost, or fraud control";

b. "[O]nly a small percentage of customers misunderstand the fee, discount, cost, or fraud control terms"; and

c. Professor Wind concluded that only 0.3% of FleetCor's customers were even <u>potentially</u> deceived.

d. Professor Wind's customer survey found that there was only 3% *potential* deception or misunderstanding by FleetCor customers about the limits on FleetCor's discount claims.

Wind Report (Ex. 270-A) ¶¶ 121–24 & Figure 23, Figure 21.

120. **Second**, Professor Wind reviewed the results of a natural experiment where FleetCor provided all of its customers with enhanced terms and conditions.  Wind Report (Ex. 270-A) § V.A.2.

121.   Professor Wind explained that natural experiments "can be among the most powerful forms of evidence because it is conducted in the ordinary course of a company's business, uses real customers as they act in the marketplace, and the choices made by customers have real consequences for them."  Wind Report (Ex. 270-A) ¶ 127.

122.   The FTC's expert agreed that natural experiments are "the strongest evidence that we can generate in science."  *Surveying American Public Opinion on Climate Change and the Environment, with Jon Krosnick*, Resources Radio (Aug. 25, 2020) (Ex. 309), https://www.resources.org/resources-radio/surveying-american-public-opinion-climate-change-and-environment-jon-krosnick/.

123.   These enhanced terms and conditions added a more prominent fee summary box on the first page of customers' terms and conditions, but did not change the terms and conditions themselves.  Customers were asked to accept or reject these enhanced terms and conditions.  Wind Report (Ex. 270-A) ¶¶ 128–31.

124.   Professor Wind found that the "vast majority of FleetCor's customers accepted the enhanced Terms & Conditions."  Wind Report (Ex. 270-A) ¶ 4.

125.   In particular, Professor Wind found that only 0.13% rejected the revised terms and less than 0.07% requested changes.  Wind Report (Ex. 270-A) ¶¶ 133–34.

126.   Professor Wind concluded that, if customers were not aware of the fees prior to receiving the enhanced terms and conditions, they would have rejected the enhanced terms or stopped using their cards.  That they did neither "show[s] that FleetCor customers were not deceived by the terms when they signed up for their fuel card."  *See* Wind Report (Ex. 270-A) ¶¶ 4, 132–35.

127.   Another FleetCor expert, Professor Schoar, noted that customers' usage of their fuel cards also did not change after accepting the enhanced terms.  Had customers been unaware of these terms previously, Professor Schoar opines that usage would have decreased significantly.  Schoar Liability Report (Ex. 269-A) ¶ 157.

128.   **Third**, Professor Wind also commissioned and reviewed an analysis of all FleetCor customer complaints to assess whether they provide evidence of deception or lack of disclosure.  Wind Report (Ex. 270-A) ¶¶ 139–51; Wind Report (Ex. 270-B) App. C, D.

129.   The results show that FleetCor has a low complaint rate relative to the size of its business sand that its complaint rate is even lower than

major bank competitors, including Bank of America, Capital One, and

Discovery.  *See* Wind Report (Ex. 270-B) App. C.





130.   From this analysis, Professor Wind concluded that FleetCor's actual volume of complaints "strongly contradict[s] the FTC's allegations of deception."  Wind Report (Ex. 270-A) ¶ 141.

131.   **<u>Fourth</u>**, Professor Wind analyzed all of the 1,500 FleetCor customer service calls that were produced in this case.  Wind Report (Ex. 270-A) ¶¶ 139–46.

132.   Professor Wind found that only 1.06% of customer service calls were complaints about issues in the FTC's complaint that went unresolved. Wind Report (Ex. 270-A) ¶¶ 148–49.

133.   Only 1.7% of FleetCor's customers complained about savings/discounts issues.  Wind Report (Ex. 270-B) App. D, at 13.  Professor Wind concluded these findings are "completely inconsistent with the FTC's allegations that the company has widely deceived its customers."  Wind Report (Ex. 270-A) ¶¶ 146, 150.

