IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FEDERAL TRADE COMMISSION, :
:
    Plaintiff, :
:
v. :    CIVIL ACTION NO.
:    1:19-cv-5727-AT
FLEETCOR TECHNOLOGIES, INC., :
and RONALD CLARKE, :
:
    Defendants. :
:

**<u>OPINION AND ORDER</u>**

# Table of Contents

I.  INTRODUCTION ................................................... 3

II. BACKGROUND ................................................... 4

    A. Allegedly False Advertisements ............................... 6

        i.  Ads Promising Per-Gallon Discounts (Count I): ........................... 6

        ii. Ads Promising "Fuel Only" Purchase Controls (Count II): ........... 9

        iii. Ads Promising No Transaction Fees (Count III): ....................... 11

    B. Allegedly Unauthorized Fees and Related Billing Statements (Counts IV and V) .............................................................. 12

    C. Procedural History ................................................... 15

III. LEGAL STANDARD FOR SUMMARY JUDGMENT ...................................... 16

IV. DISCUSSION ................................................... 18

    A. Count I: Promised Discounts Ads ................................... 23

        i.  The Net Impression of Discount Ads ........................... 23

        ii. Whether the Ads Were Likely To Deceive ................................... 32

        iii. Materiality ................................................... 44

    B. Count II: Fuel Only Restriction Ads ................................... 45

        i.  The Net Impression of Fuel Only Ads ........................... 45

ii. Whether the Ads Were Likely to Deceive .......................................47

iii. Materiality ...................................................................... 50

C. Count III: No Transaction Fees Ads ......................................... 51

i. The Net Impression of No Transaction Fee Ads ........................... 51

ii. Whether the Ads Were Likely to Deceive ..................................... 52

    1. The Convenience Network Surcharge ...........................53

    2. Minimum Program Administration Fee........................55

    3. Level 2 Pricing/High Risk Fee ..................................... 56

iii. Materiality ....................................................................... 60

D. Reliance ............................................................................. 60

E. Count V: Unfair Fee Practices.................................................. 63

i. FleetCor's Fee Practices Caused Substantial Injury..................... 65

    1. Unauthorized Late Fees Caused Substantial Injury......67

    2. Other Unauthorized Fees Caused Substantial Injury ...76

ii. The Injury Was Not Reasonably Avoidable.................................. 84

    1. Late Fees Were Not Reasonably Avoidable................. 86

    2. Other Unexpected Fees Were Not Reasonably Avoidable ........................................................................ 90

iii. There Were No Countervailing Benefits.......................................109

F. Count IV: Deceptive Representations on Billing Statements ................111

G. Individual Liability of Defendant Clarke................................................ 112

i. Clarke Had Authority to Control the Practices........................... 113

ii. Clarke Had Knowledge of the Practices...................................... 116

    1. Clarke Exchanged Emails with FleetCor Subordinates, Partners, and Shareholders Regarding the Ads and Practices........................................................................ 117

    2. Clarke Received and Read Public Reports Criticizing FleetCor's Ads and Practices and Discounted Them .. 119

H. Injunctive Relief..............................................................................122

V. CONCLUSION ...................................................................................128

**GLOSSARY OF REPEATED ABBREVIATIONS:**

| T&Cs | Terms and Conditions |
|------|----------------------|
| EFT | Electronic Funds Transfer |
| FMR | Fuel Management Report |

## I.  INTRODUCTION

The Federal Trade Commission brings claims in this case against FleetCor Technologies, Inc. and its CEO Ronald Clarke for violating Section 5 of the Federal Trade Commission Act ("the FTC Act"). The FTC alleges that FleetCor and Clarke made deceptive representations in advertisements and charged a slew of unauthorized, unfair fees, all in connection with FleetCor's fuel card products. Now before the Court are the FTC's Motion for Summary Judgment [Doc. 122] and Defendants' Partial Motion for Summary Judgment [Doc. 161].

In support of its claims, the FTC presents a broad and detailed array of hard, primary source evidence, including the advertisements at issue, FleetCor's internal marketing studies, and an outpouring of customer complaints regarding the company's false representations and unfair conduct. For purposes of evaluating the issues posed by the parties' respective summary judgment motions, the Court must construe the facts in the light most favorable to the party opposing each motion and accept as true all of the opposing party's factual assertions, if supported by the record. As demonstrated by the discussion below, the FTC's accumulated evidence presented in this case is compelling and overwhelms FleetCor's evidentiary and legal defenses.

In a separate order, the Court has addressed the FTC's Motion to Exclude the testimony of Defendants' expert, Dr. Yoram (Jerry) Wind. Below, the Court first details the factual background (Section II) before discussing the applicable legal standard (Section III). The Court then assesses the FTC's substantive claims and the evidence in support of each claim (Section IV).  The Court then evaluates the individual liability of Defendant Clarke and the parties' arguments as to whether injunctive relief is appropriate under the circumstances. The Court's rulings are set forth below.

## II. BACKGROUND[1]

FleetCor is a company that markets and sells "fuel cards" to businesses, government entities, and non-profit organizations that own one or more vehicles and hire people to drive them. (FTC Statement of Material Facts ("SOMF"), Doc. 132-2 ¶ 6; *see also* FleetCor New Hire Orientation, Doc. 139-7 at ECF 8.) A "fuel card" is a payment method that allows a FleetCor customer to purchase fuel and, depending on the card settings, vehicle maintenance or other goods and services. (FleetCor New Hire Orientation, Doc. 139-7 at ECF 10.) Fuel cards are an alternative to other payment methods, like cash or credit cards. (*Id.* at ECF 11.) A FleetCor customer, such as a small business, purchases fuel cards from FleetCor and distributes those cards to its employees to use for buying fuel, maintenance, and/or other goods at fueling locations, like gas stations. (*Id.* at ECF 12–14.)

---

[1] The factual description here does not constitute actual findings of fact. The Court derives the facts below from the evidence in the record and views these facts in the light most favorable to the non-moving party on the particular issue.

FleetCor provides different types of fuel cards. As relevant here, FleetCor sells: (1) Fuelman cards, accepted by merchants in FleetCor's proprietary "Fuelman Network," i.e., entities that FleetCor has directly contracted with for acceptance (FTC SOMF, Doc. 132-2 ¶ 12); (2) MasterCard fuel cards that are accepted at all fuel and maintenance locations that accept MasterCard (*id.* ¶ 19); and (3) co-branded cards that are offered in partnership with major fuel merchants, e.g., BP, Speedway, Arco (*id.* ¶¶ 23–24). The third category — the co-branded cards — operate on either the Fuelman Network or on the MasterCard Network. (*Id.* ¶ 26.)

The vast majority (90–95%) of FleetCor's customers are small- and medium-sized businesses, with less than $100,000 credit limits and fewer than 100 cards/drivers. (Deposition of Ronald Clarke ("Clarke Dep."), Doc. 144 pp. 35:16–23; 29:6–15; Deposition of Ashley Thekkekara ("Thekkekara Dep."), Doc. 147 p. 39:10–18.) However, FleetCor's internal documents indicate that customers are generally much smaller than that. (*See, e.g.*, 2017 Growth Plan PowerPoint, Doc. 138-22 at ECF 13) (noting that "accounts with fewer than 10 cards" "represent ~85% of our current SMB [small and medium-sized business] customers"). Additionally, FleetCor's new hire materials state that customers are often small business owners/co-owners who "work in the field/drive[] vehicles" and "do[n't] think of them[selves] as having a 'fleet;'" are "not always in front of a computer;" and are "short on time due to wearing multiple 'hats.'" (New Hire PowerPoint, Doc. 139-7 at ECF 47.) A FleetCor sponsored study related to "small fleet" users of one

card describes customers as: "fairly unsophisticated," "not technically inclined," "business owners but not business people," and, for some, "English was not their first language." (Small Fleet Study, Doc. 134-9 at ECF 11) (also noting "[t]he micro-small fleet decision maker for fuel cards is often the owner or the owner's wife . . ."). Further, according to FleetCor's proposed expert, Dr. Wind, approximately 75% of FleetCor's customers have 10 or fewer cards and 83% have credit limits of $20,000 or less. (Expert Report of Dr. Yoram (Jerry) Wind ("Wind Report"), Doc. 161-10 at ECF 34, Fig. 11.)

This litigation concerns, in part, FleetCor's marketing materials and certain representations made in those materials. As described below, the FTC alleges that these marketing materials made false representations by promising (1) discounts, (2) card controls for preventing fraud or misuse, and (3) no added transaction fees. These promises, according to the FTC, were false.  The relevant ads can be separated into three categories, corresponding to the first three claims asserted by the FTC.

### A. Allegedly False Advertisements

#### i.   Ads Promising Per-Gallon Discounts (Count I):

Advertisements for certain Fuelman Network cards (the Diesel Platinum, Commercial Platinum, and Discount Advantage cards) and MasterCard fuel cards state that customers using the card will achieve a specific amount of savings per gallon. (*See* Per-Gallon Discount Ads, Docs. 122-10 through 122-11, 122-13 through 122-17, 122-22.) Two sample advertisements are shown below:



(Fuelman Discount Advantage Ad, Doc. 122-10) (highlights added).

Similarly, an example of an online ad for the Fuelman Network Diesel Platinum card indicates:




APPLY TODAY!
Click here to find the right Business Fuel Card!
START CHAT
Live Chat by LivePerson
★ ★ ★ ★ ★

What is a Fleet Card?     Find the Right Card     Apply for a Card     Station Locator     Business Line of Credit

## Apply for a Card

🖶 Print   ✉ Email



**Fuelman Diesel Platinum Fleet Card**
**A complete Fuelmanagement solution for diesel fleets.**

◼ Fuelman

**Apply Now »**

**Save 10¢ per gallon on diesel fuel with a customized fleet management solution.***

With **The Fuelman Diesel Platinum**, you can fuel your business with everyday diesel savings of 10¢ per gallon throughout the Fuelman Network.* But savings at the pump are just the beginning. Our purchase controls and detailed reporting can save your business in overall fuel management costs through fuel spend monitoring and the prevention of driver theft and fraud.

**Here's how the Fuelman Diesel Platinum Fleet Card will help your business:**

Savings

- Save 10¢ per gallon on diesel fuel throughout the Fuelman Network*
- Save money with customized limits that prevent purchases outside of the parameters you select

Controls

- Ensure drivers can only make business purchases by restricting cards to fuel or fuel and maintenance only
- Get real-time transaction monitoring and account management capabilities with the iFleet online platform
- Customize card limits by gallon amount, fuel type, time or day of week
- Receive real-time email or text alerts on unusual transactions

Convenience

- Accepted at 50,000 commercial fuel and 20,000 maintenance locations nationwide
- Find convenient locations via www.fuelman.com or the Fuelman Mobile Site Locator app
- Manage your fleet on-the-go with the free Fuelman Mobile app - download it today in the iTunes or Google Play Stores by searching "Fuelman Mobile".

* Earn a 10¢ per gallon volume discount on diesel purchases. Discount is not available on purchases at Loves, Chevron/Texaco, Arco, and Sinclair. Customer's price will never be below Fuelman's cost paid to merchant.

Fuelman® is a registered trademark of FLEETCOR Technologies Operating Company, LLC.

(Fuelman Network Diesel Online Ad, Doc. 122-14) (highlights added).

### ii.    Ads Promising "Fuel Only" Purchase Controls (Count II):

Next, FleetCor's marketing materials advertise that customers can "[r]estrict purchasing to fuel only" to control employee spending:



(Fuelman Discount Advantage Online Ad, Doc. 122-22) (highlights added). MasterCard fuel card ads also market the ability to "customize purchasing

functionality by each individual card and employee" at three different "purchase levels," as indicated in the ad below:



(MasterCard Fleet Card Ad, Doc. 132-11 at 10.) In supporting application/sign-up materials, customers were given the option to select "fuel only," "maintenance only," or "fuel and maintenance only" in connection with each card:



(Universal Premium Fleet Card MasterCard Application, Doc. 125-11 at 4) (highlight added).

### iii.    Ads Promising No Transaction Fees (Count III):

The third set of marketing materials at issue involves FleetCor's promises that customers using their Fuelman Network and MasterCard fuel cards will "[p]ay no set up, transaction or annual fees," for example:



(*See, e.g.*, Fuelman Network Card Ads, Doc. 122-24 at 2, 4, 6, 8, 10.) The FTC asserts that three particular fees were assessed "per transaction" and/or "per gallon" and thus were "transaction fees." These three fees are the: (1) Convenience Network Surcharges; (2) Minimum Program Administration Fees; and (3) Level 2 Pricing Fees (a/k/a "High Risk Fees"). (FTC Brief in Support of Motion for Summary Judgment ("FTC MSJ"), Doc. 132-1 at 17–18.) These fees are discussed further below in the analyses of Counts III and V.

### B. Allegedly Unauthorized Fees and Related Billing Statements (Counts IV and V)

Besides alleging that FleetCor engaged in false advertising, the FTC also contends that FleetCor engaged in an "unfair practice" by charging other unauthorized, unexpected add-on and late fees without obtaining authorization from customers (Count V). (FTC MSJ, Doc. 132-1 at 18–19.)  Thus, Count V does not involve any particular misrepresentation but rather challenges FleetCor's general practice of charging a series of add-on fees. The FTC focuses on approximately eight different fees charged by FleetCor.

The eight fees for purposes of Count V are the three alleged transaction fees discussed above (the Convenience Network Surcharge, Minimum Program Administration Fees, and High Risk Fees), as well as the "Accelerator Rewards Fee, Clean Advantage Fee, FleetDash Fee, Fraud Protected Fee," and also late fees where FleetCor's barriers precluded timely payment or where bills were in fact paid on time. (*Id.*) *Some* of these fees are described in FleetCor's Terms & Conditions ("T&Cs"), as well as in FleetCor's internal company documents and slideshows. (*See, e.g.*, Terms & Conditions, Doc. 132-14.) A draft FleetCor company PowerPoint titled "Card Fee Summary" from August 2019 lists fees applicable to the MasterCard fuel cards as follows:

| Fee Type | Description | Timing | Communications |
|---|---|---|---|
| **Action Related Fees** | | | |
| Late Fee | Greater of 12.25% or $75 with $5000 cap per billing cycle | Exempt for 60 days | In Ts&Cs |
| Finance Charges | Prime +23.99% APR | Exempt for 60 days | In Ts&Cs |
| High Risk Fees | $3 (medium risk) /$4 (high risk) per trx. Customer will then be evaluated every three months. | Exempt for 60 days | In Ts&Cs |
| Rebate/Discount Forfeiture | Applies only to billing period when payments are late. Will automatically be earned next billing period. | Exempt for 60 days | In Ts&Cs |
| Return Check/NSF Fee | $50 per returned check | Per Incident | In Ts&Cs |

| Fee Type | Description | Timing | Communications |
|---|---|---|---|
| **Choice Service Fees** | | | |
| FleetAdvance & FleetDash (Additional Reporting) | $29.97 per month Need Link to One Sheet | Default enrollment with 60 day free trial (opt out) | Welcome Pkg; T&Cs |
| Fraud Protector | 10 or more open cards = $3/card/month up to $300. 9 or fewer cards = $15/month/account If customer opts out they will still get Exception alerts and Fraud alerts for suspicious activity. Need Link to One Sheet | Default enrollment with 60 day free trial (opt out) | Letter and email |
| Accelerator Rewards | Elite (default enrollment) = $4/month/card Could upgrade to Premier w double benefit = $8/month/card Need Link to One Sheet | Default enrollment with 60 day free trial (opt out) | Letter, emails and call |
| Expedited Card Shipping | Overnight - $35; 2-Day - $25; USPS – Free | On customer request | Sales Rep |
| Non-standard billing frequency | $2/card/month if monthly billing is selected | On customer request | Sales Rep |
| EFT set up and handling | $50 initial set up; $5.00 per draft | On customer request | Sales Rep |
| Check by Phone Fee | $0 (zero) for IVR; $15 for Customer Service Rep | On customer request | CSR |
| Tax Exempt Filing Fee | 1% of invoice amount | On customer request | Sales Rep/CSR |
| CDN Tran Fee | $3.00 per trx at CDN proprietary locations | Per Incident | In Ts&Cs |

**Does NOT apply to new customers but existing customers may have one or more of these fees**

| Fee Type | Description | Applicable Population | Communications |
|---|---|---|---|
| **Fees/Program Applicable to Existing Customers Only** | | | |
| Clean Advantage Program | 5c per gallon to offset 100% CO2 emission from fuel usage | Pre 2018 vintage customers could have been enrolled | Letter, email Fee in Fleet Management Report (FMR) |
| Minimum Program Admin Fee | 10c per gallon to cover minimum program operation cost | Pre 2017H2 vintage customers could have been charged | In Ts&Cs; Fee in FMR |

(Card Fee Summary Slides, Doc. 141-9 at ECF 7–8)[2] (highlights added).

---

[2] A number of documents were filed provisionally under seal by the FTC, after having been marked as confidential by FleetCor during discovery. Since the initial filing of the FTC's summary

In Count V, the FTC contends that many or all of these fees were charged to customers who had not agreed to pay them and in many cases were not aware of them.

As to Count IV, the FTC alleges that FleetCor made deceptive and false representations to customers on billing statements when FleetCor represented that customers owed money for the costs of these allegedly unlawful fees. (FTC MSJ, Doc. 132-1 at 31–32.) As with the T&Cs and certain fee practices, FleetCor's billing documentation has been revised throughout the time period relevant to this litigation. However, as an example, one customer's long-form Fleet Management Report (which is a transaction report separate from the customer's invoice, which does not list fees) for March 16, 2017 through March 31, 2017, includes five pages of listed fuel transactions plus a final page that includes other fees:

**CURRENT ACTIVITY SUMMARY**
SUMMARY OF ACTIVITY THIS REPORTING PERIOD

| DESCRIPTION | Gallons | # of Trans | Amount | Currency |
|---|---|---|---|---|
| DK615 - BIG DOG CONSTRUCTION | 478.42 | 1 | 1,286.79 | U.S. |
| Minimum Program Admin Fee | | | 104.04 | U.S. |
| FleetDash Fee | | | 59.94 | U.S. |
| Check Process Fee | | | -25.00 | U.S. |
| Late Fee | | | 330.78 | U.S. |
| | Total | | 1,756.55 | **U.S.** |

(Fuel Management Report Example, Doc. 137-3 at 9.)

---

judgment motion, some of the documents have been unsealed entirely, and others have been filed in redacted form. Some remain under seal. In this Opinion, the Court discusses some information contained in documents that remain provisionally sealed. In such instances, the Court has, after evaluating the competing interests, excerpted — and thus made public — relevant information without revealing any FleetCor proprietary information. In this case, the public right of access to relevant, non-proprietary information is especially significant. *See Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1365 (11th Cir. 2021) ("As we have long recognized, when 'a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case.'") (citing *Brown v. Advantage Eng'g Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992)).

Accordingly, as to Count IV, the FTC contends that these charge statements falsely represent the fees and costs for which customers are responsible because the fees themselves are unlawful.

## C. Procedural History

The FTC brought this action in December of 2019, challenging FleetCor's practices from May 2014 through the filing of the Complaint. (Doc. 1.) The FTC moved for summary judgment on all five counts brought under the FTC Act on April 16, 2021, seeking both injunctive and equitable monetary relief. (Doc. 122.) As discussed at length in the Court's February 7, 2022 Order, the FTC may no longer obtain monetary relief under Section 13(b) of the FTC Act, the provision under which this case was brought. *See AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347 (2021). Accordingly, Defendants' request for summary judgment that the FTC cannot obtain monetary relief under Section 13(b) at this time is **GRANTED**.[3] Besides seeking judgment that the FTC cannot recover money damages under Section 13(b), as granted above, Defendants also seek summary judgment that the FTC is not entitled to injunctive relief for the claims at issue. (*See* Defendants' Response ("Def. Resp."), Doc. 161.) This argument is addressed in Section IV.G of this Order.

Although monetary relief for injured consumers is unavailable under Section 13(b), the FTC seeks summary judgment on the merits of Counts I through

---

[3] As discussed in the Court's February 7, 2022 Order, the FTC may, at the conclusion of its own administrative proceedings, potentially elect to seek consumer refund relief pursuant to Section 19(a)(2) of the FTC Act. (Doc. 192 at 21.)

V and continues to seek injunctive relief. In connection with its Motion for Summary Judgment, the FTC has filed a Motion to Exclude Expert Testimony of Dr. Wind, one of Defendants' expert witnesses, which the Court has addressed in a separate order. (Doc. 171.)

## III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original). Further, a fact is not "material" unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.* ("Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

Where the moving party bears the burden of proof at trial, as here, the moving party must show that, "on all the essential elements of its case on which it bears the burden of proof, no reasonable [factfinder] could find for the nonmoving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). The FTC

must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with *significant, probative evidence* demonstrating the existence of a genuine and material dispute of fact. *Id.*

The essential question is "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250–51 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party."). In deciding this question, it is not the court's function to weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (11th Cir. 1994) (en banc). When reviewing the record evidence at the summary judgment stage, "the court must draw all reasonable inferences in favor of the nonmoving party." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The Court notes at the outset that district courts in this Circuit have on numerous occasions granted summary judgment to the FTC in assessing claims of deceptive and unfair acts under Section 5 of the FTC Act. A number of those decisions have been affirmed by the Eleventh Circuit.[4]

---

[4] *See, e.g.*, *FTC v. USA Fin., LLC*, 415 F. App'x 970, 974 (11th Cir. 2011) (affirming district court's grant of summary judgment to FTC); *FTC v. Peoples Credit First, LLC*, 244 F. App'x 942 (11th Cir.

## IV.   DISCUSSION

As noted above, Counts I through IV assert violations of Section 5 of the FTC Act in connection with allegedly deceptive representations made by FleetCor. Specifically, the FTC contends that FleetCor made false representations regarding per-gallon discounts (Count I), "fuel only" restrictions (Count II), and no transaction fees (Count III). In Count IV, the FTC contends that FleetCor made specific false representations in customer billing statements by indicating that customers owed certain fees that the FTC argues were unlawful, and therefore it was false to claim that those fees were owed. Count V is not based on any specific misrepresentation but instead alleges that FleetCor's practice of charging numerous unexpected fees (including erroneous late fees) without authorization is an "unfair practice" prohibited by Section 5 of the Act.  In this way, liability on Count IV — the alleged misrepresentations in billing statements — is contingent upon liability on Count V and a finding that FleetCor's charging of the fees at issue was an unfair practice and thus unlawful. The Court therefore discusses Count V before turning to Count IV.

---

2007) (same); *FTC v. Lalonde*, 545 F. App'x 825, 841 (11th Cir. 2013) (same); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) (Pannell, J.), *aff'd,* 356 F. App'x 358 (11th Cir. 2009) (summarily affirming grant of summary judgment to FTC); *FTC v. Windward Mktg., Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) (Hull, J.); *FTC v. Primary Grp. Inc.*, 2016 WL 4056206, at *10 (N.D. Ga. May 19, 2016) (Cohen, J.), *aff'd,* 713 F. App'x 805 (11th Cir. 2017); *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *51 (M.D. Fla. Sept. 16, 2011), *aff'd sub nom. FTC v. Krotzer*, 2013 WL 7860383 (11th Cir. May 3, 2013); *FTC v. Wolf*, 1996 WL 812940, at *5 (S.D. Fla. Jan. 31, 1996). *See also FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) (vacating district court's entry of judgment in favor of defendant and remanding for the entry of judgment in favor of the FTC and directing district court to fashion appropriate relief on remand); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1364 (11th Cir. 1988) (affirming Commission's grant of summary judgment to FTC and issuing enforcement order).