134.   **<u>Fifth</u>**, Professor Wind considered evidence of actual customer behavior to assess whether there is any evidence of deception.  Wind Report (Ex. 270-A) ¶¶ 147–51.  This analysis found that FleetCor customers do not behave in ways that are consistent with deception or lack of disclosure.  Instead, Professor Wind found:

- high retention rates (80% of customers, and 95% of sales by gallon), *id.* ¶ 234;

- high referral rates (34% of FleetCor's customers signed up based on a referral from a trusted source), *id.* ¶ 238;

- consistently high demand for its fuel cards, even after a short-seller hedge fund published false "reports" of customer dissatisfaction that led to the FTC's investigation, *id.* ¶¶ 245–46;

- no change in retention or usage patterns after fees are imposed, *id.* ¶ 248; *accord* Schoar Liability Report (Ex. 269-A) ¶¶ 156–57;

- net promoter scores and other evidence of customer satisfaction are significantly higher than the credit card industry average, Wind Report (Ex. 270-A) ¶ 259; and

- *b*oth Professors Wind and Schoar looked at how FleetCor customers reacted to the optional programs and concluded from their cancellation and usage patterns that (1) FleetCor customers were informed about the free trial program; and (2) customers who stayed in the optional programs for many months or years

did so because they valued the program.  Wind Report (Ex. 270-A) ¶¶ 181–82, 267–69; accord Schoar Liability Report (Ex. 269-A) ¶¶ 158–64.

135.  Professor Wind concluded that none of these facts would be true if FleetCor engaged in the widespread deception claimed by the FTC.  Wind Report (Ex. 270-A) ¶ 232.

136.  **<u>Sixth</u>**, Professor Wind looked at third-party behavior to determine whether FleetCor engages in deception.  Wind Report (Ex. 270-A) ¶¶ 297–306.

137.  FleetCor partners with some of the most well-recognized companies in the nation, including BP, Walmart, Mastercard, and Regions Bank.  Wind Report (Ex. 270-A) ¶¶ 298–99.

138.  Professor Wind noted that these companies are highly sophisticated and brand conscious, and they would not partner with FleetCor if the company was engaged in deceptive practices.  Wind Report (Ex. 270-A) ¶ 300.

139.  However, FleetCor has maintained and expanded these relationships over the years.  Wind Report (Ex. 270-A) ¶ 306, which provides third party validation that FleetCor is not engaged in deceptive acts or practices.

140.   **Finally**, Professor Wind noted that the convergence of each of these independent measures of deception confirmed finding of no deception. Wind Report (Ex. 270-A) ¶¶ 9, 34, 102, 307.

141.   Based upon all of the studies he conducted and analyses he did, Professor Wind concluded that "FleetCor's advertising, marketing, and sales practices are **not** likely to mislead or deceive customers."  Wind Report (Ex. 270-A) ¶ 2.

## Material Facts Concerning the FTC's Theories of Deception

142.   The FTC has asserted three theories of deception:  discount claims, fuel-only claims, and transaction fees.  *See* FTC MSJ at 8, 15, and 17.

### Rebate Claims (Count I)

143.   The FTC has not tested the net impression or meaning of any of the FleetCor's advertisements.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 497:19–25; Morwitz Dep. (Ex. 288) at 235:25–236:4.

144.   The FTC has no extrinsic evidence concerning the net impression of any FleetCor savings claim.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 497:19–25; Morwitz Dep. (Ex. 288) at 235:25–236:4.