Section 5 of the FTC Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). To establish liability under Section 5 based on a particular representation — as relevant to Counts I through IV — the FTC "must show that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." *FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021); *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).

As to the first element, "[w]hen assessing the meaning and representations conveyed by an advertisement, a court must look to the advertisement's overall, 'net impression' rather than the literal truth or falsity of the words of the advertisement." *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008) (Pannell, J.). If an advertisement either (1) expressly states or (2) clearly and conspicuously implies a claim, "the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim." *Id.* (citing first *In re Thompson Med. Co., Inc.*, 1984 WL 565377, at *102 (F.T.C. Nov. 23, 1984), then citing *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 958 (N.D. Ill. 2006) ("Where implied claims are conspicuous and reasonably clear from the face of the advertisements, extrinsic evidence is not required."), *amended on reconsideration in part on other grounds*, 472 F.Supp.2d 990 (N.D. Ill. 2007), *aff'd* 512 F.3d 858 (7th Cir. 2008)).

On the second element — whether a representation was likely to mislead customers acting reasonably — the FTC may pursue a "falsity theory," a "reasonable basis theory," or both. *Id.* at 1190. If the FTC proceeds under a falsity theory, as it primarily does in this case, it must "demonstrate either that the express or implied message conveyed by the ad is false." *Id.* On this second element, the FTC *is not required* to prove that customers were actually deceived; instead, the FTC must only establish that the representation had a "tendency to deceive" customers. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993); *Thompson Med. Co., Inc. v. FTC*, 791 F.2d 189, 193 (D.C. Cir. 1986); *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1273–74 (M.D. Fla. 2016) ("Moreover, a 'tendency to deceive' is all that is required, such that proof of actual consumer deception is unnecessary."); *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013). Thus, while "proof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *FTC v. USA Fin., LLC*, 415 F. App'x 970, 973 (11th Cir. 2011) (citing *FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)).

Further, the FTC is not required to show that the defendants *intended* to deceive consumers, as intent is not an element of the claim. *See USA Fin.*, 415 F. App'x at 974, n.2 (explaining that "a defendant cannot avoid liability under section 5 of the [FTC Act] by showing that he acted in good faith because the statute does not require an intent to deceive"); *Primary Grp. Inc.*, 2016 WL 4056206, at *10

(N.D. Ga. May 19, 2016) (Cohen, J.) (explaining that purpose of Section 5 is to protect the consuming public, thus, intent to deceive is not an element of a Section 5 violation) (citing *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005)); *FTC v. Cap. Choice Consumer Credit, Inc*., 2004 WL 5149998, at *33 (S.D. Fla. Feb. 20, 2004), *aff'd*, 157 F. App'x 248 (11th Cir. 2005); *see also FTC v. World Travel Vacation Brokers, Inc*., 861 F.2d 1020, 1029 (7th Cir. 1988). And, in evaluating whether an advertisement had a tendency to deceive, "deception is evaluated from the perspective of . . . a reasonable consumer in the audience targeted by the advertisement." *Wash. Data*, 856 F. Supp. 2d at 1272 ("The standard for 'deception' has been the 'average' or 'ordinary' person in the audience addressed by the ad, taking into account that many who may be misled are unsophisticated and unwary.") (citation omitted); *see also Matter of Cliffdale Assocs., Inc*., 103 F.T.C. 110, 1984 WL 5655319 at *48 (F.T.C. Mar. 23, 1984) (explaining that statements are evaluated "in light of the sophistication and understanding of persons to whom they were directed," whether the typical customers are children, the elderly, or doctors). Finally, there is no "extravagance defense" — that is, defendants cannot escape liability by claiming that advertisements were so unreasonable that they could not be believed. *Tashman*, 318 F.3d at 1277 (11th Cir. 2003) ("*Caveat emptor* is simply not the law").

As to the third element, materiality, "[a] representation or omission is material if it is the kind usually relied on by a reasonably prudent person." *Nat'l Urological Grp., Inc*., 645 F. Supp. 2d at 1190 ("A claim is considered material if it

involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.") (citation omitted). Express or clearly implied representations "used to induce the purchase of a particular product or service are presumptively material." *Id.*; *see also On Point*, 17 F.4th at 1080 (11th Cir. 2021) (finding that misrepresentations were material since they either induced consumers to make purchases or to surrender sensitive personal information); *FTC v. 1st Guar. Mortg. Corp.*, 2011 WL 1233207, at *12–13 (S.D. Fla. Mar. 30, 2011) (noting that representations are material if "they were instrumental in affecting the consumers' decisions to pay for goods and services" and ads that "induce the purchase of a product or service are presumed to be material to consumers as a matter of law"). As noted, this standard governs the Court's assessment of Counts I through IV.

Count V, which asserts that FleetCor's fee practices were "unfair" (a different theory than a "deceptive" claim), however, is assessed under a different framework. Under Section 5 of the FTC Act, acts or practices are considered "unfair" if: (1) the acts at issue cause or are likely to cause substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by any countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n); *Orkin Exterminating Co.*, 849 F.2d at 1364 (11th Cir. 1988); *Windward Mktg., Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) (Hull, J.).

## A. Count I: Promised Discounts Ads

The FTC moves for summary judgment on Count I, arguing that Defendants violated Section 5 of the FTC Act when they made false representations about specific per-gallon savings that customers would achieve by using FleetCor's Fuelman Network and MasterCard Network fuel cards. In response, Defendants argue that the net impression of FleetCor's discount ads do not promise per-gallon savings "under all circumstances" because certain disclaimers limit savings to the first 12 months, to certain gas station locations, or for only customers with accounts "in good standing." (Def. Resp., Doc. 161-1 at 19–20.) Defendants also argue that there is evidence that customers were not deceived by the discount advertisements. (*Id.* at 23.)

### i.   The Net Impression of Discount Ads

In support of Count I, the FTC submits dozens of advertisements promising per-gallon savings based primarily on four different fuel cards.[5] (*See* Per-Gallon Discount Ads, Docs. 122-10 through 122-11, 122-13 through 122-17.) The wording on the ads varies slightly but promises certain per-gallon savings, as follows:

- The Fuelman Discount Advantage card promises that customers will "Earn 5¢ cash back per gallon" or "Earn 5¢ cash back with the Discount Advantage FleetCard!" (Docs. 122-10, 122-11.)

- The Fuelman Diesel Platinum card promises "Save 10¢ per gallon on diesel fuel." (Docs. 122-13, 122-14.)

---

[5] The cards at issue are the Fuelman Discount Advantage card, the Fuelman Diesel Platinum card, the Fuelman Commercial Platinum card, and the Universal Premium MasterCard.

- The Fuelman Commercial Platinum card "offers a 5¢ per gallon discount on both unleaded and diesel fuel" and instructs "Save 5¢ per gallon on unleaded and diesel fuel everyday, from gallon one, with no caps on total savings." (Doc. 122-15.) This ad also promises an additional 3¢ savings per gallon for the first three months. (*Id.*)

- The Universal Premium MasterCard states "Save up to 6¢ per gallon wherever Mastercard is accepted." (Docs. 122-16, 122-17.)

As an example, one Diesel Platinum Ad states:



(Diesel Platinum Ad, Doc. 122-13.) The ad prominently displays the advertised 10¢ savings in large, bolded, bright green font at the top of the ad and also in bolded font in the "savings" section, promising the savings "throughout the Fuelman Network." (*Id.*) FleetCor argues in part that the "net impression" of the advertisement does not promise the 10¢ savings "under all circumstances" based on of the language in the disclaimer. The disclaimer, which appears in miniscule font at the bottom of the ad is magnified (significantly) and reproduced below:

*Earn a 10¢ per gallon volume discount on diesel purchases. Discount is not available on purchases at Loves, Chevron/Texaco, Arco, and Sinclair. Customer's price will never be below Fuelman's cost paid to merchant.
**Earn an additional 5¢ per gallon rebate for the first three months from account setup date. Promotional rebate applies to first 2,000 monthly, 923 bi-weekly, or 462 weekly gallons, depending on billing term. Unleaded and diesel fuel gallons are eligible for the promotional offer. Account must be setup by July 3, 2016 to be eligible for the promotional offer. The account must be in good standing and rebates are subject to forfeiture for inactivity.
***To qualify for the $100 statement credit, the account must purchase at least 3,000 gallons of fuel within the first 90 days from account-setup date. Unleaded and diesel fuel gallons are included. Promotional statement credit is credited to the account in full during the following billing cycle. Account must be set up by July 3, 2016 to be eligible for the promotional statement credit offer.

As the enhanced disclaimer remains inscrutable, the Court provides the relevant text below after having significantly magnified the text:

> *Earn a 10¢ per gallon volume discount on diesel purchases. Discount is not available on purchases at Loves, Chevron/Texaco, Arco, and Sinclair. Customer's price will never be below Fuelman's cost paid to merchant.
> **Earn an additional 5¢ per gallon rebate for the first three months from account setup date. Promotional rebate applies to first 2,000 monthly, 923 bi-weekly, or 462 weekly gallons, depending on billing term . . . . The account must be in good standing and rebates are subject to forfeiture for inactivity.

(*Id.*) In this version of the Diesel Platinum card, and most others provided, there is no indication *anywhere* that FleetCor "reserves the right" to change the rebate/discount program at any time. (*But see* disclaimer, *id.* at 6) (stating in fine-print disclaimer, at the bottom right of the ad, that Fleetman (a trademark of FleetCor) "reserves the right to change the rebate program at any time").

Another example of a discount ad is reproduced below; this one, the online advertisement for the Fuelman Discount Advantage card:



(Online Fuelman Discount Advantage Ad, Doc. 122-11) (highlights added). This ad plainly advertises earnings of 5¢ cash back for the card at issue. In the section titled "Easy to Use: Easy to Save," the ad prominently notes that the card is "[a]lso *accepted* across 6 major national brands, *including Chevron, Texaco, Loves, Pilot, Sinclair, and ARCO*." (*Id*.) (emphasis added.) Yet, conversely, the tiny-font disclaimer (shown in typed form below) indicates that the *discounts* are *not* applicable at those same national brands (where the cards are accepted):

> Rebates credited to account statement quarterly, and limited to 2,000 gallons per quarter. Rebates are subject to forfeiture for inactivity or late payment behavior during the quarter. *Discount does not apply to gallons pumped at the Convenience Network of Chevron, Texaco, Loves, Pilot, Sinclair, and ARCO*. Convenience Network is subject to change without notice.

(*Id*.) (emphasis added.) Likewise, the Universal Premium MasterCard fuel card ads indicate that customers will "Save up to 6¢ per gallon on fuel *wherever MasterCard is accepted*," but the fine, tiny print disclaimer states that half of that discount is only available at locations among the *Fuelman Discount Network* and the other half are dependent upon the number of gallons purchased at "Level 3 sites" (a term that is not defined):

> *Earn up to 6¢ per gallon in rebates from a combination of 3¢ per gallon within the Fuelman Discount Network and up to 3¢ per gallon in volume rebates. Purchases must be made within the Universal Premium FleetCard MasterCard and the account must be in good standing. Not valid on aviation, bulk fuel, propane or natural gas purchases. Volume rebates are based on the number of gallons purchased monthly and will be calculated on the gallons pumped at Level 3 sites . . . . The Fuelman Discount Network is a selected group of fuel locations that allow cardholders additional savings. For a list of participating sites, visit www.fuelmandiscountnetwork.com

(Universal Premium MasterCard Ad, Doc. 122-16.) Thus, the advertised "up to 6¢ per gallon savings" is not in fact available "wherever MasterCard is accepted," because discounts were not provided at locations outside of the Fuelman Discount Network, or, for example, if accounts were not in "good standing," if the purchase was a "bulk fuel" purchase, or if not enough gallons were purchased at "Level 3 sites," *etc.*

Based on the explicit language of the ads themselves, the Court concludes that the "net impression" of the advertisements is that customers will achieve the expressly promised per-gallon savings listed, either throughout the Fuelman Network (for the first three cards) or wherever MasterCard is accepted (for the Universal MasterCard). Contrary to Defendants' position, where the advertisement's claim is explicit, or where it is "clearly and conspicuously implie[d]," no extrinsic evidence — in the form of consumer surveys or otherwise — is required to ascertain whether the representation was made. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1189. In finding that the ads promise certain discounts, however, the Court must determine whether, as Defendants argue, the disclaimers alter that net impression such that customers would have understood the caveats that per-gallon savings would only be available at certain locations, if the account was in good standing (a term that is not defined), and/or for the first 12 months, *etc.* (Def. Resp., Doc. 161-1 at 20–21.)

"Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496, 1497 (1st Cir. 1989) ("Anything less is only likely to cause confusion by creating contradictory double meanings."). Courts in this Circuit and across the country have determined that, where a disclaimer is buried in fine print and is without accentuation, it is insufficient to alter the net impression. *See, e.g.*, *On Point,* 17 F.4th at 1080 (11th Cir. 2021) (finding that disclosures were not "sufficient to disabuse consumers of" the impression that a website would provide certain services when they were "either too small or too vague to dispel the misrepresentations otherwise created by the websites"); *Removatron*, 884 F.2d at 1496, 1497 (affirming ALJ's decision that disclaimers about hair-removal product did not cure deception); *FTC v. Brown & Williamson Tobacco Corp*., 778 F.2d 35, 42–43 (D.C. Cir. 1985) (finding that, where defendant advertised "1 mg. tar" rating on cigarettes, disclaimer indicating that this rating was from independent labs, not the FTC itself (as was typical), the disclaimer — a "fine-print legend [that], moreover, often appears in virtually illegible form, placed in an inconspicuous corner of Barclay advertisements" — did not eliminate deception); *see FTC v. Cap. Choice Consumer Credit, Inc*., 2003 WL 25429612, at *5 (S.D. Fla. June 2, 2003) (finding that, where advertisements promised a general purpose credit card, such as VISA or MasterCard, "fine print on reverse side" of ad clarifying that the credit card was a "merchandise card and not a major bank card"

was inadequate to modify net impression), *aff'd*, 157 F. App'x 248 (11th Cir. 2005); *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (rejecting defendant's argument that truthful fine print notices on reverse side of checks, invoices, and marketing inserts cured deception that check/invoice was a refund rather than offer for services); *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *51 (M.D. Fla. Sept. 16, 2011) (finding that "not MD" disclaimers were inadequate to dispel net impression regarding professional qualifications of defendant and other employees as advertised), *aff'd sub nom. FTC v. Krotzer*, 2013 WL 7860383 (11th Cir. May 3, 2013); *Wash. Data Res.*, 856 F. Supp. 2d at 1274–75 (rejecting defendants' argument that retainer agreement contained sufficient disclaimer to dispel a misrepresentation about whether a home loan was guaranteed).[6]

Opposite the heavy weight of this authority, Defendants contend — based on a single unreported district court case from California — that the disclaimers here sufficiently apprise customers that the listed savings are contingent upon the host of factors discussed previously. *See FTC v. DirectTV*, 2018 WL 3911196, at *8 (N.D.

---

[6] *See also FTC v. US Sales Corp.*, 785 F. Supp. 737, 751 (N.D. Ill. 1992) (holding that fine print disclaimers at bottom of TV ads were insufficient to qualify express representation in commercial that, regardless of credit history, consumer will not be refused a credit card); *Floersheim v. FTC*, 411 F.2d 874 (9th Cir. 1969) (finding that small print disclaimer did not cure deceptive impression on debt-collecting forms that collections were demanded from the government rather than private company); *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636–37 (2d Cir. 2018) (finding that ingredient list on product side panel did not cure front label's potentially deceptive content that Cheez-Its were "MADE WITH WHOLE GRAIN" as advertised on the box); *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1368–69 (D. Nev. 2014) (finding that fine print did not cure deception where it contained information that contradicted other provisions and was vague), *rev'd and remanded on other grounds sub nom. AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021), and *vacated on other grounds sub nom. FTC v. AMG Cap. Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021).

Cal. Aug. 16, 2018). In that case, the disclaimer at issue was larger, legible, bolded, underlined and in the center of the advertisement — a world away from the disclaimers at issue here.

Consequently, looking to the specific advertisements presently at issue, the Court concludes as a matter of law that the tiny, inscrutable print of the disclaimers does not cure the net impression of the representations in the ads cited, which promise that consumers would be afforded certain per-gallon savings throughout the Fuelman Network and wherever MasterCard is accepted, without condition or caveat.[7] Indeed, it is well-established that "[c]aveat emptor is not the law in this circuit." *IAB Mktg*., 746 F.3d at 1233 (11th Cir. 2014). This is especially true where some of the ads advertise that the cards are *accepted* at certain big merchants (presumably to draw customers to the card) while hiding in the fine print the fact that the *discounts* are not available for transactions with those same large merchants. *See Removatron*, 884 F.2d at 1496, 1497 (noting that disclaimers that contradict the rest of the ad "cause confusion by creating contradictory double meanings.").[8]

---

[7] Defendants' footnote argument that advertising discounts as available "throughout" the Fuelman Network should be understood to advertise rebates only at some locations strains credulity. The Court notes that the dictionary definition of "throughout" is "in or to every part of" or "all the way from one end to the other of." *Throughout*, Merriam-Webster (last visited June 15, 2022), https://www.merriam-webster.com/dictionary/throughout.

[8] Defendants also argue that the words "up to" on some of the ads indicate that the net impression did not in fact promise the full amount listed. The Court does not find this persuasive. The "up to" language was only on a small number of the ads at issue, specifically the MasterCard ads. The pledge of savings "up to 6¢ per gallon," at the very least conveys a net impression that a customer will achieve something close to 6¢ per gallon. However, as shown below, on average, MasterCard customers saved 1¢. *Regardless*, even if the "up to" ads only conveyed the net impression of

### ii.   Whether the Ads Were Likely To Deceive

As noted above, in arguing that the advertisements had a "tendency to deceive customers," the FTC primarily proceeds under a falsity theory. Ergo, the FTC must demonstrate that the messages conveyed by the ads — i.e., that customers would receive the promised discounts — were false. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190.

Here, FTC data analyst Anne Miles calculated the actual savings for each card as follows:

| Product | Advertised Discount Per Gallon | Average Actual Discount Per Gallon |
|---|---|---|
| Fuelman Diesel Platinum − 2016 | 10¢ | 6¢ |
| Fuelman Diesel Platinum − 2017 to 2019 | 8¢ | 6¢ |
| Fuelman Commercial Platinum | 5¢ | 3¢ |
| Fuelman Discount Advantage | 5¢ | 0.1¢ |
| UNMC | 6¢ | 1¢ |

(Declaration of Anne Miles ("Miles Decl."), Doc. 132-7 at ECF 15, Table 5.) The reasons for the differences between the advertised savings and actual savings, as calculated by the FTC's analyst, are borne out by the evidence. As noted, the

---

rebates of 1¢ and thus were not deceptive, the remainder of the ads at issue have no such qualification, and the FTC has still proved its claim, as addressed below. *See FTC v. Fin. Freedom Processing, Inc.*, 538 F. App'x 488, 489–90 (5th Cir. 2013) ("[E]ach advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads.") (quoting *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989)).

advertised discounts were categorically unavailable at certain locations. For example, even though the Fuelman Discount Advantage card was "accepted" at Love's, Chevron, Texaco, etc., the *discounts* were not available at those locations. (*See, e.g.*, Online Fuelman Discount Advantage Ad, Doc. 122-11.) And, even though the Universal MasterCard was advertised as providing up to a 6¢ discount "wherever MasterCard is accepted," Defendants admit that the discounts were unavailable if the locations did not participate in the Fuelman Discount Network, an ever-changing list of merchants.[9]

In addition, per-gallon savings that *were* afforded could be shut off or changed either (1) after customers had been using FleetCor services for some period of time, e.g., 6 months or 12 months, or (2) if customers did not purchase a certain number of gallons. For example, FleetCor's 30(b)(6) witness and Senior Vice President of Revenue Management Yvette Chen admitted that, in May 2015, MasterCard Comdata accounts that did not purchase a certain number of gallons had their discount/rebates "shut off." (Deposition of Yvette Chen ("Chen Dep.") Doc. 145-1 p. 217:7–12) (confirming that email explains that accounts with less

---

[9] The Fuelman Discount Network is a "subset of MasterCard merchant locations that participate in the discount or rebate program" (Deposition of Yue (Yvette) Chen, Doc. 153-2 p. 217:23–25). The merchants themselves determine whether they would like to participate in this network. (*Id.* p. 219:7–9.) The participant merchants "can vary very dynamically." (*Id.* p. 220:19–22.) Further, where customers shop *outside the Discount Network*, those transaction were not eligible for rebates. (Deposition of Nick Izquierdo, Doc. 150-1 p. 72:6-13.) *Based on its reading of the advertisements collectively, the Court understands that large fuel merchants — like Love's and Texaco — did not participate in the Fuelman Discount Network (see Doc. 122-11), and therefore customers using the Universal Premium MasterCard fuel card would not receive rebates from fuel purchases at those locations.*

than 150,000 annualized gallons experienced a rebate shut-off).[10] Most explicit of all is an admission from FleetCor's Head of Sales, Todd House. After FleetCor's CEO Defendant Clarke emailed Head of Sales Todd House asking if there was any "mechanism that 'forfeits customer discounts,'" where fuel price was below $3.25, (Clarke–House Email, April 2017, Doc. 139-6 at ECF 2), Head of Sales House responds:

> We added that language in early 2015 and used it as a basis to remove SMB [small and medium-sized business] volume rebates. **Fundamentally we have had minimal/no SMB rebates since beginning of 2015**.

(*Id.*) (emphasis added). A FleetCor internal company customer survey from September 2016 corroborates this assertion, as the survey found that: "Customers end up paying more than the price at the pump. *Sometimes whole dollars above station price*." (Internal FleetCor Customer Survey, Doc. 135-2 at ECF 21) (emphasis added).

FleetCor argues that the ads are not false because a disclaimer on the ads "reserves the right" to change discounts after 12 months. But, first, the Court has determined that the disclaimer does not cleanse the misleading impressions of per-gallon discounts. Second, as noted above, most of the ads do not include a

---

[10] Similarly, FleetCor admitted in its response to the FTC's statement of material facts that, beginning in March 2016, volume discounts for Universal Premium MasterCard fuel cards were reduced from 3¢ per gallon to 1¢ per gallon for accounts greater than 6 months old. (Comprehensive SOMF, Response, and Reply, Doc. 170-2 at ECF 127–28, ¶ 92.) And FleetCor admitted that, at the end of 2017, it changed the rebate structure for Diesel Platinum customers who had been FleetCor customers for 12 months more from flat cents-per-gallon rebates to volume-based rebates. (*Id.* at ECF 88, ¶ 66.)

disclaimer that FleetCor "reserves the right" to alter the discounts after 12 months at all. FleetCor also argues that the ads are not false because its Terms & Conditions (T&Cs) allow it to change or decrease the rebate structure. But post-hoc disclosures cannot cure earlier misleading representations. *See IAB Mktg.*, 746 F.3d at 1233 (11th Cir. 2014) (rejecting defendant's position that "if consumers had read the disclosures sent to them" they would not have been deceived, and noting that defendant "offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales"); *Wash. Data Res.*, 856 F. Supp. 2d at 1274–75 (rejecting defendants' position that agreements contained disclaimers sufficient to dispel misrepresentation where "the homeowner receives the retainer agreement [with the disclaimer] far too late," and only after seeing the misleading representation and signing up for a payment plan); *Resort Car Rental Sys., Inc. v. FTC,* 518 F.2d 962, 964 (9th Cir. 1975) ("The [FTC] Act is violated if [the seller] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract.") (citing *Exposition Press, Inc. v. FTC,* 295 F.2d 869, 873 (2d Cir. 1961)); *F.T.C. v. E.M.A. Nationwide, Inc.,* 767 F.3d 611, 632 (6th Cir. 2014) (affirming summary judgment for FTC and noting that defendant's later-filed contracts, with more accurate information about services, did not cure representations made in ads that promised up to 70% reductions in mortgage or credit card debt); *see also FTC v. Gill,* 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (granting summary judgment to FTC even after the defendants presented

evidence of more accurate statements and disclaimers found in consumer contracts), *aff'd,* 265 F.3d 944 (9th Cir. 2001).