145.   Exhibit 11 to the FTC's Motion for Summary Judgment is a collection of advertisements for the Fuelman Commercial Platinum Fleetcard advertising "a 5¢ per gallon discount."  Ex. 11.  Each of these advertisements contain a number of disclosures, including the following:

a.    "Discount is not available on purchases at Loves, Chevron/Texaco, Arco, and Sinclair." *Id.* at FLT_FTC00000172.

b.    "Customer's price will never be below Fuelman's cost paid to merchant." *Id.*

c.    "Fuelman reserves the right to change the rebate program at any time without prior notice." *Id.*

d.    Rebate is available "for the first twelve months following account setup." *Id.* at FLT_FTCLIT_0000953.

e.    "Rebates are subject to forfeiture if account is not in good standing." *Id.*

f.    "Program Terms and Conditions apply. Visit www.fuelman.com/terms for details." *Id.*

g.    "Fees may apply in some cases, such as for optional services, late payments and/or credit risk." *Id.* at FLT_FTC00000192, FLT_FTC00003217, FLT_FTCLIT_0000953, FLT_FTCLIT_0000954.

h.    "Program pricing is reevaluated annually and subject to change thereafter." *Id.* at FLT_FTCLIT_0000953.

146.   Exhibit 13 to the FTC's Motion for Summary Judgment is a collection of advertisements for the Universal Premium FleetCard Mastercard advertising savings of "up to" a certain amount per gallon. Each of these advertisements contain a number of disclosures, including the following:

a.    "Save 3¢ on every gallon purchased at our Fuel Man Discount Network locations nationwide." Ex. 13, at FTC-Prod-00151582.

b.    "Save up to an additional 3¢ per gallon with volume rebates." *Id.*

c.    "The Fuelman Discount Network is a selected group of fuel locations that allow cardholders additional savings and benefits.

> For a list of participating sites, visit www.fuelmandiscountnetwork.com." *Id.*

d.   "Purchases must be made with the Universal Premium FleetCard MasterCard and the account must be in good standing." *Id.* at FTC-Prod-00151586.

e.   "Volume rebates are based on the number of gallons purchased monthly and will be calculated on the gallons pumped at Level 3 sites. Unleaded and diesel grade fuels are included." *Id.*

f.   "Earn an average of 2-3 cents within the Retail Savings Network." *Id.*

g.   "Program Terms and Conditions apply. Visit www.universalpremiumcard.com/terms for details." *Id.* (emphasis omitted).

h.   "Fees may apply in some cases, such as for optional services, late payments and/or credit risk." *Id.*

147.   The limitations FleetCor applies to its rebate programs are common in the industry and likely to be expected by customers.  Wind Report (Ex. 270-A) ¶¶ 219–21; Morwitz Dep. (Ex. 288) at 273:21–275:4 (FTC's expert conceding it is "common" and "legitimate" for rebates to change over time).

148.   Advertisements promoting savings "up to" a certain amount are "common" and "how customers interpret a specific save up to claim depends on a number of factors."  Morwitz Dep. (Ex. 288) at 232:21–236:4.

149.   FleetCor has used advertisements with prominent tables demonstrating how a customer could save "up to" a certain amount. *See, e.g.*, Ex. 12, at 1.

150.   The FTC relies on a declaration by an FTC employee, Elizabeth Miles, to show that FleetCor customers received less than the advertised rate on certain fuel cards.  FTC MSJ at 12.

151.   Professor Schoar identified numerous methodological flaws with Ms. Miles's analysis.  These flaws include:

a.   "Ms. Miles made an error when matching different datasets and omitted transaction level discounts for certain UNMC customers from her discount analysis."  Schoar Rebuttal Report (Ex. 269-B) ¶ 108.

b.   "FleetCor recorded discounts accrued by Fuelman Discount Advantage customers via statement credits that Ms. Miles did not take into account in her analysis."  *Id.* ¶ 109.

c.   "As most of the rebates received by Fuelman Discount Advantage customers were not recorded in the data as discounts, Ms. Miles' calculations severely underestimate the actual per-gallon savings received by these customers."  *Id.*

d.   "FleetCor's internal discount analysis suggests that per-gallon discounts received by the Fuelman Discount Advantage customers were considerably larger than the $0.001 calculated by Ms. Miles."  *Id.*; FLT_FTCLIT_0834939 (Ex. 307).