FleetCor also admittedly withheld discounts/rebates where an account "was not in good standing," as noted in the disclaimers. Beyond the fact that the disclaimers do not alter the net impression, as held above, "good standing" is undefined. Vague disclaimers cannot "dispel the representation otherwise created" by the advertisements in question. *On Point*, 17 F.4th at 1080. *See also AMG Servs.*, 29 F. Supp. 3d at 1368 (finding that net impression was misleading where certain limitations in disclaimer were vague and uncertain).[11]

FleetCor next argues that the discount ads were not false based on the testimony of one of their experts Dr. Antoinette Schoar. Dr. Schoar found that FleetCor customers "obtained the exact savings advertised." (Expert Report of Dr. Antoinette Schoar Report, Doc. 161-8 at ECF 290–94, ¶¶ 114–19). But Dr. Schoar's finding (1) is only based on one of the four cards at issue in Count I, and (2) is based on an assessment that includes the fine-print disclaimers and caveats in the net impression. (*Id.* at ECF 291 ¶ 115.) However, the Court has determined, as a matter of law and based on significant legal authority outlined above, that the fine-print exclusions — such as discounts not being available at certain large-scale merchants, or only being available for 12 months, or only being available to accounts in "good standing" — do not cure the net impressions of the obviously-

---

[11] The Supreme Court's decision in *AMG* regarding the statutory availability of monetary relief did not alter the district court's findings as to the substantive violations under Section 5.

advertised rebate amounts. Therefore, Dr. Schoar's conclusion that customers achieved the "savings advertised" does not create a fact dispute because her baseline of what was advertised is not the same as the baseline as determined by the Court as a matter of law. Moreover, even if Dr. Schoar's testimony were relevant as to one of the four cards at issue, the FTC has undisputedly proven that the advertisements for the remaining three cards were false. For these two reasons, Dr. Schoar's opinion is not evidence sufficient to rebut the FTC's evidence that the advertisements of all four cards were in fact false, as a matter of law.

For purposes of determining whether an ad was likely to deceive, relevant legal authority demonstrates that where advertisements make certain promises, do not deliver on those promises, and thus are false, the advertisements have a tendency to deceive customers. *See Peoples Credit First*, *LLC*, 244 F. App'x 942, 944 (11th Cir. 2007) (affirming district court's grant of summary judgment to the FTC and affirming that ads had tendency to deceive where ads promised platinum credit card with $5,000 limit upon payment but did not deliver on this promise); *FTC v. Wolf*, 1996 WL 812940, at *5 (S.D. Fla. Jan. 31, 1996) (granting summary judgment to FTC where defendant advertised that purchasers would achieve a specific level of earnings in connection with purchased vending machines, and "few, if any, of the purchasers of the defendants' business ventures realized" the promised return); *FTC v. Lalonde*, 545 F. App'x 825, 837 (11th Cir. 2013) (affirming grant of summary judgment and finding that where company represented that it could raise consumer credit scores so that consumers could

obtain mortgages, but company was unable to do so for nearly all customers, representations had tendency to deceive); *USA Fin.*, 415 F. App'x at 973 (affirming district court's grant of summary judgment to the FTC where net impression was that advertised credit cards could be used to make purchases anywhere, not just from defendant, and therefore ads had tendency to deceive); *Wash. Data Res.*, 856 F.Supp.2d at 1274 (finding that advertisement tended to deceive where defendant did not deliver on its promise that customers were guaranteed to obtain home loan); *Cap. Choice*, 2003 WL 25429612, at *5 (finding that where defendant did not provide general purpose credit card, as advertised, and instead provided defendant's limited-purpose merchant card, advertisements had tendency to deceive); *FTC v. E.M. Sys. & Servs., LLC*, 2017 WL 8794849, at *1 (M.D. Fla. Jan. 17, 2017) (finding that where company promised to reduce interest rate on customers' credit card debt and save significant amount of money, but failed to deliver on promised savings for most customers, telephonic ads had tendency to deceive); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528, 532 (S.D.N.Y. 2000) (after trial, finding that representations that customers could obtain revenue in excess of amount invested had tendency to deceive where only few investors could achieve such results).

Here, because the discount ads make certain promises of per-gallon discounts and FleetCor did not deliver on those promises, the ads are false and therefore have a tendency to deceive based on the authority above.

Further, as laid out in the legal standards section, the FTC is not required to provide proof of *actual* deception to establish its claim. *See USA Fin.*, 415 F. App'x at 973; *Figgie*, 994 F.2d at 605–06; *Lanier Law, LLC*, 194 F. Supp. 3d at 1273–74. However, such evidence is "highly probative" to show that a practice has a tendency to mislead consumers acting reasonably. *Id.*

Here, the FTC points to a swath of "highly probative" evidence of actual deception. First, the FTC relies on a slew of FleetCor's own internal customer survey studies.[12] One internal FleetCor survey from January 2018 of "First Year Attrition" of "Small Fleet Customers" (Doc. 139-9 at ECF 19) that was designed to "identify several opportunities to improve retention based on current customer experiences" found that "*70% of customers felt that savings and discounts did not meet their expectations*." (First Year Attrition Survey, Doc. 139-9 at ECF 19) (emphasis added.) Another "small fleet attrition" survey commissioned by

---

[12] In support of its motion for summary judgment, the FTC relies on nearly a dozen studies and surveys that were completed by consulting firms specially retained by FleetCor to study issues related to customer experience, customer "attrition" (i.e., ceasing to use FleetCor cards), and more. FleetCor *does not challenge the admissibility of these surveys/studies at all in its briefing*. However, in response to the FTC's SOMF, FleetCor argues that the studies are hearsay. They are not. Under Rule 801(d)(2)(C)&(D) of the Federal Rules of Evidence, party admissions made by a party's agent or a person whom the party authorized to make the statement are excluded from the definition of hearsay. Here, the surveys, that were "conducted by [] outside consultant[s] specially retained by the defendant to identify" customer concerns, are plainly not hearsay. *Walden v. Seaworld Parks & Ent., Inc.*, 2012 WL 4050176, at *2 (E.D. Va. May 31, 2012) (finding that accessibility audit — to identify compliance issues — conducted by consultant for defendant was not hearsay); *Theriot v. J. Ray McDermott & Co.*, 742 F.2d 877, 882 (5th Cir. 1984) (finding agent's statement made within scope of authority was admissible as a party admission); *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1306 (9th Cir. 1983) (finding that outside report authorized by party was non-hearsay admission). Defendants also object in their response to the FTC's SOMF (but not in their briefs) to the customer complaints made within the studies as hearsay. The Court addresses that contention at n.13, 33, and similarly finds that those complaints are not hearsay.

FleetCor, this one from February 2020 (Doc. 140-5), concluded that a significant theme cited by customers as to why they left FleetCor was "[n]ot seeing value (21%): most customers specifically state *not getting discounts 'promised'*" and, of those stating value as their "primary reason" for leaving, "*87% stated discounts not as promised or too low.*" (Feb. 2020 Small Fleet Attrition Survey, Doc. 140-5 at ECF 15, 17) (emphasis added) ("19% Claim Discounts were not Accurately Described").

The FTC also cites to individual complaints that comport with the aforementioned internal survey data. For example, FleetCor's documents of customer service calls include case comments written by FleetCor customer service representatives stating, e.g.,

> Spoke to [customer] sed [said] was to rec. .5 cpg [cents per gallon] discount [and] acct stated by his sale rep which he e-mailed rep/ was not happy he has not received credit . . . acciout [sic] is set up as a Fuelman Discount Advantage account and is supposed to be getting a flat .5 cpg discount and is not . . . .

(FleetCor Customer Service Raw Data #1, Doc. 134-12.)[13] Another customer was "upset is not receiving .5 cpg discount." (*Id.*) Another FleetCor employee record of a customer call stated:

---

[13] In its briefs, FleetCor does not directly challenge any customer complaints as inadmissible hearsay. However, in its response to the FTC's SOMF, FleetCor objects to certain customer complaints as hearsay. Federal Rule of Evidence 803(3) contains an exception to the hearsay rule, excepting any statement of a declarant's then-existing state of mind, emotion, physical condition, etc. Customer complaints to survey responses have been held to fall within this exception. *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227 (2d Cir. 1999), *amended on reh'g on other grounds* (Sept. 29, 1999); *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1054 (5th Cir. 1981); *BoDeans Cone Co., LLC v. Norse Dairy Sys., LLC*, 678 F. Supp. 2d 883, 902 (N.D. Iowa 2009) (finding customer complaints in surveys conducted by third-party vendor admissible

> Spoke to [customer]. *He was promised that he was going to get rebates every time he fueled. He didn't know about the fuelman discount network,* I explained [to] him about it and he decided to cancel.

(FleetCor Customer Service Raw Data #2, Doc. 198-41) (emphasis added). Likewise, other customer service reports include reference to customer comments stating, "Do as promised! I have yet to receive a rebate/cash back, but am charged late charges and extra for fuel. What gives?! It gets old calling every month." (FleetCor Customer Service Raw Data #3, Doc. 198-37.) In an internal email, FleetCor's Head of Field Sales admitted, "Per the attachments, many [customers] have matched receipts to invoices and are proving that *not only are they not getting 5 and 8 cents off, they are paying over pump price*." (Panhans Email August 2017, Doc. 198-5 at ECF 4) (emphasis added).[14]

There is, consequently, formidable evidence that the rebate ads "were not just likely to mislead consumers, but actively [did] so, with hundreds of customer complaints . . . and a consumer survey to rely on." *On Point*, 17 F.4th at 1080 (11th Cir. 2021) (finding that district court's determination that website ads had a tendency to deceive and that court's grant of preliminary injunction was supported by sufficient evidence).

---

under Rule 803(3) where surveys were "offered to establish facts about [customers'] mental impressions about their relationship with [defendant]"). The Court also notes that these particular complaints are notations from FleetCor's own records, as cataloged by customer service representatives, and therefore, the documents themselves fall within the business records exception, as records kept in the ordinary course of FleetCor's business. Fed. R. Ev. 803(6).

[14] The Court also reiterates that deception claims are assessed "in light of the sophistication and understanding of persons to whom they were directed." *Cliffdale Associates*, 103 F.T.C. 110 at *48. Here, again, FleetCor's own materials demonstrate that customers were "fairly unsophisticated," "not technically inclined." (Small Fleet Study, Doc. 134-9 at ECF 11.)

In the face of this evidence, Defendants attempt to create a dispute of fact as to whether the discount ads had a tendency to deceive based on the testimony of Dr. Wind. Specifically, Defendants rely on Dr. Wind's decision tree conclusion that only 0.3% of customers were potentially deceived. The Court held in its separate *Daubert* Order that Dr. Wind's particular decision tree model was so unreliable as to be inadmissible under *Daubert* standards and the evidentiary record presented.[15] The Court also notes that Dr. Wind did not specifically address the discount ads in question. Under the FTC Act, "where a defendant deploys a marketing campaign with a series of discrete communications with consumers, 'each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive advertisements.'" *FTC v. E.M.A. Nationwide, Inc.,* 767 F.3d 611, 632 (6th Cir. 2014) (quoting *FTC v. Fin. Freedom Processing, Inc.,* 538 F. App'x 488, 489–50 (5th Cir.2013))

And while the Court does not rely on Dr. Wind's evidence in support of its above ruling, even if it were to consider Dr. Wind's report, such consideration would not alter the calculus. As noted above, nowhere in Dr. Wind's report did he consider the actual advertisements at issue in Count I and none of his data or

---

[15] As a reminder, Dr. Wind's survey sample only included respondents who were current customers as of April 23, 2020 and therefore omitted customers from 2014 through April 23, 2020 who may have left FleetCor potentially because they felt deceived. Beyond methodologically slanting the pool of respondents, Dr. Wind also designed his decision tree to include a series of considerations that were not relevant to deception, presumably for the purpose of whittling down the number of customers who were potentially deceived.

opinions speak to the operative question of whether the particular per-gallon representations at issue had a tendency to deceive customers. Defendants attempt misdirection by pointing to Dr. Wind's opinions regarding customer understanding of T&Cs. But FleetCor's T&Cs — sent to customers *after* sign-up — have no bearing on whether an initial advertisement had a tendency to deceive. *Wash. Data Res.*, 856 F. Supp. 2d at 1274–75 (rejecting defendant's argument that retainer agreement had sufficient information to cure earlier misrepresentation where homeowner's received retainer agreement only after signing up for the payment plan); *see also Resort Car Rental Sys., Inc.*, 518 F.2d 962, 964 (9th Cir. 1975) ("The [FTC] Act is violated if [the seller] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."); *Tashman*, 318 F.3d at 1277 (11th Cir. 2003) ("[N]o one doubts the utility of phone cards or claims that the product is a scam; *all that is at issue are the statements made by defendants*.") (emphasis added).[16]

On this second element, Defendants have pointed to no relevant, admissible evidence that creates a dispute of material fact as to whether the discount ads had a tendency to deceive customers about the promises of per-gallon discounts, based

---

[16] The Court also notes that some of the raw data from Dr. Wind's report actually supports the FTC's position that customers were often generally misinformed about per-gallon discounts. In Dr. Wind's Appendix A — which Defendants conveniently omitted from filing — Dr. Wind found that (1) *between 13–17% of customers (incorrectly) believed that per-gallon discounts could not be affected by the volume of fuel purchased, the fueling location, or the wholesale price of fuel*; (2) between 27–45% did not form an expectation about per gallon discounts; (3) between 19–31% did not know or recall about discounts; and (4) only  17–33% of customers in fact understood that per-gallon discounts could be affected by location, amount of fuel purchased, or wholesale price of fuel. (Wind Appendix A, Doc. 170-4 at ECF 60, Ex. 9.)

on the net impression of the specific advertisements. *Anderson*, 477 U.S. at 248 (noting that the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law"). The Court thus finds that the ads at issue did have such a patent "tendency to deceive" FleetCor's customers and that the evidence of such was so one-sided that the Court must find that FleetCor violated the FTC Act.

### iii.   Materiality

Defendants do not seriously dispute that the promises of per-gallon discounts were material. An internal FleetCor survey from June 2017 found that, for "small fleet" customers, the "*promise of discounts* and widespread acceptance of the Comdata fuel card *drives customers to the program*." (*See* Small Fleet FleetCard Research, Non and Lapsed Users, Doc. 134-9 at ECF 8) (emphasis added). FleetCor's own study therefore demonstrates that the promises of discounts were likely to affect customer choice regarding a product and were therefore material. *See Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190. That these per-gallon discount promises were "used to induce the purchase of a particular product" also supports a finding of materiality as a matter of law. *Id.*; *Windward Marketing, Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representation concerning the price of a product or service are presumptively material."); *Peoples Credit First*, 244 F. App'x at 944 (finding that

implication that, upon payment of $45, consumer would receive platinum card, not merchant card, was material).

Thus, on Count I, the FTC has established that (1) FleetCor made representations in its ads for certain per-gallon discounts; (2) these representations were not accurate and had a tendency to deceive consumers; and (3) the representations were material. Defendants have pointed to no evidence that creates a genuine dispute of material fact as to any element.

## B. Count II: Fuel Only Restriction Ads

The FTC next argues that it has established that FleetCor made promises that customers could restrict their employees' purchases to "fuel only" when that was not in fact true. Responding, Defendants contend that customers were not deceived by the fuel only representations. (Def. Resp., Doc. 161-1 at 23–24.)

### i.   The Net Impression of Fuel Only Ads

Defendants do not dispute that FleetCor's ads promised customers that they could limit employee spending on cards to "fuel only." One example is below:



## Controls:

### 24/7 Expense Management.

> **Save money** and gain peace of mind. BuilderPro enables you to **customize purchasing functionality** by each individual card and employee:

PURCHASE LEVELS

1. Materials, fuel, & maintenance
2. Fuel & maintenance only
3. Fuel only

> **Online account management:** Monitor employee transactions in real-time and manage your account online.

> **FleetAdvance:** our mobile application helps you and your employees find the cheapest fuel sites in your area.

(MasterCard Fleet Card Ad, Doc. 132-11 at ECF 2) (highlight added).  In addition, when customers filled out applications to sign up for cards, such as the Universal Premium MasterCard, they were given the option to designate each card as "fuel only," as shown below:



**Universal Premium FleetCard MasterCard®**
Fax completed application to 855-815-2225
or email to smbfax@fleetcor.com

COMPANY NAME: _____     FLEET CONTACT: _____

### 1. DRIVER/VEHICLE CARD SETUP

| | | Card Access (Select One) | | |
|---|---|---|---|---|
| Required for each card requested. Cards may be assigned to a person or a vehicle. Enter an employee's name or a vehicle description. The first word in a Vehicle Description must be "VEHICLE". | | Fuel Only | Maintenance Only | Fuel and Maintenance Only |
| **Description** (limit to 24 characters for Driver Cards; 15 characters for Vehicle Cards) | Vehicle/Employee Number | | | |
| Ex: V E H I C L E _ F O R D _ F 1 5 0 _ 1 4 3 _ _ _ _ | 5 7 8 4 0 0 | ☒ | ☐ | ☐ |
| 1. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | _ _ _ _ _ _ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ |

46

(MasterCard Application, Doc. 125-11 at ECF 4.) The net impression of these representations is that customers could limit employee spending associated with a particular card to *only fuel*. *See Cliffdale Assocs.*, 1984 WL 565319, at *46 (F.T.C. March 23, 1984) (explaining that, where the claim is express, "the representation itself establishes the meaning").

### ii.   Whether the Ads Were Likely to Deceive

Again, the FTC proceeds on a falsity theory and must therefore show that the messages conveyed by the ads were false. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190. As evidence, the FTC relies on FleetCor's internal training materials, in which FleetCor employees are taught about the different cards and controls. One slide in the company materials acknowledges that, although cards can be set to "*fuel only*," this "*is a misnomer*" that "really means" that "cards will only be able to purchase at fuel sites"; however, they can be used to purchase "fuel, snacks, beer," and more:

## Cards can be set to "Fuel Only"

- Remember: MasterCard products can not limit by product type, so "Fuel Only" is a misnomer – it really means:
  - The cards will only be able to purchase at fuel sites
  - **The cards will be limited to one item per transaction (item can be fuel, snacks, beer, etc.)**

(FleetCor New Hire Training Slideshow, Doc. 134-19 at ECF 34) (emphasis added.) To further establish that the "fuel only" representation had a tendency to deceive, the FTC points to evidence of a particularly serious customer complaint. *See, e.g.*,

*USA Fin.*, 415 F. App'x at 973 (noting that *proof of customer deception is not required* but customer complaints are "highly probative" evidence supporting tendency to deceive); *Alcoholism Cure Corp.*, 2011 WL 13137951, at *47 (same). Here, the FTC points to an email from a customer whose employee used a fuel only card to purchase over $200,000 of Speedway gift cards. (October 2017 Email Thread, Doc. 198-6 and ECF 3–4.) The customer writes, "Our big concern is how a 'fuel only' card can have these non fuel charges on them such as misc/groceries and gift cards." In a follow-up email, the customer further complains:

> After reviewing these charges[,] [w]e are disputing all of the $208,688.05 of illegal charges. Drivers should not be allowed to purchase gift cards on a "fuel only" card. *If that was known to us we would never have opened the account.*

(*Id.*) (emphasis added).

In response, Defendants argue first that Dr. Wind's report provides evidence that customers were generally not deceived. But again, Dr. Wind's testimony is not reliable or admissible for the reasons discussed in the Court's *Daubert* Order. Further, the conclusion Defendants rely on in the Wind Report does not discuss deception based on the *particular* representation at issue: that cards could be used to purchase "fuel only." On top of this, actual *proof of deception is not required*.[17] Even if Dr. Wind's testimony was admissible, it would not create a dispute of fact on this issue.

---

[17] This is not to be confused with proof of falsity, which is required under the FTC's theory.

Next, Defendants contend that purchases could in fact be limited to "at the pump" purchases alone. (Def. Resp. at 24) (citing Thekkekara Dep., Doc. 147 pp. 170:19–171:14.) But this is another attempt at misdirection. Even if there is some evidence that FleetCor offered *another* "at the pump" option, separate and apart from the "fuel only" option advertised, it is undisputed that the "fuel only" option — as referenced in the advertisements at issue and supported by the application materials excerpted above — was a "misnomer" and allowed purchases for other non-fuel products. Thus the "fuel at the pump" option, which was not advertised, nor included in the application materials, is irrelevant to the representations at issue.[18] *Tashman*, 318 F.3d at 1277 (11th Cir. 2003) ("[A]ll that is at issue are the statements made by defendants."). Indeed, Defendants concede that "because the cards can be coded to allow purchases only at fuel locations . . . a driver could use the card to purchase soft drinks or other items sold at that gas station." (Def. Resp., Doc. 161-1 at 23 n.8.)

Based on the undisputed evidence, the "fuel only" advertisement and corresponding application documents with "fuel only" representations did not in fact allow a card to be limited to "fuel only." The Court concludes therefore that this ad had a tendency to deceive, and in fact did deceive. No reasonable factfinder could find otherwise. *See AMG Servs., Inc.*, 29 F. Supp. 3d at 1368 (holding that boldfaced representation promising payment of fixed sum is misleading when the

---

[18] For this same reason, the expert report of Dr. Schoar is also immaterial. Whether other transactions were declined because they were for non-fuel purchases through the "at the pump" option, is not relevant to the "fuel only" option which was undisputedly not for fuel only.

sum is not in fact fixed); *Cap. Choice Consumer Credit., Inc.*, 2004 WL 5149998, at *33 (S.D. Fla. 2004) (holding that defendants' advertisements that customers would receive unsecured major credit card with at least $4,000 limit had tendency to deceive where customers instead received secured cards with lower limits; also noting that the court may not ignore evidence that reasonable consumers were "likely to rely on, and in fact did rely on, Defendants' misrepresentations and [instead] impose on consumers a duty of 'walking around common sense'") (citing *Tashman*, 318 F.3d at 1278), *aff'd*, 157 F. App'x 248 (11th Cir. 2005).

### iii.   Materiality

Defendants do not argue that the fuel only representations were immaterial. As noted, the FTC relies on evidence that a customer would not have purchased the card had he known that it was in fact *not* able to be limited to fuel only purchases. (*See* October 2017 Email Thread, Doc. 198-6 at ECF 3–4.) FleetCor internal surveys bolster this assertion, with 15% of customers stating that purchase controls were a "main benefit" that most customers sought to gain in applying for their FleetCor cards. (*See* Research Survey, Doc. 139-9 at ECF 44); (*see also* Small-Fleet FleetCard Research Study, Doc. 134-9 at ECF 14) (including customer comment, noting "I was always concerned that the Amex card could be used for something different. And I had requests from drivers before saying 'We're very low on cash. Can we use the card for food for this trip and then you will take that out of our pay at the end of when we calculate our commission?' I wanted to eliminate that.") This evidence demonstrates that the ads' representations with respect to

fuel only purchasing controls were likely to impact customer choice to sign up for FleetCor's cards (as opposed to another company's) and were therefore material. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190.