152.   In addition to these methodological flaws, Professor Schoar found that "Ms. Miles' calculation of restitution associated with per-gallon savings in this case rests on several unsupported assumptions."  Schoar Rebuttal Report (Ex. 269-B) ¶ 110.  These unsupported assumptions include:

a.   "Ms. Miles' calculations imply that *all* FleetCor's customers were aware of and relied upon at-issue [discount] claims in FleetCor's advertisements and ignored or were confused by any other disclosures provided by FleetCor to those customers . . . ."  *Id.*

b.   "Ms. Miles' calculations imply that *all* gallons purchased by customers enrolled in the at-issue programs would have been eligible for 100 percent of the advertised discounts." *Id.*

c.   "Without preparing any analyses to determine which, if any, customers were confused by the terms of the rebate agreements and would have changed their purchasing behavior had the disclosures associated with discount limitations been adequate, Ms. Miles' calculations imply that all customers that enrolled into the at-issue card programs over a certain period were harmed." *Id.* ¶ 111.

d.   "Ms. Miles did not conduct any analyses to determine which customers were harmed by the inadequate disclosures, what the amount of injury to those customers was, and what the net unlawful profits from those harmed customers were. She simply calculated the difference between the actual discounts received by customers and the advertised discounts assuming that all gallons purchased by customers—without exceptions—would have earned the advertised rebates." *Id.* ¶ 113.

153.   Professor Schoar's review of FleetCor's rebate data revealed that customers who did not receive the maximum rebate advertised did so because they fell into one or more exclusions.  Schoar Rebuttal Report (Ex. 269-B) ¶ 115.  Professor Schoar concluded that FleetCor's customers received the discounts that were advertised.  *Id.*

**Fuel Only Claims (Count II)**

154.   An analysis of FleetCor's "fuel only" cards shows that 97% of all dollars spent were only on fuel.  Wind Report (Ex. 270-A) ¶ 271.

155.   An analysis of FleetCor's declined transactions reveals that over two million transactions were declined because they were for non-fuel purchases.  Schoar Liability Report (Ex. 269-A) ¶ 139.

156.   When using a Fuelman Mastercard at an accepting location, "if fuel only has been requested by the customer, then . . . the customer can . . . make a purchase at the pump alone."  Thekkekara 2-19-21 30(b)(6) Dep. (Ex. 294) at 170:19–171:14.

**Transaction Fees (Count III)**

157.   The FTC contends that FleetCor's Convenience Network Surcharge (CNS), Minimum Program Administration Fees (MPAF), and Level 2 pricing are transaction fees, all of which are disclosed multiple times to customers.  Wind Report (Ex. 270-A) ¶¶ 153–79; *id.* ¶¶ 189–93; Wind Report (Ex. 270-B) App. T.

    a.   CNS is a fee for out-of-network purchases (like an out of network ATM fee).  Chen Decl. (Ex. 272) ¶ 18.

    b.   The MPAF is a fee that applied in certain programs when fuel prices fall below a benchmark amount, until 2018.  *Id.*

    c.   Level 2 pricing is not a fee, but rather is a markup on the price of fuel for customers who are higher credit risk.  *Id.*

158.   A transaction fee is a fee charged for every transaction on a fuel or credit card.  Coan Dep. (Ex. 280) at 39:19–40:2; Chen Decl. (Ex. 272) ¶ 16 ("A transaction fee is a fee charged by a company per every transaction (for the right to make the transaction).").

159.   The Convenience Network Surcharge (CNS), Minimum Program Administration Fees (MPAF), and Level 2 pricing are not transaction fees. Chen Decl. (Ex. 272) ¶ 18.

160.   FleetCor has never even charged MPAF or Level 2 on a transaction basis (they are per gallon charges).  Chen Decl. (Ex. 272) ¶ 19.

161.   Level 2 pricing is not even a fee at all.  Chen Decl. (Ex. 272) ¶ 18.

162.   FleetCor has not charged transaction fees to Fuelman customers since 2014.  Chen Decl. (Ex. 272) ¶ 17; Clarke Dep. (Ex. 279) at 280:7–20; Panhans Dep. (Ex. 289) at 178:22–179:7.