On Count II, the FTC has established that (1) FleetCor made representations that cards could be limited to fuel only purchases; (2) those representations were false and had a tendency to deceive customers; and (3) those representations were material.

### C. Count III: No Transaction Fees Ads

The FTC contends that it has established as a matter of law that FleetCor made false representations that customers would not pay any transaction fees, that the representations had a tendency to deceive customers, and that the representations were material. In opposition, Defendants argue that the particular fees at issue were not "transaction fees," that reasonable customers would not view the fees at issue as "transaction fees," and that FleetCor disclosed these fees multiple times. (Def. Resp., Doc. 161-1 at 25–26.)

### i. The Net Impression of No Transaction Fee Ads

In numerous advertisements, FleetCor guaranteed customers that, in signing up for FleetCor's fuel cards, customers would pay "no set-up, transaction or annual fees," as shown by a portion of one ad, reproduced below:



(Various No Transaction Fees Ads, Doc. 122-24.) Defendants do not dispute that the ad represents that customers will pay no transaction fees. And, where the claim is express, "the representation itself establishes the meaning." *See Cliffdale Assocs.*, 1984 WL 565319, at *46.

### ii.   Whether the Ads Were Likely to Deceive

Once again, the FTC proceeds on a falsity theory and must therefore establish that messages conveyed by the ads were false. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190. The FTC argues that three particular fees charged by FleetCor were in fact "transaction fees," including: the (1) Convenience Network Surcharges; (2) Minimum Program Administration Fees; and (3) Level 2 Pricing/High Risk Fee. (FTC MSJ, Doc. 132-1 at 18.) In their response brief, Defendants argue that the ads were not false because none of these fees were called

"transaction fees," and the second two were not charged on a transactional basis. (Def. Resp., Doc. 161-1 at 25–26.)  The Court discusses each fee in turn.

### 1.  The Convenience Network Surcharge

Section 9.5 of FleetCor's Terms & Conditions (magnified to 300%) describes the Convenience Network Surcharge (a/k/a the Special Network Pricing) as follows:

> 9.5  <u>Special Network Pricing.</u>  Fuelman reserves the right to charge for the use of select sites/merchants. The added charge to use these sites will not exceed the greater of ten cents ($0.10) per gallon or two dollars fifty cents ($2.50) per transaction. The list of select sites/merchants is available upon request by calling Fuelman Customer Service.

(T&Cs, Doc. 132-14 at ECF 2.) Thus, the Convenience Network Surcharge is an added charge at specific fueling sites that is either 10¢ per gallon or $2.50 *per transaction*. FleetCor's internal company documents from August 2019, compiled to "help sellers potentially answer questions on fees," include the following description of the Convenience Network Surcharge for the Fuelman Network and the MasterCard Network, respectively:

| Convenience Trx Fee | $3 per trx at Convenience Network Locations | Exempt for 60 days | In Ts&Cs |
|---|---|---|---|
| CDN Tran Fee | $3.00 per trx at CDN proprietary locations | Per Incident | In Ts&Cs |

(Draft FleetCor Card Fee Summary Slides, Doc. 141-9 at ECF 6–7.)[19] These FleetCor documents indicate that the Convenience Network Surcharge for

---

[19] FleetCor's T&Cs reflect that the network pricing was updated at some point to allow for a network surcharge fee of $3.00 per transaction, instead of $2.50, thereby comporting with FleetCor's internal fee summary documents. (T&Cs, Doc. 132-14 at ECF 10.)

Fuelman cards and for the Universal MasterCard were internally denominated "Trx" or "Tran" fees that were charged "per trx" (i.e., *per transaction*) at certain locations. As icing on the cake, the FTC also points to the deposition testimony of Yvette Chen, FleetCor's Senior Vice President of Revenue Management. (Chen Dep., Doc. 145-1 p. 20:5–6.) In her deposition, Ms. Chen references and discusses the network surcharge for the MasterCard network as a "transaction fee." For example, Ms. Chen is asked "And what are the CDN transaction fees?" In response, she explains:

> So the CDN transaction fees. So first let me explain what does the CDN mean. The CDN stands for Comdata, and it's specific in this case referring to the Comdata proprietary truck stop network.
>
> And so as a part of the program benefit provided by the *Fuelman MasterCard fuel card*[20] product offered by FleetCor, customers who have access to the Comdata proprietary truck stop network . . . in exchange for [convenience and benefits] provided by the network, *customer will be assessed a transaction fee when they make a fuel purchase at the Comdata, now, proprietary truck stop locations.* So that's the CDN tran fee.

(*Id.* pp. 132:20–133:13) (emphasis added); (*see also id.* p. 136:7–13) (acknowledging that a network fee is a transaction fee and asserting that customers are made aware of the fee through the T&Cs). The evidence therefore undisputedly establishes that the Convenience Network Surcharge was a "transaction fee." Defendants' semantic gymnastics do not land.

---

[20] The ad promising no transaction fees for the Universal Premium MasterCard can be found, e.g., at Doc. 122-24 at ECF 24.

## 2. Minimum Program Administration Fee

FleetCor's T&Cs describe the Minimum Program Administration Fee as follows in text here magnified:

9.8    Minimum Program Administration Fee.  Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may charge a Minimum Program Administration Fee of up to 10 cents per gallon or $2 per transaction to cover ongoing program operation costs.

(T&Cs, Doc. 132-14 at ECF 5.) Thus, where fuel price is under $3.25, a fee can be assessed of 10¢ per gallon or $2 *per transaction* to cover operation costs. The same FleetCor internal fee documents discussed above describe the Minimum Program Administration Fee, as of 2019, applying to existing customers but not new customers:

| Minimum Program Admin Fee | 10c per gallon to cover minimum program operation cost | Pre 2017H2 vintage customers could have been charged | In Ts&Cs; Fee in FMR |
|---|---|---|---|

(Draft FleetCor Card Fee Summary Slides, Doc. 141-9 at ECF 8.) As a practical matter, a fee charged *per gallon* is by its nature a transaction fee. While such a per gallon fee might vary based on the specific number of gallons pumped, it is assessed in every fuel purchase transaction. To the extent that Defendants attempt to make such a distinction, it is unpersuasive. In the face of FleetCor's own documents acknowledging that the Minimum Program Administration Fee is charged per transaction and/or per gallon, Defendants have presented no counter-evidence.

### 3. Level 2 Pricing/High Risk Fee

FleetCor's T&Cs explain that the Level 2 Pricing charge is assessed against all accounts that FleetCor deems to be a "High Risk." FleetCor determines that an account is "High Risk" if: (1) the client's credit score is below a certain level (520 or lower for commercial scores, or 660 or lower for individual score); (2) the client's credit score drops 51 points or more in a 3-month period; (3) the client is assessed more than one late fee in a 12-month period; (4) the client makes a payment that is not honored by the customer's bank; *or* (5) the client "operates in the trucking or transportation industry."[21] (T&Cs, Doc. 132-14 at ECF 7, Section 9.7.) The T&Cs further explain that the High Risk Fee is an incremental charge above current pricing at a maximum of 20¢ per gallon purchased. (*Id.*) The 2019 FleetCor internal fee document slides (discussed above) define the High Risk Fee for the Fuelman cards as "20c to 30c per gallon depending on level of risk . . ." and for the MasterCard Network cards as "$3 (medium risk) /$4 (high risk) *per trx.*" (Doc. 141-9 at ECF 6–7) (emphasis added).

Internal FleetCor emails discuss the High Risk Fee as a "transaction fee" and, indeed, direct customer service representatives to "avoid the words 'High Risk' [and] [i]nstead, use the term 'Transaction Fee'" when responding to customer questions. (April 2016 Email Exchange re: MasterCard, Doc. 198-26 at ECF 2.) In her deposition, Ms. Chen, who, as previously noted, is FleetCor's Senior Vice President of Revenue Management, references the high risk "transaction fee" at

---

[21] This would seem to include a significant portion of FleetCor's customers.

least a dozen times. (*See, e.g.*, Chen Dep., Doc. 145-1 pp. 227:5–10; 232:24–233:7) ("The high risk transaction fee is very specific called out as – under the high credit risk accounts section in the terms and conditions . . . That section provides summarized criteria, notifying the customer who – the criteria that they could be deemed high risk and the high risk transaction fee that they could be charged if they are deemed high risk.").

Based on all of this evidence, the FTC presented evidence that the "no transaction fee" ads were false because FleetCor did in fact charge three separate types of transaction fees.

*   *   *

Although not required, the FTC also presented evidence that customers were actually deceived by these various transaction fees. One (of many) internal FleetCor surveys regarding fee practices (discussed at length in connection with Count V) indicates that customers felt tricked by, for example, the High Risk Transaction Fee. (*See* Voices of Customer Hanover Survey, Doc. 198-2 at ECF 23) ("They put us on Tier 2 pricing which is 15 cents a gallon extra. They just added it to our account without our knowledge, supposedly based on late charges or bad credit, neither of which is apprised. We haven't been late.") Similarly, a FleetCor customer complained via email about the Convenience Network Surcharge as follows.

> The letter states that we are subject to a $3 "Convenient Network Surcharge" if we go to certain locations to get fuel. The letter provides a few examples of some places where the surcharge may be in effect,

but goes on to state, "...and certain other branded/unbranded merchants." You can't even tell me where I will be penalized . . . .

(Customer Email Exchange, Doc. 140-21 at ECF 3–4.) A FleetCor employee viewed this complaint and forwarded it on to his/her superior, Chet Panhans, the Head of Field Sales. Mr. Panhans then noted, "[h]is comments are very similar to what my reps and managers are experiencing *across the board . . . . Neither the Web Site nor the App designates sites with regards to trans fee*—leaving customers frustrated." (*Id.* at ECF 2) (emphasis added).[22]  This evidence of actual deception — though not required — is "highly probative" that the ads had a tendency to deceive. *USA Fin.*, 415 F. App'x at 973; *Alcoholism Cure Corp.*, 2011 WL 13137951, at *47; *see also On Point*, 17 F.4th at 1080 (noting that websites were not just likely to mislead but in fact did mislead customers, with hundreds of consumer complaints and a consumer survey as support).[23]

As noted, based on the record evidence outlined above, plus the added value of a common sense review of the advertisements and documents, the three fees at issue are all "transaction fees." Accordingly, the FTC has demonstrated that the

---

[22] Again, although not a basis for the Court's decision-making, the Court notes that FleetCor's own proffered expert's evidence cuts against it. Dr. Wind's survey results show that customers he surveyed indicated surprise at being charged the High Risk Transaction Fee. (*See, e.g.*, Wind Raw Data, Doc. 170-7) (including statements such as "I don't see anything that allows for a High risk charge in the program, yet I am getting charged one" and "[S]top charging me hidden fees that I could only find on the Vehicle Management Report and not on my actual Customer Statement. *This is a deceptive billing practice and should be criminal*. As a result, I've had to pay over $400 in late fees and high credit risk fees because I didn't know about your deceptive practices until recently") (emphasis added).

[23] Once again, deception claims are assessed "in light of the sophistication and understanding of persons to whom they were directed." *Cliffdale Assocs.*, 103 F.T.C. 110 at *48.  Customer complaints demonstrate that FleetCor's actual customers were in fact deceived.

representations that customers would be charged "no set-up, transaction, or annual fees" were false, and also indicate a tendency to deceive. *See AMG Servs., Inc.*, 29 F. Supp. 3d 1368 (holding that "it requires no citation of authority to demonstrate" that a "boldfaced representation" that promises payment of a fixed sum is misleading when the sum is not in fact fixed); *On Point*, 17 F.4th at 1079 (finding that, where ads represented that website provided government services, but company did not provide government services and ads were false, website ads had tendency to deceive); *Lalonde*, 545 F. App'x at 837 (11th Cir. 2013) (finding that, where company's representations stating or implying that it could raise consumer credit scores was false, representations had tendency to deceive).

Defendants present no relevant, countervailing evidence in response. To the extent that Defendants rely on a declaration first from Ms. Chen that FleetCor does not charge transaction fees, that declaration is belied by her own deposition testimony. Similarly, Defendant Clarke's self-serving, conclusory testimony that FleetCor does not charge transaction fees is contradicted by heaps of evidence, including: Ms. Chen's deposition; internal FleetCor training documents; and FleetCor T&Cs. Accordingly, Clark's testimony is similarly insufficient to create a dispute of material fact as to whether FleetCor charges transaction fees. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (reversing lower court's denial of summary judgment and explaining that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment"); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 988 (N.D. Cal. 2010) (finding that "bald and uncorroborated" testimony of individual defendant did not create dispute of fact where his testimony that it was company policy to exclude schools and banks from telemarketing activities was contradicted by significant record evidence that company did target such entities, such that no jury could reasonably conclude otherwise), *aff'd* 475 App'x 106 (9th Cir. 2012); *see also Haves v. City of Miami,* 52 F.3d 918, 920 (11th Cir. 1995) ("[A] genuine issue of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor.").

### iii.    Materiality

Defendants do not dispute that the ads representing that FleetCor charged "no transaction fees" drew in customers, related to the purchase of a product, and were therefore material.  *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190; *1st Guar. Mortg. Corp.*, 2011 WL 1233207, at *12–13. Accordingly, the FTC has established as a matter of law that (1) FleetCor represented that customers would pay no transaction fees on the cards at issue; (2) customers were in fact charged transaction fees, and thus the representations had a tendency to deceive; and (3) those representations were material.

### D. Reliance

Before turning to Counts IV and V, the Court addresses the issue of reliance. Defendants argue in their initial response brief that the FTC failed to show

customer reliance or that it is entitled to a presumption of reliance on any of the deceptive advertising claims discussed in Counts I through III. (Def. Resp., Doc. 161-1 at 26–27.) Defendants contend that reliance can only be presumed where ads are widely disseminated, and that the FTC has not proven such dissemination. (*Id.* at 27.) In response, the FTC argues that, while it previously asserted that the ads at issue were widely disseminated[24] (FTC MSJ, Doc. 132-1 at 7), a showing of reliance is necessary *only* to obtain monetary relief, not injunctive relief. (See FTC Reply, Doc. 170-1 at 11.)

The authority cited by the FTC supports that conclusion. *See FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1335–36 (M.D. Fla. 2010) ("*To obtain restitution on behalf of consumers*, the FTC must show consumer injury but it is not required to show reliance by each individual consumer.") (emphasis added); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1211 ("*In addition to injunctive relief, the FTC has requested monetary relief* . . . . A corporation is liable *for monetary relief* under Section 13(b) if the FTC shows that the corporation engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted[.]") (emphases added) (internal citation omitted). Defendants do not dispute this position in their reply brief and

---

[24] "A presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *McGregor v. Chierico.*, 206 F.3d 1378, 1388 (11th Cir. 2000) (citing *Figgie,* 994 F.2d at 605).

have not pointed to any legal authority indicating reliance on specific ads is required for purposes of injunctive relief.

In addition to this authority regarding the FTC Act, in assessing other statutes, courts have explained that, for an award of damages, "the reliance requirement provides the causal link" between a defendant's wrongful activity "and the loss suffered." *Rochez Bros. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1973) (discussing reliance requirement for *damages* in the context of securities fraud); *see also SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (explaining that, in the context of securities fraud, justifiable reliance on a material misstatement or omission provides the requisite causal relationship between the misstatement and a private plaintiff's *damages*); *SEC v. City of Miami*, 581 F. App'x 757, 759 (11th Cir. 2014) (distinguishing between private enforcement actions and SEC enforcement actions with respect to reliance requirement for damages, and explaining that "[j]ustifiable reliance . . . is not an element of an SEC enforcement action . . . and a private plaintiff's 'reliance' does not bear on the determination of whether the securities laws were violated, only whether that private plaintiff may recover damages") (cleaned up).[25]

It is also well established that injunctive relief may "extend beyond the specific violations at issue" to prevent a defendant from engaging in related

---

[25] *See also Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 486 (D.N.J. 2009) (explaining that, under the Lanham Act, "[o]ne way for a plaintiff *to prove causation for damages* under § 35(a)(2) is to show diversion of customers. This 'does not place upon the plaintiff a burden of proving detailed individualization of loss of sales' but only '*a showing of some customer reliance on the false advertisement*'") (internal citation omitted) (emphasis added).

deceptive practices in the future. *RCA Credit Servs.*, 727 F. Supp. 2d at 1335 (citing *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965)). Thus, in such instances of "fencing in," it is permissible for courts to enjoin conduct without a finding of customer reliance. Taking all of this into consideration, the Court finds that the FTC is not required to establish reliance for purposes of injunctive relief.

As the FTC has provided more than sufficient evidence to prove all elements of its first three deceptive advertisement claims, and because Defendants have not offered rebuttal evidence sufficient to create a dispute of fact on any element, summary judgment is **GRANTED** to the FTC on Counts I through III.

### E. Count V: Unfair Fee Practices[26]

The FTC brings Count V under an unfairness theory, as opposed to a deception theory. It argues that FleetCor charged customers fees without consent — in the form of both unauthorized (1) late fees and (2) other unexpected fees — in violation of Section 5's prohibition on "unfair practices."

To refresh, under Section 5 of the FTC Act, practices or acts are considered "unfair" if: (1) the acts at issue cause or are likely to cause substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by any countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n); *Orkin Exterminating Co.*, 849 F.2d 1354, 1364 (11th Cir. 1988); *Windward Mktg., Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept.

---

[26] As Count IV is contingent upon Count V, the Court addresses Count V first.

30, 1997). A practice may "be unfair without being deceptive." *Orkin Exterminating Co.*, 849 F.2d at 1367.

Here, in response to an overwhelming amount of probative evidence presented by the FTC as to each element, FleetCor responds with facts that (1) are not material, and (2) are insufficient to present a "sufficient disagreement to require submission to" a factfinder on any element. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1181 (N.D. Ga. 2008) (citing *Anderson*, 477 U.S. at 248, and ultimately granting summary judgment to FTC). Tellingly, in their response, Defendants do not engage *at all* with the three-part legal analysis as outlined by the statute and as adopted in this Circuit (and as set forth in the preceding paragraph). *See* 15 U.S.C. § 45(n); *Orkin Exterminating Co.*, 849 F.2d at 1364. Nor do Defendants respond to the FTC's cited legal authority or point to a *single case* in support of their substantive positions. Rather, Defendants attempt to gum up the analysis with facts that are irrelevant to the legal framework and/or that challenge one pebble in the FTC's large body of evidence. As another district court noted when granting summary judgment for the FTC, "[w]hatever quibbles that defendants have raised over peripheral facts in the record are small compared to the sweeping themes established by the FTC. In short, the defense presented . . . is like disagreeing over the size of the iceberg while ignoring the monumental fact that the Titanic sank." *Inc21.com Corp.*, 745 F.Supp.2d at 983.

For this reason, the Court reiterates that, for purposes of summary judgment, "[o]nce the moving party has met its burden, the burden shifts to the

nonmoving party to 'designate specific facts showing that there is a genuine issue for trial.'" *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1181 (citing *Celotex*, 477 U.S. at 324). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Windward Mktg., Inc.*, 1997 WL 33642380, at *8 (citing *Anderson,* 477 U.S. at 248, and ultimately granting summary judgment to FTC on unfairness claim). Further, "a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case." *Id.* (citing *Anderson*, 477 U.S. at 248). And, "a genuine issue of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable [factfinder] to return a verdict in its favor." *Haves,* 52 F.3d at 920.

With that background in mind, the Court proceeds to analyze each element of the FTC's unfairness claim.

### i.   FleetCor's Fee Practices Caused Substantial Injury

The FTC can satisfy the substantial injury prong of the unfairness inquiry by showing that consumers were "injured by a practice for which they did not bargain." *Windward Marketing*, 1997 WL 33642380, at *11; *Orkin Exterminating Co.*, 849 F.2d at 1364 (affirming Commission's finding that Orkin's conduct was likely to cause substantial injury because it "increased costs for services previously bargained for" when it raised customers' renewal fees to earn revenue of $7 million dollars).

Just because an injury is small does not mean it is not "substantial." An act or practice can cause "substantial injury" by doing a "small harm to a large number of people, or if it raises a significant risk of concrete harm." *Am. Fin. Servs. Ass'n v. FTC,* 767 F.2d 957, 972 (D.C. Cir. 1985) (cleaned up), *cert. denied,* 475 U.S. 1011, (1986); *Orkin*, 849 F.2d at 1365 (same). Indeed, shortly after the passage of the FTC Act, the Supreme Court recognized the importance of protecting against small harm to many people because so often

> the unfair method is being employed under circumstances which involve flagrant oppression of the weak by the strong. Sometimes, because, although the aggregate of the loss entailed may be so serious and widespread as to make the matter one of public consequence, no private suit would be brought to stop the unfair conduct, since the loss to each of the individuals affected is too small to warrant it.

*FTC v. Klesner,* 280 U.S. 19, 28 (1929) (Brandeis, J.).

Additionally, "[c]ourts have repeatedly held that billing customers *without permission* causes injury for the purposes of asserting" a Section 5 claim. *FTC v. Amazon.com, Inc.*, 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016) (emphasis added) (collecting cases)[27] ("The millions of dollars billed to Amazon customers *without a mechanism for consent*, the thousands of customers complaining about unauthorized charges, and the time spent seeking refunds for

---

[27] *See, e.g., Neovi,* 604 F.3d. at 1153; *FTC v. Ideal Fin. Solutions, Inc.,* 2014 WL 2565688, at *5 (D. Nev. June 5, 2014); *FTC v. Commerce Planet, Inc.,* 878 F. Supp. 2d 1048, 1078 (C.D. Cal. 2012); *FTC v. Inc21.com Corp.,* 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010), *aff'd,* 475 F.App'x 106 (9th Cir. 2012); *FTC v. Crescent Publ'g Group, Inc.,* 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001); *FTC v. J.K. Publications, Inc.,* 99 F. Supp. 2d 1176, 1191-1192 (C.D. Cal. 2000); *FTC v. Williams,* 2011 WL 4103542, at *9 (W.D. Wash. Sept. 13, 2011); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 719-720 (S.D. Tex. 2008).

those charges, all demonstrate substantial injury") (emphasis added); *see also Windward Mktg.*, 1997 WL 33642380, at *12 (finding that debiting consumers' accounts "without authorization" caused substantial injury).

Here, the FTC provides sufficient support to establish substantial injury as to both unauthorized (1) late fees and (2) other unexpected fees, as described below.

### 1. Unauthorized Late Fees Caused Substantial Injury

Although equitable monetary relief is not available to the FTC at this time, the FTC previously calculated what it contends is the appropriate amount of damages to customers in connection with alleged unfair late fees. Based on its calculations of FleetCor's transaction data, the FTC's estimate for damages related to unfair late fee billing for on-time or impeded payments is $213 million. (FTC MSJ, Doc. 132-1 at 41–44) (outlining damage calculation methodology and process).  As evidence supporting that customers were harmed by being charged for unfair late fees, often for on-time payments, the FTC relies on: (1) FleetCor's own internal surveys and emails; (2) customer complaints; and (3) the report and survey of the FTC's expert, Dr. Krosnick.