## Material Facts Concerning the FTC's Lack of Evidence

### No Empirical Evidence of Deception

163.   The FTC has conceded that it does not have evidence that even 10% of FleetCor's customers were deceived, viewed allegedly deceptive FleetCor advertising, relied on allegedly deceptive FleetCor advertising, or considered the allegedly deceptive claims material in their decision to enroll in a FleetCor card program.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 502:16–510:18.

164.   The FTC has conceded that it has no empirical or extrinsic evidence testing customer interpretation of the claims.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 497:19–25; Morwitz Dep. (Ex. 288) at 235:25–236:4.

165.   The FTC has no evidence of "how any FleetCor customers reacted to the particular up to claims that FleetCor made."  Morwitz Dep. (Ex. 288) at 235:25–236:4.

166.  Up-to advertising claims are common and not inherently deceptive.  Morwitz Dep. (Ex. 288) at 232:17–236:4; Miles Dep. (Ex. 287) at 236:11–254:2.

167.  Determining "how customers interpret a specific save up to claim depends upon a number of factors."  Morwitz Dep. (Ex. 288) at 232:21–236:4.

168.  The FTC has no evidence concerning how FleetCor customers interpret the term "transaction fees" or how customers interpret any of FleetCor's fees.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 511:4–512:9.

169.  The FTC does not have any evidence concerning "how many customers saw the ads that [it] contend[s] are deceptive."  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 501:2–505:9.

170.  The FTC does not have any evidence that customers actually do not understand any of the many versions of the Terms and Conditions that have been used over time.  FTC 2-25-21 30(b)(6) Dep. (Ex. 281) at 120:6–122:17; Morwitz Dep. (Ex. 288) at 16:12–14.  The FTC's own expert conceded she was not aware of a single credit card company in the United States that did not use the very billing, fee, and disclosure practices the FTC objects to here.  Morwitz Dep. (Ex. 288) at 139:11–147:6.

**FleetCor Has Identified Overriding Errors in Krosnick's Report**

171.   The FTC's claims of deception and unfairness rely heavily on the report and testimony of Professor Jonathan Krosnick.  FTC MSJ at 4, 5, 18–22, 30–31; FTC SMF ¶¶ 176, 187–94, 313.

172.   Professor Krosnick conceded that he did not test deception and disclaimed any opinion as to whether FleetCor's customers are deceived—either in general or as to any particular feature of their card programs.  Krosnick Dep. (Ex. 286) at 70:22–80:22.

173.   Professor Krosnick's study asked employees of FleetCor customers whether they remembered being told about a long list of specific fees between 2 years and more than 12 years after they signed up.  Kahana Rebuttal Report (Ex. 268) ¶ 14.

174.   Professor Krosnick's study included responses from individual owners and employees who did not remember whether they signed up for their company's FleetCor card.  Krosnick Report (Ex. 41) App. B-3, at 21.

175.   Professor Krosnick's study discouraged customers from answering "I don't know."  First, the questions designed by Professor Krosnick did not provide "I don't know" as an answer choice.  Wind Rebuttal Report (Ex. 270-C) ¶¶ 54–59.

176.   Then, if respondents still answered that they did not know or remember the answer to a question, the interviewer was instructed to say it

would be "a big help" to "give me your best estimate," "[e]ven if you're not completely sure." *See* Krosnick Report (Ex. 41) App. B-6, at 6.

177.   Professor Krosnick's instruction for respondents to answer even if they did not remember the communications or even if they did not remember being the person who signed up for a FleerCor card biased the results.  Wind Rebuttal Report (Ex. 270-C) ¶¶ 54–64; Kahana Rebuttal Report (Ex. 268-A) ¶¶ 38, 41.

178.   Professor Michael Kahana, a world renowned expert in memory, opined that "[p]eople rapidly forget details of events that lack salience, such as the specific terms of credit card fees or other common business transactions."  Kahana Rebuttal Report (Ex. 268-A) ¶ 13.