Nearly a dozen internal FleetCor company studies discuss customer reactions to fees generally. A chart outlining these fees is provided below in section (2). However, specifically as to late fees, FleetCor's own commissioned studies found that "[m]ultiple participants report being charged 'hidden fees' in the form of unexpected convenience fees or late fees." (Voice of Customer Survey, Doc. 198-

2 at ECF 23–24) (also noting "[p]articipants are charged with late fees *after paying billed charges on time*") (emphasis added.) Another internal customer survey, this one from 2018, found that customers "Feel Like They are Scammed" and "Customers Pay for FLEETCOR's Mistakes" because "*Late fees charged even when a FLEETCOR technical error prevents customer on time payment*" and more. (2018 Experience Survey PowerPoint, Doc. 140-16 at ECF 20) (emphasis added.) A graphic from that study is shown below:



(*Id.*)

Perhaps most persuasive, an internal FleetCor Customer Risk Assessment from January 2017 *acknowledges that customers were charged "[e]rroneous late fees"* and details the reasons for those erroneous charges, including that: (1) "Check Free payment posting error in Aug. resulted in payments not getting applied to accounts;" (2) "EFT [Electronic Funds Transfer] processing . . . delayed causing accounts to lock [*re-occuring*];" (3) "Check By Phone *constant* processing delay preventing timely application of payments;" and (4) "Lockbox processing delay or perception." (*See* Customer Risk Assessment, Doc. 137-18 at ECF 14–15) (emphases added).

Internal employee communications from high-level FleetCor employees further corroborate these studies. These communications demonstrate that high-level employees understood that FleetCor's charging of erroneous late fees was a "massive problem." (November 2017 Email from Senior Vice President of Product & Growth Mary Rachide, Doc. 198-50 at ECF 2). In an internal chat between two supervising employees in the customer service department, one notes that customers "can't set up online bill pay, Checkfree doesn't work half the time[.] And heave[n] forbid you mail a check…" (Fee Chat Between PC and RH, Doc. 137-15 at ECF 3.) These internal studies and employee communications all demonstrate — from the mouth of FleetCor itself — that customers were harmed by unfair late fees.

Other evidence supports this conclusion, including copious customer complaints.[28]

A sampling of these complaints, included in one of FleetCor's own internal studies, are provided below:

- "[P]ayments are not credited [o]n timely basis, statements are run before due date passes . . . . One of our payments for $4195.30 made thru CheckFree still has not posted to our account in over 8 days. Fuelman also doesn't allow more than 1 online payment every 3 business days….really!!"

- "We would make our payment on Friday morning but it would not process until later on Monday, so when we got our statement emailed to us Monday morning, it would show the other amount still not paid."

- "When payments were going to Atlanta, they were being posted late which in turn made our payment late. It should not take 10 days for a payment to post."

- "I was charged a $25 late fee on a payment that Fuelman messed up. Y'all took down my payment after I posted it, shut off my cards (while I have drivers across the US), and then charged me more money because I 'paid late.'"

- "It took 12 days from the time I sent a check before it was credited to my account."

- "MULTIPLE times we have been charged late fees when our account payment was not late then we were told we have to wait 3 billing cycles to receive that money back! It's outrageous[.]"

- "Get invoices (bills) 3 to 4 days after date you expect me to pay it that day as I am not late on payments you need to improve this[.]"

---

[28] As discussed at n.13, 33, the customer complaints in the FleetCor surveys fall under the hearsay exception in Rule 803(3) for statements of a declarant's then-existing state of mind. And the surveys/studies are not hearsay because they are party admissions.

- "Web site is failing. It is either locked when we try to log in to pay or we log in complete and not[h]ing happens when we hit the submit button. Have to call in the payment each time."

- "I'm 20 minutes south of Nashville and I don't get my statement in the mail until around the 9th. When I put my payment in the mail the next day, it often doesn't get credited until its late . . . . I feel like you guys are holding my payment so you can charge those outrageous late fees[.]"

(Email Exchange Including Survey on Late Fees, Doc. 198-50 at ECF 8–10.) (*See also*, FleetCor Internal NPS Customer Survey, Doc. 135-2 at ECF 21–22) (listing more customer complaints, e.g., "Late fees are up to $200.00! Absolutely ridiculous! We send our billing in on time, and for some reason the check never gets deposited until 10-15 days later, then we get a late fee…Dreadful!" and "No matter if I pay online or send in my payment it doesn't seem to get processed fast enough, therefore my account is always suspended for non payment.").

In addition to internal studies and customer complaints, the FTC's expert, Dr. Krosnick, surveyed FleetCor customers who were "bill payers" and found that "37.90% of FleetCor Customers were charged late fees by FleetCor on one or more occasions despite having paid their entire bill on time." (Krosnick Report, Doc. 124-1 at ECF 75, ¶ 200; Krosnick Report, Appendix B, Doc. 124-1 at ECF 126–27, ¶¶ 108–09).

**Percent of Businesses/Organizations Where Bill Payers Said They Were Charged Incorrect Late Fee**

| | N | Percent | Standard error | Margin of error | Lower bound of the 95% confidence interval | Upper bound of the 95% confidence interval |
|---|---|---|---|---|---|---|
| Any Bill Payer was informed | 46 | 37.90% | 5.15% | 10.07% | 28.35% | 48.49% |
| No Bill Payer was informed | 63 | 54.60% | 5.34% | 10.42% | 43.98% | 64.82% |
| All Bill Payers didn't know or refused to answer | 6 | 7.50% | 3.15% | 6.72% | 3.19% | 16.63% |
| Total | 115 | 100% | | | | |

Based on this evidence — internal surveys and emails, customer complaints, and an expert report — the FTC has established that customers suffered substantial injury when they were charged late fees. Accordingly, FleetCor must designate specific facts that create a genuine issue of fact as to whether customers suffered substantial injury. *See Celotex*, 477 U.S. at 324.

Yet, FleetCor does not mention "substantial injury" to consumers at all in its briefs and does not directly argue that it had permission to charge the late fees at issue. Moreover, FleetCor does not assert that the fees in question were not charged or even directly contend that customers were not charged erroneous late fees. Instead, FleetCor attempts to shift the focus to a question about intent, arguing that there is no evidence it *intentionally* delayed in posting *online* payments, citing the deposition testimony of its treasurer, Steve Pisciotta. (Def. Resp., Doc. 161-1 at 37) (citing Deposition of Steve Pisciotta, Doc. 162-9, pp. 30:2–32:9).

Pisciotta's testimony does not create a fact dispute for three separate reasons. First, the FTC is not required to prove intent, so whether FleetCor *intentionally* delayed in posting is not at issue. *Orkin Exterminating Co.*, 849 F.2d at 1368 ("The unfairness standard, focusing as it does upon consumer injury, does not take into account the mental state of the party accused of a section 5 violation."); *USA Fin.*, 415 F. App'x at 974 n.2 (affirming grant of summary judgment to FTC, finding that defendant's good faith in operating under state-issued license had "no bearing" on Section 5 violation, and noting "a defendant cannot avoid liability under section 5 of the [FTC Act] by showing that he acted in good faith because the statute does not require an intent to deceive."). Second, the issue is not whether FleetCor delayed in posting payments, let alone as to only a subset of payments (online payments). Instead, the issue is whether customers were charged unfair late fees for on-time payments (made via mail, online, or by phone) or blocked from making timely payment, *for whatever reason*.[29] Third, FleetCor's cited evidence fails to establish FleetCor's asserted proposition. In the portion of deposition testimony FleetCor references, Pisciotta outlines the general process for posting online payments, stating that payments received before cut-off time on certain days were generally processed that day. (Doc. 162-9, pp. 30:2–

---

[29] For example, while Pisciotta mentions online payment processing, FleetCor does not appear to acknowledge the many complaints and other evidence regarding problems related to <u>mailed payments</u>, other than to blame a third-party processer, as discussed below. (*E.g.*, Email Exchange Including Survey on Late Fees, Doc. 198-50 at ECF 8–10) ("I don't get my statement in the mail until around the 9th. When I put my payment in the mail the next day, it often doesn't get credited until its late.").

32:9.) Pisciotta does not represent that FleetCor never had problems with delayed processing.

On the flipside, there is overwhelming evidence — including FleetCor's own internal risk assessment study and numerous customer complaints — to support that payments were delayed in posting of *all types of payments*. (*See* Customer Risk Assessment, Doc. 137-18 at ECF 14–15) (noting "payment posting error" with Electronic Funds Transfer and Check *By Phone* "processing delays preventing timely application of payments," etc.). As such, Pisciotta's generalized statement, based on no data, that online payments were generally processed the same day does not create a triable issue in response to the evidence of delayed postings as outlined in FleetCor's own internal surveys and as discussed by FleetCor's high-level employees. *See Inc21.com Corp.*, 745 F. Supp. 2d at 988; *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (explaining that, when one story is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). Further, even accepting FleetCor's assertion that it never delayed in posting online payments (in contravention of its own internal corporate admissions), there is still concrete record evidence that FleetCor in fact did delay in posting mail and phone payments that stands completely unrebutted.

FleetCor next cites to the fact that some payments are processed by third-party "lockbox" providers. But even if FleetCor contracts out *some* payment processing, it is still responsible if customers are charged late fees for on-time

payments. *See IAB Mktg.*, 746 F.3d at 1233 (11th Cir. 2014) (finding that defendant could not absolve itself from responsibility by blaming third-party contractor or rogue telemarketers for misrepresentations where defendant had knowledge that the misrepresentations were occurring).[30]   In FleetCor's own risk assessment, mentioned above, FleetCor acknowledges that there were delays in "lockbox" processing. (Doc. 137-18 at ECF 14–15.)[31]

Next, FleetCor cites to the immaterial fact that its expert, Dr. Schoar, found "no reason to believe that FleetCor withheld payment from processing *in order to impose late fees on consumers*." (Def. Resp., Doc. 161-1 at 39) (emphasis added). But this finding is not relevant to the legal issue because, again, the FTC is not required to show intent, merely that customers were substantially injured. *Orkin Exterminating Co.*, 849 F.2d at 1368. Moreover, Dr. Schoar's late fee data actually supports the FTC's claim of substantial injury. Indeed, in reviewing online payments, Dr. Schoar found that, of the payments marked "late," 18% were in fact paid online *before the due date*. (Schoar Rebuttal Report, Doc. 161-8 at ECF 280, ¶ 98.) In addition to that, 15% of those marked late were paid on the due date.

---

[30] On this issue dealing with delays associated with processing of customers' payments processed by lockbox providers, Dr. Schoar concludes that 99.2% were credited to the customer on the date the lockbox provider deposited the check. (*Id.* ¶ 99.) However, the fact that payments were credited on the same date the lockbox provider dropped it off does not rebut the evidence that there were delays in FleetCor's overall process. This data point provides no information about how long checks were held between receipt and deposit overall and does not respond to other evidence reflecting that on-time payments were marked as late and therefore triggered late fees.
[31] FleetCor also attempts to blame customers, suggesting that, with the lockbox providers, there may be a delay where payments are "non-conforming." (Def. Resp., Doc. 161-1 at 37.) But Defendants' own expert, Dr. Schoar, found that less than 1% of payments out of the ~9,000 payments she assessed were non-conforming. (Schoar Rebuttal Report, Doc. 161-8 at ECF 281, ¶ 99.)

On this point, the FTC has presented overwhelming evidence that customers suffered substantial harm in being charged unfair late fees when they paid their bills on time or were blocked from paying bills by FleetCor's Sisyphean payment system. FleetCor has not pointed to "significant, probative evidence" to create a genuine dispute as to this conclusion. *Fitzpatrick*, 2 F.3d at 1115.

### 2. Other Unauthorized Fees Caused Substantial Injury

In addition to erroneous late fees, the FTC argues FleetCor's practice of charging a slew of other unexpected fees without obtaining prior authorization to charge these fees caused substantial customer injury. For this practice, the FTC estimates that damages related to other unauthorized fees (including transaction fees — the subject of Count III) total nearly $320 million.  (FTC MSJ, Doc. 132-1 at 41–44.) To meet its burden, the FTC again relies on (1) FleetCor's own surveys; and (2) customer complaints.

### a. Internal surveys

A number of studies and surveys commissioned by FleetCor demonstrate customer harm from a slew of unexpected fees. The chart below outlines some (but by no means all) relevant findings from those surveys:

| Doc. | FleetCor Survey | Survey Date | Summary of evidence |
|------|-----------------|-------------|---------------------|
| 140-4 | Customer Attrition Survey- Hanover Research | July 2016 | <u>Objective</u>: "to understand the drivers of consumers discontinuing fuel card use" <br> <u>Findings</u>: <br> • One-third of 148 respondents indicate that **fees associated with their accounts is one of the reasons they stopped using cards** |

| | | | |
|---|---|---|---|
| | | | • Of that one-third, 60% said fees were higher than expected and **40% said they were unaware of fees when they applied for the program** |
| 133-7 | Analysis of Customer Attrition by Jabian | July 2016 | <u>Objective</u>: Identify opportunities to reduce business impact of customer attrition driven by fees and the fee experience "since fees are viewed as the main driver of increased attrition" <br> <u>Findings</u>: <br> • Limiting fees during first 60 days is critical to reducing attrition <br> • Currently, **customer "expectations" are that "product sold as having no fees" and "product add-ons added without clear explanation to customer"** (i.e., FleetDash fee) |
| 134-9 | Small-Fleet FleetCard Research Phase I – Non and Lapsed Users | June 2017 | <u>Objective:</u> Understand why Micro-Small fleet customers (fleet sizes 1-20 trucks, which is 85% of Comdata's[32] small-fleet business) sign up but then do not use cards <br> <u>Findings</u>: <br> • Biggest barrier to starting/continuing usage revolves around fees <br> • **"There appears to be a lack of transparency around fees during the selling process. The bottom line is that people really don't understand the program. The fee structure is not discovered until after enrollment engendering a sense of mistrust."** |
| 135-5 | Q217 NAL: Customer Survey Results | August 2017 | <u>Findings</u>: <br> • Re Fuelman cards: 17% customers said they were charged unexpected fee; 9% said they were charged incorrect fee <br> • Re MasterCard cards: 12% said they were charged unexpected fee; 9% said they were charged incorrect fee |
| 139-9 | Small Fleet Customer: First Year Attrition | Jan. 2018 | <u>Objective:</u> Analyze perspectives and uncover challenges that impact small-business customer retention <br> <u>Findings</u>: <br> • Customers unpleasantly surprised and frustrated by "lack of transparency, |

---

[32] Comdata operates on the MasterCard platform. (*See* Doc. 137-18.)

| | | | |
|---|---|---|---|
| | | | unexpected fees, and lack of visibility into FLEETCOR policies" <br>• **42% of customers were surprised by fees and charges** <br>• **65% of customers do not understand the charges and fees they receive on invoices** |
| 198-2 | Voice of Customer – Fuelman by Hanover Research | Survey not dated | <u>Objective:</u> *Qualitative* research to address issues relevant to Fuelman customers and how to invigorate Fuelman brand and network <br><u>Findings</u>: <br>• Participants feel uninformed about Fuelman's pricing structure: "In addition to confusing billing statements, participants feel many fees or pricing changes are imposed without warnings. **Multiple participants report being charged 'hidden fees' in the form of unexpected convenience fees or late fees."** <br>• **"Participants are charged with late fees after paying billed charges on time."** |
| 140-17 | Customer Survey Analysis | Survey not dated but assesses customers from 2018 | <u>Findings</u>: <br>• Fees biggest cause of attrition once promos expire <br>• **65% of customers who stopped using Fuelman in 2018 cited unexpected fees** |
| 140-5 | NAT Small Fleet Early Life Attrition | Feb. 2020 | <u>Findings</u>: <br>• 22% of "attrited" customers leave after 1 or 2 transactions due to being surprised by fees <br>• **Fees were top reason (38%) customers cited for leaving** <br>• Of those 38%, FleetAdvance fee was top reason (55%) because too high and **not as disclosed/unexpected** <br>• Fees in general too high and not as disclosed (29%) <br>• **"Customers were charged fees they were not made aware of at time of sale, or were opted into and charged for unwanted services"** <br>• In interview of 70 small fleet, "attrited" customers who started with FleetCor in 2019, **53% felt misled** and 26% claimed |

| | | | fees were not accurately described or disclosed |
|---|---|---|---|

These studies — commissioned by FleetCor itself — provide statistical and anecdotal data to support that significant portions of FleetCor's customer base were not aware of certain fees when they signed up for FleetCor fuel cards, were frustrated with these "hidden fees," and cited these unexpected fees as the reason they stopped using FleetCor cards. The fact that these studies span a number of years further demonstrates not only the temporal length of FleetCor's fee practices but also FleetCor's long-term awareness that customers felt duped by its variety of fees and modes of imposing such. FleetCor's own studies are therefore highly probative evidence that the slew of unauthorized fees at issue here caused substantial harm.

### b. Customer Complaints[33]

As further evidence of substantial harm, the FTC points to a swath of customer complaints about unexpected fees. The Court cites to some exemplar complaints below but notes that there are many more in the record.

---

[33] As noted *infra* at n.13, FleetCor **does not contend in briefing** that customer complaints are inadmissible hearsay, though it does so in response to the FTC's Statement of Material Facts. As explained previously, customer complaints, especially in response to survey questions, fall within Rule 803(3)'s exception to the hearsay rule as statements of the declarant's then-existing state of mind. *See Brunswick Corp.*, 649 F.2d at 1054 (5th Cir. 1981); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227 (2d Cir. 1999), *amended on reh'g on other grounds* (Sept. 29, 1999); *BoDeans Cone Co., LLC v. Norse Dairy Sys., LLC*, 678 F. Supp. 2d 883, 902 (N.D. Iowa 2009). And the surveys in which the customer complaints are found are not hearsay because they are party admissions, as discussed above. *See Walden*, 2012 WL 4050176, at *2 (finding that accessibility audit — to identify compliance issues — conducted by consultant for defendant was not hearsay); *Reid Bros. Logging Co.*, 699 F.2d at 1306; *Theriot*, 742 F.2d at 882.

To start, the survey conducted by the FTC's expert, Dr. Krosnick, revealed the following customer complaints about unexpected fees from individuals who were "Bill Payers":

- "There were times when [FleetCor] would charge me for additional programs, when it was something I didn't ask for. I had to call them and go back and forth."

-  "[W]hen I reviewed by bill, they charged me more, and when I called them, they told me that they enrolled me in the program that they had to clean the air. They never asked me in [sic] that . . . ."

- "[T]hey would also add these extra programs like fraud protection. They would give you a free trial and then after than [sic] month they would charge me, I would forget to take it off, and my bill has a surcharge because I didn't call to cancel, but they're the one that [put] it on there, it was a very irritating thing about them."

(Krosnick Report, Doc. 124-1 at ECF 74, ¶ 199.)[34] FleetCor's own internal surveys also include a plethora of customer complaints. Some examples include:

- "They put us on Tier 2 pricing [High Risk Fee] . . . . They just added it to our account without our knowledge . . . . Been with them seven years, then all of the sudden in September they started adding this fee. There's a lot of hidden fees that they add, and they stopped giving us rebates." (Qualitative Hanover Study, Doc. 198-2.)

- "The occasional, inexplicable, fees you throw onto my bill, and come with as many excuses and promises to reimburse as customer reps I speak to" (Small Fleet Survey on First- Year Attrition, Doc. 139-9 at ECF 118.)

- "I'm being charged an administrative fee I think it's called. I don't agree with that. **Do what your sales rep says you are going to**

---

[34] Similarly, customer responses that were included in the "raw data" of Dr. Wind's report — but that did not make it into the final report — include complaints that state, for example, "[W]e spoke to a rep, [thought] that they had explained everything to me honestly, but they did not. They real [reel] you in and then hit you with fees a few months later. There is a lot of fine print. They don't make things clear to you," and "When I sign up[,] [t]he young lady told me info that was not the truth." (Krosnick Rebuttal Report, Doc. 167-5 ¶ 42.)

do. **Have clear representation of fees and charges**. **Have clear understanding of offered and accepted services**." (*Id.*) (emphasis added).

- "[FleetCor] started charging $0.10 per gallon over cost. Do not know why, had something to do with my credit rating which was better when I started using it . . . ." (Customer Attrition Survey, Doc. 140-4.)

One particular FleetCor study of Comdata MasterCard cards explains that "[t]here appears to be a lack of transparency regarding fees during the sales process. Fees are discovered after the fact." This study provides the following customer complaints:

"I filled out an application thinking, 'I'm happy, I'm getting this solution for my company.' Then they said, 'The card is on its way, and there will be extra fees for this and that.' I was like, 'I'm not sure if I got the right thing. *The fees I found out after the paperwork was already submitted. There was no explanation of fees on paper.*"

"The [sales] *guy told me there was no additional cost, we were going to get fuel discounts, and we were going to get all these opportunities. He said, 'I guarantee there will be no additional charges.' And then a week or two later, I got a $15 charge.*"



"I'm not saying I was a victim, but *I was misled about the fees, how I am going to be charged every time I take that nozzle and put it in my truck...So now I had another job besides running my business, literally to monitor every invoice, look at the hidden fees and try to call and fight those fees. And I was like, 'You know what, it's not worth it for me. I will just go back to American Express.'*"

"It was not explained to me in the initial [call]. *I don't like surprises and I don't like sneaky, underhanded tactics. If somebody wants to charge me something, have the gall to look me in the eye at least tell me, 'Hey. This is what we're going to charge you and why.' Don't try to sneak it in on me, because I'll drop you like a hot potato.*"

The sales rep only explained to me the discounts. I asked, 'Is there a monthly fee?' He said, 'No, there's no monthly fee, only a $50 set up fee and that's it.' That's the only fee that was discussed prior to me completing the application. And once I saw the fees I asked him about [them], he's like, 'Oh yeah, those are fees that you'll have on a monthly basis. Why was this not told to me before the application was sent?"



"When I started they tell me one thing and then later they change it. They changed the rules in the middle of the game and I was not too pleased."

15

(Small Fleet Non and Lapsed User Study, June 2017, Doc. 134-9) (highlights added).

These comments are further corroborated by statements from *FleetCor's own customer service agents*, who commented that, e.g.:

- "FleetDash shows on bill as Misc-2. Since this has a free trial period, a customer usually won't notice for a few cycles. When they do, they have no way of knowing it is for FleetDash . . . without calling." (Doc. 133-7 at ECF 33.)

- "Fees duplicate erroneously, often the customer is getting hit and they don't notice it . . . we brought it up to [FleetCor] . . . unclear if or how they addressed." (*Id.* at 32.)

The emails of high-level FleetCor employees similarly bolster the conclusion that customers were complaining *en masse* about the lack of transparency related to fees. For example, a customer, after receiving a letter from FleetCor about fee charges, complains about the lack of transparency of the Convenience Network Surcharge fee:

> The letter states that we are subject to a $3 "Convenient Network Surcharge" if we go to certain locations to get fuel. The letter provides a few examples of some places where the surcharge may be in effect, but goes on to state, "...and certain other branded/unbranded merchants." You can't even tell me where I will be penalized . . . .

(Customer Email Exchange, Doc. 140-21 at ECF 3–4.) A FleetCor employee viewed this complaint and forwarded it on to his/her superior, Chet Panhans, the Head of Field Sales. Mr. Panhans then noted, "[h]is comments are very similar to what my reps and managers are experiencing *across the board*" and that "[*n*]*either the Web Site nor the App designates sites with regards to trans fee*—leaving customers frustrated." (*Id.* at ECF 2) (emphasis added).

Based on the referenced evidence — including internal FleetCor surveys, emails, and customer complaints —the FTC has carried its burden to show that FleetCor's fee practices related to unexpected fees caused substantial injury to consumers. *Amazon.com, Inc.*, 2016 WL 10654030, at *8 ("The millions of dollars billed to Amazon customers *without a mechanism for consent*, the thousands of customers complaining about unauthorized charges, and the time spent seeking refunds for those charges, all demonstrate substantial injury"); *Orkin Exterminating Co.*, 849 F.2d at 1364 (finding substantial injury when Orkin raised customers' renewal fees, to earn revenue of $7 million dollars).