179.   The inability of FleetCor customers to recall details of fee disclosures many years after the fact reflects the reality of human memory. It is not proof of a lack of disclosure.  Kahana Rebuttal Report (Ex. 268-A) ¶¶ 31–39, 41; *see also* Wind Rebuttal Report (Ex. 270-C) ¶ 31 ("[T]his is really a commonsense point that has been well established in the marketing and consumer behavior field for decades.").

180.   Professor Krosnick himself and other FTC witnesses admitted that they could not recall what they were informed when they signed up for their personal credit cards.  *See, e.g.*, Krosnick Dep. (Ex. 286) at 368:12–376:3; FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 475:24–491:16.

181.   Professor Wind, one of the world's leading experts in consumer marketing, identified nine "fatal flaws in design and execution that render the results unreliable and invalid":

    a.    "Dr. Krosnick prevented respondents from providing the most likely answer to his questions."  Wind Rebuttal Report (Ex. 270-C) ¶¶ 54–59.

    b.    "Dr. Krosnick removed the most reliable question from his survey after pre-testing its results."  *Id.* ¶¶ 60–61.

    c.    "Dr. Krosnick included respondents in his survey that said they should not be included."  *Id.* ¶¶ 62–65.

    d.    "Dr. Krosnick's survey did not interview the correct members of Fleetcor customer buying centers."  *Id.* ¶¶ 66–72.

    e.    "Dr. krosnick's questions are invalid because they presented scenarios that never occurred with Fleetcor customers."  *Id.* ¶ 73.

    f.    "Dr. Krosnick failed to follow best practices in retrieving respondent memory."  *Id.* ¶¶ 74–79.

    g.    "Dr. Krosnick did not have a control group and therefore does not establish causation."  *Id.* ¶¶ 80–83.

    h.    "Dr. Krosnick used biased interviewers."  *Id.* ¶¶ 84–87.

    i.    "Dr. Krosnick failed to keep respondents blind to the sponsor of the study which may have caused significant bias."  *Id.* ¶¶ 88–94.

(all capitalization normalized).

182.   Given these many flaws, Professor Wind described Professor Krosnick's study as "biased," "fake," and "one of the worst studies I've ever seen" out of "thousands."  Wind Dep. (Ex. 296) at 214:1–15, 262:7–17.

183.   Applying the science of memory, and in particular a "forgetting curve," Professor Kahana determined that the vast majority of customers *would* have reported being informed of fees, had they been asked around the time they signed up, instead of years later.  Kahana Rebuttal Report (Ex. 268-A) ¶¶ 42–45.  FleetCor's experts also provided empirical evidence that FleetCor's customers are informed about the fees and terms of their fuel card, Wind Report (Ex. 270-A) § V.B; Schoar Liability Report (Ex. 269-A); Schoar Rebuttal Report (Ex. 269-B) § V.A–B.

**Declarants Do Not Provide Evidence of Deception of Unfairness**

184.   The FTC has submitted a declaration from Margaret Mohlenhoff Scott.  Ex. 60.

185.   Ms. Scott worked in FleetCor's revenue management department for six months in late 2015 through early 2016 as a revenue analyst, which is an entry-level role.  Chen Decl. (Ex. 272) ¶ 23.

186.   Ms. Scott had no involvement in FleetCor's marketing, sales, or payment processing operations.  She also had no role in determining how fees were set, imposed, or disclosed to customers.  Chen Decl. (Ex. 272) ¶ 24.

187.   Ms. Scott's statement that "FleetCor did not make it easy for customers to pay by EFT [('electronic funds transfer')] because doing so would reduce the number of customers who paid late" is false.  Ms. Scott says she

was told this by Ms. Chen and Mr. Cockrell, but they both deny it.  Chen

Decl. (Ex. 272) ¶¶ 27–28; Cockrell Decl. (Ex. 273) ¶¶ 4–5.