As referenced above, FleetCor does not mention the substantial injury prong of the unfairness analysis or argue that these charges did not occur. Neither does FleetCor directly contend that it had obtained authorization or permission to charge the fees at issue. As such, FleetCor has not presented any evidence that calls the FTC's extensive evidence into question on the issue of substantial injury. *See Windward Mktg.*, 1997 WL 33642380, at *9 (reiterating that a summary judgment movant's burden is discharged by showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case) (citing *Celotex*, 477 U.S. at 325); *Haves,* 52 F.3d at 920 ("[A] genuine issue of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable [factfinder] to return a verdict in its favor.").[35]

---

[35] FleetCor also contends that the findings of another one of its experts, Dr. Schoar, call Dr. Krosnick's conclusions into question. But Dr. Schoar's rebuttal opinion is immaterial to the legal

Accordingly, the FTC has carried its burden on the first element to show that customers suffered substantial injury when they were charged (1) erroneous late fees and (2) other unexpected fees. Defendants — who do not directly mention substantial injury — have not provided any evidence that creates a dispute of material fact on this issue that would allow a factfinder to rule in their favor.

### ii. The Injury Was Not Reasonably Avoidable

As to the second prong of an unfairness claim — whether injury was reasonably avoidable — "the Court focuses on whether the consumers had a *free and informed choice* that would have enabled them to avoid the unfair practice," here the improper late fees and other unauthorized fees. *Windward Mktg.*, 1997 WL 33642380, at *11 (citing *Am. Fin. Servs. Ass'n*, 767 F.2d at 976) (emphasis added); *see also Amazon.com*, 2016 WL 10654030, at *9 ("An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing potential avenues toward mitigating the injury after the fact.") (citing first *Orkin Exterminating Co.*, 849 F.2d at 1365–66 (11th Cir. 1988), then citing *Neovi*, 604 F.3d at 1158).

---

analysis. Dr. Schoar compared the amount of fuel that customers purchased before and after a fee was listed in their Fuel Management Report, and, from this comparison, stated that customers' fuel-buying behavior did not change after being charged the fee, thus the fees were not unexpected. (Schoar Report, Doc. 162-18.) But whether customers purchased the same amount of fuel after a fee was listed on their bill is not relevant to whether they suffered harm in the form of unexpected fee charges. And, as noted, even discounting Dr. Krosnick's survey, there is still a large volume of unrebutted evidence supporting substantial injury.

Where "anticipatory avoidance" and "subsequent mitigation" are not reasonably possible, the injury is not reasonably avoidable. For example, in *Orkin Exterminating Co.* Orkin originally promised customers at sign-up that it would not increase annual renewal fees; however, in August 1980 Orkin determined that it was going to increase annual renewal fees and informed customers via a letter notice. 849 F.2d at 1357-58. In that case, even though Orkin had notified customers of the fee increase, the Eleventh Circuit affirmed the Commission's finding that customers could not have reasonably avoided the fee increase through anticipatory avoidance or subsequent mitigation. The *Orkin* Court stated:

> Anticipatory avoidance through consumer choice was impossible because these contracts give no indication that the company would raise the renewal fees . . . . As for mitigation of consumer injury, the Commission concluded that the company's "accommodation program" could not constitute an avenue for avoiding injury because relief from Orkin's conduct was available only to those customers who complained about the increases in the renewal fees . . . . [Orkin] does not dispute that pre-1975 customers were not directly informed of the "accommodation program" unless they complained about an increase. Given that consumer information is central to this prong of the unfairness inquiry, it was proper for the Commission to determine summarily that the "accommodation program" did not provide pre-1975 customers with any real opportunity to mitigate their injuries.

*Id.* at 1365-66. Another illustrative case is *FTC v. Amazon.com, Inc.*, 2016 WL 10654030 (W.D. Wash. July 22, 2016). There, Amazon allowed customers to download, for free or for a charge, apps on their mobile phones or Kindle tablets. Some of these apps allowed for "in-app" purchases ranging from $0.99 to $99.99. *Id.* at *1. Many customers did not understand that these "in-app" purchases were additional charges, and some of the apps were targeted towards parents with

children who played app games on the relevant devices. *Id.* In assessing whether these "in-app" purchases constituted an unfair practice under the FTC Act, the district court determined that customers could not reasonably avoid these charges because most customers "were unaware of their existence," because "the only warning about in-app purchases that customers would see during the download process . . . was toward the bottom of a long 'description' note that users would have to scroll down to see," because "no affirmative assent to the charges was required," and because the refund process was difficult and often not worth the hassle for the small amount charged. *Id.* at 9-10.

Here, the FTC presents evidence that both the unfair (1) late fees and (2) other unexpected fees were not reasonably avoidable.

### 1. Late Fees Were Not Reasonably Avoidable

As noted above, the FTC's expert, Dr. Krosnick, surveyed FleetCor customers who were "bill payers" and found that "37.90% of FleetCor Customers were charged late fees by FleetCor on one or more occasions despite having paid their entire bill on time." (Krosnick Report, App. B, Doc. 124-1 at ECF 126–27, ¶¶ 108–09.)

An email from FleetCor's Senior Vice President of Product & Growth, Mary Rachide, acknowledged that improper late fees were a "massive problem." (November 2017 Email from Rachide, Doc. 198-50 at ECF 2). Likewise, FleetCor's internal surveys similarly recognize this problem. (Voice of Customer Survey, Doc. 198-2) ("Participants are charged with late fees after paying billed charges on

time."); (2018 Experience Survey PowerPoint, Doc. 140-16) (finding that customers "Feel Like They are Scammed" and "Customers Pay for FLEETCOR's Mistakes" because "Late fees charged even when a FLEETCOR technical error prevents customer on time payment"). A FleetCor internal Risk Assessment Study found that customers were charged "erroneous late fees" because of payment posting errors, online and phone processing delays, locking of accounts, and more. (*See* Customer Risk Assessment, Doc. 137-18 at ECF 14–15.)

This record evidence indicates that customers, first off, could not have reliably avoided late fees for payments that were made on a timely basis. Further, customers could not avoid late fees when FleetCor blocked their ability to make payments or misled them about deadlines for when payments had to be submitted. And, initially, payments were not made available online. Former FleetCor Revenue Analyst Margaret (Molenhoff) Scott explained that FleetCor knowingly made it difficult for customers to pay on time for the purpose of accruing late fee revenue. (Declaration of Margaret (Molenhoff) Scott Decl., Doc. 124-20 ¶ 11) ("[M]any customers wanted to set up automatic payments by EFT to help avoid late fees. . . . Ms. Chen [VP of Revenue Management] . . . told me that FleetCor did not make it easy for customers to pay by EFT because doing so would reduce the number of customers who paid late. Ms. Chen made clear to me that FleetCor did not want customers to start paying on time so that FleetCor could continue to generate late fee revenue."). This is supported by an email from 2017 in which Defendant FleetCor CEO Clarke asked his employees about "opportunities to get more late fee

revenue in 2018 . . . thru a higher rate, less/no grace days, etc, etc". (Clarke Dec. 2017 Email, Doc. 138-25.)

Eventually, even after online payment options were made available, there were numerous technical problems, and same-day payment posting was not available. (*See* 2017 Payments Overview PowerPoint, Doc. 135-3 at ECF 3) (indicating that payments made on weekdays post on the next business day, and payments made on weekdays after 5:00 p.m., on weekends, or on holidays post two business days after payment); (*see also* Email Exchange on Late Payment, Doc. 198-51 at ECF 4) (FleetCor Eastern Division Sales Manager noting that the "*language on ICD can be misleading about when payments will post*. Some reviews say same day, some reviews say allow 24 to 48 hours. I have seen it firsthand myself").[36]

Even FleetCor employees knew that customers often tried to pay on time but were blocked, stating in a work chat:

> PC: I have read so many comments today and it doesn't matter the brand, the payment process is CONSISTENT
>
> RH: Yep
>
> PC: how many calls could we reduce if we just made making payments easier – and I doubt it would be that hard on late fees
>
> RH: we see the same in the quarterly survey

---

[36] Customers could make payments via phone but there was a charge of either $15 or $25 to do so. (*Id.* at ECF 5.) And, as noted in the Risk Assessment Study, Check By Phone suffered "constant processing delay preventing timely application of payments." (*See* Customer Risk Assessment, Doc. 137-18 at ECF 14−15.)

> PC: because late payers are late payers but **people who TRY to pay and can't are the people that just can't take it**
>
> RH: Would you do business if you had to pay in 10 days? I mean we pay everything on-line but as a business I get it
>
> PC: **but they can't even pay us online**
> **They can't set up in online bill pay, Checkfree doesn't work half the time**
> **And heave[n] forbid you mail a check ...**

(Fee Chat, Doc. 137-15 at ECF 3) (emphasis added).

Other barriers to successfully paying online or by email are detailed at length in the customer complaints previously discussed in the "substantial injury" section. These barriers include extreme delays in posting mail payments, limits on online payments to one every three days, online payments not posting, the payment website locking, and more. (Email Exchange Including Survey on Late Fees, Doc. 198-50 at ECF 8–10.)

Based on this evidence — again, internal surveys, employee emails, expert evidence, and customer complaints — the FTC has established that improper late fee charges were not reasonably avoidable.

FleetCor points to no evidence to allow a factfinder to rule in its favor. Besides arguing that it did not intentionally delay posting and blaming the third-party lockbox company — as discussed in the substantial injury section — FleetCor's only response is Ms. Chen's declaration that she did not make the statement that Ms. Scott ascribes to her about intentionally making it difficult to

pay by Electronic Funds Transfer (EFT). (Chen. Decl., Doc. 161-17 ¶ 27).[37] Viewing the facts in the light most favorable to FleetCor, the Court accepts that Ms. Chen did not make this statement. Regardless, this does not create a dispute of material fact given the broad scope of evidence presented by the FTC. As noted above, the FTC does not have to prove intent. There is still overwhelming evidence to support that a significant proportion of customers could not avoid paying the unfair, and often erroneous, late fees they were charged. No reasonable factfinder could determine otherwise based on the record here.

### 2. Other Unexpected Fees Were Not Reasonably Avoidable

To carry its burden to show that the other unexpected fees were not reasonably avoidable, the FTC provides evidence that FleetCor (1) did not inform prospective customers about fees during sales or before sign-up; (2) continued to hide fees after sign-up; (3) automatically enrolled customers in add-on fee "programs"; and (4) obscured fee information on billing statements, (FTC MSJ, Doc. 132-1 at 21–30), as shown below.

First, the Court assesses the FTC's evidence that customers were not informed about fees before sign-up. To make this point, the FTC cites first to FleetCor admissions in internal company emails. For example, in one email from April 2017, FleetCor's Head of Sales, Todd House, asked the Head of the Senior

---

[37] Ms. Chen does acknowledge, however, that FleetCor limited EFT payment options at the time. (*Id*.)

Vice President of Product & Growth, Mary Rachide, "How/when are fees communicated to customers?" Rachide responds:

> The Revenue team (i.e. Yvette [Chen]) handles everything regarding fees and fee charges. **The vast majority don't occur during the Sales cycle**, so they don't necessarily impact Sales directly, so I **am not sure how much they are directly told**. Product is not directly involved in these fee assessments/changes. **This raises a potential gap as customers are not informed during the sales process of potential fees that they will incur later**. It is up to them to read the T&Cs to learn about potential fees that will hit them after the sales cycle ends.

(April 2017 Email, Doc. 135-6 at ECF 2) (emphasis added).  To further support that fees were hidden at sign-up, the FTC points to information that customer sales representatives erroneously promised prospective customers that there would be no fees. In an email exchange from November 2016, a customer asks the FleetCor representative to, "[p]er our verbal conversation" confirm that "[t]here are no set up or annual fees associated with this new account." (November Set-Up Email Exchange, Doc. 198-9 at ECF 4.) FleetCor's representative responds, "Yes, all of the points are accurate." (*Id.* at ECF 3.) Later, the same customer writes:

> Per your email on 11/10/16 you stated that my points were accurate, that there were no set up or annual fee's[sic]. **You verbally told me that there are no fee's[sic] as long as we pay our bill on time every month. We were not informed in advance of the of these other fees as noted in the pamphlet**.

(*Id.* at ECF 2) (emphasis added). In reference to this exchange, a FleetCor Director of Process & Project Management said: "*Another* example of poor early life customer experience associated with fees . . . " (*Id.*) (emphasis added). And a FleetCor study from June 2017 includes a complaint from a customer who stated:

The [sales] guy told me there was no additional cost, we were going to get fuel discounts. . . . He said 'I guarantee there will be no additional charges.' And then a week or two later, I got a $15 charge"; another complaint states: "When I started they tell me one thing and then later they change it. They changed the rules in the middle of the game. . . .

(Small Fleet Study, June 2017, Doc. 134-9 at ECF 18)

The FTC also relies on the report of its expert, Dr. Krosnick. Dr. Krosnick conducted a telephonic survey and found that personnel at only 7.02% of FleetCor's customers were informed *in advance* about all fees that FleetCor later charged them. (Krosnick Report, Doc. 124-1 at ECF 71, ¶ 191.)[38] He broke down this assessment as to each single, specific fee as follows:

**Table 2**

| Fee Name | Percent of FleetCor Customers that were charged this Fee where an Agreement Signer or Update Receiver was informed about the Fee in advance |
|---|---|
| Minimum Program Administration Fee | 19.15% |
| Level 2 Pricing or High Credit Risk Fee | 11.39% |
| Convenience Network Surcharge or Special Network Pricing | 30.43% |
| Fee for Fleet Dash | 16.13% |
| Fee for Clean Advantage | 6.25% |
| Fee for Accelerator Rewards | 21.74% |
| Fee for Fraud Protector | 14.00% |

---

[38] Dr. Krosnick surveyed both "Agreement Signers" within a company and "Update Receivers" to determine whether members of either category were informed in advance about all fees that FleetCor later charged them. Dr. Krosnick further stated that he is "offering an opinion about the percentage of FleetCor Customers where at least one Agreement Signer or Update Receiver was informed in advance about the Fees , , , even if other Agreement Signers or Update Receivers in the same business were not informed." (Krosnick Report, Doc. 124-1 at ECF 71, ¶ 190.) Thus, his conclusion that only 7.02% of customers were informed in advance of all fees they were later charged includes customers where at least one individual was informed, even if others were not.

(Krosnick Report, Doc. 124-1 at ECF 72, ¶ 192.) Thus, Dr. Krosnick's survey data and analysis is also probative evidence that a large majority of FleetCor customers were not informed about all of the fees they were later charged at the time they signed up for their fuel cards.

Second, the Court addresses FTC's argument that customers were not informed about fees *after* sign-up, whether those fees were charged from the get-go or whether they were added after some number of months. *After* signing up for fuel cards, customers were sent a copy of FleetCor's T&Cs in the mail along with the cards. (*See* Small Fleet Study, June 2017, Doc. 134-9 at ECF 18) ("The fees I found out after the paperwork was already submitted."). For the first three years relevant to this litigation, from 2014–2017, FleetCor did not make T&Cs available online. (*See* Head of Sales Email March 2017, Doc. 139-1 at ECF 2) ("They're asking for copy of our T&C's. *[A competitor's] are available online. Ours aren't.* Not wild about sharing, but withholding would seem odd given how we've talked about full disclosure. I think the biggest risk would be they pick up on MPF [Minimum Program Fee] & high risk fees and start asking whether we're charging it . . . .") (emphasis added); (*see also* April 2017 Email, Doc. 135-14 at ECF 2) ("The current process is: if a customer calls requesting a copy of their T&C, the only option we have is to send it via regular mail. . . . The current ETA is 5-7 business days."). FleetCor also refused to email copies of the T&Cs to customers during the same timeframe. (*See* 2016 Email from FleetCor Corporate Training Manager to Staff, Doc. 135-12 at ECF 3) ("All-Please review the attached alert regarding the

upcoming change in the late fee rate . . . **REMEMBER! DO NOT send electronic copies of the terms and conditions documents to customers**.") (emphasis in email).

The operative T&Cs for the first years at issue were inscrutable and look exactly like this:



(T&Cs, Doc. 132-14.)   Because the T&Cs were so difficult to read, FleetCor employees had a "read friendly" version (for employees' use only) in a larger font. (*See* Doc. 141-5.) Top FleetCor employees also acknowledged that the T&Cs are "fine print" that neither "rep[s] or customer[s]" ever read. (*See* August Email from Panhans, Doc. 198-5 at ECF 2); (*see also*, May 2017 Email from Rachide, Doc. 198-12 at ECF 2.) Courts have determined that where information about a charge was included "towards the bottom of a long 'description' note that a user would have to

scroll down to see," the charge was not reasonably avoidable. *Amazon*, 2016 WL 10654030, at *10.

Moreover*, crucially*, the T&Cs *do not address at least 3 of the fees at issue in this litigation*: the Fraud Protector, Accelerator Rewards, or Clean Advantage Fees. (*See* FleetCor Card Fee Summary Slides Doc. 141-9 at ECF 7–8.) For the fees that are mentioned in the T&Cs, the FTC argues that the language is vague, confusing, and does not indicate to customers what fees will apply to them or when. (*See, e.g.*, T&Cs, Doc. 132-14) (noting that FleetCor generally "reserves the right" to charge fees for "use of select sites/merchants" the list of which was "available upon request" by calling FleetCor customer service; explaining that Minimum Program Fee is defined by previous month's average fuel price; also noting that FleetCor "reserves the right" to charge high risk fee based on host of factors from credit score to past late fees).[39] For example, as noted above, customers complained that the Convenience Network Surcharge was charged at specific locations but nowhere was a list of those locations available to customers. (Customer Email Exchange, Doc. 140-21 at ECF 3–4) ("You can't even tell me where I will be penalized . . . ."). Customers therefore had no way to know, when fueling up, which fuel sites would cause them to incur this fee.

Besides that some fees were not included in the T&Cs and others were obscured by vague language and tiny print, the FTC presents evidence of an

---

[39] As discussed above and throughout, the late fees FleetCor charged were often charged when payment was timely or after FleetCor had blocked customers from making timely payment.

admission from FleetCor's Senior Director of Services Technology stating that FleetCor does not provide fee information in onboarding emails. (*See* July 2018 Email from Pam Coan[40], Doc. 198-47 at ECF 2) ("The only thing specific to new accounts is the onboarding emails, *none of which mention any fees*") (emphasis added) (attaching exemplar onboarding email).[41] More than simply failing to inform (let alone obtain permission) for fees, the FTC points again to the Scott declaration. (Scott Decl., Doc. 124-20.) Ms. Scott, a former FleetCor Revenue Analyst who was tasked with developing new "revenue initiatives," outlined an intentional plan to hide fees from customers early, only to add them in later when customers would be less likely to notice the fees. Specifically, Ms. Scott declared that Michael Cockrell (FleetCor's Director of Reporting and Analytics) told her the following:

> FleetCor did not charge fees to customers for the first few months after they signed up for a fuel card because customers were more likely to pay close attention to their bills during that time. I understood from these conversations that *FleetCor started charging fees to customers after the first few months because customers would be less likely to notice the fees and complain or leave FleetCor entirely*.

(*Id.* at ECF 6, ¶ 12) (emphasis added).[42] Similarly, a study done for FleetCor by Jabian Consulting advises FleetCor to limit fees during the first 60 days — when

---

[40] Ms. Coan explains that she was Senior Director of Services Technology in her deposition. (Deposition of Pam Coan, Doc. 151-1 p. 19:21–25.)

[41] FleetCor states that it disclosed fees to customers in onboarding emails but does not provide a single example of such an onboarding email to rebut Ms. Coan's email admission, cited above, or Mr. House's similar admission, cited below.

[42] FleetCor responds with a declaration from Mr. Cockrell. While Mr. Cockrell does not deny making the statement to Ms. Scott, he states that the position that FleetCor does not charge fees for two months to hide them is not correct and that instead, FleetCor "waives fees" for two or three

they are most likely to be noticed by customers — in order to reduce attrition. (2016 Jabian Attrition Analysis, Doc. 133-7 at ECF 14.)

Besides not providing fee information in onboarding emails shortly after sign-up and limiting fees for the first few months, the FTC points to numerous internal emails demonstrating that FleetCor often consciously did not tell customers when beginning to charge a new fee or when raising the amount of an existing fee. For example, in one email exchange, Defendant CEO Clarke asked Todd House, Head of Sales "what notification" a customer gets when they are put on a fee for the first time. (Doc. 136-3 at ECF 2.) The Head of Sales responds, "none. Other than T&C change." (*Id.*) Clarke then asks whether updated T&Cs are sent alongside a fee implementation. Clarifying, House explains that this is *not* the case, stating:

> Typically (like with [Minimum Program Fee]) we send T&Cs and then start charging new or different fee 30 days later on Direct. NAP more like 60 days.
>
> For high risk fees (already in T&C), we review file regularly . . . **whoever qualifies is billed going forward** . . . . **No notice provided to customer other than on fee statement**.
>
> For situations where T&Cs already allow a fee and we aren't charging up to max allowable . . . **when we increase the rate there is no additional notice to customers**, E.g. [Minimum Program Fee] started at 3c/gal . . . we increase to 10c/gal with no further notice (because T&Cs allowed it).

---

months to "let customers get used to their card and set up their payment systems." (Cockrell Decl., Doc. 161-18 ¶ 6.) Regardless of the how it is phrased, Mr. Cockrell admits that some fees are not charged for the first few months and are added on later. There is no dispute of this fact. FleetCor's intent is not at issue, as mentioned numerous times.

(*Id.*)  Other internal emails are similar. In one, Margaret Scott (who worked as a Revenue Analyst for Yvette Chen, the Senior VP of Revenue Management) tells another employee (Ami Layton) that "we are increasing the late fee cap on [Fuelman Small and Medium Business] accounts from $500 to $1000." (Email Exchange Nov. 2015, Doc. 136-6.) When Ms. Layton then asks Senior VP Chen if they need to send out new T&Cs, Chen says "no," because "the current T&C does not specify late fee caps so we are not repapering." (*Id.*); (*see also* Doc 136-8) (email outlining new Fuelman fee, stating "No customer communication planned, no need for CSR communication/opt out policy"). Compounding this problem, even where FleetCor did send out new T&Cs, it did not explain what had changed in the new version; it merely provided an effective date stating that the new version supersedes any previous version of the T&Cs. (*See* Doc. 136-14 at ECF 4.)

The FTC also presents evidence that customer service representatives were trained *not to disclose fee information* at times after sign-up. "Talking Points" directions for customer service representatives state, "DO NOT proactively inform the customer that the fee amount is subject to change and do NOT offer the schedule if not requested by the customer." (Fuel Price Initiative Status Update PowerPoint, Doc. 198-13 at ECF 13); (*See also* Senior VP Chen Email Fee Change Info, Doc. 198-14 at ECF 2) ("**Do not share with customers whether they are charged the higher or lower rate**") (emphasis in original). Thus, there is significant evidence that fees were not disclosed after sign-up.