188.   Ms. Chen and Mr. Cockrell explain the real reason FleetCor did

not offer EFT at this time was due to technological limitations.  As Ms. Chen

explains:

> When Ms. Scott worked for FleetCor, FleetCor did not have an
> automated process to manage and process EFT payments; rather,
> for the customers for whom FleetCor provided EFT payments
> options, FleetCor maintained the customers' bank account
> information offline and manually processed those payments when
> payments were due.  FleetCor allowed customers to choose the
> EFT payment option, but it charged for it because of the manual
> nature of the process and the cost associated with it.  FleetCor
> now has a more automated EFT payment process integrated with
> customer user interface, which was implemented after Ms. Scott
> left the company, and FleetCor no longer charges for EFT
> payment option.

Chen Decl. (Ex. 272) ¶¶ 28–29; *see also* Cockrell Decl. (Ex. 273) ¶ 4

("Due to technological limitations at the time, FleetCor made the

judgment that it could not expand that service to all customers.").

189.   After Ms. Scott left the company, FleetCor invested in new

payment processing systems that, among other benefits, allows every

customer to use EFT as a free payment option.  Chen Decl. (Ex. 272) ¶28;

Cockrell Decl. (Ex. 273) ¶ 5.

190.   Ms. Chen testified that, contrary to Ms. Scott's assertion, she

never said that "FleetCor did not want customers to start paying on time so

that FleetCor could continue to generate late fee revenue." Chen Decl. (Ex. 272) ¶29.

191.   Contrary to Ms. Scott's assertion, neither Ms. Chen nor Mr. Cockrell said that "FleetCor did not charge fees to customers for the first few months . . . because customers were more likely to pay close attention to their bills during that time."  Chen Decl. (Ex. 272) ¶ 30 (omission in original); Cockrell Decl. (Ex. 273) ¶ 6.

192.   Ms. Chen testified that, based on her nearly decade working at FleetCor including senior roles within the Revenue Management Department, she is "not aware of any evidence or understanding that customers pay less attention to their bills after the first two or three months." Chen Decl. (Ex. 272) ¶ 31.

193.   To the contrary, one of the main reasons customers sign up for a FleetCor card (particularly small and medium size customers) is for the reports FleetCor provides.  Chen Decl. (Ex. 272) ¶ 31.

194.   FleetCor customers use these Fleet Management Reports and find them very valuable.  Chen Decl. (Ex. 272) ¶ 31.

195.   Mr. Cockrell testified that he never said that "FleetCor's bread-and-butter customer is a mom-and-pop business where the wife handles the bills and is too busy to look things over carefully, so she just pays without questioning any of the charges."  Cockrell Decl. (Ex. 273) ¶ 7.

196.   Mr. Cockrell and Ms. Chen both deny that this statement accurately reflects FleetCor's customer base or business model.  Cockrell Decl. (Ex. 273) ¶ 7; Chen Decl. (Ex. 272) ¶ 33.

**Material Facts Concerning Mr. Clarke's Individual Liability**

197.   Mr. Clarke exercises only high-level authority and relies on numerous, capable deputies to manage day-to-day affairs of the company. *See, e.g.*, Clarke Dep. (Ex. 279) at 81:11–22.

198.   Mr. Clarke was not personally involved in the details of how a fee would be disclosed to customers or the content of any advertisement.  *See, e.g.*, Clarke Dep. (Ex. 279) at 109:4–19; *see also id.* at 71:18–72:7 (had no involvement in individual marketing decisions).

199.   Mr. Clarke instructed his employees throughout the relevant time period to ensure that customers receive adequate notice and that the company operated in accordance with the terms and conditions.  *See, e.g.*, Clarke Dep. (Ex. 279) at 119:15–120:4.

200.   Following the public allegations of unfair business practices, Mr. Clarke instructed FleetCor's general counsel to investigate the allegations. Clarke Dep. (Ex. 279) at 285:6–286:13.

201.   Mr. Clarke tasked a senior executive to identify business opportunities to improve the customer experience.  Rachide Dep. (Ex. 291) at 26:8–27:7; Clarke Dep. (Ex. 279) at 85:20–88:17, 89:12–90:3.