Case 1:19-cv-05727-AT   Document 306   Filed 08/09/22   Page 99 of 130

Third, the Court addresses the FTC's argument and evidence that customers were charged unexpected add-on fees. It is undisputed that FleetCor automatically "enrolled" customers in some "fee programs" but provided a 60-day "free trial" before the fees kicked in. FleetCor's own fee slideshow details:

| Choice Service Fees | | | |
|---|---|---|---|
| FleetDash (Additional Reporting) | $29.97 per month Need Link to One Sheet | Default enrollment with 60 day free trial (opt out) | Welcome Pkg; T&Cs |
| Fraud Protector | 10 or more open cards = $2/card/month up to $250.  9 or fewer cards = $10/month/account.  If customer opts out they will still get Exception alerts and Fraud alerts for suspicious activity. Need Link to One Sheet | Default enrollment with 60 day free trial (opt out) | Letter and email |
| Accelerator Rewards | Elite (default enrollment) = $4/month/card Could upgrade to Premier w double benefit = $8/month/card Need Link to One Sheet | Default enrollment with 60 day free trial (opt out) | Letter, emails and call |

**Does NOT apply to new customers but existing customers may have one or more of these fees**

| Fee Type | Description | Applicable Population | Communications |
|---|---|---|---|
| Fees/Program Applicable to Existing Customers Only | | | |
| Clean Advantage Program | 5c per gallon to offset 100% CO2 emission from fuel usage | Pre 2018 vintage customers could have been enrolled | Letter, email Fee in Fleet Management Report (FMR) |
| Minimum Program Admin Fee | 10c per gallon to cover minimum program operation cost | Pre 2017H2 vintage customers could have been charged | In Ts&Cs; Fee in FMR |

(FleetCor Draft Fee PowerPoint, Doc. 141-9.) Importantly, the chart demonstrates that the Fraud Protector, Accelerator Rewards, and Clean Advantage Fees ***are not included in the T&Cs***. An internal email indicates that, for the Clean Advantage Fee, accounts "will be opted in *by default*." (Doc. 136-20) (emphasis added).

Numerous courts have previously determined that such "free trial" "programs" constitute unfair practices as they impose charges which are not reasonably avoidable for consumers. *Inc21.com Corp.*, 745 F. Supp. 2d at 1004 (holding that charges from free trial program were not reasonably avoidable

99

because customers are not tasked with scrutinizing their bills to avoid charges that were not authorized); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 720–21 (S.D. Tex. 2008) (finding that, where individuals were enrolled in free trial and later charged, they were not given true "free and informed choice that would enable them to avoid" the practice); *FTC v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001) ("Given the inconspicuous end of the free tour, defendants' contention that their charges were reasonably avoidable because customers simply could have declined to 'join' after their tours had finished seems equally implausible[.]"). Thus, there is significant evidence that certain fees were added after sign-up without customer consent or notice.

Fourth, the Court addresses the FTC's argument that fees were obscured on billing statements. The FTC asserts that FleetCor did not list all fees on billing statements, or where it did, the fee descriptions were vague. In support, the FTC points out that *invoices* do not list fees and only include a total balance of all money owed (including for gas charges). (*See, e.g.*, Doc. 140-10.) Rather, FleetCor included charged fees at the end of another document, the "Fuel Management Report" ("FMR"), that includes a list of all fuel charges for the pay period. (*See, e.g.*, Doc. 137-3 at ECF 6); (*see also* Wind Raw Data, Doc. 170-7) (reporting a customer who complained: "stop charging me hidden fees that I could only find on the Vehicle Management Report and not on my actual Customer Statement. *This is a deceptive billing practice and should be criminal*.") (emphasis added).

Tellingly, on one occasion, a fee was accidentally disclosed on an invoice and FleetCor employees panicked. In emails discussing this accident, FleetCor employees were worried ("Crap!") and explained:

> This will cause a lot of noise and our odds of keeping this fee will go down and our odds of losing customers will go up. We discussed where the fee would appear before launching to ensure that it didn't show up on the invoice . . . .what happened? Is there any way to stop it until this can be fixed so it shows up on the [Fuel Management Report] as opposed to the invoice?

(March 2016 Email, Doc. 142-20 at ECF 4). FleetCor internal surveys describe that "Fee labeling is confusing with many fees labeled 'Misc.'" (Business Update PowerPoint, Doc. 141-14 at ECF 28); (*see also* Voice of Customer Hanover Study Doc. 198-2) ("Participants receive charges with no clear source" and "Participants' internal accounts do not match Fuelman's statements"). Before September 2017, certain fees — like the High Risk Fee — were not disclosed *at all* on the FMR and, according to FleetCor employees, "the only way [customers] notice the price difference is to compare the amount we invoice them to their receipts." (September 2017 Email from Revenue Analyst, Doc. 137-8 at ECF 4.)

On this issue, Dr. Krosnick's customer survey data is fully consistent with this extensive evidence of FleetCor's established custom and practice of adding an array of unauthorized fees after customer sign-up and burying any reference to the fees at the end of lengthy Fuel Management Reports. Specifically, Dr. Krosnick found, based on his survey, that "Bill Payer" personnel at only 25.23% of FleetCor

customers later saw fees on their bills or the corresponding Fuel Management Reports. (*Id.* at ECF 73 ¶ 197.)

In view of the wide range of evidence assembled, the FTC has established that FleetCor charged a slew of fees that: were never discoverable to customers, were obscured by undecipherable language, were hidden in tiny print in T&Cs that were not sent to customers or were made difficult to access, were added on without notice, or were charged in spite of promises by customer service reps (or ads) that such fees would not be charged.

Numerous courts have explained that charges are not reasonably avoidable where customers do not provide permission for the charges or where the details of the charges are obscured by tiny print, confusing billing statements, and the like. *See, e.g.*, *Amazon.com*, 2016 WL 10654030, at *10 (noting that before March 2012, "no affirmative assent to the charges was required"); *Crescent Pub. Grp.,* 129 F. Supp. 2d at 322 (finding that harm was not reasonably avoidable where billing statements did not in some instances make clear what customers were being billed for, who was billing them, or how to contest the charges). The Court reiterates again that the operative question on whether harm is reasonably avoidable is whether customers can reasonably "anticipate" the harm and avoid it. *See Orkin Exterminating Co.*, 849 F.2d at 1365–66 (finding that, even where Orkin sent out letters *notifying customers in advance of raised renewal fee*, anticipatory avoidance through consumer choice was impossible because (1) initial agreements did not indicate that company would charge higher fees, (2) refunds were only

available to those customers who called and complained, and (3) switching to another competitor would not allow consumers to avoid injury); *Amazon.com*, 2016 WL 10654030 at *9 (rejecting Amazon's arguments that customers could have "identified and sidestepped a potential injury" because customer could have pursued refund after the fact, noting that (1) time seeking refund constitutes harm, (2) Amazon did not make option of refunds known, and (3) small amounts charged would result in reasonable people not seeking refunds).[43]

Based on the abundance of above evidence — employee emails, company PowerPoints, fee statements, and customer complaints — the FTC has shown that customers could not reasonably avoid the harm of the unexpected fees, especially where FleetCor's internal materials indicate that customers are often "fairly unsophisticated" "business owners but not business people" who are "not technically inclined" and are "short on time due to wearing multiple hats." (Small Fleet Study, Doc. 134-9 at ECF 11); (New Hire PowerPoint, Doc. 139-7 at ECF 47.). (*See also* Small Fleet Study, June 2017, Doc. 134-9) ("I was misled about the fees . . . . [N]ow I had another job besides running my business, literally to monitor every invoice, look at the hidden fees and try to call and fight those fees.").

It is thus FleetCor's burden to point to facts showing that there is a genuine issue for trial as to whether the fees were reasonably avoidable. FleetCor disputes

---

[43] Again, as Justice Brandeis noted, the FTC Act protects small harm to many people where "although the aggregate of the loss entailed may be so serious and widespread as to make the matter one of public consequence, no private suit would be brought to stop the unfair conduct, since the loss to each of the individuals affected is too small to warrant it." *Klesner,* 280 U.S. at 28.

the findings of Dr. Krosnick's survey finding that personnel at only 7.02% of FleetCor customers were informed *in advance* about all fees that FleetCor later charged them. (Krosnick Report, Doc. 124-1 at ECF 71, ¶ 191.) In so disputing, FleetCor relies on a rebuttal report from its "memory expert," Dr. Michael Kahana who posits, based on a "forgetting curve" that customers' inability to remember fee disclosures simply reflects the fallibility of human memory. (Kahana Rebuttal Report, Doc. 161-7 at ECF 21–26, ¶¶ 31–39.) In his rebuttal, however, Dr. Kahana does not challenge Dr. Krosnick's finding based on his survey of customers that only 7% of Update Receivers and 25% of Bill Payers were informed of the fees at issue via regular billing processes, leaving those conclusions unrebutted. Indeed, even discounting Dr. Krosnick's findings, other evidence, such as FleetCor's own admissions, still demonstrate that many fees were not affirmatively disclosed by representatives at sign up or later in the process. (*See, e.g.*, Clarke and House Email Exchange, Doc. 136-3 at ECF 2) (in which Head of Sales House explains that there is a "potential gap as customers are not informed during the sales process of potential fees that they will incur later"). FleetCor points to a sales representative training PowerPoint stating that, though the T&Cs are the "principal way" FleetCor communicates fees to customers, sales representatives "may face questions" about fees. (Training PowerPoint, Doc. 162-18.) *If asked*, sales representatives are supposed to tell customers that all fees are "choice-based" or "action-based," for example stating that "*we don't charge 'across the board' fees. We only charge fees for optional services that you choose.*" (*Id.* at ECF 12–13) (emphasis added).

First, nowhere does FleetCor point to any evidence of a customer sales script where representatives read information about the seven or so specific fees that the FTC alleges were unexpected. Moreover, this training PowerPoint directs representatives to respond *with misleading information*.[44] The undisputed evidence shows that FleetCor did not "only charge fees for optional services that you choose." (*Id.*) Rather, as noted, FleetCor automatically "enrolled" customers in "fee programs" they *did not choose*, including the Clean Advantage, FleetDash, Fraud Protector, Accelerator Rewards, and the Minimum Program Administration Fees. (*See* FleetCor Fee PowerPoint, Doc. 141-9) (describing these fees as having "default enrollment").  In addition, the Convenience Network Surcharge is charged "across-the-board" to any customer who purchases fuel at certain locations that are in the network and is not an "optional service." [45]

---

[44] With respect to FleetCor's misleading responses, the Court understands that the FTC has brought Count V under an unfairness theory as opposed to a deceptiveness theory. These two theories involve "distinct lines of inquiry," and, a practice may certainly "be unfair without being deceptive." *Orkin Exterminating*, 849 F.2d at 1367. But the two are not wholly unrelated here. The Court does not view Count V in a vacuum, and it is relevant that FleetCor's advertisements (the subject of Count III) promised no "set up, transaction or annual fees" of any sort. Thus, while deception is not the crux of an unfairness claim — and is certainly not required — it is nevertheless relevant that FleetCor's internal training materials directed sales representatives to respond to questions about fees with misleading responses.

[45] FleetCor also argues that the head of FleetCor's phone sales team "walk[s] the floor" to make sure reps are properly answering questions about fees. (Beagles Decl., Doc. 161-16 ¶¶ 4,9.) This is irrelevant as there is still no evidence of use of affirmative disclosure scripts and guidelines, and moreover, the training materials direct reps to respond to questions with misleading responses. *F.T.C. v. Kennedy*, 574 F.Supp.2d 714, 720 (S.D. Tex. 2008) (where evidence demonstrated that, in spite of lawful scripts and guidelines (unlike here, where, as noted above, the scripts were misleading and do not demonstrate affirmative disclosure processes), customers were still misled, it was immaterial that "supervisors walked the sales floor and monitored calls for noncompliant conduct").

FleetCor also points out that it sends customers its T&Cs after they sign up and, since 2017, has made available a link to the T&Cs on its website. (Chen Dep. II., Doc. 153-1 p. 20:4-6.) This fact is not in dispute — it is just insufficient as a matter of law to demonstrate that all of the fees were reasonably avoidable in light of the remaining evidence. This other evidence demonstrates that the T&Cs are vague, *do not mention a number of the fees at issue*, and do not indicate to customers what fees might apply to them and under what circumstances, e.g., in the case of which fuel sites will cause the Convenience Network Surcharge fee to be assessed. *See Alcoholism Cure Corp.*, 2011 WL 13137951, at *54 (rejecting defendant's position, as to the unfair practice claim, that billing was done "with authorization" when terms and conditions allowed for the excess charges at issue because substantial customer evidence demonstrated that customers did not read T&Cs and believed only that they were signing up for a membership at cost of $100 a month); *Amazon.com*, 2016 WL 10654030 at *9 (rejecting Amazon's arguments that customers could have "identified and sidestepped a potential injury" because terms and conditions disclosed information about in-app purchases at end of fine print pop-up); *Am. Fin. Servs. Ass'n*, 767 F.2d at 977 (finding that consumer injury was not reasonably avoidable in part because consumers' "ability to shop and bargain is further constricted by the fine print and technical language used in the contract" and because of lack of customer understanding of terms); *Orkin Exterminating Co.*, 849 F.2d at 1366 (finding that consumer injury was not reasonably avoidable even though Orkin notified customers of fee increase where

initial agreements did not indicate that there would be fee increase); *Crescent Pub. Grp.*, 129 F. Supp. 2d at 322 (in context of preliminary injunction, finding that injury was not reasonably avoidable where defendants obscured the point at which fees began being charged and thus customers could not simply decline to join or opt out of charges of which they were unaware).

As to the add-on fees, FleetCor does not dispute that customers were automatically signed-up for added fees such as the Clean Advantage Fee. Rather, FleetCor points out that, upon being "enrolled," customers were sent a mailer announcing the "program." (Chen Decl., Doc. 161-22, ¶ 13.) This is not disputed either. The mailer, however, in no way makes clear to a reasonable customer that they are going to be automatically enrolled and in turn assessed a regular additional fee. (Clean Advantage Letter, Doc. 136-20 at ECF 6.)[46] Moreover, regardless of whether this letter *notified* customers of fees, it in no way obtained customers' *authorization* to enroll the customer in the new program and be charged the fees. These types of automatic enrollment charges are unfair practices and the associated charges are not reasonably avoidable for consumers. *Inc21.com*

---

[46] The letter begins with multiple paragraphs about businesses across the country "taking steps to do something about their fleets' $CO_2$ emissions" and announces the Clean Advantage Program, "a turnkey sustainability program" that "automatically calculates your fleet's $CO_2$ emissions . . . ." (Clean Advantage Letter, Doc. 136-20 at ECF 6.) After multiple paragraphs, the letter explains that "[b]est of all, you do not have to do anything to take advantage of this great program. Just keep using your [] card as you do today. Beginning Nov 1st we will calculate and offset your vehicles' $CO_2$ emissions for $0.05 per gallon each month . . . ." (*Id.*)

*Corp.*, 745 F. Supp. 2d at 1004; *Kennedy,* 574 F. Supp. 2d at 720–21; *Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d at 322.[47]

FleetCor also points out facts related to its disclosure of fees on Fuel Management Reports. But again, where customers have never agreed or been informed of charges in the first place, post-hoc inclusion of the charges on billing statements does not render those charges reasonably avoidable. *Amazon.com*, 2016 WL 10654030, at *10; *Orkin Exterminating Co.*, 849 F.2d at 1365–66; *Windward Mktg.*, 1997 WL 33642380, at *3, *13 (finding that harm was not avoidable where customers never authorized charges and "verifiers" who called them to follow up "never asked consumers for express authorization" to debit bank accounts); *Inc21.com Corp.*, 745 F. Supp. 2d at 1004 (finding that, where customers never agreed to purchases in the first place, they had no reason to scrutinize their bills and therefore harm was not reasonably avoidable) ("This order declines to allow defendants to blame unsuspecting customers for failing to detect and dispute unauthorized billing activity").

Taking all of this evidence into consideration, the FTC has plainly demonstrated that the unexpected fees were not reasonably avoidable because:

- customers were not told about the fees at the onset (and in fact could be misled about fees, upon inquiring);

---

[47] It is also apparent that the decision to make the fee "opt-out" as opposed to "opt-in" was made for the purpose of raising revenue. (*See* Chen Email re Clean Advantage Fee, Doc. 136-21 at ECF 3) (**"[W]e planned** ▮▮▮▮▮▮ **revenue initiative in 2018 . . . by enrolling . . . customers into program under 'Free Trial' approach which could not be realized through 'Opt In' approach**") (emphasis in original).

- customers were not told when a new fee, such as the Clean Advantage Fee, was going to be applied to them;

- the inscrutable T&Cs, which were primarily sent by mail and after sign-up, were insufficient to alert customers to all of the fees charged, because they did not include fees and did not indicate when and where fees would be assessed; and

- the post-hoc disclosures that were made (mostly after 2017) on Fuel Management Reports were too late to allow customers to avoid the injury.

In response to this evidence, FleetCor fails to come forward with "significant, probative" facts to create a genuine dispute of fact such that a reasonable factfinder could rule in its favor. *Anderson*, 477 U.S. at 250–51 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party.").

### iii. There Were No Countervailing Benefits

The cost-benefit prong of the unfairness test is "'easily satisfied' where . . . a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." *Amazon.com*, 2016 WL 10654030, at *11 (citing *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000)); *see also Orkin Exterminating Co.*, 849 F.2d at 1365 (affirming Commission's decision that "because the increase in the fee was not accompanied by an increase in the level of service provided or an enhancement of its quality," "no customer benefits [] resulted from Orkin's conduct.").

Here, FleetCor relies on its experts' testimony related to the general benefits afforded by FleetCor cards, such as spending and fraud controls, access to credit, and replacing less efficient methods of payment such as reimbursements. (Def. Resp. Doc. 161-1 at 40.)

However, even accepting that evidence as true, those general benefits — efficiency, fraud controls, etc. — are "not incompatible with the practice of affirmatively seeking a customer's authorized consent to charge" the fees at issue in Count V. *Amazon.com*, 2016 WL 10654030, at *10. In fact, more transparency regarding fees could provide a more efficient experience for customers, who would not have to expend hours on the phone with customer service, determining how to pay their bills in light of barriers to timely payment or reviewing their Fuel Management Reports with a microscope to see what fees they were charged. (*See also* Small Fleet Study, June 2017, Doc. 134-9) ("[N]ow I had another job besides running my business, literally to monitor every invoice, look at the hidden fees and try to call and fight those fees.")

Indeed, FleetCor's own internal surveys suggest that bettering FleetCor's fee and billing practices would allow FleetCor to retain more customers. For example, an internal FleetCor study for "small fleet" customers is illustrative. This survey explained that FleetCor had an "opportunity" to keep more small-fleet customers, as follows:

> If you provide a benefit-based program that is transparent (about fees and ultimate value), fair (don't fee them to death), simple (make it easy for them in terms of invoicing, payments, and reporting), and

responsive (higher touch onboarding and follow-through customer service), they are likely to pay you back with their loyalty increasing their overall lifetime value.

(*See* Small Fleet Research Study, Doc. 134-9 at ECF 9.)

FleetCor does not point to any evidence that creates a dispute of material fact on any of these elements under the governing law and legal standard, which FleetCor does not engage with. Here, the evidence is "so one-sided" that the FTC "must prevail as a matter of law" on Count V. *Anderson*, 477 U.S. at 251–52 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party."). The Court **GRANTS** summary judgment to the FTC on Count V.

### F. Count IV: Deceptive Representations on Billing Statements

Neither the FTC nor Defendants devote much attention to Count IV, and both sides appear to acknowledge that it rises and falls with Count V. As Count IV is a deception claim, the FTC must show that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." *Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).

On the first element, the FTC argues, and Defendants do not dispute, that the fees listed on the Fuel Management Report billing statements were representations that customers owed the listed amounts. Second, the FTC contends that the representations were likely to mislead and deceive because the customers in fact did not owe the amounts (e.g., a late fee for a payment that was

not late, or the Clean Advantage Fee charged without authorization) — because the fees were unlawful. Because the Court has found that the relevant fee practices were "unfair" and therefore unlawful, the FTC has proven this element. And certainly, a representation that the customers owed money for fees is material under the governing law because customers relied on those representations when paying their bills. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190 (explaining that a representation is material if it is relied upon by a reasonably prudent person in making purchase decisions); *1st Guar. Mortg. Corp.*, 2011 WL 1233207, at *12–13 (noting that representations are material if "they were instrumental in affecting the consumers' decisions to pay for goods and services"). The Court therefore **GRANTS** summary judgment to the FTC on Count IV.

### G. Individual Liability of Defendant Clarke

The FTC also moves for summary judgment on the issue of individual liability, arguing that FleetCor's President, CEO, and Chairman of the Board, Defendant Ronald Clarke, is individually liable for FleetCor's unlawful practices by virtue of his authority to control and participation in the company's sales practices and his knowledge of those practices. (FTC MSJ, Doc. 132-1 at 32.) FleetCor contends Clarke did not have authority to control, participate in, or have knowledge of the practices at issue. (Def. Resp., Doc. 161-1 at 40.)[48]

---

[48] In its reply, the FTC states that it is only required to demonstrate an individual defendant's knowledge of unlawful acts or practices "when seeking equitable monetary relief." (Pl. Reply, Doc. 170-1 at 24) (citing *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015)). Because the FTC acknowledges that it cannot obtain equitable monetary relief at this time, *see AMG*, 141 S. Ct.

An individual is liable for a corporation's violations of the FTC Act, and may be enjoined for such violations, if the FTC demonstrates that (1) "the individual either 'participated directly in the practice or acts or had the authority to control them,'" and (2) "the individual had 'some knowledge of the practices.'" *On Point*, 17 F.4th at 1083 (11th Cir. 2021) (quoting *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996)); *see* 15 U.S.C. § 53(b).

### i.   Clarke Had Authority to Control the Practices

To prove individual liability, the FTC must first demonstrate that the individual defendant had authority to control *or* directly participated in the practices at issue. *On Point*, 17 F.4th at 1083. "Authority to control . . . may be established by active involvement in business affairs and the making of corporate policy." *IAB Mktg.*, 746 F.3d at 1233 (11th Cir. 2014) (internal quotation marks omitted) (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 546, 573 (7th Cir. 1989), *overruled on other grounds by FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019)); *FTC v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1289 (M.D. Fla. 2008) ("Authority is established by proof that the individual participated in corporate activities by performing the duties of a corporate officer."). In essence,

---

at 1347, it contends it is not required to demonstrate Clarke's knowledge. (*Id.* at 20.) However, the Eleventh Circuit more recently explained that "individuals may . . . be enjoined under [Section 13(b) of the FTC Act] for the actions of corporations should the FTC establish knowledge *and* either participation or the authority to control." *On Point*, 17 F.4th at 1083 (11th Cir. 2021) (emphasis added). Thus, the Court assesses whether Clarke had knowledge of the marketing and fee practices at issue, as required to demonstrate individual liability.

the relevant inquiry is "whether [the individual] could have ended the [unlawful] practices."); *On Point*, 17 F.4th at 1084.

Clarke is FleetCor's CEO, President, and Chairman of the Board, and he held those positions throughout the period relevant to this lawsuit. (Def. Resp. to RFA, Doc. 132-3 at 5; Clarke Dep., Doc. 133-12 pp. 14:20–21, 18:18.) Clarke is charged with the most personal responsibility of any individual at FleetCor.[49] *On Point*, 17 F.4th at 1084 (finding authority to control where individual defendant was chairman and "had the most authority of anyone," besides CEO, over corporate defendant); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1207 (finding "corporate officers . . . clearly had the ability to control the corporate defendants").