**Facts Concerning The FTC's Investigation**

202.   The FTC's investigation began after a hedge fund that held a short position in FleetCor's stocks published a series of false and misleading reports about FleetCor's business practices, in hopes that the reports would drive down FleetCor's stock price.  FTC-Prod-00130162 (Ex. 297) (citing FTC-Prod-00130170).

203.   That hedge fund then engaged, through a third party, an attorney with personal connections to senior FTC lawyers to encourage the Commission to open an investigation.  *Id.*; Hudson Cook, LLP Responses to Non-Party Subpoena (Ex. 308), at Response to Request No. 1 (Camil Consulting as client).  Chen Decl. (Ex. 272) ¶¶ 34–36.  Notably, Camil Consulting obtained a FleetCor fuel card, but had zero transactions.  The internet listing for the company says it is a private investigator for financial firms, including hedge funds.  *Id.*

204.   Although the FTC asserts a widespread scheme of deception and unfairness, the FTC admitted that it "does not know," let alone have evidence to support, that even ***ten percent*** of FleetCor's customers saw or relied on the allegedly deceptive ads, were deceived by FleetCor ads, or failed to give express informed consent to any fees.  FTC 3-23-21 30(b)(6) Dep. (Ex. 282) at 502:16–510:18.

205.    This is contradicted by the overwhelming empirical evidence. Professor Wind's testimony shows that the majority of FleetCor's customers were aware that fees could apply, that the vast majority knew how to obtain additional information about fees, and less than one-half of 1% were even potentially deceived about the fees.  *See* Wind Report (Ex. 270-A) ¶¶ 121–26.

206.    Similarly, Professor Schoar showed that FleetCor' customers were not deceived as to fees:  she analyzed how FleetCor customers used their cards and demonstrated that customer behavior did not change when fees were imposed and itemized in customers' Fleet Management Reports, indicating that FleetCor customers were not "surprised" or uninformed about the fees.  Schoar Liability Report (Ex. 269-A) ¶¶ 154–55.

Dated:  May 17, 2021                    Respectfully submitted,

                                        /s/ Mark D. Hopson
John Villafranco                        Mark D. Hopson, *pro hac vice*
Jaimie Nawaday                          Benjamin M. Mundel, *pro hac vice*
Levi M. Downing                         Daniel J. Hay, *pro hac vice*
KELLEY DRYE & WARREN LLP                SIDLEY AUSTIN LLP
3050 K Street, N.W.                     1501 K Street, N.W.
Washington, D.C. 20007                  Washington, DC 20005
Tel: (202) 342-8400                     Tel:  (202) 736-8048
Fax: (202) 342-8451                     Fax: (202) 736-8711
jvillafranco@kelleydrye.com             mhopson@sidley.com
jnawaday@kelleydrye.com                 bmundel@sidley.com
ldowning@kelleydrye.com                 dhay@sidley.com
*Counsel for Ronald Clarke*             *Counsel for FleetCor Technologies, Inc.*

                                        Michael A. Caplan, Ga. Bar No. 601039
                                        Jessica A. Caleb, Ga. Bar No. 141507
                                        CAPLAN COBB LLP
                                        75 Fourteenth Street, N.E.
                                        Suite 2750
                                        Atlanta, Georgia 30309
                                        Tel: (404) 596-5600
                                        Fax: (404) 596-5604
                                        mcaplan@caplancobb.com
                                        jcaleb@caplancobb.com
                                        *Counsel for All Defendants*

## LOCAL RULE 5.1 CERTIFICATION

Pursuant to LR 7.1(D), I hereby certify that the foregoing was prepared

with 13-point Century Schoolbook font in accordance with LR 5.1(C).


/s/ Mark D. Hopson
Mark D. Hopson, *pro hac vice*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel:  (202) 736-8048
Fax: (202) 736-8711
mhopson@sidley.com
*Counsel for FleetCor Technologies, Inc.*