In particular, as CEO, Clarke makes and supervises company policy and is the "ultimate decision-maker," "along with the board," of which he is Chairman. (Clarke Dep., Doc. 133-12 pp. 16:24–17:2.) *See IAB Mktg.*, 746 F.3d at 1233 ("Authority to control . . . may be established by active involvement in business affairs and the making of corporate policy[.]") (internal quotation marks omitted). Clarke's responsibilities also include having the final say on and being "ultimately responsible" for FleetCor's day-to-day decisions, including decisions for the fuel card business. (Def. Resp. to RFA, Doc. 132-3 at 5–7; Clarke Dep., Doc. 133-12 pp. 16:24–18:13.) In fact, Clarke pays "close attention" to FleetCor's fuel card business and considers it a "critical component" of FleetCor. (Clarke Dep., Doc. 133-12 pp.

---

[49] By way of illustration, when Clarke was asked in his deposition what his responsibilities as CEO are, he replied, "How much time have you got . . . ?" (Clarke Dep., Doc. 133-12 p. 14:24.)

23:17, 25:12.). For example, Clarke approved the decision to implement the Minimum Program Administration Fee and the subsequent decision to increase the amount of that fee. (*Id*. pp. 108:17–109:7) (acknowledging he was made aware of the implementation of the fee and did not object to it); (House Dep., Doc. 133-16 pp. 181:24–182:6); (Email Exchange Between Clarke and Subordinates, Doc. 138-18 at ECF 2.)

All FleetCor employees, including those in the fuel card division, report to Clarke directly or indirectly. (Def. Resp. to RFA, Doc. 132-3 at 8.) Further, "when [Clarke] make[s] a decision or give[s] a direction, no matter who to, the expectation is that FleetCor employees will execute [it]." (Clarke Dep., Doc. 133-12 p. 17:13–16.)[50] Given this evidence, had Clarke "chosen to exercise that authority, he likely could have nipped the offending [activities] in the bud." *On Point*, 17 F.4th at 1084 (11th Cir. 2021) (cleaned up).

In response, FleetCor argues that Clarke's authority and oversight are only high-level, and thus his position is insufficient to establish his authority to control FleetCor's unlawful practices. (Def. Resp., Doc. 161-1 at 40–42.) To support this proposition, FleetCor cites factually and procedurally distinguishable caselaw from the First Circuit and district courts in the Ninth and Second Circuit. (Def. Resp.,

---

[50] In fact, with respect to the expectation that Clarke's directions will be followed, Ron Clarke is the namesake of the so-called "Ron rule" at FleetCor, under which employees who disagree with Clarke too frequently are removed. (Clarke Dep., Doc. 133-12 p. 54:8–19) ("We have 10 decisions to make[,] you and I, if there's a pattern where there's more than one [decision] that you and I disagree, you got the wrong boss and I got the wrong subordinate. So I don't tolerate lots of that. . . . . If I'm making your decisions 5 out of 10 times, go find a new job.").

Doc. 161-1 at 40–41.) In *Coro, Inc. v. FTC*, the CEO was found to have no knowledge and not to have participated in any way in the practices at issue, unlike here, as discussed further below. 338 F.2d 149, 154 (1st Cir. 1964). In the other two cases FleetCor relies on, the corporate defendants' CEOs were removed from the cases on motions to dismiss in light of the conclusory allegations.[51]

But here, as the evidence above demonstrates, Clarke was in an apex position and plainly paid close attention to the company's critical fuel card businesses and practices. *See, e.g.*, *On Point*, 17 F.4th at 1070–71, 1084 (11th Cir. 2021) (finding corporate defendant's chairman had authority to control); *USA Fin., LLC*, 415 F. App'x at 974–75 (11th Cir. 2011) (finding corporate defendant's vice president, who signed business documents on corporation's behalf, had authority to control); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1207 (finding corporate officers have authority to control corporate defendants). Thus, the Court concludes that the FTC has satisfied the first prong of the individual liability analysis.[52]

### ii.   Clarke Had Knowledge of the Practices

To satisfy the second prong of the individual liability analysis, the FTC must demonstrate that Clarke had "some knowledge" of FleetCor's unlawful practices. *On Point*, 17 F.4th at 1083. An individual's knowledge of practices that violate the

---

[51] *See FTC v. Swish Mktg.*, 2010 WL653486, at *5–6 (N.D. Cal. Feb. 22, 2010) (finding unsupported pleadings insufficient to allege CEO had authority to control); *FTC v. Quincy Bioscience Holding Co., Inc.*, 389 F. Supp. 3d 211, 220–21 (S.D.N.Y. 2019) (finding pleadings sufficient to allege both president and CEO of corporate defendant had authority to control – but insufficient to allege CEO had knowledge of – practices at issue).

[52] The FTC also argued that Clarke directly participated in FleetCor's unlawful practices. However, because the FTC has proved its case under the authority to control theory, the Court need not assess whether the FTC's evidence of participation is sufficient.

116

FTC Act may be established by demonstrating that the individual had "'actual knowledge of the [unlawful] conduct, was recklessly indifferent to its [unlawfulness], or had an awareness of a high probability of [unlawfulness] and intentionally avoided learning of the truth.'" *FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017) (quoting *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014)); *see Nat'l Urological Grp.*, 645 F. Supp. 2d at 1207. Furthermore, "[a]n individual's degree of participation in the business is probative of knowledge." *FTC v. Partners in Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).

The FTC argues that Clarke had knowledge of FleetCor's unlawful practices based on (1) email communications with FleetCor subordinates, partners, and shareholders and (2) internal FleetCor studies and public reports about FleetCor's practices that Clarke received, read, and disclaimed as "fake news."

### 1. Clarke Exchanged Emails with FleetCor Subordinates, Partners, and Shareholders Regarding the Ads and Practices

Clarke's knowledge of FleetCor's practices is demonstrated by email exchanges with subordinates, including Clarke's own email requests for information about the company's marketing and fee practices. (*See, e.g.*, April Email Exchange, "A question & a request," Doc. 136-3 at ECF 2–3.) Responsive emails demonstrate that, upon requesting this information, Clarke was told that:

- Customers often paid more than the pump price of fuel despite per-gallon savings promises (Email Exchange After March 2017 Report, Doc. 139-3 at ECF 2–4);

- Small and medium-sized business ("SMB") customers received "minimal/no" rebates for at least two years (Email Exchange Between Clarke and Subordinates, Doc. 139-6 at ECF 2); and

- FleetCor's practices with regard to disclosing fees in its T&Cs are vague, while its methods of disclosing fees on invoices and notifying customers of new or increased fees are nearly nonexistent. (Email Exchange Titled "A question & a request", Doc. 136-3 at ECF 2–3); (Email Exchange Between Clarke and Subordinates re Fees on Invoices, Doc. 139-4 at ECF 2-3, 11, 14, 17, 19, 21, 23.)

Specifically, with respect to the lack of small and medium-sized business ("SMB") savings, Clarke asked FleetCor Head of Sales Todd House if there was a "mechanism" at FleetCor that "forfeits customer discounts." (Email Exchange Between Clarke and House, Doc. 139-6 at ECF 2.) On April 27, 2017, Head of Sales House replied, "We added that language in early 2015 and used it as a basis to remove SMB [MasterCard] volume rebates. Fundamentally we have had minimal/no SMB rebates since the beginning of 2015." (*Id.*)

With respect to fee disclosure, Clarke asked House, "'[W]hat notification' does a customer get when they are put on a fee for the first time (eg MPF, high risk fee, etc)." (Email Exchange, "A question & a request," Doc. 136-3 at ECF 2–3.) House replied, "[N]one. Other than a T&C change." (*Id.*) House further explained to Clarke that "where T&Cs already allow a fee and we aren't charging up to the max allowable . . . when we increase the rate there is no additional notice to customers." (*Id.*)

Clarke himself also took a particular interest in FleetCor's late fee practices and, in December 2017, advised subordinates that he was interested in

"opportunities to get more late fee revenue in 2018 . . . thru a higher rate, less/no grace days, etc, etc." (Email Exchange Between Clarke and Subordinates re Late Fees, Doc. 138-25 at ECF 2.)

Clarke was also aware that practices like those discussed above were the reasons many fuel card customers left FleetCor, based on the attrition statistics that Clarke received in a PowerPoint sent via email and that was presented to FleetCor employees. (FleetCor PowerPoint On Growth Plan, Doc. 138-22 at ECF 21) (showing that, of the fuel card customers who left, 32% left due to fees that were "too high, unexpected, [and/or] incorrect," and 23% left as a result of the "lack of discounts [and/or] terms.")

Additionally, FleetCor shareholders and partners contacted Clarke *personally* to alert him to their concerns about numerous customer complaints about FleetCor's practices. (Emails Between Clarke and Partner, Doc. 198-33 at ECF 4–5) ("[The partner is] getting these type [of customer complaint] emails sent to us in waves and *as you know*, for some time now we have lost so many fuel accounts. Looks around 500+ the past twelve months or so.") (emphasis added); (Email Between Clarke and Shareholder, Doc. 142-17 at ECF 2) (shareholder expressing concern over impact of "various fee practices, customer complaints, [and] low disclosure," among other issues).

### 2. Clarke Received and Read Public Reports Criticizing FleetCor's Ads and Practices and Discounted Them

Clarke also had knowledge of the alleged deceptive and unfair practices at issue in this lawsuit from public reports, including a March 2017 report outlining

problematic practices at FleetCor, which Clarke acknowledged having received and read. (Email Exchange re March 2017 Report, Doc. 138-15 at ECF 2–7) (including email regarding the report's allegations). Through this report, Clarke also became aware of multiple Better Business Bureau complaints regarding fees. (Email Exchange Between Clarke and Subordinates re Fees, Doc. 198-35 at ECF 6.)

Further, it appears that the March 2017 report was not the first public report criticizing FleetCor's practices. The March 2017 report was shared with Clarke through an email, the body of which read, "*Another* report just published," after which Clarke responded, "Here we go *again*! This article seems particularly stupid to me" and asked subordinates to fix FleetCor's Better Business Bureau rating "ASAP . . . just like we did *last tim*e." (Email Exchange re March 2017 Report, Doc. 138-15 at ECF 2–3) (emphasis added.) Clarke also instructed subordinates to "remind investors that 'many Fleet[C]or customers' are receiving big discounts." (*Id.* at ECF 3.)[53]

Despite his awareness of considerable data regarding customer complaints, customers' lack of discounts, and other issues, Clarke dismissed public reports, like the March 2017 report, as "fake news" during a presentation to investors. On this quarterly earnings call, Clarke did not address the problematic practices giving rise to the reports and waves of customer complaints. (Transcript of FleetCor Quarterly Earnings Call, Doc. 124-18 at ECF 4.)

---

[53] Notably, the FTC points out that Clarke's instructions pertained to communications to investors and public perception of FleetCor; he did not instruct his subordinates to take any actions to resolve the customer complaints.

In response to this evidence, FleetCor halfheartedly argues that these materials are "out-of-context complaints and studies that made their way to Mr. Clarke's desk," and that "other executives were responsible for following up on th[ese] matters." (Def. Resp., Doc. 161-1 at 42.) FleetCor also highlights Clarke's instruction to FleetCor's general counsel to investigate the allegations in the March 2017 report and others, as well as Clarke's deposition discussion of his opinion of FleetCor's culture of compliance. (Clarke Dep., Doc. 161-24 pp. 285:11–286:13; 89:12–90:3.) Thus, FleetCor asserts that Clarke took reasonable measures to ensure compliance with the law. (Def. Resp., Doc. 161-1 at 42.)

FleetCor has not presented any evidence to create a fact dispute as to Clarke's knowledge. As demonstrated above, there is overwhelming evidence of Clarke's knowledge including: (1) a volume of email communications between Clarke and his subordinates; (2) warnings from shareholders and partners; (3) customer complaints to FleetCor and the Better Business Bureau; (4) public reports; (5) internal studies with respect to marketing, fees, and customer attrition; and (6) Clarke's general degree of involvement discussing the practices at issue.  In light of this evidence, as outlined above, FleetCor's argument that Clarke lacked knowledge is unpersuasive. *See Partners In Health Care*, 189 F. Supp. 3d at 1368 (finding knowledge established by "numerous consumer complaints, the Better Business Bureau's investigation, emails from employees and marketers, and the high cancellation rate made available to him" and noting that "[a]n individual's degree of participation in the business is probative of

knowledge"); *IAB Mktg. Assocs.*, 746 F.3d at 1233 (finding knowledge based on actual knowledge of a material misrepresentation that had been made to corporate defendant's consumers). It is plain that Clarke had actual knowledge of FleetCor's unlawful practices or, *at the very least*, that he was recklessly indifferent to the unlawful nature of FleetCor's practices. The FTC has therefore established that Clarke had knowledge of FleetCor's unlawful practices.

Accordingly, the Court concludes the FTC has satisfied both prongs of the individual liability analysis by demonstrating Clarke's authority to control FleetCor's unlawful practices and his knowledge of those practices. The Court therefore **GRANTS** summary judgment to the FTC on the issue of individual liability.

### H. Injunctive Relief

Notwithstanding issues of liability, Defendants contend that no injunctive relief is appropriate since, according to them, the conduct at issue has ceased. The FTC argues that Defendants' unlawful conduct is ongoing and that Defendants' conduct demonstrates a strong likelihood of future violations.

Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the FTC may "seek, and after proper proof, the court may issue, a permanent injunction." It is well-settled that "permanent injunctive relief is appropriate if 'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *USA Fin., LLC*, 415 F. App'x at 975 (citing *SEC v. Caterinicchia*, 613 F.2d

102, 105 (5th Cir. 1980)).[54] Where a district court concludes that the evidence "indicates a reasonable likelihood of future violations," permanent injunctive relief is appropriate. *Id.* (affirming district court's grant of permanent injunction to FTC, even though it was undisputed that defendant ceased its deceptive practices in 2007 and complaint was filed in 2008, but district court determined that there was reasonable likelihood of future violations). Thus, "[i]f the FTC is able to demonstrate that there is 'some cognizable danger of recurrent violation, something more than a mere possibility,' then the FTC is entitled to injunctive relief." *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (concluding that the FTC was entitled to permanent injunction where past violations were "numerous and grave")). In determining whether there is "some cognizable danger of a recurrent violation," courts consider the following factors:

> the egregiousness of the defendant's actions; the isolated or recurrent nature of the actions; the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the defendant's recognition of the wrongful nature of his conduct; and the likelihood that the defendant's occupation will present opportunities for future violations. . . .

*FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1289 (M.D. Fla. 2016) (citing *FTC v. RCA Credit Servs.*, 2010 WL 2990068, at *5 (M.D. Fla. July 29, 2010) (quoting *Sec. Exch. Comm'n v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)).

---

[54] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Where a district court determines that injunctive relief is appropriate, the injunction may "extend beyond the specific violations at issue" to prevent a defendant from engaging in related deceptive or unfair practices in the future. *RCA Credit Servs.*, 727 F. Supp. 2d at 1335 (M.D. Fla. 2010) (citing *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965)); *see also Windward Mktg.*, 1997 WL 33642380, at *15 (Hull, J.) ("It is well settled that those caught violating the FTC Act can expect some 'fencing in'. . . . These 'fencing in' provisions are needed to prevent similar and related violations from occurring in the future.") (internal quotations omitted) (citing *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957), and *Trans World Accts., Inc. v. FTC*, 549 F.2d 212, 215 (9th Cir. 1979)); *see Wolf*, 1996 WL 812940, at *5 ("Broad injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise[.]") (citing *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)).

Here, the mountain of evidence presented by the FTC demonstrates that FleetCor's violations were far-reaching. FleetCor's ads were not "isolated inciden[ts] of deception" but rather left customers consistently feeling swindled and misled.[55] FleetCor's misleading fee practices were even more pervasive.[56] Not only were these recurrent, but the "degree of scienter" involved is plain. *Lanier*

---

[55] (*See, e.g.*, FleetCor Customer Service Raw Data #3, Doc. 198-37) ("Do as promised!"); (Small Fleet Attrition Survey 2018, Doc. 139-9 at ECF 19) (finding that "70% of customers felt that savings and discounts were not as promised").

[56] (*See, e.g.*, Small Fleet Non and Lapsed User Study, June 2017, Doc. 134-9) (""I don't like surprises and I don't like sneaky, underhanded tactics . . . . I was misled about the fees"); (Voice of Customer Survey, Doc. 198-2 at ECF 23) (also noting "[p]articipants are charged with late fees after paying billed charges on time").

*Law, LLC*, 194 F. Supp. 3d at 1289. Nearly a dozen internally commissioned studies and surveys, plus dozens of emails of high-level employees, establish that FleetCor was well aware that customers were being hoodwinked. More than that, there is unrefuted evidence in the record that the conduct was intentional — and that it came straight from the top. (Clarke Email re Late Fees, Doc. 138-25 at ECF 2) (requesting information on "opportunities to get more late fee revenue in 2018 . . . . thru a higher rate, less/no grace days, etc, etc.").[57]

The record indicates that FleetCor's deceptive advertising and unfair fee practices were ingrained in the fabric of the company for years. *See Lanier Law, LLC*, 194 F. Supp. 3d at 1289 (finding that the "myriad misrepresentations, improper solicitations," and other violations were "recurrent over several years despite numerous consumer complaints," supporting permanent injunctive relief); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (where violations were "numerous and grave," permanent injunctive relief was warranted).

Further, Defendants have in no way "recogni[zed] the wrongful nature of their conduct" and, as the business is still fully operational, the "occupation" surely "present[s] opportunities for future violations." *Lanier Law, LLC*, 194 F. Supp. 3d at 1289 (finding permanent injunction appropriate where defendants "made no assurances against future violations, and indeed, they continue to deny the wrongful nature of their conduct. These Defendants have given the Court no reason

---

[57] (*See also* Jabian Attrition Study 2016, Doc. 133-7) (advising FleetCor to limit fees during first 60 days to limit attrition, noting that customer "expectations" were that product had no fees); (House-Clarke Email, Doc. 136-3) (House telling Clarke that fees often kick in at 60 days).

to believe that they will abstain" from the practices in the future); *USA Fin., LLC*, 415 F. App'x at 975 (finding that defendants showed unwillingness to comply with law by forming new corporate entity that could engage in similar conduct); *Windward Mktg.*, 1997 WL 33642380 at *15 (finding permanent injunction appropriate where defendants would continue to operate in telemarketing sector, noting that fencing in provision "seeks to ensure that any future activities are less likely to violate the law in the manner accomplished via the practices in this case").

Beyond these sprawling prior violations, there is demonstrable record evidence — contrary to Defendants emphatic position — that FleetCor's unfair practices persist. For example, FleetCor's own internal study **from 2020** found that, of individuals who "attrited" (i.e., stopped using FleetCor cards), "53% felt misled and 26% claimed fees were not accurately described or disclosed." (Small Fleet Attrition Study Feb. 2020, Doc. 140-5) ("Customers were charged fees they were not made aware of at the time of sale, or were opted into and charged for unwanted services."). FleetCor has not provided any evidence that it has implemented an affirmative disclosure process or that it does not automatically opt customers in to fees for "programs" they have not requested. And while the specific advertisements at issue in Count I–III are no longer circulated, such voluntary cessation is not adequate to protect against future violations where FleetCor is easily able to put forth similar ads anew. *See Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (finding that "[a]lthough they contend that they no longer make the exact formulations of the products at issue," defendants continue to

market similar products and thus the "current business endeavors could serve as a platform for continuing violations of the FTC Act"); *FTC v. Sage Seminars*, 1995 WL 798938, at *6 (N.D. Cal. Nov. 2 1995) ("Nevertheless, the voluntary cessation of violative conduct does not vitiate the need for injunctive relief if there is a possibility that the defendant is 'free to return to his old ways'") (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).

Additionally, it is plain that, if Defendants' violations continue and recur, "the harm to consumers is certain and serious." *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1210. The numerous ongoing complaints highlight the real harm suffered by FleetCor's customers. Moreover, FleetCor's own internal documents demonstrate that FleetCor's customers are often "fairly unsophisticated" "business owners but not business people" who "work in the field/drive vehicles" and are "short on time due to wearing multiple hats." (Small Fleet Study, Doc. 134-9 at ECF 11); (New Hire PowerPoint, Doc. 139-7 at ECF 47). In other words, many customers lack time and manpower to scour the T&Cs and Fuel Management Reports with a microscope, spend hours on the phone with customer service representatives trying to pay a bill on a system that does not function, or get a refund for an improper charge. Indeed, because the harm involved small amounts losses spread to many people, the public interest in enjoining future conduct is further increased. *Klesner,* 280 U.S. at 28 ("[A]lthough the aggregate of the loss entailed may be so serious and widespread as to make the matter one of public consequence, no private suit would be brought

to stop the unfair conduct, since the loss to each of the individuals affected is too small to warrant it.").[58]

Based on the full record, it is clear that, though some of FleetCor's unlawful practices have ceased, others continue and, further, FleetCor's past repetitive "conduct indicates that there is a reasonable likelihood of further violations in the future.'" *USA Fin., LLC*, 415 F. App'x at 975. Permanent injunctive relief in some form is therefore appropriate and indeed imperative to protect the public interest at stake. Defendant's motion for summary judgment on this point is **DENIED**. While the Court finds that some form of permanent injunctive relief is appropriate, the specific scope of the injunctive relief requires additional consideration and likely some measure of evidence about the status of corrective actions and practices at the company. The Court will therefore hold a hearing in connection with issues concerning the nature of the injunctive relief required and necessary "fencing in" provisions.

## V. CONCLUSION

As thoroughly detailed above, the FTC has presented detailed evidence from a wide variety of sources demonstrating that FleetCor's advertisements were deceptive under the FTC Act's three-part test. The FTC has similarly proved, based on extensive evidence, that FleetCor's fee practices related to improper late fees and other unauthorized fees were "unfair practices," as defined by the relevant

---

[58] Defendants' argument that the FTC does not outline the four injunctive factors and thus does not seriously seek injunctive relief is baseless. The FTC has submitted a detailed proposed order on injunctive relief, as well as demonstrated comprehensive evidence on each factor.

statute and applicable legal authority. The FTC has also shown that FleetCor's billing statements based on those unfair fees were deceptive under the operative legal framework. Next, the FTC has established that Defendant Clark had the authority and knowledge to stop these systemic deceptive and unfair acts and practices. Finally, the FTC has established that FleetCor's violations of the FTC Act were pervasive and long-lasting and that therefore injunctive relief is appropriate.

In response to the FTC's expansive, detailed evidence — the most probative of which comes straight from FleetCor's own internal emails and commissioned surveys — FleetCor fails to present any responsive evidence that is sufficient to create a genuine factual dispute as to any legal element of the FTC's claims. As a result, the FTC's Motion for Summary Judgment [Doc. 122] is **GRANTED IN FULL** as to Counts I through V both as to FleetCor itself and as to the individual liability of Defendant Clarke. Summary judgment is also granted in favor of the FTC on the issue of the necessity of appropriate injunctive relief that shall be determined at an ensuing hearing.

For the reasons articulated above, Defendants' Partial Motion for Summary Judgement [Doc. 161] is **GRANTED** as to monetary relief but **DENIED** as to injunctive relief.

The Court will hold an **in-person** hearing on **September 1, 2022 at 1:30 p.m. in Courtroom 2308** to continue on **September 2, 2022**, if necessary, to address the appropriate scope of injunctive relief. If counsel for the parties view this allocation of time as insufficient, they are directed to contact the Court's

Courtroom Deputy, Mr. Harry Martin, no later than August 15, 2022 to advise the Court of the time allocation requested.

As the Court grants summary judgment in favor of the FTC, the pending pretrial motions in limine [Docs. 208, 210, 211, 212, 213, 214, 215, 216] are **DENIED AS MOOT**.


**IT IS SO ORDERED** this 9th day of August 2022.

_____
**Honorable Amy Totenberg**
**United States District Judge**